UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CODA DEVELOPMENT s.r.o., CODA INNOVATIONS s.r.o., and FRANTISEK HRABAL, | Case No. 5:15-CV-01572-SL |
| Plaintiffs, | |
| v. | JUDGE SARA LIOI |
| | **REDACTED VERSION OF DOCUMENT FILED UNDER SEAL** |
| THE GOODYEAR TIRE & RUBBER COMPANY and ROBERT BENEDICT, | |
| Defendants. | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' REMAINING CLAIMS

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and Local Rules 7.1 and 7.2, and this Court's Orders (Dkt. 211 & 220), Defendants The Goodyear Tire & Rubber Company and Robert Benedict (collectively, "Goodyear") move for summary judgment on all remaining claims asserted by Plaintiffs Coda Development s.r.o., Coda Innovations s.r.o., and Frantisek Hrabal (collectively, "Coda") in their Amended Complaint (Dkt. 53-1). As a matter of law, Coda cannot show that it is entitled to an Order requiring correction of the inventorship of any Goodyear patents (Coda's First and Second Causes of Action), that Goodyear misappropriated any Coda trade secrets (Coda's Fourth Cause of Action), or that Coda is entitled to a declaratory judgment (Coda's Fifth Cause of Action). Detailed reasons in support of this motion are set forth in the attached memorandum incorporated herein.

Dated:  February 8, 2021          By:   */s/ David M. Maiorana*
                                         Calvin P. Griffith  (0039484)
                                         David M. Maiorana  (0071440)
                                         John C. Evans  (0081878)
                                         JONES DAY
                                         North Point
                                         901 Lakeside Avenue
                                         Cleveland, Ohio  44114
                                         cpgriffith@jonesday.com
                                         dmaiorana@jonesday.com
                                         jcevans@jonesday.com

                                         *Attorneys for Defendants The Goodyear
                                         Tire & Rubber Company and Robert
                                         Benedict*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **CODA DEVELOPMENT s.r.o., CODA INNOVATIONS s.r.o., and FRANTISEK HRABAL,** | Case No. 5:15-CV-01572-SL |
| Plaintiffs, | |
| v. | JUDGE SARA LIOI |
| **THE GOODYEAR TIRE & RUBBER COMPANY and ROBERT BENEDICT,** | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT ON PLAINTIFFS' REMAINING CLAIMS**

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................. 1

II.    BACKGROUND ................................................................. 2

    A.   Coda's Publications And Patents (2001-2009).................... 2

    B.   Coda's Two Meetings With Goodyear And Their Aftermath (2009-2015) .......... 4

    C.   Coda's Lawsuit Against Goodyear (2015-Present) ............... 6

III.   LEGAL STANDARDS (SUMMARY JUDGMENT AND TRADE SECRETS) ............ 7

IV.    GOODYEAR IS ENTITLED TO SUMMARY JUDGMENT ON CODA'S TRADE SECRETS CLAIM (COUNT 4) ............................... 9

    A.   Coda's Alleged Trade Secrets Are Indefinite And Fail To Comply With This Court's Discovery Orders ............... 9

        1.   Coda Did Not Describe The Alleged Trade Secrets With Particularity ........................................ 9

        2.   Coda Impermissibly Recombined And Rewrote The Alleged Trade Secrets ................................ 11

    B.   Coda Cannot Establish That Its Alleged Trade Secrets Were Not Generally Known Or Readily Ascertainable, Or That Goodyear Used Or Disclosed Them ........................... 14

        1.   The Alleged "Pump Location" Trade Secrets (TS15–16, 18–19, & 24) ..................................... 14

            (a)   Alleged Trade Secret No. 15 ....................... 15

            (b)   Alleged Trade Secret No. 16 ....................... 19

            (c)   Alleged Trade Secret No. 18 ....................... 21

            (d)   Alleged Trade Secret No. 19 ....................... 22

            (e)   Alleged Trade Secret No. 24 ....................... 23

        2.   The Alleged "Pump Configuration" Trade Secrets (TS01–02 & 11) ...... 24

            (a)   Alleged Trade Secret No. 1 ........................ 24

            (b)   Alleged Trade Secret No. 2 ........................ 25

            (c)   Alleged Trade Secret No. 11 ....................... 26

        3.   The Alleged "Pump Creation" Trade Secret (TS05) ............... 27

        4.   The Alleged "Interface" Trade Secret (TS07) ................. 28

        5.   The Alleged "Testing" Trade Secrets (TS23) ................. 30

        6.   The Alleged "Marketing And Commercialization" Trade Secret (TS25) ....................................... 31

# TABLE OF CONTENTS
(continued)

Page

7. Alleged Trade Secret No. 27 Regarding A "System"............................. 31
8. The Alleged "Pressure Management" Trade Secrets (TS03–04, 20, 22) ................................................................................................ 33
    (a) Alleged Trade Secret No. 4 ...................................................... 33
    (b) Alleged Trade Secret No. 20 .................................................... 35
    (c) Alleged Trade Secret No. 22 .................................................... 37
    (d) Alleged Trade Secret No. 3 ...................................................... 38

C. Coda's Alleged Trade Secrets Lack Independent Economic Value ................... 39
D. Coda Did Not Adequately Protect The Secrecy Of Its Alleged Trade Secrets ........................................................................................................ 43
E. Exclusion Of Coughlin Further Warrants Summary Judgment .......................... 45

V. CODA IS NOT ENTITLED TO DECLARATORY JUDGMENT (COUNT 5) ............ 48
VI. GOODYEAR IS ENTITLED TO SUMMARY JUDGMENT ON CODA'S § 256 INVENTORSHIP CLAIMS (COUNTS 1 & 2)................................................. 48
VII. CONCLUSION ................................................................................................ 50

# TABLE OF AUTHORITIES

**Page**

CASES

*360 Mortg. Grp., LLC v. Stonegate Mortg. Corp.*,
No. 5:14-CV-00310-F, 2016 WL 4943933 (E.D.N.C. Sept. 14, 2016), *aff'd*,
740 F. App'x 263 (4th Cir. 2018) ................................................8

*Alexsam v. IDT*,
715 F.3d 1336 (Fed. Cir. 2013)................................................45

*ALZA Corp. v. Andrx Pharm., LLC*,
603 F.3d 935 (Fed. Cir. 2010)................................................3

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................7

*Arco Indus. Corp. v. Chemcast Corp.*,
633 F.2d 435 (6th Cir. 1980) ................................................10

*B. Braun Med., Inc. v. Rogers*,
163 F. App'x 500 (9th Cir. 2006) ................................................48

*Burroughs Wellcome Co. v. Barr Labs., Inc.*,
40 F.3d 1223 (Fed. Cir. 1994)................................................48, 49

*Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*,
No. 3:13-CV-82-CRS-CHL, 2017 WL 4799815 (W.D. Ky. Oct. 24, 2017)................................................10

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................7

*Champion Foodservice, LLC v. Vista Food Exch., Inc.*,
No. 1:13-CV-1195, 2016 WL 4468001 (N.D. Ohio Aug. 24, 2016)................................................8

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)................................................45, 47

*DB Riley, Inc. v. AB Eng'g Corp.*,
977 F. Supp. 84 (D. Mass. 1997) ................................................43

# TABLE OF AUTHORITIES
(continued)

*Dow Chem. Canada Inc. v. HRD Corp.*,
909 F. Supp. 2d 340 (D. Del. 2012), *aff'd*, 587 F. App'x 741 (3d Cir. 2014) ........................10

*DTM Research, L.L.C. v. AT & T Corp.*,
245 F.3d 327 (4th Cir. 2001) ..................................................................................41

*Dura Global, Techs., Inc. v. Magna Donnelly Corp.*,
No. 07-CV-10945-DT, 2008 WL 2064516 (E.D. Mich. May 14, 2008).................................8

*ECT Int'l, Inc. v. Zwerlein*,
228 Wis. 2d 343 (Ct. App. 1999) ....................................................................43, 44

*Eli Lilly & Co. v. Aradigm Corp.*,
376 F.3d 1352 (Fed. Cir. 2004)..............................................................................48, 49

*Ethicon, Inc. v. U.S. Surgical Corp.*,
135 F.3d 1456 (Fed. Cir. 1998)..............................................................................49

*Fina Oil & Chem. Co. v. Ewen*,
123 F.3d 1466 (Fed. Cir. 1997)..............................................................................48, 49

*Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*,
258 F. App'x 860 (6th Cir. 2008) ...........................................................................8

*Hickory Specialties, Inc. v. Forest Flavors Int'l, Inc.*,
215 F.3d 1326 (6th Cir. 2000) ...............................................................................7

*Huffman v. Electrolux Home Prod., Inc.*,
129 F. Supp. 3d 529 (N.D. Ohio 2015)....................................................................47

*IDX Sys. Corp. v. Epic Sys. Corp.*,
285 F.3d 581 (7th Cir. 2002) ..............................................................................8, 32

*In re Heparin Prod. Liab. Litig.*,
No. 1:08-HC-600000, 2011 WL 1059660 (N.D. Ohio Mar. 21, 2011) ...................................47

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)..............................................................................................45

**TABLE OF AUTHORITIES**

(continued)

**Page**

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
   429 F.3d 1344 (Fed. Cir. 2005)..................................................................47

*MP TotalCare Servs. v. Mattimoe*,
   648 F. Supp. 2d 956 (N.D. Ohio 2009).....................................................7, 8

*Pride v. BIC Corporation*,
   218 F.3d 566 (6th Cir. 2000) ......................................................................46

*PrimePay, LLC v. Barnes*,
   No. 14-11838, 2015 WL 2405702 (E.D. Mich. May 20, 2015) ............39, 42

*REG Synthetic Fuels, LLC v. Neste Oil Oyj*,
   841 F.3d 954 (Fed. Cir. 2016).....................................................................49

*Rogers Indus. Prods. Inc. v. HF Rubber Mach., Inc.*,
   188 Ohio App. 3d 570, 2010-Ohio-3388, 936 N.E.2d 122 (9th Dist.) ........8

*ScentSational Techs. LLC v. PepsiCo, Inc.*,
   773 F. App'x 607 (Fed. Cir. 2019) ..............................................................50

*Sears Ecological Applications Co., LLC v. MLI Assocs., LLC*,
   652 F. Supp. 2d 244 (N.D.N.Y. 2009) ........................................................44

*Shu-Hui Chen v. Bouchard*,
   347 F.3d 1299 (Fed. Cir. 2003)..............................................................49, 50

*Silicon Image, Inc. v. Analogix Semiconductor, Inc.*,
   No. C-07-00635 JCS, 2008 WL 166950 (N.D. Cal. Jan. 17, 2008) ...........43

*SiOnyx, LLC v. Hamamatsu Photonics K.K.*,
   332 F. Supp. 3d 446 (D. Mass. 2018) .........................................................50

*Smith v. Goodyear Tire & Rubber Co.*,
   495 F.3d 224 (5th Cir. 2007) ......................................................................46

*Spring Indus., Inc. v. Nicolozakes*,
   No. 99AP120075, 2000 WL 1751163 (Ohio Ct. App. Nov. 21, 2000) .......39

**TABLE OF AUTHORITIES**

(continued)

**Page**

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*,
   687 N.E.2d 661 (Ohio 1997)........................................................................39, 41

*Structured Capital Sols., LLC v. Commerzbank AG*,
   177 F. Supp. 3d 816 (S.D.N.Y. 2016)...................................................................43

*Sunkin v. Hunter Eng'g Co.*,
   No. 5:15-CV-892, 2016 WL 5390408 (N.D. Ohio Sept. 27, 2016)..........................7

*Therm-O-Disc, Inc. v. Maatuk*,
   No. 1:00-CV-02105, ECF No. 89, slip op. (N.D. Ohio Oct. 9, 2002) ......................8

*Thermodyn Corp. v. 3M Co.*,
   593 F. Supp. 2d 972 (N.D. Ohio 2008)..................................................................7

*Utilase, Inc. v. Williamson*,
   188 F.3d 510 (6th Cir. 1999) ................................................................................8

