# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CODA DEVELOPMENT s.r.o., CODA INNOVATIONS s.r.o., and FRANTISEK HRABAL, | ) ) ) ) | CASE NO. 5:15-cv-1572 |
| PLAINTIFFS, | ) ) | JUDGE SARA LIOI |
| vs. | ) ) | **MEMORANDUM OPINION AND ORDER** |
| GOODYEAR TIRE & RUBBER COMPANY and ROBERT BENEDICT, | ) ) ) | |
| DEFENDANTS. | ) ) | |

Before the Court are two motions for summary judgment filed by defendants Goodyear Tire & Rubber Company and Robert Benedict ("Benedict") (collectively "Goodyear" or "defendants").

The first motion seeks summary judgment on the remaining claims in the first amended complaint.[1] (Doc. No. 221 [Sealed], Defendants' Motion for Summary Judgment on Plaintiffs' Remaining Claims.) Plaintiffs Coda Development s.r.o., Coda Innovations s.r.o., and Frantisek Hrabal ("Hrabal") (collectively, "Coda" or "plaintiffs") filed a brief in opposition. (Doc. No. 244 [Sealed], Corrected Brief Opposing Defendants' Motion for Summary Judgment on Plaintiffs' Remaining Claims.) Goodyear filed a reply brief. (Doc. No. 254 [Sealed], Reply Memorandum in Support of Defendants' Motion for Summary Judgment on Plaintiffs' Remaining Claims.)[2]

---

[1] Doc. No. 53 is the sealed version of the first amended complaint, which is filed in a public, redacted form at Doc. No. 52. Any citations herein to the first amended complaint are to the sealed version.

[2] The public, redacted versions of this motion, opposition, and reply are Doc. Nos. 229, 245, and 256, respectively. Any citations herein to the briefs on summary judgment are to the sealed versions.

The second motion, filed with leave, seeks summary judgment as to trade secret damages. (Doc. No. 222 [Sealed], Defendants' Motion for Summary Judgment as to Trade Secret Damages.) Coda filed a brief in opposition. (Doc. No. 241 [Sealed], Coda's Opposition to Defendants' Motion for Summary Judgment as to Trade Secret Damages.) Goodyear filed a reply brief. (Doc. No. 255 [Sealed], Reply in Support of Defendants' Motion for Summary Judgment as to Trade Secret Damages.)[3]

The briefs are further supported by several declarations: Doc. No. 223 [Sealed], Declaration of David M. Maiorana in Support of Defendants' Motion for Summary Judgment (2/8/2021); Doc. No. 230 [Sealed], Supplemental Declaration of David M. Maiorana (2/17/2021); Doc. No. 240 [Sealed], Declaration of Katherine D. Cappaert in Support of Coda's Opposition (5/5/2021); and Doc. No. 253 [Sealed], Declaration of David M. Maiorana in Support of Defendants' Reply (6/4/2021).[4]

For the reasons set forth herein, Goodyear's motion for summary judgment on Coda's remaining claims is denied and Goodyear's motion for summary judgment as to trade secret damages is denied.

## I. BACKGROUND

### A.    Procedural Summary

On August 9, 2015, Coda filed its complaint against Goodyear, Benedict, and a third defendant (who has since been dismissed), alleging various claims relating to the purported misappropriation by defendants of Coda's confidential and proprietary Self-Inflating Tire ("SIT")

---

[3] The public, redacted versions of this motion, opposition, and reply are Doc. Nos. 225, 243, and 257, respectively. Any citations herein to the briefs on summary judgment are to the sealed versions.

[4] The public, redacted versions of these declarations are Doc. Nos. 226, 231, 246, and 258, respectively. Any citations herein to the declarations are to the sealed versions.

technology, invented by Hrabal (Coda's CEO) and allegedly orally disclosed to Goodyear under a non-disclosure agreement during the course of two meetings in January and June of 2009. The original complaint set forth thirteen claims for correction of inventorship under 35 U.S.C. § 256, one claim under the Lanham Act, and several state law claims (two for fraudulent non-disclosure, one for misappropriation of trade secrets, two for tortious interference with business relations/prospective economic advantage, one for negligent misrepresentation, and one for unjust enrichment).

Goodyear filed a motion to dismiss, which this Court granted on September 29, 2016. (*See* Doc. No. 30, Memorandum Opinion; Doc. No. 31, Judgment Entry.) On October 27, 2016, Coda filed a motion to amend the judgment or for relief from the judgment, along with a motion for leave to file an amended complaint. On September 26, 2017, the Court denied both motions (except for granting a correction to footnote 5 in the original dismissal order). (*See* Doc. No. 42, Memorandum Opinion and Order.)

Coda timely appealed both the dismissal order and the order denying relief from the judgment. On February 22, 2019, the Federal Circuit vacated this Court's orders and remanded for further proceedings. That court noted that it was "aware of no reason why [plaintiffs] should not be permitted to file their proposed amended complaint on remand." *CODA Dev. s.r.o. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1362 (Fed. Cir. 2019).

Following remand, on April 15, 2019, Coda filed the first amended complaint setting forth five claims: three seeking correction of inventorship, one for misappropriation of trade secrets, and one for a declaratory judgment. (Doc. No. 53.[5]) Goodyear answered on May 13, 2019, having been

---

[5] Of the five claims in the first amended complaint, one claim for correction of inventorship (Count Three) was voluntarily dismissed on February 2, 2021. (*See* Doc. No. 218, Order.)

granted an unopposed extension of time. (Doc. No. 57, Answer to First Amended Complaint.) On

August 1, 2019, after consultation with counsel, the Court set the case management dates and

deadlines. (*See* Doc. No. 66, Case Management Plan and Trial Order ["CMPTO"].[6])

Early in the course of discovery, during the first status conference under the case

management plan—with both counsel and all party representatives participating (*see* Minute Order

[non-document] (11/1/2019))—the Court discussed Goodyear's concern that "Coda refuses to . . .

provide a closed-ended response [to certain interrogatories.]" (Doc. No. 74, Defendants' Notice of

Discovery Dispute at 2.[7]) In an order issued following that status conference, the Court determined:

> Under the peculiar circumstances of this case, where the alleged disclosure
> of trade secrets was *entirely oral*, the danger of plaintiffs "molding" their claims by
> way of subsequent supplementation of their original recollection of those two 2009
> conversations is of particular concern. Plaintiffs claim they *told* defendants their
> trade secrets and defendants thereafter misappropriated them. Under that scenario,
> it is entirely reasonable for defendants to request . . . that plaintiffs supply a "closed"
> recital of their recollection of what was orally imparted in the two meetings of
> limited duration in 2009.

(Doc. No. 82, Memorandum Opinion and Order at 7 (emphases in original).) The Court then

ordered:

> Accordingly, the Court will require that plaintiffs supply a "closed"
> response to [the relevant interrogatory[ies]], supplying sufficient specificity and
> description to permit defendants to know what discovery will be relevant and what
> specific claims of trade secret misappropriation they must defend against.
>
> As a final caution, the Court directs plaintiffs to take this discovery mandate
> seriously and *not* provide a response so broad that it is meaningless or so
> incomplete, vague, and evasive that it is useless. Should the Court determine that

---

[6] These original dates and deadlines have been amended and modified at least eight times, primarily due to numerous discovery disputes. (*See* Doc. No. 78, Amended CMPTO; Second Amended CMPTO (non-document) (1/17/2020); Order (non-document) (3/26/2020); Doc. No. 92, Third Amended CMPTO; Doc. No. 96, Fourth Amended CMPTO; Doc. No. 128, Fifth Amended CMPTO; Doc. No. 135, Modified Fifth Amended CMPTO; and Doc. No. 184, Second Modified Fifth Amended CMPTO.)

[7] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

plaintiffs fail in this regard, and do so purposefully, it will reserve the right to sanction plaintiffs up to and including dismissal. This is not prejudicial to plaintiffs because *plaintiffs themselves* are the ones who know what they said to defendants during the two meetings. There is no need to *discover* anything from the defendants in order for plaintiffs to write down their recollection of those meetings.[5]

> [5] Presumably, it was also plaintiffs themselves who made the choice to rely entirely upon an *oral* disclosure, which easily lends itself to the very situation the parties find themselves in now.

> That said, although general supplementation will not be permitted, should it be determined that plaintiffs *inadvertently* failed to include something in their answer[s] . . . , the Court will remain open to entertaining limited supplementation upon a showing of an exceptional reason for doing so.

