**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **CODA DEVELOPMENT s.r.o., CODA INNOVATIONS s.r.o., and FRANTISEK HRABAL,** | Case No. 5:15-CV-01572-SL |
| Plaintiffs, | |
| v. | JUDGE SARA LIOI |
| **THE GOODYEAR TIRE & RUBBER COMPANY and ROBERT BENEDICT,** | |
| Defendants. | |

**DEFENDANTS' RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

Defendants—collectively, "Goodyear"—move for judgment as a matter of law (JMOL) pursuant to Fed. R. Civ. P. 50(a).  Plaintiffs—"Coda"—have been fully heard on their trade-secret claims, and no reasonable jury could find that Coda has any specific trade secrets, nor that any such secret was misappropriated by Goodyear.  Further, the Court should grant JMOL of no trade-secret damages to Goodyear, because Coda's claim for damages is speculative and the product of impermissible guesswork by its experts, and also should grant JMOL on Coda's punitive-damages claim on the basis that no reasonable jury could find that Goodyear committed any act of "actual malice" that could possibly merit punitive damages under Ohio law.

## I.      RELEVANT FACTS

### A.      Alleged Trade Secrets.  Coda accuses Goodyear of trade-secret

misappropriation.  Coda says it orally disclosed 27 trade secrets across a few hours during two meetings that took place in January and June 2009—though it now claims misappropriation of just 17.  No one at Coda—certainly not Mr. Hrabal—ever wrote these supposed secrets down before those meetings, or for many years afterward.

In fact, there were no trade secrets—or even thoughts (let alone allegations) of trade-secret misappropriation—until an investment banker and the lawyers he engaged came up with these theories for "potential trade secrets and other Coda ideas used by Goodyear" over six years after the fact.  D-293; Dkt. 358 at 1088:14.  Coda's case-in-chief has laid bare the fact that the first thought of accusing Goodyear of trade-secret misappropriation came from Mr. Jackson, the investment banker, who authored D-293 in November 2015 (three months *after* this suit had been filed) to "get the lawyers thinking about" how to craft a trade-secret case, so those lawyers could "formulat[e] correct trade secrets."  Dkt. 358 at 1089:20-21, 1090:24-1091:2.  According to that 2015 document, Mr. Hrabal did not remember a number of things about what he disclosed at the meetings with Goodyear:  "For many of these, the content of disclosure to Goodyear is

uncertain."  D-293; Dkt. 358 at 1107:5-6.

      **B.**    **Damages.**  Coda seeks as much as $246,000,000 in "actual losses" under the Ohio

Uniform Trade Secrets Act, O.R.C. § 1333.63(A), and has pled a claim for treble damages under

O.R.C. § 1333.63(B).  Coda's damages expert, Webster, has purported to measure those "actual

losses" under a royalty theory.  Yet Coda never even tried to get a patent to license, nor did it put

on any testimony regarding what these nonexistent patent claims might look like or whether they

even claimed patentable subject matter.  Further, Goodyear has never sold a self-inflating tire,

and thus has received zero dollars in revenues to which any conceivable royalty rate could be

applied.  And now that Coda's case-in-chief has closed, it is clear that there is no evidence—and

certainly not clear-and-convincing evidence—that Goodyear acted with actual malice, as the

treble-damages subsection of this statute requires.

      It is against this backdrop that the Court must evaluate the legal basis for letting Coda's

case go forward under Rule 50(a).

## II.    LEGAL STANDARD

      "If a party has been fully heard on an issue during a jury trial and the court finds that a

reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that

issue, the court may . . . (A) resolve the issue against the party; and (B) grant a motion for

judgment as a matter of law against the party on a claim or defense that, under the controlling

law, can be maintained or defeated only with a favorable finding on that issue."  Fed. R. Civ. P.

50(a)(1).  "[V]ague, conclusory statements do not suffice to get a case to a jury."  *Lemon v.

Norfolk S. Ry. Co.*, 958 F.3d 417, 420 (6th Cir. 2020); *see also, e.g.*, *Groeneveld Transport

Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 507 (6th Cir. 2013) ("entirely conclusory"

evidence is insufficient to defeat JMOL); *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286,

1294 (Fed. Cir. 2007) ("little more than conclusory evidence" will not defeat JMOL).

2

"In order to prevail on a misappropriation-of-trade-secret claim in Ohio, a plaintiff must establish: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 985 (N.D. Ohio 2008) (citing *Heartland Home Finance, Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008) (interpreting O.R.C. §§ 1333.61 *et seq.*)).  "An entity claiming trade secret status bears the burden to identify and demonstrate that the material is included in categories of protected information under the statute and additionally must take some active steps to maintain its secrecy." *State ex rel. Besser v. Ohio St. Univ.*, 732 N.E.2d 373, 378 (Ohio 2000).

## III.  ARGUMENT

The Court should grant JMOL on Coda's trade-secret claims—their proofs have failed to establish the existence of actionable trade secrets or misappropriation of any such secrets—and on Coda's "actual" and punitive damages claims.