*Vanderbilt Univ. v. ICOS Corp.*,
   601 F.3d 1297 (Fed. Cir. 2010)......................................................................48, 49

*Yoe v. Crescent Sock Co.*,
   No. 1:15-CV-3-SKL, 2017 WL 11479991 (E.D. Tenn. May 25, 2017)....................8

**STATUTES**

35 U.S.C. § 102........................................................................................................44

35 U.S.C. § 112..........................................................................................................3

California Uniform Trade Secrets Act ......................................................................48

Ohio Uniform Trade Secrets Act, O.R.C. § 1333.61 ............................................7, 39

**OTHER AUTHORITIES**

Fed. R. Civ. P. 37 ......................................................................................................9

Fed. R. Civ. P. 56 ......................................................................................................7

Fed. R. Evid. 702 ................................................................................................45, 47

## TABLE OF ABBREVIATIONS

| **TERM** | **DEFINITION** |
|---|---|
| 2007 PCT | Coda's International Patent Application Publication No. WO 2007/134556, filed on May 23, 2007 |
| 2008 Tire Technology article | Tire Technology International 2008 article, "Self-inflating tire technology," by Hrabal |
| 2009 PCT | Coda's International Patent Application Publication No. WO 2009/103252, filed on February 20, 2009 |
| '254 patent | Goodyear's U.S. Patent No. 8,113,254, filed on December 21, 2009 |
| '586 patent | Goodyear's U.S. Patent No. 8,042,586, filed on December 21, 2009 |
| '731 patent | Coda's U.S. Patent No. 7,117,731, PCT filed on December 5, 2002, and issued on October 10, 2006 |
| Benedict | Co-defendant Robert Benedict, Ph.D. |
| Coda | Plaintiffs Coda Development s.r.o., Coda Innovations s.r.o., and Frantisek Hrabal, collectively |
| Coughlin | Coda's technical expert, E. Bryan Coughlin, Ph.D. |
| Coughlin report | Report of Coda's technical expert, E. Bryan Coughlin, Ph.D., served on September 10, 2020 |
| Dkt. ## | Enumerated docket entries in the above-captioned case |
| Ellmann | United States Patent No. 7,225,845, issued on June 5, 2007 |
| Ex. | Exhibits cited herein, which are attached to the Declaration of David M. Maiorana, filed concurrently herewith |
| Goodyear | Defendants The Goodyear Tire & Rubber Company and Robert Benedict, Ph.D., collectively |
| Hamburg presentation | Coda presentation given in February 2009 at the Tire Technology Expo in Hamburg, Germany |
| Hrabal | Co-plaintiff Frantisek Hrabal |
| Jackson Chart | Excel spreadsheet created by Daniel Jackson circa November 2015, regarding Coda's potential trade secrets (CODA0122722) |
| Lindner | Sweden Patent No. 183,890, published on May 21, 1963 |
| Mineur | Coda's industry expert, Mark H. Mineur |
| Mineur report | Report of Coda's industry expert, Mark H. Mineur, served on September 10, 2020 |

| | |
|---|---|
| NDA | Non-disclosure agreement, in general, alternately, the NDA executed on January 1, 2009 between Coda and Goodyear |
| OUTSA | Ohio Uniform Trade Secrets Act, O.R.C. § 1333.61, *et seq.* |
| Sheppard | United States Patent No. 3,304,981, issued on February 21, 1967 |
| Sprague | Goodyear's technical expert, James K. Sprague, Ph.D. |
| Sprague report | Report of Goodyear's technical expert, James K. Sprague, Ph.D., served on November 16, 2020 |
| tr. | Transcript of deposition taken in the above-captioned case |
| Webster | Coda's damages expert, Shirley Webster |
| Webster report | Report of Coda's damages expert, Shirley Webster, served on September 10, 2020 |

# I.     INTRODUCTION

Coda originally contended that it orally disclosed twenty-seven alleged trade secrets in a few hours of meetings in January and June 2009.  A few days before this motion was due, Coda withdrew its contention of misappropriation as to ten of those alleged trade secrets (nos. 6, 8–10, 12–14, 17, 21, and 26).  (Ex. 1.)  Similarly, of the twenty-one causes of action Coda asserted in its Complaint (Dkt. 1), only four remain:  inventorship as to two Goodyear patents (Counts 1 & 2); trade secrets misappropriation (Count 4); and declaratory relief deriving from Count 4 (Count 5).  (Dkt. 53-1.)  The remaining claims have no more merit than the others Coda has already dropped.  As for the trade secrets claim, this Court ordered Coda to both list its alleged trade secrets and describe them with particularity.  (Dkt. 82.)  But many of Coda's listed trade secrets are vague and indefinite; worse, Coda attempts to reword and recombine the alleged trade secrets into new ones, without seeking leave of the Court to do so.  To the extent described, the listed alleged trade secrets were generally known or readily ascertainable, or they do not describe anything used by Goodyear; Coda's own internal records confirm that the alleged trade secrets were known.  Further, even if the ideas at issue were secret, they derive no independent economic value from such secrecy.  Indeed, Coda believed it had to patent its technology, and saw so little value in secrecy that it agreed to an NDA that ██████████████.  And history confirms that, regardless of what Coda may or may not have said to Goodyear in 2009, nothing has ever enabled Goodyear, Coda, or anyone else to commercialize a product that embodies any alleged  trade secret.

Coda simply cannot meet its burden of proof, and the Court should grant summary judgment in Goodyear's favor on all of Coda's remaining claims.[1]

---

[1] While Goodyear has always disputed the merits of Coda's claims, we now know that Coda and its counsel lacked a good faith basis for bringing this lawsuit.  The complete absence

## II.     BACKGROUND

### A.     Coda's Publications And Patents (2001-2009)

Coda's self-inflating tire ("SIT") technology involves a peristaltic pump, actuated by the forces generated by a rolling tire, to pump air into the tire to maintain pressure. The basic idea is that an air tube, in or on a tire, or tire rim, compresses as the tire rolls. Like toothpaste in a tube, the air is squeezed through the tube and, if the tire pressure is low, through a valve into the tire. Otherwise, the air can be recirculated back through the tube or blown out to the atmosphere.

The idea of using a peristaltic pump to maintain pressure in a tire was not new; in fact, the concept dates back more than a century. (Ex. 2 at 7.)[2] Before 2009, many patents described peristaltic-pump SIT technology, including Coda's own patent publications. (*Id.* at 9–15.)

Coda aggressively sought to patent its SIT concepts, starting in 2001. Coda typically applied first in its native Czech Republic and then filed corresponding international applications under the Patent Cooperation Treaty ("PCT"), which could then be pursued regionally, such as in the U.S. or Europe. These applications were all published. (*E.g.*, Exs. 3–5.) Their disclosures are not trade secrets, and Coda's founder and CEO, co-plaintiff Hrabal, agrees that the information in these publications are not trade secrets. (Ex. 6, Hrabal tr., at 23:20–24:5.)

Coda's extensive patent portfolio now includes over 30 patents and applications worldwide. Key Coda applications had published by 2009, including the 2007 PCT. The 2007 PCT discloses Coda's SIT design with a peristaltic-pump chamber in the tire sidewall, either built into the wall while it is made or by a tube (or "hose") embedded in a groove (a.k.a., "slot")

---

of good faith is demonstrated by, *inter alia*, the documents that Coda was recently ordered to produce, and Coda's last-minute abandonment of 10 alleged trade secrets. The conduct of Coda and its counsel is sanctionable, and Goodyear intends to pursue all available remedies.

[2] Exhibits ("Ex.") cited herein are attached to the Declaration of David M. Maiorana, filed concurrently herewith.

in the wall.  (Ex. 3 at *e.g.*, 23:32–24:9.)  Figure 7.a from the 2007 PCT shows a pump chamber

(1; yellow)  in the tire wall (4; blue)  located near and above the tire rim (7; pink):



(Coloring added.)  The pump in Figure 7.a is made during the molding process, but one could

also put a tube in the slot.  (*Id.* at 24:5–7.)  Or, one could put a flap tube (*i.e.*, "ancillary

structure")  between the tire and rim, containing the pump.  (*Id.* at 18:27–32.)  And while the

2007 PCT figures have the pump near the tire rim, the 2007 PCT broadly discloses that "it can

also be created . . . *anywhere else in the wall* or at the wall of the tire 4, so, for example, even in

the tread area."  (*Id.* at 18:2–6 (emphasis added).)  Putting a pump "anywhere in the wall,"

including near and above the rim, was no secret.  Rather, Coda tried to patent it, and last year, the

Patent Office issued U.S. Patent No. 10,723,184, which is based on the 2007 PCT and includes

claims covering that idea.  (Ex. 7 at, *e.g.*, claims 3 and 7.)  The 2007 PCT discloses Coda's

alleged "pump location" trade secrets, and detailed information about Coda's SIT technology.[3]

Also worth noting is the 2009 PCT, which describes Coda's regulators (*i.e.*, pressure

management devices).  The 2009 PCT teaches how to regulate air flow into the tire when needed,

and how to recirculate it when the tire is at proper inflation.  The 2009 PCT discloses Coda's

alleged "pressure management" trade secrets, including various valve arrangements and layouts.

---

[3] Coda did its best to ensure its many patents fully enable the technology they describe. (Ex. 6, Hrabal tr. at 26:3–16, 31:1–12.) Patent claims, by law, must enable persons of skill in the art to practice the full scope of the claims, without need for undue experimentation.  35 U.S.C. § 112(1); *see also ALZA Corp. v. Andrx Pharm., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010).

(Ex. 4.)  Coda patented these ideas; in 2018, the Patent Office issued the 2009 PCT as U.S. Patent No. 10,124,636, which contains claims covering the alleged pressure management trade secrets.  (*See* Ex. 8.)

Beyond applying for dozens of patents, Coda widely publicized its technology.  Before 2009, Coda published videos on its website about its SIT technology and how it works.[4]  Coda also made numerous public presentations about its technology at industry conferences, and authored numerous trade publications describing its technology.  (*See, e.g.*, Exs. 9–11.)  Coda's publicity campaign led, in part, to Coda receiving awards for its technology and Goodyear's initial interest in meeting with Coda.  (Dkt. 53-1 at ¶¶ 79, 82–83.)

**B.      Coda's Two Meetings With Goodyear And Their Aftermath (2009-2015)**

Goodyear met with Coda in January and June 2009 for a total of a few hours.  A non-disclosure agreement governed the two meetings, but all obligations expired on January 1, 2012.  (Ex. 12 at ¶ 6.)  In the January 2009 meeting, Coda gave a lengthy PowerPoint presentation that is virtually identical to the presentation (Ex. 10) that Coda gave a month later at an industry conference in Hamburg, Germany.  Nothing in the PowerPoint was secret.  Later in 2009, Goodyear visited Coda to look at Coda's prototype, and Coda tried to manage expectations, explaining in advance that, "there is not much more to see than what is already on our website."  (Ex. 13 at 2.)  In June 2009, Goodyear and Coda met in a hotel room, and Coda showed Goodyear the prototype tire shown in videos on Coda's website.  (*See supra* at n. 4.)

After the 2009 meetings, Goodyear declined to engage in a joint development program with Coda because Coda had no development facilities, expertise, or experience.  (Ex. 14 at 3, 7; Ex. 2 at 15–16.)  Goodyear, however, understood that Coda had made patent filings, and knew that if Goodyear found that an SIT design was actually feasible in a commercial product, then

---

[4] https://www.youtube.com/watch?v=s7yo84p9JWQ.

Goodyear might need to license those patents.  (Ex. 14 at 4–5.)  But Goodyear could not know what technology would actually work or whether Coda would obtain issuance of any relevant patent claims.  Thus, while Goodyear considered a commercial SIT product a long shot, it set out to develop its own technology and monitored Coda's patent filings.  (*Id.*)

At least as early as August 2011, Coda learned of two Goodyear patent applications that had been published (these issued as the two patents in Counts 1 and 2, the '254 and '586 patents). But there is no evidence that Coda was worried about trade secrets at the time.  No contemporaneous documents reflect any belief by Coda that Goodyear's patents contained Coda's trade secrets.  Indeed, when Hrabal first became aware of Goodyear's applications, he made no mention of trade secrets, rather, he stated that ███████████████████████ ██████████████████████" that the '254 application ████████████████████," and that Goodyear ████████████████████████ (Ex. 15 at 1.)