(*Id*. at 7–8 (footnote and emphases in original).) Coda subsequently supplemented its responses to Goodyear's interrogatories. (*See* Doc. No. 223-20, Plaintiffs' Supplemental Responses to Defendants' First Set of Interrogatories.) In particular, Coda listed twenty-seven trade secrets that it allegedly disclosed to Goodyear relating to its SIT technology. (*Id*. at 24–27.) Since that supplementation, Coda has withdrawn ten of these listed claims of trade secret misappropriation, namely, nos. 6, 8–10, 12–14, 17, 21, and 26. (Doc. No. 223-1, Scott Richey Email to Calvin P. Griffith (2/3/2021) at 2.)

Following resolution of all discovery disputes and completion of discovery, Goodyear filed its two motions for summary judgment—one on the merits of Coda's remaining claims (Doc. No. 221) and the other on damages relating to trade secret misappropriation (Doc. No. 222). This order addresses each motion in turn, after reciting the underlying facts.

**B.     Underlying Facts**

In their briefs, the parties recite some of the facts without specific reference to the record.[8] This is not the best practice for summary judgment. Because the Court itself has no independent

---

[8] Coda's brief is particularly lacking in record citations, instead consisting largely of argument by counsel. On summary judgment, the burden is on the non-movant to establish, with specific reference to the record, that there are

duty to search the record for support and because neither party has objected to the use of this technique, for some of this factual background, the Court will cite to the parties' briefs, merely to set a context for this opinion, and will use pinpoint citations to the record only where necessary. All facts, however, remain to be proven at trial unless, at that time, the parties jointly stipulate to a set of facts.

Hrabal, an engineer from Prague (and Coda's CEO), allegedly spent several years developing technologies on behalf of Coda that enable vehicle tires to self-inflate. (Doc. No. 244 at 8.) Coda's SIT technology maintains tire pressure through use of a peristaltic pump activated by the forces generated by a rolling tire. (Doc. No. 221 at 13.) The idea of a self-inflating tire with a peristaltic pump dates back to 1899. (Doc. No. 223-2, White Paper: "Self-Inflating Tires" (Robert Benedict, June 2009) at 8.) But the *idea* has yet to be successfully developed into reliable *technology*.

In his brief in opposition, Hrabal describes his alleged years-long trial-and-error method relative to his SIT technology. He eventually conceived of his "flap solution," which involves manufacturing a tire "with a flap of rubber in the area of the tire bead," such that "[t]he act of mounting the tire on a rim seals the flap, leaving a hollow channel adjacent to the rim and acting as a pump tube[.]" (Doc. No. 244 at 15.) Hrabal tested the flap solution for several years, but "was unable to get [it] to pump sufficiently to inflate a tire[.]" (*Id*. at 16.) In 2007, Hrabal conceived the idea of building his prototype lab wheel with epoxy rim and sidewall extensions. (*Id*. at 17.) With

---

facts in dispute. Attorney argument untethered to factual citations is unhelpful and inappropriate and causes the Court substantial time to differentiate fact from pure argument. Likewise, string citations to evidence without detailed description or explanation are wholly insufficient.

this arrangement, he was "able to achieve pumping pressures sufficient to inflate a commercial tire." (*Id*.)

Based on his experiments, Hrabal claims that he confirmed two important things: (1) that his flap solution would work if he could get it to stay in place (*i.e.*, not "walk away," as he put it); and (2) that the force actuating the pump in the prototype was coming from the area above the rim[.]" (*Id*. at 17–18.) The tire sidewall is less rigid farther away from the rim and exhibits more flexion. This flexion of the sidewall above the rim area is allegedly what causes the epoxy sidewall extension on his prototype to pinch the tube. (*Id*. at 18.) According to Hrabal, this confirmed that "he could embed a tube in a groove in this location of the sidewall, and achieve the same pumping pressures as his prototype." (*Id*.) That is, he purportedly learned that a sidewall pump could be achieved without relying on the rim of the tire to create a pinch in the tube. (*Id*.)

Hrabal presented his flap solution at the Society of Automotive Engineers ("SAE") World Conference in April 2008, where he won the prestigious Technology Award. (*Id*.) In addition to applying for patents and giving presentations at conferences, Coda published videos on its website about the workings of its SIT technology. (Doc. No. 221 at 15 (citing https://www.youtube.com/watch?v=s7yo84p9JWQ).) Goodyear and others noticed this "exciting SIT concept[.]" (Doc. No. 240-35, Email from David Anckaert to Robert Benedict, et al. (1/7/2009) at 3.) In 2008, at the suggestion of General Motors ("GM"), Goodyear requested a meeting with Coda to discuss the SIT technology (which GM wanted to commercialize in its first electric car—the Chevy Volt). The parties executed a nondisclosure agreement that restricted use of any information disclosed by Coda. (Doc. No. 223-12, Confidential Information Disclosure Agreement ("NDA").) By its terms, all obligations under the NDA expired on January 1, 2012. (*Id*. ¶ 6.)

7

The first meeting between Coda and Goodyear occurred on January 15, 2009 in Frankfurt, Germany. Hrabal and Maros Topoli (Coda's Director of Marketing) met with several Goodyear representatives, including Benedict, who was "responsible for Goodyear's research and development relating to [SIT] technology." (Doc. No. 53 ¶¶ 22, 86; Doc. No. 223-20 at 5–6.) The second meeting took place in Prague on June 15, 2009. Prior to this meeting, in the email chain setting it up, Topoli advised Goodyear that Coda "will be glad to meet you in person and provide answers to your questions[,]" but that "there is not much more to see than what is already on our website." (Doc. No. 223-13, Email from Maros Topoli to Christian Spieker (6/1/2009) at 3.) Several Goodyear representatives participated, including Benedict; Hrabal was accompanied by Topoli and Ladislav Szabo, one of Coda's early investors. (Doc. No. 223-20 at 6.)

Hrabal claims that he and his colleagues, using a PowerPoint presentation (*see* Doc. No. 223-20 at 6 (citing Doc. No. 240-23, PowerPoint Presentation on SIT (1/15/2009))), gave "a multi-hour presentation" that "included the following topics: where in the tire a pump could be located; how the pump should be built and designed; the pressure management systems that could be employed (regulator with dead space or recirculation with a three-way valve); how efficiently the pump could compensate for the tire's typical leakage; marketing strategies; Coda's strategic position and plans for further technical and business development, and Mr. Hrabal's testing of his prototypes." (Doc. No. 223-20 at 6; *see also id.* at 7–21 (describing each topic in detail).)

According to Coda, at the conclusion of the second meeting, Benedict asked to speak privately with his team in the meeting room with the prototype—a request that was granted. Unbeknownst to Coda at the time, Benedict then photographed the prototype and other Coda exhibits. (Doc. No. 244 at 21.)

8

Shortly after the second meeting, Benedict prepared a white paper on self-inflating tires. (*See* Doc. No. 223-2.) Therein, Benedict noted that a market survey "had a very high customer need fulfillment and purchase intent, leading to an exceptionally high unit potential index." (*Id*. at 4.) Benedict stated that "[p]art of the motivation for considering self[-]inflated tires came from the marketing campaign of the CODA company that has been publicizing a self inflated tire concept based on a tire deformation powered peristaltic pump coupled with regulating and check valves and an air passage under the tire bead." (*Id*. at 8.) In his white paper, Benedict describes Coda and its work on the SIT technology. (*Id*. beginning at 16.) He identifies the three components of Coda's system: a tire peristaltic pump, regulating and check valves, and an air passage. (*Id*.) Benedict's ultimate assessment was that Coda has "an idea without functioning prototypes[.]" (*Id*. at 17.) He recommended that Goodyear "develop using best technology" and noted that Coda "has thought about this for many years [and] their architecture may be useful[.]" (*Id*.) Therefore, he recommended exploring a product consisting of:

> A tire integrated, bi-directional rotationally driven, peristaltic pump
> A simple mechanical, single pressure set regulating valve
> An air passage into the tire cavity
> System fault detection from a separate, existing TPMS [tire pressure monitoring system].

(*Id*. at 22.)

On December 21, 2009 (more than a year before the obligations under the NDA expired), Goodyear filed two patent applications covering SIT technology. These applications eventually issued as U.S. Patent No. 8,042,586 ("the '586 Patent"), naming Benedict as one of two inventors (*see* Doc. No. 223-23, "Self-Inflating Tire Assembly") and U.S. Patent No. 8,113,254 ("the '254 Patent"), naming Benedict as the sole inventor (*see* Doc. No. 223-30, "Self-Inflating Tire"). According to Coda, the '586 Patent "consists of Coda's secret idea for the pump tube location[]"

9

(*i.e.*, "tube in groove" location) and "claims as an invention a self-inflating tire with a peristaltic pump formed by a tube embedded in an outward-facing groove in the tire sidewall[,]" and the '254 Patent claimed Coda's invention of a bi-directional pump. (Doc. No. 244 at 23–24.)