### A.  Coda's Alleged Trade Secrets 1, 2, 3, 4, 7, 11, 15, 16, 18, 19, 20, 22, 24, 25, And 27 Are Indefinite

As this Court has noted, "'A plaintiff is required to identify a trade secret with specificity to separate the secret from general knowledge.'"  Dkt. 262 at 16, quoting *AtriCure, Inc. v. Jian Meng*, 842 F. App'x 974, 980 (6th Cir. 2021).  *See also Alice's Home v. Childcraft Educ. Corp.*, No. 09AP-299, 2010 WL 3448319, at *4 (Ohio Ct. App. Sept. 2, 2010) (also cited in Dkt. 262 at 16, and noting that it requires "the proponent of a trade secret [to] 'fully articulat[e] . . . precisely what aspects of [a product] constitute[ ] a protectable trade secret[ ]'").  Thus, to be actionable under the OUTSA, a trade secret must be described with particularity.  Dkt. 221 at 19 (citing cases).  To quote the Court, "we have to be exacting."  Dkt. 359 at 1569:15.

This Court has enforced this requirement through a procedural order requiring Coda to

3

disclose its alleged trade secrets—all, again allegedly, disclosed orally to Goodyear—with "sufficient specificity and description to permit defendants to know . . . what specific claims of trade secret misappropriation they must defend against."  Dkt. 82 at 7.  This discovery order came with the Court expressly "reserv[ing] the right to sanction plaintiffs up to and including dismissal."  *Id.* at 7-8.  More recently, the Court has made clear that "the Court has to make that determination" (Dkt. 353 at 173:20), that the "whole purpose of the Court's order" was to carry out this requirement of the substantive trade-secret law (*id.* at 173:25 to 174:4), and that "if they're not defined to the level of legal sufficiency, then obviously the Rule 58 [*sic* in transcript; should be '50(a)'] motion will come into play.  *Id.* at 174:10-11.

This is that Rule 50(a) motion.  For the Court's convenience, Goodyear has attached as Exhibit A to this motion a chart of Coda's alleged trade secrets, showing where each is legally indefinite, or where the evidence demonstrates without material dispute that the "secret" was previously published, or not disclosed to Goodyear in 2009, or not used or disclosed by Goodyear.  Here, we briefly describe the fatal flaws in each of these secrets.

**Pump-Location "Secrets" (15, 16, 18, 19, 24):**  We learned from Coda's experts Webster and Coughlin, and from Coda's counsel, that these five alleged trade secrets are "foundational," in that those secrets "are the heart of a bundle of rights that typically get licensed in this kind of arrangement."  Dkt. 359 at 1394:21-25 (Coda's counsel, Ms. Hartman).  *See also, e.g.*, *id.* at 1397:23-25 (Ms. Hartman again; "the trade secrets are foundational to what Coda was doing and because it was the only solution that functioned and was workable"); *id.* at 1454:24-1455:1 (Webster; "Dr. Coughlin informed me that the pump location trade secret is considered foundational, which means if you don't have it, you're not getting there.").

Coda's pump-location secrets aren't adequately defined as a matter of law.  Each of these

4

five "foundational" alleged secrets are so vague as a matter of pump location that they did not provide Goodyear with fair notice, and have allowed Coda's witnesses to present conveniently malleable theories all throughout trial.

Take **"secret" 16** to start:  "Coda's design, development, and testing regarding the feasibility and improvements in self-inflating tire technology by embedding a tube in a groove in a tire sidewall to act as a peristaltic pump."  While "embedding a tube in a groove in a tire sidewall to act as a peristaltic pump" might qualify as specifying the "design," this secret is absolutely empty of content regarding what "development and testing," let alone "feasibility and improvements," were disclosed.

What is more, Coda itself has confirmed through testimony and arguments that the term "groove" is not sufficiently specific to provide fair notice to Goodyear.  Coda has been trying to avoid the consequences of its prior disclosures of a tube embedded in a "slot" or "crevice" in a tire sidewall.  *E.g.*, D-043 at CODA0004608:16 (2007 PCT application; "slot"); D-058 at GY00000296 (2008 *Tire Technology* article; "the tubing can be created as a crevice in the sidewall"); Dkt. 356 at 679:20-24.  The 2007 PCT says that "[a] hollow hose to contain the chamber 1 can be put in the slot formed by matrix 9" (*id.* at CODA0004627:5-6), and that slot can be created by "cutting with a thermal knife" (*id.* at CODA0004626:33)—exactly how Hrabal created his "groove."  Dkt. 356 at 664:11-23 ("cutting a groove . . . [w]ith the thermal knife").

Next, **"secret" 24**:  "Coda's knowledge regarding the optimal location for placement of a pump in a tire for tire manufacturers, namely, in the sidewall close to, and above, the rim where the tire cyclically deforms in response to deformation."  Several of Coda's alleged trade secrets are stated as "Coda's knowledge regarding . . .," and all are indefinite for failing to specify what that "knowledge" was.  With respect to alleged secret 24, Coda tried to be specific by using the

5

term "namely," but what it then named was a vague location with malleable, relative terms like "close to, and above."  As the Court will recall, Coda has tried to add terms like "avoiding rim crush," *e.g.*, Dkt. 355 at 361:17-362:5; Dkt. 356 at 655:25-656:4, and Coda's expert Coughlin attempted to distinguish this "secret" from a prior-art disclosure by arguing that the disclosure did not show an "optimal placement" because it was "far and away from the rim."  This is exactly the mischief that vague terms like "close to and above" cause—it allows an expert to run amok, just as Coughlin tried to do.