Before this lawsuit was filed, Coda thought that the ideas claimed in Goodyear's patents were already disclosed in Coda's earlier patents and other prior art—*i.e.*, they were not secrets. (Ex. 16 █████████████████████████████████████████ ████"); Ex. 17 at 2 ███████████████████████████████████ ████████████); *see also* Ex. 5, the '731 patent.)  Co-plaintiff Hrabal even analyzed Goodyear's '586 patent claims against his own prior public disclosures, and concluded that ██ ██████████████████████████████ (Ex. 18.) ███████████████████ ██████████████████████████████████████████████ ███████████████████████████. (*E.g.*, Ex. 17 at 2 (████████████████ ██████████████████████████████████████████████ ██████).)

C.    Coda's Lawsuit Against Goodyear (2015-Present)

Coda filed this lawsuit in August 2015, asserting mostly patent-related claims.  (Dkt. 1, Counts 1–13.)  Coda also asserted a trade secrets claim.  (*Id.*, Count 16.)  Goodyear moved to dismiss all claims.  (Dkt. 16.)

To Goodyear's knowledge, Coda's first list of potential trade secrets was created in around November 2015, *after* Goodyear had filed its motion to dismiss.  (Ex. 19.)  It categorized various ideas as either having ███████████████████████████" or ███████████ █████████████"  Three months after filing this lawsuit, Coda still had no idea whether it actually possessed any relevant trade secrets.  (*Id.*)

Coda's hypothesized trade secrets have been moving targets.  Coda's original descriptions of its alleged trade secrets were vague and open-ended (*see* Dkt. 79), and the Court ordered Coda to provide supplemental responses correcting these deficiencies (*see* Dkt. 82).  In its Court-ordered supplemental interrogatory responses, Coda listed 27 alleged trade secrets (now down to 17) that it supposedly described to Goodyear during the 2009 meetings.  (Ex. 20, Coda's Supp. Resp. to Interrogatory No. 2 at 23–26.)  Though Coda has no contemporaneous record of what it allegedly said to Goodyear (other than the admittedly non-secret PowerPoint) (Ex. 6, Hrabal tr. at 460:9–461:14), Coda contends that Goodyear improperly used those orally-conveyed alleged trade secrets in its Air Maintenance Tire ("AMT") project and in related patent filings.  (Dkt. 53-1 at ¶¶ 149–78.)

Goodyear never commercialized a product that embodies any alleged trade secret.  As to Coda, from 2001 through 2019 it attempted to sell or license its SIT technology to at ████ tire manufacturers and others.  (Ex. 20 at 186–189.)  Despite two partnerships with tire manufacturers, neither Coda nor its partners have ever been able to make or sell a commercially viable tire that embodies any Coda SIT technology.  No one has.

-6-

## III.     LEGAL STANDARDS (SUMMARY JUDGMENT AND TRADE SECRETS)

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A non-moving party must show genuine factual disputes by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1).  If the non-moving party fails to identify genuine fact disputes for issues on which it bears the burden of proof, the Court must grant summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Mere disagreement will not avoid summary judgment; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  And, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252.

The OUTSA authorizes an action for trade secret misappropriation.  O.R.C. § 1333.61, *et seq.*  A claimant must show "(1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 985 (N.D. Ohio 2008).  "A plaintiff bears the burden of proving the elements of the claim, including that information is a trade secret." *Sunkin v. Hunter Eng'g Co.*, No. 5:15-CV-892, 2016 WL 5390408, at *4 (N.D. Ohio Sept. 27, 2016) (citing *Thermodyn*, 593 F. Supp. 2d at 985).

A claimant must prove that its alleged trade secret is neither generally known nor readily ascertainable. *See, e.g., Hickory Specialties, Inc. v. Forest Flavors Int'l, Inc.*, 215 F.3d 1326 (6th Cir. 2000) ("Matters of public knowledge or general knowledge in the industry or ideas which are well known or easily ascertainable, cannot be trade secrets.") (citation omitted).  Public disclosure extinguishes any misappropriation claim. *MP TotalCare Servs. v. Mattimoe*, 648 F.

Supp. 2d 956, 966–67 (N.D. Ohio 2009); *Rogers Indus. Prods. Inc. v. HF Rubber Mach., Inc.*, 188 Ohio App. 3d 570, 577, 2010-Ohio-3388, 936 N.E.2d 122 (9th Dist.). It is a proper summary judgment basis. *Champion Foodservice, LLC v. Vista Food Exch., Inc.*, No. 1:13-CV-1195, 2016 WL 4468001, at *9 (N.D. Ohio Aug. 24, 2016) (Lioi, J.) (granting summary judgment because "[i]nformation publicly disclosed is not a trade secret") (citing *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 862 (6th Cir. 2008)).

A claimant also must define alleged trade secrets with particularity. *See, e.g., Yoe v. Crescent Sock Co.*, No. 1:15-CV-3-SKL, 2017 WL 11479991, at *3 (E.D. Tenn. May 25, 2017) ("The 'reasonable particularity standard' has been described as requiring that the trade secret 'be identified clearly, unambiguously, and with specificity.'") (quoting *Dura Global, Techs., Inc. v. Magna Donnelly Corp.*, No. 07-CV-10945-DT, 2008 WL 2064516, at *1–2 (E.D. Mich. May 14, 2008)). Insufficient particularity also is a proper summary judgment basis. *Utilase, Inc. v. Williamson*, 188 F.3d 510 (6th Cir. 1999) (affirming summary judgment where "evidence fails to establish a genuine issue of fact . . . inasmuch as Plaintiff failed to state with specificity a protected trade secret") (citation omitted); *Therm-O-Disc, Inc. v. Maatuk*, No. 1:00-CV-02105, ECF No. 89, slip op. at 7 (N.D. Ohio Oct. 9, 2002) (granting summary judgment where claimant "has failed to identify with specificity as required under the [OUTSA] a precise description of his alleged trade secrets allegedly misappropriated in that he has not provided responsive answers to relevant interrogatories or complied with this Court's Orders regarding discovery").[5]

---

[5] *See also IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002) (affirming summary judgment where claimant "failed to identify with specificity the trade secrets that it accuses the defendants of misappropriating"); *360 Mortg. Grp., LLC v. Stonegate Mortg. Corp.*, No. 5:14-CV-00310-F, 2016 WL 4943933, at *4 (E.D.N.C. Sept. 14, 2016) (granting summary judgment where claimant "fails to offer admissible evidence to support its vague and overly broad description" of alleged trade secrets), *aff'd*, 740 F. App'x 263 (4th Cir. 2018).

## IV.  GOODYEAR IS ENTITLED TO SUMMARY JUDGMENT ON CODA'S TRADE SECRETS CLAIM (COUNT 4)

Goodyear is entitled to summary judgment on Coda's trade secrets claim for several reasons. *First*, Coda failed to describe the alleged trade secrets with particularity, as this Court required in its Orders. *Second*, for each alleged trade secret, the information described was generally known or readily ascertainable, and/or not used by Goodyear. *Third*, Coda cannot establish "independent economic value" for its alleged trade secrets. *Fourth*, the NDA, with its expiration of all obligations on January 1, 2012, does not constitute a reasonable measure to protect the alleged trade secrets. *Fifth*, the expert on which Coda relies to establish its claims is unqualified, and his opinions are unreliable. There are no fact disputes that would preclude summary judgment on any of these issues, each of which is an independent basis for granting summary judgment on Coda's trade secret claim and related declaratory judgment claim.

### A.  Coda's Alleged Trade Secrets Are Indefinite And Fail To Comply With This Court's Discovery Orders

#### 1.  Coda Did Not Describe The Alleged Trade Secrets With Particularity

On November 1, 2019, this Court ordered Plaintiffs to provide "a complete list of the trade secrets (with particularity) that they claim were orally disclosed to defendants," in response to Goodyear's Interrogatory No. 2. (Minute Order of Nov. 1, 2019; *see also* Dkt. 82 at 1 (quoting Nov. 1, 2019 Minute Order).) That list is "closed," and Coda cannot supplement it absent "an exceptional reason to do so." (*Id.*) Pursuant to that Order, on January 30, 2020, Coda provided a list of alleged trade secrets that remained vague, indefinite, evasive, and ultimately nonresponsive. *See* Fed. R. Civ. P. 37(a)(4). Coda's list contradicts this Court's Orders and precedent requiring particularity. For this reason, Coda's trade secrets claim fails at the outset.

Coda describes many alleged trade secrets simply as "Coda's knowledge regarding" a given topic, without particularizing what the supposed "knowledge" is. That is indefinite. *See,*

*e.g.*, *Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, No. 3:13-CV-82-CRS-CHL, 2017 WL 4799815, at *4 (W.D. Ky. Oct. 24, 2017) ("[T]rade secrets are not made up of bodies of knowledge, but rather specific facts, formulas, documents, and other particularities.") (citation omitted). [6]  Coda also frames many alleged trade secrets broadly as "Coda's design and development" in a technical area, or its "strategy" for something, without specifying what the particular design, development or strategy is. [7]  That too is indefinite.  *Arco Indus. Corp. v. Chemcast Corp.*, 633 F.2d 435, 441 (6th Cir. 1980) (reversing district court's finding of misappropriation of an alleged trade secret claiming a manufacturer's "approach and layout" as "vague and overly broad" because "[t]he constituent parts of the approach and layout are never specified"); *see also Dow Chem. Canada Inc. v. HRD Corp.*, 909 F. Supp. 2d 340, 347–48 (D. Del. 2012), *aff'd*, 587 F. App'x 741 (3d Cir. 2014) (granting summary judgment when one alleged trade secret "refers to a list of chemical characteristics . . . without actually identifying what comprises that list," another recited "a certain 'concept' without any details as to the specifics of this concept," and another was "a 'list of physical characteristics'" with no details).

Take, for example, alleged trade secret no. 18 (TS18):[8]



(Ex. 20 at 25.)

TS18 neither describes what Coda's alleged "knowledge" is, nor explains "███████████
███████████████████████████" actually "affects" anything, in general, or the elements of TS18 that follow, in particular.  At most, Coda hints that some aspect of TS18 is

---

[6] *See, e.g.*, Ex. 20, alleged trade secret nos. 2, 4, 11, 18-20, 25, and 27.
[7] *See, e.g.*, Ex. 20, alleged trade secret nos. 7, 13–15, and 22.
[8] For brevity, "TS##" as used herein refers to specific Coda alleged trade secrets as enumerated in its supplemental response to Goodyear's interrogatory no. 2. (Ex. 20 at 23–26.)

somehow ██████████████████████████." Even Coda's expert, Coughlin, could not usefully describe what TS18 means; when asked, "████████████████ ███████████████████████████" he responded with nonsense:



(Ex. 21 at 195:1–15.)  Since TS18 apparently depends on ███████████████████" particular to any given tire and requires ███████████" to determine what it is—none of which Coda defined in TS18 or even claims to have disclosed to Goodyear—TS18 is indefinite.

### 2. Coda Impermissibly Recombined And Rewrote The Alleged Trade Secrets

There are other problems with Coda's vague and evasive descriptions of the alleged trade secrets.  In attempting to show misappropriation, Coda's technical expert, Coughlin, failed to analyze the listed alleged trade secrets on a trade-secret-by-trade-secret basis; rather, he reshuffled them into eight new combinations and then considered those new combinations *collectively*.  And now, after Coda dropped 10 of the alleged trade secrets, his collective analyses are rendered even more improper because those analyses were of *different* combinations of alleged trade secrets.  Worse, his analysis rewords the listed alleged trade secrets while attempting to shoehorn them into the different language recited in the claims of Goodyear patents.  All of that is improper.  Coda never sought leave to recombine or rewrite the alleged trade secrets, despite this Court's clear Order that "additions to this list at a later time will be

-11-

permitted only upon showing of an exceptional reason to do so . . . ."  (Dkt. 82 at 1.)  For this additional reason, the Court should grant summary judgment.