In 2011, Goodyear applied for a U.S. Department of Energy grant based on its Air Maintenance Tire ("AMT") technology.[9] (Doc. No. 240-8, Funding Opportunity DE-FOA-0000239.) The principal investigator listed for the project was Benedict. (*Id.* at 19.) Goodyear identified the project objective as "develop[ing] and demonstrat[ing] an in-tire system for automatically maintaining a set air pressure in a Radial Medium Truck (RMT) tire, by way of a tire borne mechanism." (*Id.* at 3.) Goodyear stated that its "AMT concept is innovative due to the placement of the peristaltic pump." (*Id.* at 7.) It specifically noted: "Prior peristaltic pump efforts (e.g. CODA) rely on the rim flange to provide a pinch point for the tire mounted pump. . . . By designing the pinch point of the pump into the tire cross-section, we minimize the effect of the rim geometry on pumping capacity." (*Id.*) Goodyear further identified bi-directionality as an innovative feature—"that the system is designed to work in either rotational direction." (*Id.* at 8.) Based on these representations, Goodyear received over $1.5 million in federal grant monies. (Doc. No. 223-22, Expert Report of E. Bryan Coughlin, Ph.D. at 82 (¶ 203).)

In September 2012, Coda received an unsolicited email from a former Goodyear employee, Rick Parmalee. Parmalee stated that he had met Hrabal "several years ago with regard to SIT." (Doc. No. 240-39, Email from Rick Parmalee to Hrabal (9/20/2012) at 3.) He noted that, while he had been employed by Goodyear at the time, he was presently retired and "[had] a consulting business." (*Id.*) Under a link to an online news article, Parmalee's email stated: "I see in the news

---

[9] Coda also claims that Goodyear incorporated Coda's trade secrets into Goodyear's own AMT technology and applied for separate patents on that technology, in addition to the patents on the SIT technology. (Doc. No. 53 ¶¶ 158, 178.)

today that Goodyear has in my opinion copied SIT. . . . Unfortunate. I thought China was bad." (*Id*. at 3–4.)

After some investigation, Coda filed this lawsuit on August 9, 2015.

## II. SUMMARY JUDGMENT STANDARD

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 487 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); s*ee also Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

### III. MOTION RE: REMAINING CLAIMS (Doc. No. 221)

**A.    Misappropriation of Trade Secrets (Count Four)**

In count four of the first amended complaint, Coda alleges, *inter alia*, as follows:

12

151. As more fully set forth below, Coda's institutional knowledge comprised numerous trade secrets that had independent economic value from not being generally known to, and not being readily ascertainable through proper means by other persons who can obtain economic value from their disclosure or use. Further, they are the subject of efforts that are reasonable under the circumstances to maintain their secrecy. Goodyear acquired Coda's trade secrets through improper means. Goodyear both disclosed and used Coda's trade secrets by filing patents based on those trade secrets, without express or implied consent. Goodyear knew or had reasons to know that the trade secrets were acquired by improper means. Goodyear acquired the trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use, or they were derived from or through a person who owed a duty to Coda and/or Mr. Hrabal to maintain their secrecy or limit their use.

152. As set forth in paragraphs 27 through 72, which describe Coda's and Mr. Hrabal's research and developments in SIT technology, Coda had a vast amount of institutional knowledge concerning SIT technology. While some of that knowledge may have involved public information, Coda's institutional knowledge also included nonpublic technical information, designs, processes, compilations, devices, methods, techniques, improvements, and business information or plans that were trade secrets concerning the SIT technology.

* * *

156. The insights that Mr. Hrabal gave Goodyear, pursuant to the NDA, based on his eight-year journey to the prototype provided Goodyear with untold advantages. They also held significant economic value. The insights gave Goodyear a clear path and identified where potential missteps lay. They told Goodyear, "Hey, go down this path, not that path," or "This path has these problems."

157. Goodyear needed those insights. In fact, before Goodyear ever met with Coda, it had previously attempted and failed to develop a self-inflating tire called the Cycloid. Moreover, there was public prior art disclosing the use of a peristaltic pump tube for self-inflating tires well before Goodyear met with Coda. For example, both U.S. Patent No. 7,225,845 (the "Ellman patent") and Coda's '556 application were public in 2007 and disclosed self-inflating tires having peristaltic pump tubes in the tire bead or rim area. Despite those disclosures, Goodyear did not start developing a self-inflating tire in 2007. Nor did Goodyear start developing a self-inflating tire in 2008, after Mr. Hrabal published his article in Tire Technology International. But in 2009, after Goodyear got a brain-drain from Mr. Hrabal and learned about his eight years of self-inflating tire development, which included substantial amounts of non-public, confidential and trade secret information, Goodyear started filing for patents on self-inflating tires.

158. Indeed, less than six months after meeting with Mr. Hrabal to view, evaluate, and discuss his prototype, Goodyear filed two patent applications on self-inflating tire technology, both containing Coda trade secrets gleaned from that meeting, and their prior meeting and related correspondence. Since then, Goodyear has obtained at least 67 issued patents on self-inflating tire technology, a massive portfolio built on top of trade secrets stolen from Coda. It also developed its own self-inflating tire product called the Air Maintenance Tire, or AMT, which appears to contain at least Coda's seminal tube in the sidewall groove invention. Goodyear has never denied that the AMT is based on Coda's technology.

159. Instead of continuing its development efforts after its Cycloid disaster, Goodyear eschewed any self-inflating tire technologies. Goodyear only became interested in self-inflating tires again after meeting with Coda. But instead of partnering with Coda—which was the stated reason for Goodyear's request to meet with Coda and view Coda's prototype—Goodyear simply took what it learned from Coda and used that information to obtain patents, make its own product, and get a head-start on further self-inflating tire development.

(Doc. No. 53.) Count four then outlines in significant detail "specific examples of Goodyear's theft of Coda's trade secrets[,]" (*id.* ¶¶ 162–177), concluding with the following allegations:

178. Goodyear disclosed, without Plaintiffs' knowledge or consent, Plaintiffs' trade secrets by, among other things, publicly disclosing them to the United States Patent Office in its patent applications, and to the world by allowing those patent applications to be published; and by sharing Plaintiffs' trade secret in its presentation to the Department of Energy, Project ID ## VSS085. Goodyear also acquired Plaintiffs' trade secrets through improper means including, but not limited to, promising to abide by the terms of an NDA and then later violating that NDA by applying for patents on Plaintiffs' trade secrets, or on technology derived from Plaintiffs' trade secrets, without ever informing Plaintiffs it was doing so or engaging in a formal joint development project as contemplated in the NDA. Plaintiffs are informed and believe that Goodyear has also incorporated Plaintiffs['] trade secrets into its AMT tire, which is currently in fleet testing and will soon become commercially available.

179. Mr. Hrabal has been, and continues to be harmed by Goodyear's incorporation of Coda's trade secrets into Goodyear's patent applications.

(*Id.*)

The Ohio Uniform Trade Secrets Act ("OUTSA" or the "Act"), Ohio Rev. Code § 1333.61, *et seq.*, authorizes an action for trade secret misappropriation. In order to prevail on an OUTSA

claim, "a plaintiff must prove: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Advance Wire Forming, Inc. v. Stein*, No. 1:18-cv-723, 2020 WL 5026523, at *19 (N.D. Ohio Aug. 25, 2020) (citing *Tomaydo-Tomahdo, LLC v. Vozary*, 82 N.E.3d 1180, 1184 (Ohio Ct. App. 2017)); *see also Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008).

"The question of whether something is a trade secret is a question of fact to be determined by the trier of fact upon the greater weight of the evidence." *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003) (per curiam) (citing *Valco Cincinnati, Inc. v. N & D Mach. Serv., Inc.*, 492 N.E.2d 814, 819 (Ohio 1986)); *In re Rev. of Alt. Energy Rider Contained in Tariffs of Ohio Edison Co.*, 106 N.E.3d 1, 9 (Ohio 2018).

OUTSA defines "trade secret" as "information" that satisfies both of the following:

(1)    It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2)    It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D). The Ohio Supreme Court has established a six-factor test for determining whether information constitutes a trade secret pursuant to OUTSA:

(1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

15

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E.2d 661, 672 (Ohio 1997) (citing *Pyromatics, Inc. v. Petruziello*, 454 N.E.2d 588, 592 (Ohio Ct. App. 1983) (further citation omitted)). "No single factor is dispositive." *Hance v. Cleveland Clinic*, __ N.E.3d __, 2021 WL 1699909, at *5 (Ohio Ct. App. Apr. 29, 2021) (citation omitted).