Now, **"secret" 15**:  "Coda's improvements in self-inflating tire technology by assessing alternative locations of a peristaltic pump in the following areas . . . ."  Mr. Hrabal actually seemed put off when Goodyear's counsel pointed out that the alleged secret disclosed neither what the assessments were, nor "what the knowledge is in the alleged trade secret"—he admitted that this secret went to "the knowledge that I gained from this assessment," and when Goodyear's counsel pointed out that this "knowledge that I gained" was not set forth in the alleged secret, he objected that "That's would probably be too long document.  It's, you know, a lot a knowledge that was gained over the years."  Dkt. 356 at 682:22-683:8.  Long or not, if that was his secret, he needed to specify it to give Goodyear fair notice.  He didn't.

Additionally, Hrabal attempted to distinguish the last "alternative location" mentioned in this alleged secret from the 2007 PCT application by attempting to import the "no-rim-crush" requirement that is not to be found in the text of the alleged secret.  This is a second and independent reason it is indefinite.

Turn now to **"secret" 19**:  "Coda's knowledge regarding the behavior of the tire sidewall during the course of tire rotation to evaluate a preferred location for the pump tube based on rigidity, centrifugal forces, and proximity to air source."  Here again, the alleged secret claims

"Coda's knowledge," but doesn't specify what that knowledge was.  Proof that this alleged secret was vague, non-specific, and infinitely malleable came from Hrabal's testimony itself:  In a rambling monologue describing trade secret 19, he included a host of descriptors not to be found in the text of the trade secret—"dead volume," "bead," "hose," "regulator," and "interface."  Dkt. 355 at 426:24-429:1.

Finally, **"secret" 18**:  "Coda's knowledge regarding how moving the pump relative to the tire bead (axially or radially) affects the leverage and compressive force exerted on the pump, impacts the ability to open and close the tube, and the magnification of the leverage from the flexion of the sidewall, as demonstrated by the built-out groove of the prototype."  Here, again, the secret covers Coda's undisclosed knowledge.  Something in Hrabal's head.  Here again, Hrabal tried to take advantage of this vagueness by asserting that this secret involved something called a "scissor effect," but that, too, is nowhere to be found in the text of the secret.

Allowing these secrets—particularly these five allegedly "foundational" ones—to remain in this case would be fundamentally unfair to Goodyear, which has not been provided the adequate notice required by this Court's orders.  They should be removed from the case now.

The same goes for these other, non-"foundational" alleged secrets:

- **Pump-Configuration "Secrets" (1, 2, and 11):**  These "secrets" are inadequately specific as well.  Alleged secret 1 is indefinite because it contains no mention of a "regulator" or "backward circulation," neither of which appears in the alleged secret, and each of which Hrabal tried to add via his testimony.  Dkt. 355 at 462:4-10.  Alleged secrets 2 and 11 are indefinite because they claim "Coda's knowledge of how to design and develop" certain pumps, without specifying what that "knowledge" was.

- **Pressure-Management "Secrets" (3, 4, 20, and 22):**  Each of these alleged secrets is indefinite as well.  Alleged secret 3 was described by Hrabal using a long and drawn-out description of that secret that contained elements never mentioned in the secret ("membrane signaling," "air spring," "peristaltic pump," "the membrane click[ing] out" and "actuat[ing] the inflation of the tire").  Alleged secrets 4 and 20, like several other of Coda's alleged secrets, claim "Coda's

knowledge of how to design and develop" certain tire systems, but never describes what that "knowledge" was. And similarly, alleged secret 22 claims as part of its secret Coda's "knowledge of the different pressure-temperature response characteristics of" the previously listed "alternatives," yet Coda nowhere describes what that "knowledge" was in the language of the secret.

- **Interface "Secret" (7):** This alleged secret claims "Coda's design and development of a multi-purpose interface for transporting air in a self-inflating tire that can" perform a variety of functions. This secret is indefinite because it is claimed purely in functional terms, without any specification of *how* those functions might be carried out, or *what structures* might have been envisioned for accomplishing these various goals. That is indefinite.

- **Marketing/Commercialization "Secret" (25):** Again, as with so many of Coda's alleged secrets, this one claims "Coda's knowledge of potential tire-making cost savings promoted by self-inflating tire technology, by permitting the removal or reduction of the inner liner," without adequately setting forth what that knowledge was. Hrabal's testimony tried to fill these gaps by adding information—the rubber used in an "inner liner" is "expensive rubber," but the rubber used to make the rest of the tire is "cheaper." Dkt. 355 at 412:22-414:4.