Coughlin's analysis of the new group of "pump location" trade secrets (TS15–19 and 24) illustrates this problem.  He never addressed TS15–19 and 24 on a trade-secret-by-trade-secret basis.  Rather, he analyzed the new combination *collectively*, opining broadly, for example, that Goodyear's ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████."  (Ex. 22 at ¶ 253 (emphasis added).)

Coughlin's approach suffers from fatal flaws.  *First*, this recombination of separate alleged trade secrets is an unauthorized new "compilation" of trade secrets.  Coda listed TS15–19 and 24 as separate and distinct alleged trade secrets.  (Ex. 20 at 25–26.)  But Coda never sought leave of Court to modify the listed trade secrets to be a sub-compilation of alleged trade secrets, much less showed "exceptional cause" for why it should be given leave to recombine the alleged trade secrets as it has done.[9]

*Second*, Coughlin also rewords TS15–19 and 24, which (as actually described by Coda) conspicuously lack the term "bending region" among other features.  (*See id.*)  He repeatedly recharacterizes the "pump location" trade secrets as locating a pump in the *bending region* of a sidewall.  (*See, e.g.*, Ex. 22 at ¶ 251 (mischaracterizing the alleged "trade secret pump location" as ████████████████████████████████████████████████████████████ ████████████████████████████."); *see also*, *e.g.*, ¶ 533 (distinguishing the 2007 PCT from TS15–19, and 24 on the basis of a "bending region" requirement not present in the alleged trade

---

[9] Coughlin also failed to analyze all the other alleged trade secrets on a trade secret-by-trade secret basis, except TS27, but TS27 is simply a global "catch-all" that incorporates all of TS01–TS26, as well as everything Coda said to Goodyear about SIT technology and Coda's SIT patents.

secrets).)  But Coda never listed the '586 patent claims, or the recited "bending region" limitation, in any of the listed alleged trade secrets.  Moreover, as the following table shows, the scope of TS15 differs *substantially* from even just the "bending region" limitation of the '586 patent claims.

| TS15 | '586, cls. 1 & 18 |
|---|---|
|  | at least one <u>bending region</u> operatively bending within a rolling tire footprint responsive to a <u>bending strain</u>, whereby the <u>bending region in a bending condition</u> within said rolling tire footprint having a <u>bending strain neutral axis</u>, a <u>compression side of the neutral zone</u>, and an <u>elongation side of the neutral zone</u> |

Nothing in the '586 claim limitation says anything about beads, treads, spacers, flap tubes, flap passages, or rims.  (*See* Ex. 23 at 10:29–54.)  And nothing in TS15 says anything about a bending region, bending strains, neutral axes, neutral zones, or compression/elongation sides of neutral zones.  For similar reasons, TS16–18 and 24 also differ substantially in scope from the '586 patent claims.[10]

Coda's attempt to make the alleged trade secrets a moving target is improper.  As this Court held, Goodyear was entitled to "know . . . what specific claims of trade secret misappropriation they must defend against." (Dkt. 82 at 7.)  Coda's unauthorized, after-the-fact attempt to recombine and rewrite its list of alleged trade secrets contravenes the Court's Orders. (*Id.*)  For this reason, the Court should grant summary judgment.

---

[10] This problem pervades Coughlin's analysis of all the other listed alleged trade secrets, as do other indefinite aspects of alleged trade secrets discussed more particularly in Section IV.B, below.

**B.     Coda Cannot Establish That Its Alleged Trade Secrets Were Not Generally Known Or Readily Ascertainable, Or That Goodyear Used Or Disclosed Them**

Goodyear did not use any secret or confidential information from Coda in its development work.  Nothing in Goodyear's nine years' of development records cites to something confidential that Coda said in its meetings with Goodyear as the basis for a Goodyear development decision, and Goodyear's work was done independently.  However, that issue need not be addressed, because the items that Coda describes as alleged trade secrets were generally known or readily ascertainable, and/or the cited Goodyear use or disclosure does not match up with the described trade secret.

For each alleged trade secret, Coda relies entirely on its expert, Coughlin, to argue that the trade secret was not generally known, and that it was used or disclosed by Goodyear.  His analysis fails as a matter of law.  Coughlin categorized Coda's alleged trade secrets into eight groups: (1) pump location; (2) pump configuration; (3) pump creation; (4) interface-related information; (5) testing; (6) marketing and commercialization; (7) overall system; and (8) pressure management.  Below, Goodyear addresses each of the remaining 17 alleged trade secrets on a trade-secret-by-trade-secret basis, and establishes how each alleged trade secret (1) was generally known or readily ascertainable, and/or (2) does not describe anything used or disclosed by Goodyear.

**1.     The Alleged "Pump Location" Trade Secrets (TS15–16, 18–19, & 24)**

Each of TS15–16, 18–19 and 24 was generally known or readily ascertainable and, in many cases, Coda concedes that Goodyear neither used nor disclosed them.  Moreover, in August 2011, when Hrabal became aware of Goodyear's '586 patent's application (which Coda now claims discloses the "pump location" trade secrets), he stated, " ███████████████ ██████████████ " because Goodyear was █████████████████████████

-14-

██████████████████.” (Ex. 15 at 1.)  He even opined later that the pump locations in the '586 patent were ████████████████████. (Ex. 18.)  Those beliefs are incompatible with a belief that the '586 patent discloses or claims any Coda trade secrets.  Goodyear addresses TS15–16, 18–19 and 24 separately and in turn below.

(a)     **Alleged Trade Secret No. 15**



. (Ex. 20 at 25.)

Coda cannot meet its burden of proof with respect to TS15.  *First*, there is no evidence that Goodyear used or disclosed TS15.  Coughlin admitted that he found no evidence that Goodyear used or disclosed: (1) locating a pump tube "████████████████████ ████"; (2) ████████████"; (3) "████████████████████████"; (4) "████████████████████"; or (5) "████████████████" (Ex. 21 at 99:24–101:1, 103:11–25, 105:6–14, 105:24–106:13; *see also* Ex. 22 at ¶¶ 236–70 (Coughlin).)  Those are all "alternative locations" that Coda defined in TS15 as required to be "assessed."

*Second*, TS15 was generally known or readily ascertainable.  In pre-2009 publications, Coda made no secret that a peristaltic pump could be located in any of a variety of locations.  For example, in the 2007 PCT, Coda explained that the pump could be located in the bead area of the tire, or "anywhere else in the wall or at the wall of the tire, so, for example, even at the tread of the tire." (Ex. 3 at 18:2–6.)  The 2007 PCT also disclosed a peristaltic pump in the sidewall against the rim (*e.g.*, Fig. 7.a), between the tire and the rim at the end of a flap passage (*e.g.*, Figs. 3.e, 3.h), and in the sidewall above the rim in an outward facing groove.  (*Id.* at 5:13–17,

18:2–6, 19:22–27, 24:5–9; *see also* Ex. 24 at ¶¶ 212–13 (Sprague).)  The alternative locations in TS15 were anything but secret.

Indeed, prior to this lawsuit, Hrabal admitted his belief that the 2007 PCT disclosed the subject matter of TS15.  Using an annotated 2007 PCT Figure 3(h) and passages from the '586 patent and 2007 PCT (*see* below), he illustrated his belief that ███████████████████████ ████████████████████████████████████████████:



(Ex. 18, FH Claim Chart at CODA0516947, 949.)  Hrabal stated that "████████████████████ ██████████████████████████████████████████████████████ ██████ (*id.* at 949), and that ████████████████████████████████████ ██████████████████████" (*id.* at 951).  Thus, Hrabal agrees that the 2007 PCT disclosed placing a pump near and above the rim in an outward facing groove.

Further, the 2007 PCT teaches that Figure 3(h) can be created "within the wall of the tire" itself "by cutting operation, cutting with a thermal knife, melting off, or burning out."  (Ex. 3 at 23:32–24:1.)  The "slot" (item 10 in the figure) may have a "U-shaped cross-section" (*Id.* at

5:13–17), and a "hollow hose" to contain the pump chamber can be put into the "slot formed by . . . the above mentioned method" (*id.* at 24:5–20). (*See also* Ex. 24 at ¶¶ 189, 212 (Sprague); Ex. 21 at 151:9–152:20 (Coughlin).) Of course, the "slot" disclosed in the 2007 PCT is a "groove"—the dictionary definition of "slot" is a "narrow opening *or groove*." (Ex. 24 at ¶ 212; *see also* Ex. 6, Hrabal tr. at 123:20–124:22 ("███████████████████████████████████ ████████████████████████████████████.").) Elsewhere, Hrabal admitted that "████████████." (Ex. 18 at CODA0516947.)

Similarly, there is no dispute that Coda's 2003–2007 website disclosed locating a pump: (1) in the tread area (Ex. 25), (2) within the sidewall near and above the rim (*id.*), and (3) on the radial face of the bead abutting the rim (Ex. 26). (*See also* Ex. 24 at ¶ 210 (Sprague); Ex. 21 at 68:20–25 (Coughlin).) Below are figures from Coda's website that showed a pump located in the tread area or in the sidewall near and above the rim (red arrow; added to figures), as described in TS15.



(Ex. 25 (location of peristaltic pumps circled in green).)[11] In fact, Hrabal stated that ████ ██████████████████████████████████████████████████████████. (*See*

---

[11] The portion of the tire shown in this figure is on the road. When it rotates 180°, the pump to which the red arrow points will be above the rim.

Dkt. 196 at 13.)[12]  Hrabal thus admitted that ███████████████████████████████
███████████████████████████████  Below is another Coda website figure that

showed the pump located near the radial face of the bead abutting the rim.



(Ex. 26 at 2, 17 (location  of peristaltic  pump  identified  by red crescent circled in green).)

 Elsewhere, Coda published articles and presentations showing a peristaltic pump located

in the tire sidewall  near and above the rim.  Two examples  are shown below.




(Ex. 9, 2008 Tire Technology  article  at 113 (left);  Ex. 10, Hamburg  presentation  at 36 (right).)

Coda further published that pumps could be created by making a slot to the outside of the tire,

and inserting a tube.  (*See supra* at 16; Ex. 18 at CODA0516947, 949.)  There were no locations

that Coda kept secret.

---

[12] The FH Claim Chart provided by Coda on February 4 was missing the page on which
Hrabal discussed the 2003–2007 website and these figures.

*Third*, Coughlin does not explain how TS15 (or any of the other alleged "pump location" trade secrets) was not generally known or readily ascertainable. (*See* Ex. 22 at ¶¶ 481–587.) Rather, he uses the claims of Goodyear's '586 patent as a surrogate for Coda's actual alleged trade secrets, and assumes that their allowance by the Patent Office means that Coda's alleged trade secrets must not have been known. (*Id.* at ¶¶ 500–507.) The fallacy in his logic is that the claims of the '586 patent, and the scope of Coda's alleged trade secrets, as discussed above, are not the same. In this regard, the Examiner's reason for allowing the '586 patent actually refutes Coughlin's position; the Examiner found that, with regard to claim 1 of the '586 patent, ███

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ " (*Id.* at ¶ 507.) However, neither TS15 nor any of Coda's alleged trade secrets includes such a limitation. (*See also*, *id.* at ¶¶ 533–48 (Coughlin distinguishing the "pump location" trade secrets from the 2007 PCT on the basis of a "bending region" limitation not present in TS15–16, 18–19, and 24).) The '586 patent is not a proper surrogate for Coda's alleged trade secrets, and Coughlin failed to address the actual language of the alleged trade secrets.

### (b) Alleged Trade Secret No. 16

████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████ . (Ex. 20 at 25.)