"[O]nce material is publicly disclosed, it loses any status it ever had as a trade secret." *State ex rel. Rea v. Ohio Dep't of Educ.*, 692 N.E.2d 596, 601 (Ohio 1998) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002, 104 S. Ct. 2862, 81 L. Ed. 2d 815 (1984)[10]; *MP TotalCare Servs., Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 966–67 (N.D. Ohio 2009) (finding that by publicly displaying its "wound care decision tree" at conferences for wound care suppliers, plaintiff extinguished any claim to trade secret protection).

"A plaintiff is required to identify a trade secret with specificity to separate the secret from general knowledge." *AtriCure, Inc. v. Jian Meng*, 842 F. App'x 974, 980 (6th Cir. 2021)[11] (citing *Alice's Home v. Childcraft Educ. Corp.*, No. 09AP-299, 2010 WL 3448319, at *4 (Ohio Ct. App. Sept. 2, 2010) (stating that the proponent of a trade secret must "fully articulat[e] . . . precisely what aspects of [a product], either in design, material, or function, constitute[ ] a protectable trade secret[]")).

Goodyear asserts it is entitled to summary judgment on this misappropriation claim for several reasons, each of which, according to Goodyear, is an independent basis for summary judgment. The Court will address each argument separately.

---

[10] In *Ruckelshaus*, the Supreme Court recognized that protection would continue to extend in a situation where an individual discloses the secret to someone who is under an "obligation to protect the confidentiality of the information[.]" *Ruckelshaus*, 472 U.S. at 1002. Here, there is no dispute that the parties entered into a NDA. The dispute is over what was disclosed by Coda under the terms of that agreement.

[11] *AtriCure* was an appeal from a district court's grant of a preliminary injunction; to that extent, it is not on all fours with the instant case. Nonetheless, its articulation of the law regarding trade secrets is helpful.

16

### 1.      Failure to describe trade secrets with particularity

Goodyear argues that it is entitled to summary judgment because, contrary to this Court's order requiring a complete list of trade secrets (*see* Doc. No. 82), Coda has failed to describe with particularity the trade secrets it allegedly disclosed to Goodyear, instead responding to the Court's order by supplying a list that "remained vague, indefinite, evasive, and ultimately nonresponsive." (Doc. No. 221 at 20.[12]) Goodyear criticizes Coda's use of broad categories to describe its trade secrets, such as "Coda's knowledge regarding [a topic]," or "Coda's design and development [in a technical area]," or its "strategy[,]" without specifying what the particular design, development, or strategy is. (*Id*. at 21.)

As an example in support of this argument for summary judgment, Goodyear cites Coda's trade secret no. 18 ("TS18"):

> Coda's knowledge regarding how moving the pump relative to the tire bead (axially or radially) affects the leverage and compressive force exerted on the pump, impacts the ability to open and close the tube, and the magnification of the leverage from the flexion of the sidewall, as demonstrated by the built-out groove of the prototype.

(*Id*. (quoting Doc. No. 223-20 at 26).) Goodyear argues that this statement "[a]t most . . . hints that some aspect of TS18 is somehow 'demonstrated by the built-out groove of the prototype.'" (*Id*. at 21–22.)

---

[12] Goodyear also argues that Coda's expert, E. Bryan Coughlin, Ph.D., has impermissibly recombined and rewritten Coda's trade secret list. (Doc. No. 221 at 22–24.) Goodyear claims that, rather than analyzing each alleged trade secret separately, Coughlin "reshuffled them into eight new combinations and then considered those new combinations *collectively*." (*Id*. at 22 (emphasis in original).) Goodyear asserts that Coda needed to seek leave of Court if it wished to recombine or rewrite its trade secret list. In opposition, Coda responds that Coughlin grouped the trade secrets to efficiently address them. The Court perceives no reason to equate *grouping* the trade secrets (for analysis purposes) with *rewriting* them. In any event, by itself, that would not be a basis for granting summary judgment and, therefore, need not be discussed further.

In opposition, Coda argues that particularity is aimed at reasonable notice to a defendant; it is not an element of a trade secret claim. (Doc. No. 244 at 26.) Coda further argues that Goodyear has focused exclusively on the list, while ignoring the accompanying detailed description of each listed trade secret, and that Goodyear never before claimed that the trade secret list supplied by Coda in response to this Court's order gave inadequate notice for purposes of defending itself. (*Id.*)

Coda argues that Goodyear cannot obtain summary judgment in its favor on *all* of the trade secrets by challenging a *single* trade secret, *i.e.*, TS18. (*Id.* at 28 (quoting *Cincinnati Indus. Mach., Inc. v. VMI Holland BV*, No. 1:09-cv-604, 2012 WL 13109820, at *16 (S.D. Ohio Aug. 15, 2012) ("Whether information is a trade secret is a fact-intensive inquiry . . . [that] must be undertaken for each trade secret [plaintiff] claims.").) Coda insists that TS16, read in conjunction with TS18, illustrates the flaw in Goodyear's argument. TS16 is directed to "Coda's design, development, and testing regarding the feasibility and improvements in self-inflating tire technology by embedding a tube in a groove in a tire sidewall to act as a peristaltic pump." (*Id.* (quoting Doc. No. 223-20 at 26).) Coda argues that Goodyear has been on notice at least from the time Coda was granted leave to amend the complaint that

> Hrabal showed to Goodyear's employees his prototype during the meetings and "pointed out to the Goodyear engineers the location on the prototype's sidewall on which the sidewall extension rested, which was between the rim and the midpoint of the tire sidewall." ([Doc. No. 53 ¶¶ 11–12, 13].) The trade secret is the "location in the sidewall [that] would provide the necessary flexion of the rubber of the tire sidewall to deform the tube and achieve sufficient pumping action to obtain the same results as [Hrabal] achieved with his prototype." (*Id.* ¶¶ 13–14.)

(*Id.* (noting that Goodyear refers to this location as the "bending region.") (citations, as corrected, in original).) Coda argues that its original response to Interrogatory No. 2 "gave notice that the trade secret included 'embedding a tube in a groove in tire sidewall that would act as a peristaltic pump[.]'" (*Id.* at 29 (quoting Doc. No. 240-40 at 29).) The interrogatory response further "made

18

clear that the groove was to be positioned in what Goodyear refers to as the 'bending region,' stating that Mr. Hrabal told Goodyear 'where to embed the prototype's pump tube in the sidewall of the tire (i.e., at the location of the epoxy rim extension) [which] was trade secret information.'" (*Id*. (further quoting Doc. No. 240-40 at 29).)

In reply, Goodyear continues to insist that Coda has been indefinite in identifying its trade secrets and that Coda's reference to TS16 is of no assistance. (Doc. No. 254 at 8.) Goodyear claims that Coda's list of trade secrets must be "complete in itself and should not refer to the pleadings, or to depositions or other documents, or to other interrogatories[.]" (*Id*. at 9.)

Goodyear is correct that Coda was to supply a complete list of its allegedly misappropriated trade secrets. The Court intended that Coda be prevented from making its claims a "moving target"—as its oral disclosure tended to encourage—and that Goodyear be placed on notice as to Coda's claims. Coda supplied a list of twenty-seven trade secrets (*see* Doc. No. 223-20 at 24–27), ten of which it has now withdrawn.

Although the Court agrees that some of Coda's listed trade secrets are anything but a model of clarity, the Court also concludes that it would be inappropriate to grant summary judgment to Goodyear on Coda's trade secret claims given the entirety of the record. The Court acknowledges Goodyear's citation to case law stating that bodies of knowledge do not constitute trade secrets. (Doc. No. 221 at 21 (*citing e.g.*, *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, No. 3:13-cv-82, 2017 WL 4799815, at *4 (W.D. Ky. Oct. 24, 2017) ("[T]rade secrets are not made up of bodies of knowledge, but rather specific facts, formulas, documents, and other particularities.") (citing *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 254 F.R.D. 463, 467 (M.D. Fla. 2008) ("it is insufficient to describe the trade secrets by generic category").) But, although several of the "trade secrets" in Coda's list do mention "Coda's knowledge" of or about a broader topic, each

19

one then identifies specifics that are included in that topical knowledge. Although it is a close call, at this time the Court will permit the issue to be presented to a jury. Whether all of Coda's trade secret claims can withstand a directed verdict will be determined after a presentation of the evidence. If any do, it will become a question of fact for the jury whether any of the itemized components of the various bodies of knowledge identified by Coda might constitute separate trade secrets.