- **System "Secret" (27):** This final secret also claims "Coda's knowledge"—this time, the combination of Coda's alleged "pressure management," "pump location," and "interface" trade secrets. Dkt. 355 at 453:7-15. But at least the "pressure management" and "pump location" secrets were themselves inadequately described; combining deficient secrets under the unelaborated heading of "Coda's knowledge" does not make the combined alleged secrets any less deficient.

**B.** **Coda's Alleged Trade Secrets 3, 15, 16, 22, And 24 Are Not Secrets, Because They Were Disclosed To The Public In Patents Or Otherwise**

Another large chunk of Coda's alleged trade secrets cannot be trade secrets at all, because, as listed in Exhibit A, they were disclosed and available to the public before Hrabal's 2009 meetings with Goodyear. This is undisputed on this record, and so JMOL should be granted as to these alleged secrets as well.

Coda itself is responsible for these disclosures. Its 2007 PCT application (D-043), a lengthy patent disclosure with 45 pages of detail that was made public two years before Coda and Goodyear ever met, disclosed "embedding a tube in a groove in a tire sidewall to act as a peristaltic pump," a pump "in the sidewall close to, and above, the rim," and all kinds of other

information that Coda now claims to have been kept secret.  Coda's website (D-047), prototype

(P-886), and its 2008 *Tire Technology* article (D-058), all publicly available long before the 2009

meetings with Goodyear, disclosed (among other things) the supposedly "foundational" pump

location information allegedly orally transmitted to Goodyear in 2009—in particular, the

prototype that Hrabal carried around with him to trade shows and exhibitions, including the

Society of Automotive Engineers "exhibition" in 2008, *id.* at 394:5-18 (where he reaped an

award), which had been visible on the Coda website since at least 2008, *id.*at 407:3, and which

by Hrabal's own admission disclosed "embedding a tube in a groove."  Dkt. 355 at 457:10-13.

Further, the threaded regulator supposedly disclosed in alleged secret 3 was disclosed in

Coda's website video long before the 2009 meetings.  Dkt. 356 at 687:7-19.  It was also the

subject of a 2008 patent application by Coda, Dkt. 355 at 397:2-4, and threaded regulators were

physically shown to Goodyear in the 2009 meetings—but not marked "confidential." Dkt. 356 at

685:15-23.  That negated any possibility that the regulator could be confidential.  D-066 (non-

disclosure agreement) at CODA0002481 ¶ 8 ("All Confidential Information disclosed in

documentary *or tangible form* shall be marked 'Confidential'.") (emphasis added).

Finally, though it should not be necessary for the Court to reach this issue to grant JMOL

for Goodyear, it is undisputed that Coda failed to "take some active steps to maintain [this

information's] secrecy," as Ohio trade-secret law requires.  *State ex rel. Besser*, 732 N.E.2d at

378.  The record is clear that Coda's Hrabal was profligate with his public disclosures—he

presented substantially the same slideshow from the January 2009 meeting at a public conference

in Hamburg, Germany mere weeks later, Dkt. 356 at 585:6-11, and displayed his prototype

containing the "foundational" secrets.  He includes among his alleged secrets—particularly in

trade secret 27—"Coda's technology disclosed in its patents and patent applications."  While

Hrabal attempted to claim at trial that these were still trade secrets until the patent applications were published, Dkt. 356 at 590:1-591:15, there is no evidence that Hrabal took adequate steps to fulfill his legal obligation "to maintain [his alleged secrets'] secrecy." To the contrary, Hrabal actively disclosed this information in public conferences and sought patents—he even admitted that his "intention at the time of the Goodyear presentation, January 2009, was to protect that [pressure-management-system] design through patent protection." Dkt. 356 at 590:10-13. The most Hrabal could say about his efforts to maintain secrecy is that "plans can change" and that he "could take it [meaning the patent application] away" prior to publication "and no one would ever see it." *Id.* at 591:2-10. But what he "could" have done is not probative of Coda having taken "active steps" to maintain secrecy. That is a failure of proof under Ohio law.

### C. Coda's Alleged Trade Secrets 15, 23, And 24 Were Not Disclosed To Goodyear

For the reasons set forth in Exhibit A, none of Coda's alleged secrets 15, 23, and 24 were disclosed to Goodyear in the 2009 meetings. In particular, as for alleged secret 23, testing data was conveyed to Goodyear in "an e-mail from Mr. Hrabal to people at Goodyear," Dkt. 359 at 1639:10-1640:2, *without* a confidentiality designation. P-471 (e-mail). That negates any possible claim that "secret" data was disclosed to Goodyear.

### D. Coda Presented No Evidence Of Goodyear's Use Or Disclosure Of Trade Secrets 1, 2, 5, 7, 23, and 27

Coda presented no evidence that Goodyear used or disclosed trade secrets 1, 2, 5, 7, 23, and 27. These secrets should be removed from the case:

- **Bidirectional and Symmetrical "Secrets" (1 and 2):** Coughlin's argument that the '254 patent (D-191) was somehow evidence that Goodyear used and disclosed the "symmetrical" trade secrets fails—the '254 patent discloses an *asymmetrical* tire assembly; thus, it does not use or disclose the "symmetrical implementation of the pump system" of alleged trade secret 1, or the "symmetrical pump tubes" of alleged trade secret 2. Dkt. 356 at 1614:20-23, 1627:9-17; U.S. Patent No. 8,113,254 at 3:51-55.