TS16 was generally known or readily ascertainable. As noted, the 2007 PCT discloses locating a peristaltic pump in the sidewall near and above the rim in an outward facing groove. (Ex. 3 at, *e.g.*, 24:5–11 (a "hollow hose to contain the chamber 1 can be put into the slot"); *id.* at 34:25–27 (claim 15—"The manufacturing method according to any of the above mentioned

claims, characterized by the fact that a hose containing the chamber (1) is inserted into the slot . .

. .”); Ex. 24 at ¶¶ 222–24 (Sprague); Ex. 21 at 152:12–157:15 (Coughlin).)   Indeed, Hrabal

admitted that the 2007 PCT disclosed ███████████████████████████████████████

████████   (Ex. 18 at CODA0516951 █████████████████████████████████████████

████████████████████████████████████████████████████████.”) (referring to

Figs. 2(a)–(d), below).)



Coughlin also admitted as much.  (Ex. 21 at 151:9–152:20 (“████████████████████████████

████████████████████████████████████████████████████████.”).)   Thus,

Coda itself disclosed TS16, and Coughlin’s analysis does not show to the contrary.  (*See* Ex. 22

at, *e.g.*, ¶¶ 533–48 (distinguishing the “pump location” trade secrets on the basis of a “bending

region” requirement not present in TS15–16, 18–19, and 24).)   Though Coughlin attempts to

draw analogies to the ’586 patent claims, TS16 broadly refers to embedding a tube in a groove

*anywhere* in a tire sidewall, while the ’586 patent claims recite far more detailed and precise

limitations than TS16, including the “compression side of the neutral axis of the bending region.”

Besides, TS16 was published elsewhere before the 2007 PCT.  For example, the Ellmann

patent discloses a self-inflating tire with a tube (“hose 4”) in a groove (“duct 3”) in a tire

sidewall.  (Ex. 27 at 2:16–30 (“[A] duct can be provided in the tire itself in the area of its bead

chamfer."); Ex. 24 at ¶ 221 (Sprague).) The Lindner patent also discloses a self-inflating tire with a tube ("hose") in a groove ("channel") in a tire sidewall. (Ex. 28 at 1 ("Pumping arrangements . . . are primarily characterized in that channels are disposed on one or both side walls of tire, in such a manner that they are closed when the sidewall is bent outward beyond the normal extent."); *id.*, Figs. 3 & 4; Ex. 24 at ¶ 220 (Sprague).) Once again, Coughlin did not compare TS16 to these prior art references. (*See* Ex. 22 at ¶¶ 530–31, 533.) Instead, he rewrote TS16 to include "bending region" or "█████████████████████████" limitations to contend that TS16 is not disclosed in the prior art. (*See id.* at ¶ 531.) That is improper for several reasons, including that Coda never sought leave to modify its listed alleged trade secrets.

(c)      **Alleged Trade Secret No. 18**



(Ex. 20 at 25.)

TS18 is vague and indefinite. It does not describe what the alleged "knowledge" is, nor how "████████████████████████" actually "affects" anything, in general, or the elements of TS18 that follow, in particular. (*See* Ex. 24 at ¶ 238 (Sprague).) At most, Coda hints that some aspect of TS18 is somehow ██████████████████████████████████ ███████" Even Coughlin could not make heads or tails of TS18; when asked, "████████ ██████████████████████████████████████████████," he made it more vague, as discussed above in Section IV.A.

Insofar as TS18 has something to do with Coda's prototype, that was published in videos on Coda's website. (*See* Ex. 24 at ¶ 242–43 (Sprague); Ex. 6, Hrabal tr. at 387:3–390:9 ("█ ████████████████████████████████████████████████████████████████ ████████████████.").) The published video shows flexion of the sidewall causing

-21-

compressive force to be exerted on the tube.  (*See supra*, n. 4.)  Moreover, Coughlin points to no evidence that Goodyear ever used or disclosed a built-out groove (like in Coda's laboratory prototype) or otherwise used or disclosed TS18.  (*See* Ex. 22 at ¶¶ 236–70 (Coughlin); Ex. 24 at ¶ 245 (Sprague).)   None exists.

### (d)     Alleged Trade Secret No. 19



(Ex. 20 at 25.)

TS19 is vague and indefinite.  It does not describe the allegedly secret '███████ ████████████████████████" or how that knowledge is used to '███████ ████████████████████" based on anything.  (*See* Ex. 24, Sprague report at ¶ 248.) TS19 also does not state where the '███████████" is, or why it is ████████████ ██████████████████████"

To the extent that TS19 is defined, Goodyear's expert explains how it was known prior to 2009.  (Ex. 24 at ¶¶ 249–53.)  In the 2007 PCT, Coda disclosed its knowledge regarding the behavior of the tire sidewall and how that affects pump placement; for example, the forces can be generally perpendicular to the pump chamber (Ex. 3 at 8:7–9), and the pump located where it "can easily be connected to the air inlet and outlet and all the chamber parts" and "close to the rim where they are subjected to the lowest centrifugal forces within the tire" (*id.* at 8:25–31). The 2007 PCT also explains that the rigidity of the bead can make tire behavior in that area more predictable and protected against wear.  (*Id.* at 8:31–9:3; *see also* Ex. 24 at ¶ 252 (Sprague).) Coughlin's only response is to declare that the passages from the 2007 PCT ████████ ████████████████████" TS19, without explanation or analysis.  (*See* Ex. 22 at ¶ 552.)  Nor does he explain or point to any evidence showing how Goodyear allegedly used or disclosed it.  (*See id.* at ¶¶ 236–70; Ex. 24 at ¶ 254 (Sprague).)

(e)        **Alleged Trade Secret No. 24**

███████████████████████████████████████████
███████████████████████████ (Ex. 20 at 26.)

For the same reasons discussed above for TS15 and TS16, Coda publicly disclosed locating a peristaltic pump in "████████████████████████████████████████

██████." Again, Coda's 2003–2007 website displayed an animation of the figures shown in Ex. 24 (*see supra*, at 17), which shows ██████████████████████████████████.[13] And Coda concedes that this location is "████████████████████." In its response to Goodyear's Interrogatory No. 1, Coda stated that ████████████████████████████ ████████████████████████████████████████████ ████████████████████" (Ex. 20 at 10.)  The pump location disclosed on Coda's website is ████████████████████████. Coda also disclosed TS24 to the public in Hrabal's 2008 Tire Technology article and in the Hamburg presentation.  Both display the same image, shown below, which discloses a pump chamber in the sidewall close to, and above, the rim.



Figure 3.

Further, Hrabal admitted that the 2007 PCT discloses ████████████████████████████ ██████████ (Ex. 6 at 77:5–13, 88:13–9:2, 90:23–24.)

In sum, TS24 was also generally known or readily ascertainable for the same reasons that locating a peristaltic pump "████████████████████████" (TS15) was known.  (*See*

--------

[13] https://web.archive.org/web/20031007005238/http://www.selfinflatingtire.com/index.asp.

*also* Ex. 24 at ¶¶ 315–20 (Sprague).)

     **2.**     **The Alleged "Pump Configuration" Trade Secrets (TS01–02 & 11)**

     Coda categorizes TS01–02 and 11 as the "pump configuration" trade secrets (along with now-withdrawn TS12 and 21). Coughlin further divides them into the "symmetry and bidirectionality" trade secrets (TS01 and TS02) and the "additional pump configuration" trade secret (TS11). Coda cannot show that these items constitute trade secrets, and/or that any Coda secret information was used by Goodyear.

     **(a)**     **Alleged Trade Secret No. 1**



(Ex. 20 at 23.)

     TS01 was well-known long before 2009. The Sheppard patent (issued in 1967) describes a self-inflating tire system that operates when the tire rotates in either direction, with a symmetrical peristaltic pump system. (Ex. 29 at 2:4–14, Figs. 1–2; *see also* Ex. 24 at ¶¶ 77–79 (Sprague).) Coda's expert, Coughlin, admitted this. (Ex. 21 at 229:17–230:21.)

     Coughlin points to no evidence refuting that TS01 was generally known or readily ascertainable. He merely opines that Coda's "symmetry and bidirectional" trade secrets, as a whole, were not publicly available or readily ascertainable because the Patent Office issued the '254 patent to Goodyear and the DOE awarded Goodyear a grant. (*See* Ex. 22 at ¶ 606.) The argument is a non-sequitur—the claims of the '254 patent differ from TS01. For example, claim 1 of the '254 patent requires, among other things, "an outlet device positioned within the annular passageway at a location substantially 180 degrees apart opposite the inlet device . . . wherein the inlet device comprises a T-configured inlet mechanism [and] . . . the outlet device compris[es] a T-configured outlet mechanism." (Ex. 30 at 6:29–7:3, Fig. 1 (below, annotations added).)



FIG−1

Nothing in TS01 comes close to those detailed and specific claim limitations.  Moreover, when

Hrabal became aware of the '254 patent's application, he declared that ' ██████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ " (Ex. 15 at 1.)  Hrabal also wrote that in

Goodyear's '254 patent ████████████████████████████████████

████████████████████████████████ ." (Ex. 17 at 2.)

**(b)    Alleged Trade Secret No. 2**



(Ex. 20 at 23.)

For the same reasons that TS01 was generally known or readily ascertainable, so was

TS02.  Indeed, Sheppard's two oppositely-oriented pumps extend nearly 360-degrees around the

tire.  (Ex. 21, Coughlin tr. at 231:1–234:20.)  Lindner also discloses two symmetrically-oriented

pump tubes providing bi-directionality.  (Ex. 28; *see also* Ex. 24 at ¶ 97 (Sprague).)  And the

2009 PCT discloses variant pump tube lengths.  (Ex. 4 at 4:1–2, 13:19–22, 14:31–15:1.)  Further,

-25-

Hrabal admitted that he publicly disclosed ███████████████ in the Hamburg presentation. (*See* Ex. 6 at 186:19–187:17; *see also* Ex. 10 at 35; Ex. 19 at row 22 ('██████ ███████████████████')) Goodyear's expert, Sprague, explains that fully circular, circular, and super circular pump tube lengths were all disclosed in the prior art before 2009, including by Coda itself (Ex. 24 at ¶¶ 95–102), and Coughlin does not challenge these facts. Instead, he simply declares that the "symmetry and bidirectional" trade secrets were not publicly known or readily ascertainable because Goodyear obtained the '254 patent. (*See* Ex. 22 at ¶¶ 592–606.) Once again, that is a non-sequitur because no evidence links TS02 to the '254 patent claims' detailed and specific limitations.

(c)       **Alleged Trade Secret No. 11**

Ex. 20 at 24.)

Coughlin does not offer an opinion that TS11 was not generally known or readily ascertainable. (*See* Ex. 22 at ¶¶ 588–621 (addressing TS01–02, but ignoring TS11).) Sprague, however, explains how each element of TS11 was *not* secret. (Ex. 24 at ¶¶ 184–92; *see also* Ex. 3, 2007 PCT at 4:16–22, 5:13–17, 7:6–33, 8:1–20, 13:27–29, 23:13–16, 24:5–20.) Moreover, Coda agrees that ███████████████████████████ ████████████████████████████████ (Ex. 19 at row 7), and that it publicly disclosed ████████████████████ (*id.* at row 11), ██████████ (*id.* at row 18), ████████████ (*id.* at row 22), █████████ ████████ (*id.* at row 27 ████████████████████████

-26-

██████████████████████████████████████████████████████████

████████████████  (*id.* at row 26).[14]

### 3.    The Alleged "Pump Creation" Trade Secret (TS05)

Coda categorizes TS05 as a "pump configuration" trade secret (along with now-withdrawn TS13 and 14).

**Alleged Trade Secret No. 5**

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████.  (Ex. 20 at 24.)

Goodyear did not use or disclose TS05, which requires that the use of a ████████" that is

████████████████████████████." Coughlin cites only to Goodyear's disclosure of a *silicone*

*strip* in patent applications published in 2013.  (Ex. 22 at ¶¶ 335–45.)  Nowhere does Coughlin

point to any evidence showing that Goodyear ever used or disclosed ███████████████████

███████████████████████████ which is what Coda claims as its trade secret.

(*See id.*)  This is no surprise, considering that Hrabal ██████████████████████████

██████████████  (Ex. 19 at row 9.)