This basis for summary judgment on count four fails.

### 2.      Information was generally known or readily ascertainable, and/or not used

Goodyear next addresses each of Coda's alleged trade secrets separately, pointing out how, in its view, each one was generally known or readily ascertainable. (Doc. No. 221, beginning at 25.) In opposition, Coda argues that it is not a defense that the misappropriated information *could have been* gleaned from public sources, since Goodyear *actually* received the secrets from Hrabal via a confidential relationship. (Doc. No. 244 at 31–32 (citing *Imperial Chem. Indus. Ltd. v. Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 743 (2d Cir. 1965) ("It is no defense in an action of this kind that the process in question could have been developed independently, without resort to information gleaned from the confidential relationship.")).) *See also Vitro Corp. of Am. v. Hall Chem. Co.*, 254 F.2d 787, 793 (6th Cir. 1958) (quoting *Franke v. Wiltschek*, 209 F.2d 493, 495 (2d Cir. 1953) ("It matters not that defendants could have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. The fact is that they did not. Instead they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment.")). In Coda's view, "[t]he Court need not go further with the analysis." (Doc. No. 244 at 32.)

20

This argument by Goodyear cannot form the basis for summary judgment on the trade secrets claim if, in fact, Goodyear actually obtained the relevant information via a confidential relationship with Coda. That is a matter for a fact-finder.[13] Further, although Goodyear now points to many publicly available sources, it is not clear whether it relied on them, as opposed to something it obtained from Coda, when applying for its own patents.

This basis for summary judgment on count four fails.

### 3.     Failure to establish "independent economic value"

Goodyear next argues that "[u]nder Ohio law, a claimant must prove that an alleged trade secret 'derive[s] independent economic value . . . from not being generally known [ ], and not being readily ascertainable . . . .'" (Doc. No. 221 at 50 (quoting Ohio Rev. Code § 1333.61(D)) (further citations omitted).) Goodyear claims that Coda has failed in this regard and, notably, that Coda and all of its damages experts fail to distinguish between Coda's patented technology and its alleged trade secrets. (*Id.* at 51.) Goodyear argues that, [a]t most, Coda has evidence of a potential value of a possible business opportunity for a self-inflating tire . . . ." (*Id.* at 53.)

In opposition, Coda claims that it has "raised a triable issue that the trade secrets 'derive[] independent economic value, actual or potential, from not being generally known . . . [or] readily ascertainable by proper means.'" (Doc. No. 244 at 47 (quoting OUTSA).) Coda argues that, "[o]n this record, a reasonabl[e] juror could find that Goodyear had abandoned its self-inflating tire efforts by 2008, learned of Coda's confidential information in 2009, and rekindled its self-inflating tire project as a result, culminating in its grant awards and industry accolades." (*Id.* at 48.) Coda claims that, in the Sixth Circuit, as even admitted by Goodyear (*see* Doc. No. 221 at 50), "a trade

---

[13] To the extent Goodyear's lengthy argument may be an assertion that none of Coda's listed trade secrets actually *are* trade secrets because they were public knowledge, that too is a question for a fact-finder.

secret's value may be expressed in terms of 'the value [to] the defendant of the secret at the time of misappropriation, the value derived from savings because of increased productivity, or the value derived from savings in research costs.'" (Doc. No. 244 at 48 (quoting *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 486 (6th Cir. 2002)).)

Although, as Goodyear argues, no one has actually exploited the SIT technology to generate sales, Coda argues that this is not a requirement it must prove. Further Coda claims to "have evidence that mainstream tire manufacturers refused to work with Coda, fearing that Goodyear would accuse them of patent infringement." (Doc. No. 244 at 49 (citing Doc. No. 240-1 at 8).)

Coda is correct that a reasonable juror could conclude that Coda was unable to market its product to other tire manufacturers (and thus capitalize on its value) because of the manufacturers' fear of legal entanglements with Goodyear, who appeared to already be pursuing its own SIT technology opportunity.

This argument for summary judgment fails.

### 4.      No reasonable measure to protect the trade secrets

Goodyear claims Coda failed to take reasonable steps to protect its trade secrets. (Doc. No. 221 at 54.) Goodyear argues that, because the NDA entered into by Goodyear and Coda expired less than three years after its execution, such limited duration agreement "defeats a claim of trade secrets misappropriation as a matter of law." (*Id*. (citing cases from other jurisdictions[14]).) In

---

[14] Goodyear cites *Structured Capital Sols., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 835 (S.D.N.Y. 2016) (granting summary judgment that no trade secret misappropriation had occurred in situation where NDA expired a year after it was executed), which in turn cited *Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, No. 07-cv-635, 2008 WL 166950, at *17 (N.D. Cal. Jan. 17, 2008) (noting "courts have denied trade secret protection . . . where the information was disclosed under a [NDA] with only a limited duration") (citing *DB Riley, Inc. v. AB Eng'g Corp.*, 977 F. Supp. 84, 91 (D. Mass. 1997) (holding plaintiff had not taken reasonable steps to protect his design drawings because the confidentiality requirement extended only ten years after the NDA expired); *ECT Int'l, Inc. v. Zwerlein*,

addition, according to Goodyear, even after Coda learned of Goodyear's applications for the '586 and '254 Patents—which Coda now claims disclose its alleged trade secrets—Coda "chose to do nothing." (*Id*. at 55.)

In opposition, Coda asserts that there are material facts in dispute with respect to this matter. It claims that "[d]espite being a small shop, [it] took active measures to protect its confidential information." (Doc. No. 244 at 49–50 (citing *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 724 (7th Cir. 2003) ("expectations for ensuring secrecy are different for small companies than for large companies").) The measures taken by Coda included: (1) regularly requiring NDAs before disclosing confidential information to third parties (Doc. No. 240-20, Ex. T ¶ 42; Doc. No. 223-22, Ex. 22 ¶ 734); (2) marking confidential documents (including test results) with proprietary labels (Doc. No. 240-47, Ex. AZ at 2); (3) password-protecting its computers (Doc. No. 223-22 ¶¶ 735–36); and (4) physically locking its prototypes in a secured area (*id*.).

Coda further argues that the NDA's expiration date is but one factor a jury can consider, in addition to other provisions in the NDA, in deciding whether Coda adequately protected the information as a trade secret. (Doc. No. 244 at 50.) Moreover, under Ohio law, a jury could find the information to be a trade secret even if the parties had not executed *any* NDA. (*Id*. at 51 (citing *Columbus Steel Castings Co. v. King Tool Co.*, Nos. 11AP-351, 11AP-355, 2011 WL 6931518, at *6 (Ohio Ct. App. Dec. 30, 2011) (handshake agreement is sufficient)).)

---

597 N.W.2d 479, 484–85 (Wis. Ct. App. 1999) (finding no protectible trade secrets because the confidentiality requirement in a non-compete agreement expired one year after termination of employment)). Coda distinguishes these cases (*see* Doc. No. 244 at 51), and relies instead upon *BladeRoom Grp. Ltd. v. Facebook, Inc.*, No. 5:15-cv-1370, 2018 WL 1569703, at *7 (N.D. Cal. Mar. 30, 2018) ("the fact that a *contract* expired does not automatically render any information incapable of receiving trade secret protection") (emphasis in original); *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 880 (N.D. Cal. 2018) ("the presence of a contract . . . may support a finding of reasonable measures, but an expired contract does not automatically render any information incapable of receiving trade secret protection").

Coda also argues that the NDA is expressly governed by German law. (Doc. No. 223-12 ¶ 13.) In civil law countries such as Germany, the parties' subjective intent is an important consideration when interpreting an NDA. (Doc. No. 240-3, Article: "Choice of Law and Interpreting Contracts in International Commercial Arbitration" (Leslie Gordon Fagen and Daniel Thacken, 2006) at 4–5.) Hrabal believed, based on his years of experience with NDAs, that the expiration provision did not mean that he was relinquishing his trade secret rights after three years; rather, he believed that "the fact that [the] NDA is terminated should get all parties to the position like if no NDA was signed and no information shared." (Doc. No. 240-20 ¶¶ 38–41.)

Coda also disputes Goodyear's assertion that Coda did nothing after learning of Goodyear's patent applications. As Hrabal explains in his declaration, he began "reaching out to U.S. lawyers to see how to protect Coda from Goodyear's misdeeds[,]" meeting as early as December 2011 with attorney Steven Carlson.[15] (*Id*. ¶ 6.)