10

- **Interface "Secret" (7):**  Hrabal stated that he had no knowledge of a Goodyear prototype that used a pump and interface to inflate the tire.  Dkt. 356 at 878:17-879:1.  Coughlin's testimony was similarly deficient when he attempted to compare the Hinque patent (P-010) with alleged trade secret 7 with vague descriptors not found in the language of that alleged secret (e.g., "circular components").  Dkt. 356 at 1638:24-1639:6.

- **Pump Creation "Secret" (5):**  This alleged secret describes a filament embedding process that involves "coating the filament in a silicone lubricant."  Coughlin cited figure 5-2 from the 2014 AMT closeout report (P-427) that shows "removal of a silicone strip after tire cure."  Dkt. 356 at 1637:1-6.  But a "silicone strip" is not a "filament," nor is that strip coated with a "silicone lubricant."

- **Test Results "Secret" (23):**  Hrabal cannot claim test results as a trade secret when he failed to take reasonable steps to maintain secrecy when disclosing the results to Goodyear.  The confidentiality agreement (D-067) required that all confidential information be marked "Confidential" when disclosed.  Hrabal did not mark the email (P-471) disclosing the test results confidential, as he was required to do under the NDA to maintain secrecy (D-066 at CODA0002481 ¶ 8), and therefore did not take the necessary steps to maintain secrecy.

- **System "Secret" (27):**  The only evidence in the record that Goodyear used or disclosed this trade secret is an unelaborated, conclusory statement by Coughlin "that Goodyear did use and disclose that trade secret."  Dkt. 356 at 1643:17-25.  Conclusory statements like that do not create triable issues to avoid JMOL.

### E.     Plaintiffs Failed To Submit Evidence That The Alleged Secrets Were "Not Generally Known Or Readily Ascertainable"

Finally, plaintiffs failed to submit any non-conclusory evidence that any of their alleged secrets were not generally known or readily ascertainable.  O.R.C. § 1333.61(D)(1).  This was plaintiffs' burden.  *See* Dkt. 359 at 1561:9-21 ("MR. CLOERN: . . . Trade secrets are a little weird because you have to establish, as your plaintiffs' burden, one of the elements is the trade secret is not new and unknown or readily ascertainable.").  The evidence on this essential element of plaintiffs' claims is so thin and conclusory that, as a matter of law, no reasonable jury would be able to render a verdict for plaintiffs on this issue.  *E.g.*, Dkt. 359 at 1595:14-16, 1596:11-12, 1618:7-8; testimony on 9/13/2022 (Coughlin); Dkt. 356 at 539:21-24 (Hrabal).

*      *      *      *

In sum:  Coda failed to make out multiple essential elements of its trade-secret-misappropriation claim as to *every one* of its alleged secrets.  The Court should grant JMOL.

**F.    The Court Should Grant JMOL Of No Damages For Trade-Secret Misappropriation Under the Ohio Uniform Trade Secrets Act**

Regardless of liability under the OUTSA, Coda's claim for trade-secret-misappropriation damages is one no reasonable jury could embrace.  It is a façade—it starts with a speculative foundation, on top of which teeters an edifice of supposition and guesswork.  The law—both the procedural protections supplied by Rule 50(a) as well as the substantive guarantees of damages law—is designed to keep these kinds of threadbare claims from the jury as a matter of law.  The Court should do just that here and remove this speculative damages claim from this case.

Start with the law:  A damages claim of any kind, for any tort, is governed by the basic principle that "damages may not be determined by mere speculation or guess," but must at the very least be shown "as a matter of just and reasonable inference."  *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).  Applying these principles to a claim under the OUTSA, the Sixth Circuit has held that a plaintiff "may not recover" if its damages claim "is based upon speculation or conjecture."  *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 401 (6th Cir. 2013) (citing *Blair v. McDonagh*, 894 N.E.2d 377, 385-86 (Ohio Ct. App. 2008)).

The OUTSA underscores these general principles.  It only authorizes "[d]amages" that "may include both the actual loss caused by misappropriation and the unjust enrichment caused by the misappropriation that is not taken into account in computing actual loss."  O.R.C. § 1333.63(A).  "In lieu" of these measures of damages, "damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty that is equitable under the circumstances."  *Id.*  Here, Coda seeks damages for "actual loss," not for "unjust enrichment."

12

So Coda must "show that the misappropriation *in fact caused* a loss"—it must "demonstrate with reasonable certainty that it suffered a loss" caused by Goodyear's wrongdoing, and "provide some demonstrable link" between the alleged misappropriation and its claimed "actual loss." *Allied Erecting*, 511 F. App'x at 403-04 (emphasis added).

The Court, in denying Goodyear's motion for summary judgment on damages (Dkt. 222, incorporated here by reference), expressly "d[id] not rule out the possibility of judgment as a matter of law following the presentation of evidence."  Dkt. 262 at 36.  Now that Coda has showed all its cards, it is clear that its damages claim is so founded on speculation and guesswork that no reasonable jury could find damages—"actual loss"—here.  Coda's damages case is speculation all the way from root to branch to twig to leaves.