In any event, TS05 was generally known or readily ascertainable.  (Ex. 24 at ¶¶ 146–48

(Sprague).)  Indeed, Coda admitted that ████████████████████████████████████████

██████████████████████  (Ex. 19 at rows 8–9.)  Further, a prior Goodyear patent

application disclosed molding channels in tires using a silicone-rubber-coated wire.  (Ex. 22 at ¶

148 (Sprague).)  Likewise, Coda's 2007 PCT also discloses all aspects of TS05, including the

use of a coating (*i.e.*, a "separator") on a filament (the "matrix"), but does not explicitly state that

the separator can be a ████████████.  (*Id.* at ¶ 147 (citing Ex. 3 at 10:2–4, 22:9–16).)  A tire

---

[14] In the Jackson Chart, ███████████████████████████████████████████
████████████████████████████████████████

engineer would readily ascertain that , could be used as the 2007 PCT's optional "separator." (*Id.*) Coughlin fails to explain how TS05 was not generally known or readily ascertainable from the 2007 PCT. Instead, he argues broadly that "█████████████████████████████████████████████████████████████████" and points to Coda's interrogatory response that "█████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████." (*See* Ex. 22 at ¶¶ 633–34.) None of that information, however, is called out or hinted at in TS05.

### 4. The Alleged "Interface" Trade Secret (TS07)

Coda categorizes TS07 as an "interface" trade secret (along with now-withdrawn TS08). Coda cannot show that Goodyear misappropriated TS07.

**Alleged Trade Secret No. 7**



. (Ex. 20 at 24.)

By its terms, the interface of TS07 relates to the transport of air in a peristaltic pump system and includes a combination of at least ten different features. Coda describes the alleged interface functionally, with a list of things that it must do, yet nowhere does Coughlin show how Goodyear used or disclosed an interface that, likewise, does all the things required by TS07. (*See* Ex. 22 at ¶¶ 406–19; *see also* Ex. 24 at ¶ 164 (Sprague).)

Coughlin identifies only Goodyear's U.S. Patent No. 8,291,950 ("the '950 patent) as purportedly disclosing Coda's "interface trade secrets," pointing to an "air tube body" in Figures 10A and 13 as disclosing the alleged interface. (Ex. 22 at ¶¶ 411–12.) Those figures are reproduced below left and middle, with the "air tube body" colored in blue. Coughlin also

identified the "air passage" (shown in light purple), below right, from a Goodyear document as constituting the alleged interface.  (*Id.* at ¶ 415.)



FIG–10A    FIG–13

However, in all cases, virtually all of the elements of TS07 are missing:  No air passage is (1) ████████████████████████, (2) ██████████████████████████, (3) ████████, (4) ██████████████, (5) ████████████, or (6) ██████████. (Ex. 31, the '950 patent at 6:21–31, 7:52–59; *see also* Ex. 24 at ¶ 164 (Sprague).)  Coughlin simply ignores all of these elements.  (*See* Ex. 22 at ¶¶ 411–19.)

Air passageways, moreover, were generally known or readily ascertainable.  Indeed, Coda admitted that its interface design ████████████████████ (Ex. 19 at rows 13–14), that ████████████████████████████████████████████████████████████████████████████████████████████████ (*id.* at row 23).  The 2007 PCT, moreover, discloses an air passageway (a "member 19, including its Vv part") (Ex. 3 at 15:21–28, Fig. 5(e), below) that serves an end to the pump and connects the pump to the atmosphere (*id.* at 16:29–17:1), goes around the bead or through the layers of the tire (*id.* at 26:20–21), and connects to the tire interior (*id.* at 26:25–27, 27:1–4).  (*See also id.* Figs. 5(a)–5(f); Ex. 24 at ¶¶ 158–63 (Sprague).)



### 5.    The Alleged "Testing" Trade Secrets (TS23)

Coda categorizes TS23 as a "testing" trade secret (along with now-withdrawn TS10). Coda cannot show that TS23 constitutes a trade secret, and/or that Goodyear used any Coda secret information.

**Alleged Trade Secret No. 23**



(Ex. 20 at 26.)

Goodyear did not use or disclose Coda's " █████████████████ ," which apparently refers to the laboratory prototype in Coda's website video.  Likewise, Goodyear did not use or disclose any of Coda's test results.  Thus, Coda cannot show that Goodyear used or disclosed TS23 as Coda defined it in its Court-ordered interrogatory response.  (*See* Ex. 24 at ¶ 314.) Indeed, Coughlin does not point to any specific use or disclosure of TS23.  (*See* Ex. 22 at ¶¶ 427–37.)  Instead, he opines, without evidence, that " ███████████████████ ████████████████ " (*Id.* at ¶ 435.)  It is conclusory speculation.

-30-

Further, Coda cannot establish that TS23 was not generally known or readily ascertainable. Coda publicly explained on its website that testing on the prototype demonstrated that SIT could generate enough pressure to maintain proper pressure in vehicle tires. (Ex. 24 at ¶ 312, Fig. 112 (Sprague).) This was not a secret. (*Id.* at ¶¶ 306–13.)

### 6. The Alleged "Marketing And Commercialization" Trade Secret (TS25)

Coda categorizes TS09 as a "marketing and commercialization" trade secret (along with now-withdrawn TS09 and 26). Coda cannot show that TS25 was secret or that Goodyear used it.

**Alleged Trade Secret No. 25**

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.
(Ex. 20 at 26.)

TS25 lacks particularity because it does not describe what Coda's secret "knowledge" is or why SIT technology would ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Further, Coughlin admitted that Coda has no evidence that Goodyear actually used or disclosed TS25. (*See* Ex. 21 at 201:21–24 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇."), 207:15–24 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇").) And Coughlin does not offer an opinion that TS25 was not generally known or readily ascertainable. (*See* Ex. 22 at ¶¶ 480–668.) Sprague, however, explains how TS25 was not secret. (Ex. 24 at ¶¶ 322–23.) Coda cannot make out a claim for misappropriation of TS25.

### 7. Alleged Trade Secret No. 27 Regarding A "System"



(Ex. 20 at 26.)

TS27 is an omnibus, "catch all" compilation of everything that Coda allegedly presented to Goodyear in 2009, including admittedly public information such as the PowerPoint presentation, "███████████████████████████████████████████████ ██████████" This is the epitome of failing to particularly define a trade secret. *See IDX Sys.*, 285 F.3d at 583 ("It has been both too vague and too inclusive, effectively asserting that all information in or about its software is a trade secret.  That's not plausible—and, more to the point, such a broad assertion does not match up to the statutory definition.").

Further, Coughlin provides no independent analysis or opinion regarding Goodyear's alleged use or disclosure of TS27, other than to assert that "█████████████████████████ █████████████████████████████████████████████████████████████ █████████████████████████" (referring to the entirety of his preceding report).  (Ex. 22 at ¶ 469.)  However, TS27 includes far more than just alleged TS01–26; it includes all of the technology disclosed in Coda's patent filings (to the extent Coda disputes that its patent filings do not disclose TS01–26).  But nowhere does Coughlin explain what technology Goodyear used from Coda's patents.  In fact, he admitted that he does not know, and did not do such an analysis. (Ex. 21 at 188:14–194:3; *id.* at 193:21–23 ("█████████████████████████████████████ █████████████████████████████████████████████████████████████ Neither Coda nor its experts have explained what technology from Coda's patents was used by Goodyear, as would be required for TS27.  And now that Coda has withdrawn its misappropriation contentions as to 10 of the other 26 alleged trade secrets—all of which are incorporated into TS27—Coda's failure to explain how Goodyear allegedly used TS27 is only compounded.[15]

---

[15] Another Coda expert, Mineur, opined that ████████████████████████████████ █████████ (Ex. 32 at ¶ 129 ("███████████████████████████████████

### 8. The Alleged "Pressure Management" Trade Secrets (TS03–04, 20, 22)

Coda categorizes alleged Trade Secret Nos. 3, 4, 20, and 22 as "pressure management" trade secrets. Coda cannot show that these items constitute trade secrets, and/or that Goodyear used any Coda secret information.

#### (a) Alleged Trade Secret No. 4



(Ex. 20 at 23.)

TS04 relates to management of air pressure in an SIT system. Part of TS04 relates to non-recirculating systems with "dead space," and the other part (text in red above) relates to recirculating systems.

#### (i) "Dead space"/non-recirculating systems

The concept of "dead space" refers to having a portion of the peristaltic pump that is non-compressible. (Ex. 6, Hrabal tr. at 237:21–238:2.) This limits the maximum pressure that the pump can generate, and, in conjunction with the length of the compressible portion, sets the compression ratio. (*Id.* at 240:3–15.) By setting a maximum pressure, one can avoid over-inflation. (*Id.*)

Before 2009, Hrabal spoke and wrote extensively about using dead space (or a non-compressible section of the tube) to ensure that the SIT pump did not over-inflate the tire. For

███████████████████████████████████████████████████████ .").)

example, he posted a video on his website explaining how this could be done.[16]  He also explained his ideas in presentations to the tire industry.  (*E.g.*, Ex. 10 at 43 (shown below).)



Hrabal admitted that the slide above (which is from his public Hamburg presentation) illustrates (1) ████████████████████████████████████████████████ ██████ (Ex. 6 at 240:3-15); and (2) ███████████████████████████████ (*id.* at 245:9–24).  In the non-recirculating system on the bottom ("Cycle Y"), the incompressible portion (red) of the tube is between the pumping portion (green) and atmosphere.  In the system on the top ("Cycle X"), the incompressible portion would be between the pumping portion and the tire interior.  All of the non-recirculating concepts in TS04 were publicly disclosed by Coda in the Hamburg presentation and elsewhere.  (*See* Ex. 19 at row 24; Ex. 22 at ¶¶ 119–28, 143 (Sprague).)  Coda recognized this fact in the Jackson Chart, where it categorized this information as "████ ████████████████████," and even identified ██████████████████████████████████ ████████████████████.  (Ex. 19 at row 24.)

---

16
https://web.archive.org/web/20030807085735/http://www.selfinflatingtire.com/index.asp?content=how.html

### (ii)  Recirculating systems

Coda also publicly disclosed the recirculating system ideas defined in TS04.  Coda has admitted that Coda's patent filings disclosed "████████████████████████████████████ ██████████████████████████████████████████████████████████████." (Ex. 19 at row 15.)  Further, the 2009 PCT expressly discloses a recirculating system that eliminates dead space (Ex. 4 at 4:9–11; Ex. 6, Hrabal tr. at 283:1–13); a regulator with a three-way valve that recirculates air while the tire is not being inflated, thus minimizing pump wear and maximizing efficiency (Ex. 4 at 3:9–13, 6:10–15, 14:13–16; Ex. 6, Hrabal tr. at 268:22–269:19, 283:1–22); and a recirculating system whereby operation of the tire in reverse does not damage the system (Ex. 4 at 12:29–13:1; Ex. 6, Hrabal tr. at 269:21–276:2; *see also* Ex. 24 at ¶¶ 129–41 (Sprague).)

Coda also cannot show that Goodyear used or disclosed TS04.  Coughlin never even addresses the non-recirculating components of TS04 (*see* Ex. 22 at ¶¶ 377–98), and merely states that Goodyear disclosed in its patents ███████████████████████████████████ ██████████" (*id.* at ¶¶ 378–79).  But recirculation within the pump tube was known from the 2009 PCT, as Coughlin concedes.  (*Id.* at ¶ 371 (████████████████████████████ ██████████████████).)  The 2009 PCT was not a trade secret, and neither is TS04.

### (b)  Alleged Trade Secret No. 20



(Ex. 20 at 25.)