There are material factual disputes as to whether Coda took sufficient steps to protect its alleged trade secrets.

### 5.  Coda's expert is unqualified and his opinions are unreliable

Finally, Goodyear argues that Coda's expert, E. Bryan Coughlin, Ph.D. ("Coughlin"), is not qualified and his opinions are unreliable. As a result, according to Goodyear, "Coda cannot establish the essential elements of its claims." (Doc. No. 221 at 56.) As authority for this proposition, Goodyear cites only Coda's brief before the Federal Circuit, where Coda stated: "Plainly, what the prior art discloses is a complex inquiry, requiring expert testimony." (*Id*. (quoting *Coda v. Goodyear*, No. 18-1028, Brief for Appellant, ECF No. 14 at 37 (Fed. Cir. Dec.

---

[15] Steven Carlson, of a law firm in California, was listed as "of counsel" when this lawsuit was filed in August 2015. (*See* Doc. No. 1, Complaint at 39.)

11, 2017) (further citations omitted)).) Therefore, Goodyear seeks summary judgment on the basis that expert testimony is required to prove misappropriation of trade secrets, but Coda's expert must be excluded.

Goodyear specifically asserts that Coughlin, as a polymer chemist, lacks the "'knowledge, skill, experience, training, or education . . . or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue[.]'" (Doc. No. 221 at 56 (quoting Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. E. 2d 469 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. E. 2d 238 (1999)).) Goodyear claims that all of its patents-at-issue, all of the currently alleged trade secrets, and all of the relevant prior art relate to the field of mechanical engineering in general and tire design, engineering, and manufacture in particular—fields that are outside the realm of Coughlin's specialized knowledge as a chemist. (*Id*.)

Goodyear cites a Fifth Circuit case involving tire design and manufacture where both summary judgment and the exclusion of a polymer scientist were affirmed. In *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224 (5th Cir. 2007), the court found:

> Moore is not a tire expert. He has never been employed in any capacity dealing with the design or manufacture of tires. He has never published any articles regarding tires nor has he ever examined a tire professionally prior to this litigation. His only experience with tires is as a consumer. . . . Nonetheless, Smith insists that "[a] tire is simply an application of the fundamental issues of polymer science." That is true in some sense, just as it is true that asbestos, heart valves, and cupcakes can all be broken down into their basic atomic particles; but that does not mean an atomic physicist is qualified to testify regarding any asbestosis, medical malpractice, or confectionary issue. It's the science's application to tires that concerns us here, and Moore has absolutely no experience applying polymer science to tires.

*Id*. at 227. Goodyear claims that here, as in *Smith*, Coughlin has no experience applying polymer chemistry to tire design. (Doc. No. 221 at 57, citing also *Newell Rubbermaid, Inc. v. Raymond*

25

*Corp.*, No. 5:08-cv-2632, 2010 WL 2643417, at \*4 (N.D. Ohio July 1, 2010), *aff'd*, 676 F.3d 521 (6th Cir. 2012) (a case involving the design and safety of forklifts, where this Court excluded an expert who, "although trained in engineering, does not have specific qualifications to be identified as an expert in the field of forklifts.").)

Goodyear claims that Coughlin has even fewer relevant credentials than the expert rejected in *Newell Rubbermaid*. "Coughlin is not a mechanical engineer, and he has neither theoretical nor practical training or experience related to tires." (Doc. No. 221 at 58 (citing cases).) "Coughlin's opinions and testimony are not 'the product of reliable principles and methods' because he has not 'reliably applied the principles and methods to the facts of the case.'" (*Id.* (quoting Fed. R. Evid. 702).) "[Coughlin] did not explain how specific evidence supports a finding that Goodyear misappropriated" Coda's listed trade secrets and he "improperly used Goodyear's patents as surrogates for the alleged trade secrets, ignoring where the two materially differ." (*Id.*)

According to Goodyear, "Coughlin lacks the requisite expertise to assist a fact finder on the issue of self-inflating tire technology and his methodology is fatally flawed. He is not qualified to testify on any issue for which Coda offers him." (*Id.*) As a result, Goodyear claims that it is entitled to summary judgment, as Coda is unable to meet its burden of proof on the trade secret misappropriation claim. (*Id.* (citing *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1358 (Fed. Cir. 2005) ("Having already concluded . . . that the district court's [*Daubert*] rulings were proper, this court affirms the district court's related grant of partial summary judgment[.]").)

In opposition, Coda argues that, although there is no basis to exclude Coughlin, summary judgment would not be warranted even if he were excluded because Coda can establish misappropriation of trade secrets even without Coughlin's testimony. (Doc. No. 244 at 52.)

26

Coda claims that, although expert testimony might be helpful to the jury to explain the prior art and its relationship to Coda's trade secrets, such testimony is not required. Coda claims it does not need Coughlin to establish that it has trade secrets because it can accomplish that with the testimony of Hrabal and, with that information, the jury is competent to evaluate the question of misappropriation. (*Id*. at 52–53.) Coda further argues that it need not have retained an expert on the question of misappropriation because Hrabal himself is qualified to testify in that capacity; Hrabal is able to identify his trade secrets found in Goodyear's public documents. (*Id*. at 53.) Moreover, Coda could also establish misappropriation through cross-examination of Goodyear's engineers that worked on its AMT project. (*Id*.)

In any event, Coda claims that Coughlin should not be excluded as an expert because the primary trade secret here involves "a specific type of self-inflating tire[,]" namely, "[a] peristaltic self-inflating tire[.]" (*Id*.) Coda points out that "[w]hile Goodyear is full of tire engineers and tire experts, Goodyear tried and failed for seven years to make a self-inflating tire." (*Id*.) Therefore, "[s]imply being a tire engineer or tire expert does not necessarily provide expertise on self-inflating tires." (*Id*.) Coda claims that polymer science, Coughlin's field, is *the* most applicable expertise "because it is necessary to understand material properties, bulk properties, flexion, bending, and deformation of the rubber under various strains, conditions, and environment[s] that affect a polymer peristaltic pump integrated within a rubber tire." (*Id*. at 53–54 (citing Doc. No. 223-22 at ¶¶ 4–10).) Coda also claims that Coughlin "consulted with one of Coda's other experts, Mark Mineur, a tire engineer with nearly thirty years' experience working for Goodyear." (*Id*. at 54.) Coda faults Goodyear for "[f]ailing to consider the full scope of Coughlin's background and materials he considered[.]" (*Id*. at 54–55 (citing, among authority, *Berry v. City of Detroit*, 25 F.3d 1342, 1349–50 (6th Cir. 1994) (explaining that aeronautical engineer would be a helpful witness

as to how bumblebees fly, even if the engineer had never seen a bumblebee)).) Finally, Coda distinguishes *Smith*, the case relied upon by Goodyear, noting that it was a products liability case (where the issue was how a conventional tire is supposed to perform), not a trade secret misappropriation case (where the issue is about the concept of integrating a peristaltic pump into rubber—a polymer). (*Id.* at 55.)

In reply, Goodyear claims that, even if Coughlin were theoretically qualified, as argued by Coda, he has never performed the kind of specific tire-related activity that Coda relies upon. (Doc. No. 254 at 31.) In addition, Goodyear asserts that Hrabal,[16] "a primary fact witness and a party," may not testify as an expert because he did not submit an expert report. (*Id.*)[17]

Goodyear is seeking judgment on Coda's trade secret misappropriation claim by summarily rejecting Coda's expert. But Goodyear has not presented a rigorous application of the teachings of *Daubert*, 509 U.S. at 592–93 ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology

---

[16] Goodyear also challenges Richard Klopp, Ph.D., P.E. ("Klopp") as a proper expert for Coda. In a footnote in its opposition brief, Coda asserted that, even if Coughlin were to be excluded, Coda can still rely upon Klopp for expert testimony regarding prior art. (Doc. No. 244 at 52 n.25.) Neither Coda nor Goodyear has raised or fully briefed proper support for, or opposition to, Klopp as an expert. As a result, the Court will not address that issue at this time.