*Hypothetical, Nonexistent Patents.*  The root of Coda's "lost licensing opportunity" damages theory is the unreasonable speculation that, but for Goodyear's alleged misappropriation of its secrets, Coda would have applied for and successfully obtained hypothetical patents that would have claimed the alleged trade secrets.  Webster admitted on cross-examination that this was a prerequisite to her assumption of commercialization of imaginary products.  Dkt. 359 at 1487:13-1488:3.  This Court has encountered this kind of speculative claim before and found it wanting.  In *Davis v. Brouse McDowell*, No. 5:28CV1356, 2009 WL 10703128 (N.D. Ohio May 22, 2009) (Lioi, J.), this Court granted summary judgment to the defendant in a legal-malpractice action, despite plaintiff's claim that, due to the law firm's malpractice, she was prevented from obtaining patents for her ideas.  The Court held that the plaintiff was required to "identify the potential claims that would have supported a patent," *id.* at *13, and show that, but for the malpractice, applications for patents would have been filed containing those patent claims, and "would have resulted in the issuance of patents for her

inventions."  *Id.* at *11.  And in *Brouse McDowell*, the plaintiff failed to "identify the potential claims," let alone demonstrate that those claims would have been patent-eligible subject matter and patentable over prior art, nor did she provide evidence that would allow a reasonable jury to conclude that it was more likely than not that those claims "would have resulted in the issuance of patents."  *Id.* at *13.  The Federal Circuit affirmed.  596 F.3d 1355, 1363-64 (6th Cir. 2010).

Coda's case is even more lacking.  It has not "identif[ied] the potential [patent] claims"— a failure that would make it impossible for this jury to evaluate, in a non-speculative manner, the plausibility of Coda's chain of contingencies leading to its damages claim.  The fact that Coda could have applied for patents, but did not—a fact conceded by Webster, Dkt. 359 at 1549:7-1550:4—makes this claim even more speculative at the start.  In *Russo v. Baxter Healthcare Corp.*, 140 F.3d 6 (1st Cir. 1998), the First Circuit called a trade-secret plaintiff's theory that he "would . . . have obtained foreign patents" a "totally speculative" one, given that he "never applied for such patents (so that, for example, it can never be known whether some wholly separate and different reason would have caused rejection of the applications)."

Indeed, Coda's claim that it would have obtained patents on all alleged trade secrets is even more speculative than in *Brouse McDowell* or *Russo*, because here, in light of 123 years of patents and publications in this area, not to mention Coda's profligate disclosures in articles, trade shows, and published patents and patent applications, it is highly doubtful that Coda could possibly navigate the statutory requirements of novelty (35 U.S.C. § 102(b) (pre-2011 version); 35 U.S.C. § 102(b)(1)(B) (post-2011 version)), let alone non-obviousness (35 U.S.C. § 103).  But all that the Court needs for purposes of JMOL is the fact that Coda has never even attempted to "identify the potential claims that would have supported a patent," *Brouse McDowell*, 2009 WL 10703128, at *13, nor has Coda shown that, but for the alleged misappropriation, applications for

14

patents would have been filed containing those patent claims, and "would have resulted in the issuance of patents for her inventions." *Id.* at *11.

Finally, Webster simply assumes patentability in her damages analysis (because she is not qualified to give any such opinion). Dkt. 359 at 1510:11-1511:9, 1547:6-20. But she has no basis for that assumption because Coughlin never opined that the alleged trade secrets are patentable—not in his report, and not at trial.

***Hypothetical, nonexistent commercial products.*** Next, in order to collect royalties on its nonexistent patents claiming the alleged trade secrets, Coda must conjure commercial products covered by those patents, and further imagine that those illusory products are wildly successful in a nonexistent market. No evidence in the record supports either claim. Webster assumes commercialization without any basis. Mineur, on whom Webster purported to rely, explicitly recanted his opinions regarding commercialization of a self-inflating tire product by Goodyear, or any other tire company, during his deposition. Dkt. 223-36 at 57:11-24. He never supplemented his report to reflect that fact, and instead simply repeated the same disavowed opinions from his report at trial. On cross, he was again forced to admit that he had no basis for such opinions. Dkt. 356 at 1353:25-1354:12; Dkt. 359 at 1500:14-1502:1 ("I'm not testifying that they would have" commercially launched a self-inflating tire).

What is more, no evidence—not even expert-witness speculation—shows what the technical features of these hypothetically wildly successful hypothetical products would be. *See, e.g.*, *Scentsational Techs., LLC v. Pepsi, Inc.*, 13-cv-8645 (KBF), 2018 WL 1889763, at *6-8 (S.D.N.Y. April 18, 2018) (granting summary judgment of no causation and no damages where trade-secret plaintiff offered "commercialization" timelines that were "*ipse dixit*, pure speculation, or both").