Coda cannot establish misappropriation of TS20 for many of the same reasons it cannot with regard to TS04 and the other "pressure management" trade secrets. First, TS20 is indefinite, vague, and lacks particularity. It does not define the ██████████████████ ████████████████████████████████████████████████████████████████████████ ██████████ to which it refers. Further, Coda disclosed TS20 in the 2009 PCT, which (1) ██████████████████████████ (Ex. 4 at 3:9–11); (2) ██████████████████ ████████████████████████ (*id.* at 8:31–10:23, Figs. 1(a)–1(b)); (3) ██████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████ (*id.* at 5:28–6:2, 29:25–27); (4) ████████████████████████████ (*id.* at 6:10–28); (5) ██████████████████████████████████████ ██████████████████ (*id.* at 8:14–9:32, Figs. 1(a)–1(b)); (6) ██████████████████ ████████████████████████████████████ *id.* at 28:4–8); (7) ████████████████████ (*id.* at 7:15–17, 7:31–8:2, Figs. 4(a)–(c), Figs. 13(a)–(f)); and (8) ██████████████████████ (*id.*). There is nothing described in TS20 that is not also disclosed in the 2009 PCT or Coda's other public disclosures.

Finally, Coughlin does not explain how or where each element of TS20 was used or disclosed by Goodyear. He claims that ██████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████ (Ex. 22 at ¶ 378), but even if true, that is merely one aspect of TS20. He never opines that Goodyear used or disclosed TS20 as Coda described it. Quite the opposite, Coughlin asserts that Benedict drafted an invention disclosure that "██████████████████████ ████████████████████████" regarding the "pressure management" trade secrets (*Id.* at ¶ 370), and

-36-

then asserts that ████████████████████████████████████████████████████████

████████████████████████ '" (*id.* at ¶ 371).  TS20 was not secret.

(c)        **Alleged Trade Secret No. 22**



(Ex. 20 at 25.)

TS22 is directed to closure elements for the pressure management system and was known

or readily ascertainable from Coda's 2009 PCT.  For example, Figure 1(a) shows a membrane <u>M</u>

that is part of a closure element <u>R</u> (also called a "reference space").  (Ex. 4 at 8:21–24, 17:20–

23.)



When the tire pressure drops, membrane <u>M</u> comes closer to input <u>V3</u> until that valve closes.  (*Id.*

at 9:11–15.)  It also discloses examples of a spring-assisted membrane.  (*Id.* at 20:31–21:5, Figs.

3(a)–(d).)  Likewise, a spring-loaded closure element can replace the membrane <u>M</u>.  (*Id.* at

22:22–23.)  Further, electronic management may be used.  (*Id.* at 22:29–31 ("Alternatively, the

last input <u>V3</u> or the suction hole <u>S0</u> or output <u>V0</u> can be opened and closed by an electronic

control unit.").)  The 2009 PCT also explains how temperature can affect tire pressure and the

SIT system, and offers alternatives that avoid such issues.  (*Id.* at 22:18–20 ("Thus the membrane

<u>M</u> can protrude only when the tire pressure actually drops down below the desires pressure of the

tire, regardless of warming or cooling of the tire.").)  Further, Coda admitted in the Jackson

-37-

Chart that ███████████████████████████████████████████████████████

██████████████████████████████████████████████. (Ex. 19 at row 21 (*e.g.*, in

the Tire Technology article).)  Coda fully disclosed TS22 and did not protect it as a trade secret.

### (d)  Alleged Trade Secret No. 3

████████████████████████████████████████████████████████

███████████. (Ex. 20 at 23.)

TS03 describes ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████. Coda made this idea generally known or readily ascertainable

from the 2009 PCT, which describes that "the reference space $\underline{R}$ with the membrane $\underline{M}$ or a

spring, can be shiftable in the direction from/to the last input $\underline{V3}$ or the output $\underline{V0}$." (Ex. 4 at

26:5–7, Figs.  7(a)–(b) (below).)





Shifting the placement closer to the aperture will increase the desired pressure, and shifting

farther will cause a decrease.  (*Id.* at 26:9–19.)  Threaded members (such as set screws) were

well-known and were a well-known means to make these sorts of setting adjustments.  (*E.g.*, Ex.

33 at 1:66–3:51, Fig. 1 (showing threaded member to adjust distance of membrane in a valve);

Ex. 24 at ¶¶ 110–13 (Sprague).)  In its website video, Coda itself showed that a threaded member

could be used to adjust the desired pressure setting for an SIT system.  (*Id.* at ¶ 112, Fig. 41.)

TS03 was generally known or readily ascertainable; it is not a trade secret.  Moreover, ██████

██████████████████████████████████████████. (Ex. 19 at row 12.)

\*       \*       \*

In sum, each of Coda's alleged trade secrets was generally known or readily ascertainable, and/or not used by Goodyear.

### C.      Coda's Alleged Trade Secrets Lack Independent Economic Value

Under Ohio law, a claimant must prove that an alleged trade secret "derive[s] independent economic value . . . from not being generally known [], and not being readily ascertainable . . . ."  O.R.C. § 1333.61(D); *see Spring Indus., Inc. v. Nicolozakes*, No. 99AP120075, 2000 WL 1751163, at \*2 (Ohio Ct. App. Nov. 21, 2000) (affirming summary judgment of no trade secrets misappropriation where "the record does not establish that this information was of any economic value"); *see also PrimePay, LLC v. Barnes*, No. 14-11838, 2015 WL 2405702, at \*24 (E.D. Mich. May 20, 2015) (claimant "bears the burden of establishing a claim of misappropriation of trade secrets and must . . . establish the independent economic value of the material."). A claimant may show, for example, "the savings effected and the value to the holder in having the information as against competitors," "the amount of effort or money expended in obtaining and developing the information," or "the amount of time and expense it would take for others to acquire and duplicate the information." *State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E.2d 661, 672 (Ohio 1997).

Coda has no evidence to show that any alleged trade secret has "independent economic value" from not being generally known or not readily ascertainable. For example, no Goodyear or Coda competitor ever licensed Coda's trade secrets independent of Coda's other SIT technology. Indeed, ████████████ ██████████████████████████████ ████████████████████████ (Ex. 34 at ¶ 3.1.) And, Coda never independently valued the alleged trade secrets. Daniel Jackson, Coda's Rule 30(b)(6) witness on the economic value of

Coda's patents and alleged trade secrets, testified that Coda did not know the economic value of each of Coda's alleged trade secrets.



(Ex. 35, Jackson tr. at 188:15–189:4.)  One of Coda's experts, Mineur, who was tasked with providing '███████████████████████████████████████████████████████████████████'' (Ex. 31 at ¶ 11), lumped in Coda's patents with the alleged trade secrets, because he '██████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████''  (Ex. 36, Mineur tr. at 71:7-16; *see also id.* at 72:12-14 (failed to ███████████████████████████████████████'').)

Coda's damages expert, Webster, likewise failed to distinguish the alleged trade secrets from Coda's SIT technology.  Despite Coda's belief that ████████████████████████████ (*e.g.*, Ex. 17 at 2), she failed to account for the independent value of those patents or the alleged trade secrets (Ex. 37 at 90:6–91:14).  Further, Coda's experts' valuation of the alleged trade secrets, from a damages perspective, is based on royalties derived from a hypothetical *patent* license that they opine Goodyear would have taken "but-for" the alleged misappropriation.  (*See, e.g.*, Ex. 38 at 96–98.)  However, they had no opinion on what specifically would be included in that license, and Mineur admitted that he '████████████████████████████████████████████ ██████████████████████████████████████████.''  (Ex. 36 at 60:3-17.) He further testified:



(*Id.* at 62:24-64:2.)  Thus, Coda's damages analysis does not serve as a surrogate for proving independent economic value of the alleged trade secrets.

Further, Coda's experts opined that Goodyear and Coda needed *more* than just the alleged trade secrets to realize any economic gain from Coda's SIT technology.  Mineur opined that ███████████████████████████████████████.  (*See, e.g.*, Ex. 32 at ¶ 151.) And Webster opined that ███████████████████████████████████ ████████████████"  (Ex. 38 at 98; *see also* Ex. 37, Webster tr. at 194:8–11.)  Plainly, Coda cannot establish that the alleged trade secrets have any independent commercial value from not being known ██████████████████████████.  *See DTM Research, L.L.C. v. AT & T Corp.*, 245 F.3d 327, 332 (4th Cir. 2001) ("The 'proprietary aspect' of a trade secret flows, not from the knowledge itself, but from its secrecy.  It is the secret aspect of the knowledge that provides value to the person having the knowledge.") (citation omitted).

Coda cannot establish the value of the alleged trade secrets through other means.  *See Plain Dealer*, 687 N.E.2d at 672.  For example, Coda also cannot show that Goodyear gained any head start value from Coda's alleged trade secrets.  Mineur opined that "███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████"  (Ex. 32 at ¶ 57), but he did not know how long that would have taken Goodyear

*without* the alleged knowledge and use of Coda's trade secrets.  (Ex. 36 at 158:18–22.)  Mineur also did not know or consider how much time or money it cost Coda to develop its SIT technology, in general, or the alleged trade secrets, in particular.  (*Id.* at 158:18–159:18.)  As such, the opinion of Goodyear's expert, Sprague, that Goodyear obtained no head start as a result of any information from the 2009 meetings (Ex. 24 at ¶¶ 334–41) stands unrefuted.

Similarly, a third Coda expert, Coughlin, opined that



(Ex. 22 at ¶¶ 665–732.)  However, he failed to show a nexus between any award or grant and any particular trade secret, as opposed to Goodyear's own contributions.  (*See id.*) Despite that "the claimed trade secret must be specifically identified, and its unique economic value explained," *PrimePay*, 2015 WL 2405702, at *22, he never addressed any particular trade secrets, or accounted for the value of Goodyear's contributions.

At most, Coda has evidence of a potential value of a possible business opportunity for a self-inflating tire, but Mineur admitted that



.  (Ex. 36 at 205:24-206:8 ("

").)

None of Coda's experts opined or testified that any of Coda's alleged trade secrets were necessary to commercialize a self-inflating tire to capture that business opportunity.  In fact, Webster's business case evaluation actually refutes the notion that Coda's alleged trade secrets have independent economic value.  She based her valuation for an SIT passenger tire on

Goodyear's valuation of its "On-Wheel" design, which Coda does not even contend uses Coda's trade secrets (because it has no peristaltic pump in the tire wall). (*See* Ex. 38 at 106 and Sched. 11.3 (citing GY00604627, tab "Financial Value Summary" (Ex. 39)); Ex. 40 (describing AMT on-wheel concepts).) Thus, both Coda and Goodyear identified potential market value for a product that incorporates *none* of the alleged trade secrets.

This Court should find, as a matter of law, that Coda has failed to show independent economic value for any of the alleged trade secrets.

### D. Coda Did Not Adequately Protect The Secrecy Of Its Alleged Trade Secrets

The NDA for the meetings between Coda and Goodyear expired on ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮. (Ex. 12 at ¶ 6 ("▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").) Numerous courts have held that a confidentiality agreement of limited duration defeats a claim of trade secrets misappropriation as a matter of law. *See, e.g.*, *Structured Capital Sols., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 835 (S.D.N.Y. 2016) (granting summary judgment of no trade secrets misappropriation where plaintiff disclosed the information pursuant to an NDA that expired a year after it was executed); *Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, No. C-07-00635 JCS, 2008 WL 166950, at *17 (N.D. Cal. Jan. 17, 2008) ("[C]ourts have denied trade secret protection . . . where the information was disclosed under a non-disclosure agreement with only a limited duration."); *DB Riley, Inc. v. AB Eng'g Corp.*, 977 F. Supp. 84, 91 (D. Mass. 1997) (holding plaintiff had not taken reasonable steps to protect its design drawings—which therefore did not constitute trade secrets—because it had provided them to a customer under an agreement maintaining confidentiality only for ten years after the expiration of the agreement); *ECT Int'l, Inc. v. Zwerlein*, 228 Wis. 2d 343, 356, (Ct. App. 1999) ("ECTI does not have a protectible trade secret . . . because it has manifested its intent that the confidentiality of trade secrets expires one

year after an employee terminates his or her employment.").  If Coda's alleged trade secrets were worth what Coda claims they were, the NDA, as a matter of law, did not reasonably protect them.