[17] Goodyear makes no mention of the distinctions in Fed. R. Civ. P. 26(a)(2) regarding the disclosure of expert testimony. Rule 26(a)(2)(B) requires written reports only "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Experts who are not "retained or specially employed" are required by Rule 26(a)(2)(C) only to disclose "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." Rule 26(a)(2)(C) "is meant to apply only to so-called hybrid witnesses, *i.e.*, fact witnesses who can also provide expert testimony under Federal Rules of Evidence 702, 703, or 705." *Call v. City of Riverside*, No. 3:13-cv-133, 2014 WL 2048194, at *3 (S.D. Ohio May 19, 2014). The advisory committee notes indicate that this "summary" disclosure "is considerably less extensive than the report required by Rule 26(a)(2)(B)[]" and that "Courts must take care against requiring undue detail" from these witnesses. Fed. R. Civ. P. 26(a)(2)(C) advisory committee's note to 2010 amendment. At this juncture, the Court need not decide whether Hrabal is a "hybrid witness" and, if so, whether an appropriate Rule 26(a)(2)(C) disclosure has been timely made.

underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." (footnotes omitted)). Goodyear merely states in conclusory fashion, without reference to Coughlin's expert report, that Coughlin is not qualified to offer any opinions in this case and that his opinions, in any event, are not reliable.

The Court is not inclined to reject Coughlin as an expert at this juncture, although it does not rule out that possibility should Goodyear, prior to trial, make a properly supported motion in limine under *Daubert*. As a result, this argument for summary judgment on the trade secret misappropriation claim fails.

### 6. Summary Conclusion -- Misappropriation of Trade Secrets (Count Four)

For the reasons set forth, the Court concludes that there are material factual disputes for resolution by a fact-finder that preclude summary judgment on count four. But the Court also acknowledges that a properly-supported *Daubert* motion and/or hybrid-witness motion prior to trial may affect whether there is sufficient evidence to allow an expert witness to testify and/or to submit the case to a fact finder for disposition. To that extent, Goodyear's motion for summary judgment is denied.

### B. Correction of Inventorship (Counts One and Two)

In count one of the first amended complaint, Hrabal alleges that he is either "the first, true, and original inventor of the self-inflating tire assembly claimed in the '586 Patent[,]" or, in the alternative, that he "contributed to the conception of at least one of the inventions claimed in the '586 Patent." (Doc. No. 53 at ¶¶ 115, 121.) Hrabal claims that "Mr. Losey and Mr. Benedict are, through error, named in the '586 Patent as inventors[,]" as neither of them "conceived of, or contributed to the conception of, the inventions claimed in the '586 Patent." (*Id*. at ¶¶ 119, 120.) In count two, Hrabal alleges that he "conceived of, or contributed to the conception of, the

invention of at least one claim of the '254 Patent[,]" and that, as such, he is "an inventor of the '254 Patent." (*Id.* at ¶¶ 129, 130.) Pursuant to 35 U.S.C. § 256,[18] Coda seeks "an Order from the Court requiring correction of the inventorship of [both] Patent[s] and an Order directed to the U.S. Commissioner of Patents (the Director of the U.S. Patent and Trademark Office) requiring issuance of a Certificate of Correction." (*Id.* at ¶¶ 114, 128.)

"The inventors as named in an issued patent are presumed to be correct." *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997) (quotation marks and citation omitted). "The general rule is that a party alleging misjoinder or non-joinder of inventors must meet the heavy burden of proving its case by clear and convincing evidence[.]" *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004).

Relying solely on its arguments for the misappropriation claim, Goodyear makes a cursory argument with respect to the '586 Patent that Coda "has insufficient evidence to support Hrabal's inventorship claims[,]" because "[a]t most, all Hrabal provided Goodyear was his explanation of concepts that he had patented or were otherwise known." (Doc. No. 221 at 60.) Goodyear also argues that Coda cannot show Hrabal's conception of "every feature of the subject matter claimed in the patent." (*Id.* (citation omitted).) With respect to the '254 Patent, Goodyear asserts that Coda

---

[18] Title 35, United States Code, Section 256 provides as follows:

(a) Correction. -- Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent, the Director [of the U.S. Patent and Trademark Office] may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

(b) Patent Valid if Error Corrected.--The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

35 U.S.C. § 256.

cannot show that Hrabal ever collaborated with his alleged co-inventors with respect to the claimed subject matter. (*Id.*)

In opposition, as for the '586 Patent, Coda insists that "the concept of the tube in groove solution was not 'otherwise known.'" (Doc. No. 244 at 55.) It further argues that Goodyear has failed to identify any feature of the claims of the '586 Patent that Hrabal did not provide Goodyear during the 2009 meetings. (*Id.*) As for the '254 Patent, Coda argues that Goodyear's own documents show that Goodyear learned about bi-directionality from Coda. (*Id.* at 56 (citing Doc. No. 240-51, Exhibit BD).)

The Court concludes that there are material factual matters that must be decided by a jury before count one and/or count two can be resolved. Neither is amenable to resolution on summary judgment.

## C.      Declaratory Judgment (Count Five)

In the first amended complaint, Coda alleged as follows in count five:

> 181.    There exists an actual, ripe, and justiciable controversy between Coda and Defendants regarding each party's rights and interests in connection with issued patents and pending patent applications that incorporate or use a misappropriated Coda trade secret in a scope and effect to be determined by the jury (collectively, the "Disputed Patents"), as well as any and all related applications that have been filed or will be filed by Goodyear based on those ideas.

> 182.    As a result of the conduct and events described in detail above, Coda possesses legal ownership, and/or equitable ownership and/or other interests in the Disputed Patents inconsistent with and superior to any interest claimed by Goodyear. Coda's ownership and related interests include: (a) sole legal and equitable ownership of the '586 Patent; (b) joint and equitable ownership of the '254 Patent; (c) joint and equitable ownership of the '784, '661, '955, and '132 Patents; and (d) equitable ownership in all of the Disputed Patents. The Court should so declare pursuant to 28 U.S.C. § 2201.

(Doc. No. 53.)

The first amended complaint originally contained a third count for correction of inventorship of four of the patents listed above in ¶ 182 (*i.e.*, the '784, '661, '955, and '132 Patents); but that third count of the FAC was voluntarily dismissed with prejudice on February 2, 2021. (*See* Doc. No. 218.) Therefore, the Court construes count five as no longer seeking declaratory relief with respect to those four patents.[19] The only patents-in-suit remaining are the '586 Patent and the '254 Patent.

Goodyear has moved for a summary order with respect to count five—Coda's independent claim for declaratory judgment. The Court will resolve the question of available relief at another time.[20] To that extent, for record purposes, this portion of Goodyear's motion is denied without prejudice.

### IV. MOTION RE: TRADE SECRET DAMAGES (Doc. No. 222)

In count four of its first amended complaint, Coda alleges, *inter alia*, that it is "entitled to damages for Goodyear's misappropriation of Coda's trade secrets, including for Coda's actual loss and Goodyear's unjust enrichment, to a reasonable royalty, to attorney's fees, to assignment of

---

[19] The original complaint had sought correction of inventorship for twelve different patents owned by Goodyear ('586 [2 counts], '081, '036, '784, '137, '270, '661, '785, '254, '306, '484, and '126). When Coda filed its first amended complaint, it dropped most of these patents. Correction of inventorship was sought in count one against Goodyear and Benedict for only the '586 Patent and in count two against Goodyear and Benedict for only the '254 Patent; count three sought correction of inventorship against Goodyear for the '784 Patent and the '661 Patent, plus two new patents ('955 and '132). By dismissing count three on February 2, 2021, those four patents were dropped entirely from the case, including from count five.

[20] The only case cited by Goodyear in support of its request is *B. Braun Med., Inc. v. Rogers*, 163 F. App'x 500 (9th Cir. 2006), which was applying the California Unfair Trade Secrets Act, not Ohio law. Coda is seeking declaratory relief under the federal Declaratory Judgment Act, 28 U.S.C. § 2201(a). Such relief is, arguably, not ruled out in a correction of inventorship case. *See Fuma Int'l, LLC v. Steiger*, No. 1:14-cv-2154, 2015 WL 4093349, at *1 (N.D. Ohio July 2, 2015) (denying motion to dismiss complaint brought under 28 U.S.C. §§ 2201–02 that sought "a declaratory judgment regarding the ownership and inventorship of [certain] pending patents" pursuant to 35 U.S.C. § 256). The Court observes that it previously distinguished *Fuma* in its September 29, 2016 order dismissing plaintiffs' complaint. But it did so on grounds other than the availability of declaratory relief under § 256—an issue this Court did not address in its dismissal order. *See Coda Dev. s.r.o. v. Goodyear Tire & Rubber Co.*, No. 5:15-cv-1572, 2016 WL 5463058, at *6 (N.D. Ohio Sept. 29, 2016).

Goodyear's patents that claim subject matter comprising Coda's trade secrets, and to all other fair relief." (Doc. No. 53 at ¶ 150.) In its prayer for relief, Coda seeks various injunctive orders and "actual damages, lost profits, or a reasonable royalty" under OUTSA, as well as "disgorgement of all unjust enrichment" and "treble damages[.]" (*Id.*, Prayer for Relief.)