15

Given that companies have been trying—without success—to create a commercial self-inflating tire since at least 1899, Coda's fantasy of a swift and successful commercial product released by Goodyear in 2013—with Bridgestone following a year later, and Michelin, and Continental a year after that—blinkers all of the realities, and seeks to have the jury award damages on a completely fanciful—which is to say, impermissibly speculative—theory.  The Court should not allow these speculative fantasies to go to the jury.

**_Speculative Licenses On Nonexistent Patents._**  Coda's suppositions do not end there. Based on the speculation that Coda would have obtained patents covering its trade secrets, and that Goodyear and other tire manufacturers would have commercialized self-inflating tire products using Coda's alleged trade secrets (now converted into nonexistent patents), Coda then branches out to posit that Goodyear would have bought an exclusive license to the nonexistent Coda patent(s) for the full 20-year term of a U.S. patent, with royalty rates of $2 per imaginary passenger tire sold and $8 per imaginary commercial tire sold, thus paying royalties on nonexistent products through 2029.

There is no evidence that Goodyear would have taken a license of any kind from Coda, exclusive or nonexclusive.  The one document touted by Coda, a September 9, 2009 email from Dr. Benedict (an engineer, not a license negotiator, Dkt. 359 at 1518:11-21) about Coda's August 30, 2009 RFI, focused on Coda's existing _patents_, not _trade secrets_.  Further, that email noted that exclusive licenses pose "higher risk[s]," yet there is no evidence in the record that Goodyear (or anyone with licensing authority) either shared that view or preferred exclusive licenses.  The only evidence in the record regarding Coda's willingness to license is Mr. Hrabal's testimony that Coda was "considering" licensing its IP (not just the alleged trade secrets) for $2 per passenger tire and $8 per commercial tire—but Mr. Hrabal made no mention of an exclusive

16

license to Goodyear.  To the contrary, his "plan was to sell the licenses"—plural—to "tire manufacturers"—again, plural.  Dkt. 356 at 544:21-545:1.  And there is no evidence that Goodyear in fact would have agreed to partner with Coda in the manner hypothesized; Webster speculated that this was merely "possibl[e]."  Dkt. 359 at 1489:3-15.

*An Assumed Sublicense Granted To Bridgestone.*  Next, Coda supposes that exclusive licensee Goodyear would have granted a sublicense to its competitor Bridgestone, who in turn would develop and sell more licensed products.  There is, of course, no evidence as to Bridgestone's licensing preferences or practices.  None of Coda's experts spoke to anyone from Bridgestone, and no Bridgestone witness came to trial to tell the jury what royalty rate or other licensing terms they would have agreed to with Goodyear.  Dkt. 359 at 1501:10-19, 1520:13-1521:15.  Moreover, it is not just speculative—but counterintuitive—for Coda to guess that the same Goodyear that it speculated preferred the "higher risk" exclusive license would in the same breath be willing to give up to a competitor the exclusivity that it paid a premium to purchase.  Coda's speculation that vehicle manufacturers desire multiple suppliers is just that—speculation unsupported by evidence.  Dkt. 359 at 1521:16-1524:10.

*Further Assumed Sublicenses Granted To Other Competitors.*  Coda then assumes that Goodyear would have further sublicensed other tire-making competitors, Michelin and Continental.  As with Bridgestone, there is zero record evidence from Michelin, and zero record evidence from Continental.  Dkt. 359 at 1520:13-1521:13.  The jury would have to speculate as to what those companies would have done, even if "exclusive" licensee Goodyear had been willing to license a competitor, and thereby render its "exclusive" license nonexclusive.

*Failure To Apportion.*  Aside from all of this speculation built on assumption premised on hypothesis, Coda's proffered damages claim is not apportioned to the value of the alleged

17

trade secrets as required by controlling law.  To evaluate trade-secret damages, courts look to analogous patent-law principles and the laws of other jurisdictions. *See Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 486 (6th Cir. 2002) (citation omitted).  Plaintiffs must apportion between alleged trade secrets and other, non-trade secret contributions, *Ford Motor Co. v. Versata Software, Inc.*, No. 15-cv-10628, 2018 WL 10733561, at *10-11 (E.D. Mich. July 9, 2018), and between and among alleged trade secrets, as well as those that were *not* misappropriated.  *Id.* at *11; *see also MSC Software Corp. v. Altair Eng'g, Inc.*, No. 07-12807, 2015 WL 13273227, at *12 (E.D. Mich. Nov. 9, 2015).

Webster admitted that she did not value individual trade secrets, but rather valued what she claims to be Coda's lost commercialization opportunity as a whole.  Dkt. 359 at 1531:13-1532:12.  She presented the same opinion at trial regarding the assumed misappropriation of the 17 remaining alleged trade secrets as she presented in her report based on the assumed misappropriation of all 27 alleged trade secrets that Coda originally identified—$246 million.  Dkt. 359 at 1534:20-1536:4.  She further admitted that her calculation would have to change if the jury determined that Goodyear did not misappropriate an alleged trade secret that was "foundational", *id.* at 1537:25-1539:14, but she failed to provide the jury with any mechanism to make any such change or to otherwise explain what that change would be.  That only makes Coda's damages case even more speculative.