Coda's owners, moreover, believed that trade secret protection was not a useful way to protect SIT.  As explained  by Daniel  Jackson:



(Ex. 35 at 28:18–25:11.)  Yet, even after Coda became aware, in August 2011, of Goodyear's applications for the '586 and '254 patents—which Coda now claims disclose the alleged trade secrets—Coda chose to do nothing.  Coda had until at least June 23, 2012 to apply for patents on the alleged trade secrets (if it had actually believed they were Coda trade secrets) and trigger interference proceedings against the Goodyear patents to prove prior invention, but did not.  35 U.S.C. § 102(g); *Sears Ecological Applications Co., LLC v. MLI Assocs., LLC*, 652 F. Supp. 2d 244, 252 (N.D.N.Y. 2009).  Indeed, Hrabal was aware his ability to challenge Goodyear's applications, but specifically chose *not* to do so, because Goodyear "

(Ex. 15 at 1.)  Under these circumstances, Coda's decision not to protect its alleged trade secrets by seeking patent protection for them was unreasonable.[17]

### E.  Exclusion Of Coughlin Further Warrants Summary Judgment

Coda relies on Coughlin to establish that Goodyear misappropriated the alleged trade secrets and that the alleged trade secrets meet the statutory definition of protectable trade secrets. Coughlin, however, is neither qualified to offer his opinions nor are his opinions reliable. Without Coughlin's opinion and testimony, Coda cannot establish the essential elements of its claims.  *See Coda v. Goodyear*, (No. 18-1028) Brief for Appellant ECF No. 14 at 37 (Fed. Cir. Dec. 11, 2017) ("Plainly, what the prior art discloses is a complex inquiry, requiring expert testimony.") (citing *Alexsam v. IDT*, 715 F.3d 1336, 1348 (Fed. Cir. 2013); *Proveris v. Innovasystems*, 536 F.3d 1256, 1267 (Fed. Cir. 2008)).

As a polymer chemist, Coughlin lacks the "knowledge, skill, experience, training, or education . . . or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  He has no education, training, or experience related to tire design, engineering, or manufacture.  (Ex. 22 at ¶¶ 4–10.)  He admitted that he is neither a mechanical engineer nor a tire engineer, nor has he ever designed or help design a tire.  (Ex. 21 at 17:4–14.)  All of the Goodyear patents-at-issue, all of the currently alleged trade secrets, and all the relevant prior art relate to the field of mechanical engineering, in general, and tire design, engineering, and manufacture, in particular. No alleged trade secret involves polymer chemistry.  Thus, the specialized knowledge of a chemist, like Coughlin, is no help to the trier of fact.

---

[17] In reality, Coda had existing patents and patent applications that disclosed and claimed the alleged secrets. (*See supra*, Section IV.B.)  However, if there had been something that was not disclosed in earlier filings, Coda could have, and should have, sought patent protection.

Courts have excluded polymer experts as unqualified in tire design and manufacture cases for precisely these reasons. In *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007), the Fifth Circuit affirmed summary judgment and the exclusion of a polymer scientist, Dr. Moore, who the plaintiff hired to testify that Goodyear's tire design or manufacture was faulty. Affirming the district court's rulings, the court found:

> Moore is not a tire expert. He has never been employed in any capacity dealing with the design or manufacture of tires. He has never published any articles regarding tires nor has he ever examined a tire professionally prior to this litigation. His only experience with tires is as a consumer. ... Nonetheless, Smith insists that "[a] tire is simply an application of the fundamental issues of polymer science." That is true in some sense, just as it is true that asbestos, heart valves, and cupcakes can all be broken down into their basic atomic particles; but that does not mean an atomic physicist is qualified to testify regarding any asbestosis, medical malpractice, or confectionary issue. It's the science's application to tires that concerns us here, and Moore has absolutely no experience applying polymer science to tires.

*Id.* at 227. As in *Smith*, Coughlin has absolutely no experience applying polymer chemistry to tire design.

Likewise in *Newell Rubbermaid*, where this Court excluded an expert who lacked hands-on design experience. No. 5:08-CV-2632, 2010 WL 2643417 (N.D. Ohio July 1, 2010), *aff'd*, 676 F.3d 521 (6th Cir. 2012). At issue was the design and safety of a forklift that had malfunctioned and injured one of the plaintiff's employees. Interpreting Rule 702's expertise requirement, this Court noted "[a]lthough this requirement has always been treated liberally, as the Sixth Circuit recently observed in *Pride v. BIC Corporation*, 218 F.3d 566 (6th Cir. 2000), that liberal interpretation of this requirement 'does not mean that a witness is an expert simply because he claims to be.'" *Id.* at *3. The Court found that the expert had ample theoretical engineering experience, but nevertheless "although trained in engineering, [he] does not have specific qualifications to be identified as an expert in the field of forklifts." *Id.* at *4. The court explained that "[h]e admits that he has never designed any component of a forklift nor consulted

-46-

with a forklift manufacturer with respect to the design of a forklift.  Further, . . . he never designed or tested any such [safety] alternatives, not even for purposes of his report.  [He] himself has no formal training in the operation of forklifts."  *Id.*

Coughlin is even less qualified.  Unlike the expert in *Newell Rubbermaid*, Coughlin is not a mechanical engineer, and he has neither theoretical nor practical training or experience related to tires.  *See also Huffman v. Electrolux Home Prod., Inc.*, 129 F. Supp. 3d 529, 537 (N.D. Ohio 2015) ("Expertise in the technology of fruit is not sufficient when analyzing the science of apples, and courts have excluded the testimony of engineers because their expertise was not particular to the science involved in the case."); *In re Heparin Prod. Liab. Litig.*, No. 1:08-HC-600000, 2011 WL 1059660, at *10 (N.D. Ohio Mar. 21, 2011).

Further, and as shown above, Coughlin's opinions and testimony are not "the product of reliable principles and methods" because he has not "reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  Coughlin did not analyze the alleged trade secrets either individually on a trade-secret-by-trade-secret basis or even as Coda actually described them, and he did not explain how specific evidence supports a finding that Goodyear misappropriated each of them.  He also improperly used Goodyear's patents as surrogates for the alleged trade secrets, ignoring where the two materially differ.

Coughlin lacks the requisite expertise to assist a fact finder on the issue of self-inflating tire technology and his methodology is fatally flawed.  He is not qualified to testify on any issue for which Coda offers him.  The Court should exclude his opinions and testimony and grant summary judgment in favor of Goodyear.  *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1358 (Fed. Cir. 2005) ("Having already concluded . . . that the district court's [*Daubert*]

-47-

rulings were proper, this court affirms the district court's related grant of partial summary judgment.").

## V.      CODA IS NOT ENTITLED TO DECLARATORY JUDGMENT (COUNT 5)

For at least the same reasons that Coda's misappropriation of trade secrets claim fails, Coda is not entitled to declaratory judgment.  (*See* Dkt. 53-1 at ¶ 181 (Coda basing its declaratory judgment claim on Goodyear patents that allegedly "incorporate or use a misappropriated Coda trade secret").)  Additionally, the OUTSA, does not permit this form of equitable relief for alleged trade secret misappropriation. *See B. Braun Med., Inc. v. Rogers*, 163 F. App'x 500, 508–509 (9th Cir. 2006) (holding that patent assignment is not available relief for alleged trade secret misappropriation under California Uniform Trade Secrets Act, which shares the same operative provisions as the OUTSA).

## VI.     GOODYEAR IS ENTITLED TO SUMMARY JUDGMENT ON CODA'S § 256 INVENTORSHIP CLAIMS (COUNTS 1 & 2)

Hrabal claims to be the sole inventor of the '586 patent and a joint inventor of the '254 patent.  "The general rule is that a party alleging misjoinder or non-joinder of inventors must meet the heavy burden of proving its case by clear and convincing evidence." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004).  An inventor must have contributed to the original conception of the specific idea later claimed in the patent, and the vision for the claimed invention must be "so clearly defined" that it can be reduced to practice without further research. *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1227–28 (Fed. Cir. 1994).  The contribution must be more than known concepts. *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997).  Further, joint inventorship requires some quantum of collaboration with co-inventors leading to a collective conception of the claimed invention. *Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297, 1303 (Fed. Cir. 2010); *Eli Lilly*, 376 F.3d at 1359 ("Joint

inventorship . . . can only arise when collaboration or concerted effort occurs—that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts.").

As demonstrated with Coda's trade secrets misappropriation claim, Coda has insufficient evidence to support Hrabal's inventorship claims. At most, all Hrabal provided Goodyear was his explanation of concepts that he had patented or were otherwise known. *Fina Oil*, 123 F.3d at 1473 ("[A] person will not be a co-inventor if he or she does no more than explain to the real inventors concepts that are well known and the current state of the art.").

With regard to the '586 patent, Coda cannot show Hrabal's conception of "every feature of the subject matter claimed in the patent." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998). The disclosure of the alleged trade secrets (even if assumed to be true) was not a "clearly defined" disclosure of each and every one of the claims in the '586 patent. *See Burroughs Wellcome*, 40 F.3d at 1228; *REG Synthetic Fuels, LLC v. Neste Oil Oyj*, 841 F.3d 954, 962 (Fed. Cir. 2016) ("Conception must include every feature or limitation of the claimed invention.") (citation omitted). Indeed, ██████████████████████████████████████ ██████████████ (Ex. 18.) With regard to the '254 patent, Coda cannot show that Hrabal ever collaborated with his alleged co-inventors with respect to the claimed subject matter. Indeed, Coughlin admitted that ████████████████████████████████████████████ ███████████████████████████████." (Ex. 21 at 216:13–15.)

Moreover, Coda has no evidence corroborating Hrabal's asserted conception of all the limitations of each claim of the '586 patent or any of the limitations in the '254 patent's claims. *Shu-Hui Chen v. Bouchard*, 347 F.3d 1299, 1309 (Fed. Cir. 2003) ("[The corroboration] rule addresses the concern that a party claiming inventorship might be tempted to describe his actions

in an unjustifiably self-serving manner in order to obtain a patent or to maintain an existing patent.") (collecting cases). Coda's lack of corroborating evidence warrants summary judgment in Goodyear's favor. *See, e.g., ScentSational Techs. LLC v. PepsiCo, Inc.*, 773 F. App'x 607, 611 (Fed. Cir. 2019) (affirming summary judgment denying right to correction of inventorship due to insufficient corroborating evidence); *SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 332 F. Supp. 3d 446, 478–80 (D. Mass. 2018).

## VII.    CONCLUSION

For all of the foregoing reasons, Goodyear respectfully requests that the Court grant summary judgment in Goodyear's favor and against Coda on all of Coda's remaining claims and causes for relief.

Dated: February 8, 2021                    Respectfully submitted,


By:    */s/ David M. Maiorana*
        Calvin P. Griffith  (0039484)
        David M. Maiorana  (0071440)
        John C. Evans  (0081878)
        JONES DAY
        North Point
        901 Lakeside Avenue
        Cleveland, Ohio  44114
        cpgriffith@jonesday.com
        dmaiorana@jonesday.com
        jcevans@jonesday.com

        *Attorneys for Defendants The Goodyear*
        *Tire & Rubber Company and Robert*
        *Benedict*

**<u>LOCAL RULE 7.1(f) CERTIFICATION OF COMPLIANCE</u>**

Pursuant to Local Rule 7.1(f) and the Court's order granting an extension of the page limitation (Dkt. 211), I hereby certify that the foregoing Memorandum totals 50 pages in length, excluding the cover page, table of contents, table of authorities, certificates, and exhibits. This Memorandum, therefore, complies with the page limits for memoranda in support of dispositive motions in standard track cases, which applies to this Motion for Summary Judgment pursuant to the Court's Order of January 20, 2021.

By:   /s/ David M. Maiorana
      *An attorney for Defendants The Goodyear Tire & Rubber Company and Robert Benedict*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 16th day of February, 2021, a copy of the foregoing was electronically filed with the Court and will be served upon counsel of record via the Court's electronic filing system.

/s/ David M. Maiorana
*An attorney for Defendants The Goodyear Tire & Rubber Company and Robert Benedict*