Goodyear's second motion for summary judgment seeks an order that, as a matter of law, injunctive relief is not available. (Doc. No. 222 at 1.[21]) Goodyear also argues that Coda is not entitled to damages with respect to its trade secrets claim because Coda cannot prove either "actual loss" damages or causation-in-fact, and cannot support its damages calculations.

OUTSA authorizes three kinds of damages for trade secret misappropriation:

. . . Damages may include both [1] the actual loss caused by misappropriation and [2] the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for [3] a reasonable royalty that is equitable under the circumstances considering the loss to the complainant, the benefit to the misappropriator, or both, for a misappropriator's unauthorized disclosure or use of a trade secret.

Ohio Rev. Code § 1333.63(A) (bracketed numerals added). "Scant Ohio caselaw interprets this section[,]" but Ohio Rev. Code § 1333.68 requires that the provisions of the Act be construed "'to effectuate their general purpose to make uniform the law with respect to their subject among states enacting them.'" *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 486 (6th Cir. 2002) (quoting Ohio Rev. Code § 1333.68). Courts therefore "draw on the law of other jurisdictions . . . to aid . . . in construing the Ohio statute." *Id.*

---

[21] OUTSA does permit the enjoining of actual or threatened misappropriation. Ohio Rev. Code § 1333.62. Other than the mere assertion that injunctive relief is unavailable, Goodyear has made *no* argument to explain why that would be so in this case. Therefore, the Court need not address this request by Goodyear.

"Plaintiffs bear the burden of proving damages and may not recover if their entitlement to damages is based upon speculation or conjecture." *Allied Erecting & Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 401 (6th Cir. 2013) (citing *Blair v. McDonagh*, 894 N.E.2d 377, 385–86 (Ohio Ct. App. 2008)). "'If it is certain that damages have resulted, [however,] mere uncertainty as to the amount will not preclude the right of recovery.'" *Id.* (quoting *Fiorilli Constr., Inc. v. A. Bonamase Contracting, Inc.,* No. 94719, 2011 WL 198662, at *4 (Ohio Ct. App. Jan. 13, 2011)); *see also Marzullo v. J.D. Pavement Maint.,* No. 96221, 2011 WL 6141624, at *7 (Ohio Ct. App. Dec. 8, 2011) ("As a general rule, once a plaintiff establishes a right to damages, that right will not be denied because damages cannot be calculated with mathematical certainty." (quotation marks and citation omitted)). Ohio courts have defined sufficient certainty regarding the existence of damages as "'that degree of certainty of which the nature of the case admits.'" *Fouty v. Ohio Dep't of Youth Servs.,* 855 N.E.2d 909, 918 (Ohio Ct. App. 2006) (quoting *Bemmes v. Pub. Emps. Retirement Sys.,* 658 N.E.2d 31, 36 (Ohio Ct. App. 1995) (further citation omitted)).

Goodyear devotes this entire motion to attacking Coda's right to, and calculation of, damages should Coda prevail on its claim that Goodyear misappropriated Coda's trade secrets. But, as Coda points out in its opposition brief, these arguments "at best, are rebuttals to Coda's expert opinion, not grounds for summary judgment." (Doc. No. 241 at 5.) Coda notes:

> At this stage, there is plenty of evidence to go to a jury on damages. In fact, Goodyear recognized the value of Coda's trade secrets, and repeatedly touted the benefits of placement of the peristaltic tube, as claimed in U.S. Patent No. 8,042,586 (the "'586 Patent") to the Department of Energy ("DoE"), as part of its efforts to obtain a $1.5M development grant, which it received. Goodyear also recognized the profit gains it would see with the launch of a SIT. Goodyear's own Rule 30(b)(6) witness admitted that the innovations patented in U.S. Patent No. 8,042,586 (the "'586 Patent")—which covers key trade secrets alleged by plaintiffs here—was the "core" basis for Goodyear's AMT project. The profit forecasts of

34

> AMT valued in the hundreds of millions of dollars. This value is derived from these trade secrets here. As Ms. Webster explains, this value can be quantified by looking at the effects of how Goodyear's misappropriation impacted Coda. *Following Goodyear's destruction of Coda's trade secrets, Coda was unable to find companies interested in licensing its SIT technology because they were concerned about Goodyear's patent protection and work on SITs. This resulted in [ ] lost business opportunities for Coda. It should be left to the jury to determine the value of those lost opportunities.*

(*Id.* (emphasis added).)

Goodyear relies on the fact that, even if it is proven that it misappropriated Coda's trade secrets, since *Goodyear* was never able to capitalize on the idea by producing a commercially viable self-inflating tire, Coda cannot prove damages because it cannot prove that Goodyear profited, nor can Coda show that, had Goodyear not misappropriated the secrets, *Coda* itself would have been able to capitalize on the idea. Goodyear claims this is all speculation.

At first blush, Goodyear's arguments have some appeal. But Coda correctly argues in opposition that "'[t]he most elementary conceptions of justice and public policy require the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'" (*Id.* at 7 (quoting *Broan Mfg. Co., Inc. v. Assoc. Distrib., Inc.*, 923 F.2d 1232, 1236 (6th Cir. 1991) (citation omitted)).)

In *Broan Mfg. Co.*, a trademark infringement action "governed by the law of damages of tort actions[,]" 923 F.2d at 1235, the court noted:

> As a general rule, "damages are not permitted which are remote and speculative in nature." *Agricultural Servs. Ass'n v. Ferry–Morse Seed Co.,* 551 F.2d 1057, 1072 (6th Cir. 1977). "This rule serves to preclude recovery, however, only where the *fact* of damage is uncertain, *i.e.,* where the damage claimed is not the certain result of the wrong, not where the *amount* of damage alone is uncertain." *Grantham and Mann, Inc. v. American Safety Prods.,* 831 F.2d 596, 601–02 (6th Cir. 1987) (emphasis added) (citations omitted); *see also Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562–63, 51 S. Ct. 248, 250, 75 L. Ed. 544 (1931). Indeed, in trademark cases courts draw a sharp distinction between

35

proof of the *fact* of damage and proof of the *amount* of damage. As the Seventh Circuit pointed out:

> When determining damages in an unfair trade practices case, the courts distinguish between the amount of proof needed to show "that some damages were the certain result of the wrong" and the amount of proof needed to ascertain the exact amount of damage. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 267 [66 S. Ct. 574, 581, 90 L. Ed. 652] . . . (1946) (Frankfurter, J., dissenting on other grounds). The plaintiff is held to a lower burden of proof in ascertaining the exact amount of damages because, "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Id.* at 265 [66 S. Ct. at 580].

*Otis Clapp & Son, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738, 745 (7th Cir. 1985). Thus, although to set a damage figure "arbitrarily" or through "pure guesswork" is impermissible, *Ferry–Morse Seed,* 551 F.2d at 1072, "[o]nce the existence of damages has been shown, all that an award of damages requires is substantial evidence in the record to permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages." *Grantham and Mann,* 831 F.2d at 602; *see also Ferry–Morse Seed,* 551 F.2d at 1072 ("A plaintiff 'must present "data from which the amount of probable loss could be ascertained as a matter of reasonable inference."'" (citations omitted)). These are the principles which must be applied to the damages questions before us.

*Broan Mfg. Co. v. Associated Distributors, Inc.*, 923 F.2d 1232, 1235–36 (6th Cir. 1991).

At this juncture, it is yet to be decided whether Goodyear misappropriated Coda's trade secrets. If a jury decides that question in the affirmative, then the question remains whether those trade secrets had any value, notwithstanding Goodyear's admitted inability to capitalize on them. *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 805 F.3d 701, 706 (6th Cir. 2015) ("Where damages are otherwise difficult to measure, 'the value of the secret' to the misappropriating party can 'be a proper yardstick for a damage award.'") (quoting *MAR Oil Co. v. Korpon,* 973 F. Supp. 2d 775, 782 (N.D. Ohio 2013)). This is not a matter for summary judgment, although the Court does not rule out the possibility of judgment as a matter of law following the presentation of evidence.

## V. CONCLUSION

For the reasons set forth herein, Goodyear's motion for summary judgment on Coda's remaining claims (Doc. No. 221 [Sealed] (and Doc. No. 229)) is **denied** and Goodyear's motion for summary judgment on trade secret damages (Doc. No. 222 [Sealed] (and Doc. No. 225)) is also **denied**.


**IT IS SO ORDERED**.

Dated: September 30, 2021
                                                      _____

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**