*     *     *     *

That is more than enough for the Court to conclude that Coda's damages claim is so grounded in speculation and guesswork that it cannot go to the jury—it is based on a foundation of vapor (the hypothetical, never-applied-for patents on undefined patent claims), on which an imaginary, even counterintuitive structure of licenses, sublicenses, and commercialization has

18

been erected through expert-witness legerdemain.  *See Alcatel USA, Inc. v. Cisco Sys., Inc.*, 239 F. Supp. 2d 660, 668 (E.D. Tex. 2002) ("[T]hese assumptions and opinions, all of which serve as the foundation for Alcatel's damage theory, are simply too speculative.  A break or non-occurrence in any of the above chain of events would eviscerate the foundation of Alcatel's damages, and consequently, Alcatel's damage theory is rendered exceedingly uncertain.").

Still, there are other fatal problems with Coda's damages model—it doesn't account for other technical contributions beyond the ill-defined and hypothetically patented trade secrets (Dkt. 222 at 16-18); it doesn't take into account the alleged contributions of the alleged trade secrets incorporated into the hypothetical patents on a claim-by-claim basis (*id.* at 18); and it offers nothing but "pie-in-the-sky damages" conjecture as to the vast assumed sales of these hypothetical products (*id.* at 19-20, quoting *Telxon Corp. v. Smart Media of Delaware, Inc.*, 2005-Ohio-4931, ¶ 110 (Ct. App. 9th Dist. 2005)).

Those matters have already been briefed, and to belabor them again would be to gild the lily.  They are separate and independent reasons for granting JMOL under Rule 50(a) here.  But the most straightforward and fundamental reason that JMOL should be granted here is that Coda has not put on any case of "actual loss" under the statute—instead, it has presented a royalty theory based on a chain of assumed events so speculative as to be counterintuitive, dreamy fantasy.  This is not "actual loss" under the statute.  (And, it bears noting that it could not be a "reasonable royalty" under the statute, either, for such a royalty would have to be premised on an actual royalty base like actual sales revenues or profits, not an imaginary royalty base crafted wholly out of the hopes and dreams of Coda and its expert witness.)

JMOL should be granted.

### G.     The Court Should Grant JMOL Dismissing Coda's Punitive-Damages Claim

Coda seeks treble damages pursuant to the OUTSA.  Dkt. 53-1 at 80.  But it has put on no

evidence that would allow a reasonable jury to find, by clear-and-convincing evidence, that Goodyear acted willfully and maliciously toward Coda.

O.R.C. § 1333.63(B) provides that "punitive or exemplary damages" up to trebled damages may be awarded in trade-secret cases, but only "[i]f willful and malicious misappropriation exists."  Ohio courts understand "willful and malicious"—a standard written by the legislature in the conjunctive—as requiring "actual malice":  "The combined definitions of 'willful' and 'malicious' are . . . similar to the definition of 'actual malice' used for purposes of determining the appropriateness of a punitive damages award at common law, i.e., '(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'"  *Becker Equip. v. Flynn*, 2004-Ohio-1190, ¶ 16 (Ohio Ct. App., 12th Dist. 2004) (quoting *Calmes v. Goodyear Tire & Rubber Co.*, 575 N.E.2d 416, 419 (Ohio 1991), in turn quoting *Preston v. Murty*, 512 N.E.2d 1174, 1174 (Ohio 1987)).

Even assuming there were sufficient evidence to allow the jury to find misappropriation at all, the evidence could not support a reasonable jury finding that such misappropriation was actually malicious in nature.  The fact that actual malice must be found by the heightened clear-and-convincing evidence standard only underscores the absence of evidence here:  No reasonable jury could find that Goodyear misappropriated Coda's alleged secrets with actual malice, by clear-and-convincing evidence, on the evidence submitted by Coda, particularly given that these alleged secrets were never even articulated until after this suit was filed.

At minimum, this claim should be removed from the jury's consideration.

## IV.    CONCLUSION

For these reasons, the Court should order judgment as a matter of law in favor of Goodyear.

Dated: September 13, 2022                    Respectfully submitted,


                                             */s/  David M. Maiorana*
                                             Calvin P. Griffith (0039484)
                                             David M. Maiorana (0071440)
                                             John C. Evans (0081878)
                                             JONES DAY
                                             North Point
                                             901 Lakeside Avenue
                                             Cleveland, Ohio  44114
                                             cpgriffith@jonesday.com
                                             dmaiorana@jonesday.com
                                             jcevans@jonesday.com

                                             Gregory A. Castanias (*pro hac vice*)
                                             Tracy A. Stitt (0079949)
                                             JONES DAY
                                             51 Louisiana Ave., N.W.
                                             Washington, DC  20001
                                             gcastanias@jonesday.com
                                             tastitt@jonesday.com

                                             *Attorneys for Defendants The Goodyear Tire*
                                             *& Rubber Company and Robert Benedict*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of September, 2022, a copy of the foregoing was electronically filed with the Court and was served upon counsel of record via the Court's electronic filing system.

/s/ David M. Maiorana
One of the Attorneys for Defendants