2654

1                     UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF OHIO
                          EASTERN DIVISION

3

4  CODA DEVELOPMENT s.r.o. CODA
    INNOVATIONS s.r.o., et al.,

5

           Plaintiffs,        Case No. 5:15CV1572

6                          Akron, Ohio
       vs.                Friday, September 16, 2022

7                          8:45 a.m.
  THE GOODYEAR TIRE & RUBBER

8  COMPANY, et al.,

9         Defendants.

10

11                   TRANSCRIPT OF TRIAL
            VOLUME 10, PAGES 2654 THROUGH 2789

12           BEFORE THE HONORABLE SARA LIOI
             UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15  For the Plaintiffs:  Boyd T. Cloern
                    Dwight J. Draughon, Jr.

16                 Leah M. Quadrino
                    Scott M. Richey

17                 Steptoe & Johnson - Washington
                    1330 Connecticut Avenue, NW

18                 Washington, DC 20036
                    (202) 429-6436

19

                    Stacie R. Hartman

20                 Steptoe & Johnson - Chicago Monroe St.
                    227 West Monroe Street, Suite 4700

21                 Chicago, Illinois 60606
                    (312) 577-1258

22

                    Stephen W. Funk

23                 Roetzel & Andress
                    222 South Main Street

24                 Akron, Ohio 44308
                    (330) 849-6602

25

2655

```
 1   For the Defendants:  Calvin P. Griffith
                          John Charles Evans
 2                        Thomas S. Koglman
                          Jones Day - Cleveland
 3                        901 Lakeside Avenue
                          Cleveland, Ohio 44114
 4                        (216) 586-3939

 5                        Gregory A. Castanias
                          Tracy A. Stitt
 6                        Jones Day
                          51 Louisiana Avenue, N.W.
 7                        Washington, DC 20001

 8
     Court Reporter:      Caroline Mahnke, RMR, CRR, CRC
 9                        Lori A. Callahan, RMR, CRR
                          Federal Building & U.S. Courthouse
10                        2 South Main Street, Suite 568
                          Akron, Ohio 44308
11                        (330) 252-6021

12

13

14

15

16

17

18

19

20

21

22

23
     Proceedings recorded by mechanical stenography; transcript
24   produced by computer-aided transcription.

25
```

2656

1          Friday, September 16, 2022

2          (Outside the presence of the jury, 8:44 a.m.)

3          THE COURT:  We're going to handle some

4    preliminary matters this morning before we bring the jury in

08:45:03  5    and I instruct them on the law and we hear your closing

6    arguments.

7          The fist thing, how did our exhibit crew do?  Are we

8    complete.

9          Mr. Evans, do you want to report since you're trying

08:45:24 10    to admit exhibits, on behalf of the defendants?

11          MR. EVANS:  Yes, Your Honor, we conferred with

12    plaintiffs and we submitted the plaintiffs this morning.

13          THE COURT:  Submitted the papers.

14          MR. EVANS:  To Ms. Callahan who I believe took

08:45:39 15    them back to chambers.

16          THE COURT:  So we have an agreed list.

17          MR. EVANS:  Yes, Your Honor.

18          THE COURT:  No issues.

19          MR. EVANS:  No, Your Honor.

08:46:04 20          MS. QUADRINO:  No, Your Honor.

21          THE COURT:  When did you do this because we were

22    here pretty late last evening.  It must have been between

23    the 3:32 e-mail.

24          MS. QUADRINO:  Right.

08:46:17 25          THE COURT:  So the Court will, since there is an

 1    agreement and no issues to bring before the Court, I will

 2    admit the exhibits for both parties that have been offered.

 3        And I can see a problem here that I want to address

 4    because I want to make sure we have complete lists.

08:46:57  5        So I'm going to step down, I'm going to ask Ms.

 6    Quadrino and Mr. Evans to head my way, because I want to

 7    make sure we do this correctly.

 8        So this is your -- this list of 14 pages is the

 9    plaintiff's original list.

08:47:13 10            MS. QUADRINO:  Yes, Your Honor.

11            THE COURT:  And then this list of three pages is

12    the defendant's list, and any that plaintiff may have wanted

13    as well.

14            MS. QUADRINO:  Correct.

08:47:23 15            THE COURT:  After the defendants list.

16            MR. EVANS:  That's correct.

17            THE COURT:  Okay.  I just want to make sure that

18    they were going to have two --

19            MS. QUADRINO:  And each sides reflects the

08:47:30 20    evidence that was brought there during that case in chief --

21            THE COURT:  Sure.  And I understand that.  I

22    thought we were going to compile it under one.

23            MS. QUADRINO:  I do believe there is an effort

24    underway to get a joint list if that's helpful, but for the

08:47:52 25    record's sake, since you already have a list from the

         1    plaintiff's side --

         2               THE COURT:  That's fine.  I just wanted to be

         3    clear.  I'm completely fine.

         4         So these two, then these two lists are the exhibits

08:48:03  5    that have been offered, and I hereby admit all exhibits.  I

         6    appreciate everyone's cooperation in working through this

         7    cooperatively and collegially, I'm sure.

         8         All right.  The next issue to discuss with jury

         9    instructions and verdict forms.

08:48:34 10         Again, we met for hours last evening in a jury charge

        11    conference and again this morning.  Through the evening and

        12    morning I was receiving e-mails from the attorneys.  And I

        13    really appreciate everyone's thoughtful input.

        14         So I have now given you a fourth draft of the jury

08:49:04 15    instructions with the latest red line changes and also the

        16    verdict forms.

        17         I do -- there is one addition I need to make on the

        18    verdict form.  I realized I had forgotten to do that

        19    relative to the damages.

08:49:20 20         Are you proposing that we do that on number 5?  Oh,

        21    no.  I guess it is there.  I'm sorry.  It's already there.

        22               MS. QUADRINO:  It is.

        23               THE COURT:  I'm sorry.

        24               MS. QUADRINO:  The correction to the verdict form

08:49:43 25    would only be in connection with a reasonable royalty

1    instruction.

2                    THE COURT:  Sure.

3                    MS. QUADRINO:  That he was the only thing.

4                    THE COURT:  So based upon -- let me put it this

08:49:53 5    way, first of all.  Based upon the Court's rulings -- and

6    I'll put them all on the record -- but are there any further

7    modifications to make to, first of all, the jury

8    instructions?

9                    MS. QUADRINO:  No, Your Honor.

08:50:07 10                    MR. CASTANIAS:  No, Your Honor.

11                    THE COURT:  All right.  Based upon the Court's

12    rulings that we will place on the record, any further

13    modifications to the verdict forms?

14                    MR. CASTANIAS:  No, Your Honor.

08:50:20 15                    MS. QUADRINO:  No, Your Honor.

16                    THE COURT:  And by the way, we do have page

17    numbers on them now except for the first page, of course.

18            Okay.  So I'm going to then have these printed up now.

19    I'll allow the parties to make a record relative to the jury

08:50:44 20    instructions.

21            And, again, I want to thank the attorneys with whom I

22    worked on these instructions for their thoughtful comments

23    and thorough presentation of the issues and the law and

24    their suggestions.

08:51:07 25            So with that, Ms. Quadrino, you're up first.

 1          MS. QUADRINO:  Thank you, Your Honor.

 2          Just two points.  We note that the Court has included

 3     an instruction on the duty of confidentiality, which is

 4     largely derived from the nondisclosure agreement present in

08:51:44  5     this case.

 6          Coda goes not object to this instruction.  We just

 7     wish to note for the record that this is an issue on which

 8     defendants have filed a motion for summary judgment.  There

 9     were legal arguments presented to the Court based on the

08:51:56 10     terms of that nondisclosure agreement, and by our agreeing

11     to including an instruction on this in the jury

12     instructions, we are not waiving the legal positions that we

13     took previously.

14          THE COURT:  Very well.

08:52:06 15          MS. QUADRINO:  Secondly, based on our prior

16     discussions, we understand that Your Honor is likely not to

17     include an instruction on reasonable royalty damages.

18          Coda objects to the exclusion of an instruction on an

19     alternative form of damages based on a reasonable royalty.

08:52:21 20     Pursuant to the Ohio Uniform Trade Secrets Act, that

21     provides in lieu of damages, measured by any other methods,

22     the damages caused by misappropriation may be measured by

23     imposition of liability for a reasonable royalty that is

24     equitable under the circumstances, considering the loss to

08:52:38 25     the complainant, the benefit to the misappropriator or both

1    for the misappropriator's unauthorized disclosure or use of

2    a trade secret.  That's Revised Code 1333.63.

3         Coda is entitled to present alternative theories of

4    damages to the jury.  This Court confirms plainitff's

08:52:57  5    ability to present this theory of damages in its ruling

6    denying defendant's motion in limine seeking to exclude Coda

7    from presenting alternative theory of damages to the jury

8    and specifically finding that, quote, "Shirley Webster's

9    expert report satisfies the notice requirement with respect

08:53:11 10    to a damages theory based on reasonable royalties, no matter

11    that she may have characterized those as actual losses."

12    That's the hearing transcript from August 17, page 10, line

13    14 to 17.

14         Ample evidence has been presented to the jury in the

08:53:25 15    form of documents and fact and expert witness testimony to

16    enable the jury to calculate reasonable royalty damages.

17    And we object to excluding that instruction at this time.

18              THE COURT:  Thank you, Ms. Quadrino.

19         And those are the only two objections then?

08:53:43 20              MS. QUADRINO:  Yes.

21              THE COURT:  Mr. Castanias.

22              MR. CASTANIAS:  Thank you, Your Honor.  Yes.

23         The Goodyear defendants object to giving the damages

24    question to the jury, the punitive damages question to the

08:54:00 25    jury.  Pardon me.

1          Ohio Revised Code 1333.63(B) says, "The Court shall

2     award punitive damages up to treble and actual damages."

3     And the framers of the Uniform Trade Secrets Act, which was

4     adopted by Ohio, explicitly said it in their notes to this

08:54:21  5     draft that this was to be the allocution of responsibilities

6     between Judge and jury, and this is to be the same

7     allocution responsibilities as under 35, United States Code,

8     Section 284, the Patent Acts Enhanced Damages Provision.

9          I think that's adequate to set forth the grounds for

08:54:36  10     our objection.  And the way that our -- the instruction

11     and --

12               THE COURT:  On alternative damages.

13               MR. CASTANIAS:  -- jury form would read, so I'm

14     not going to belabor the point.

08:54:49  15               THE COURT:  Very well.  And I just want to

16     indicate relative to that decision by the Court, since I now

17     think the exchange is complete on that one, is that I was

18     persuaded by 2004 Southern District Ohio decision, Newark

19     versus Sauter, and until the Federal Circuit, the Supreme

08:55:17  20     Court would indicate otherwise, I'm going to follow that

21     law.

22          All right.  Your next point.

23               MR. CASTANIAS:  That's all from the Goodyear

24     defendants.

08:55:25  25               THE COURT:  Okay.  So just stay in place both of

1    you.

2          Relative to the damage alternative of reasonable

3    royalty, I would indicated that Ms. Webster prepared a very

4    extensive report.  In that report, to be sure, she insisted

08:55:53  5    that it was a reasonable -- I'm sorry, that her damage

6    calculation was based upon actual loss.

7          I heard the parties' arguments during the motion in

8    limine, questioned whether it was actual loss, even wrote my

9    opinion in that fashion.

08:56:16  10    When I heard the entirety of the evidence, it was just

11    reaffirmed in my mind that truly the plaintiffs, being the

12    master of their case, and the way they wanted to present

13    their evidence, presented actual loss.  It was err for me to

14    say that was that alternative theory.  It might have been

08:56:37  15    actual loss that had to do with licensing, but it was an

16    actual loss calculation.

17          The evidence in trial primarily addressed that, and

18    the record is clear as to what it is, so I'm not going to go

19    through all the evidence.  We're too close to the time when

08:56:54  20    we need to bring the jurors into the courtroom.

21          But I think it would be inappropriate and there would

22    be no guidance for the jury here as to how should they

23    decide to go with a reasonable royalty calculation, how that

24    would ever be calculated, given the lack of evidence

08:57:21  25    relative to some of that portion of that damage calculation

1    in the Court's estimation.

2         In any event, the plaintiffs, through Ms. Webster's

3    report, made it very clear that they were pursuing an actual

4    damage claim.  I'm at this date finally taking them at their

08:57:51  5    word because those how the evidence was presented even at

6    trial.

7         And so that's the basis in summary for the Court's

8    ruling.

9         The two calculations are different.  And I think it

08:58:05 10    would be very confusing for the jury to hear -- or to

11    receive a jury instruction that if you think the actual loss

12    calculation, which is based on an ideal, absolutely ideal

13    situation where there would be an exclusive license and lots

14    of sublicenses, and lots of sales of the product, to say

08:58:41 15    that that calculation somehow is insufficient, which is what

16    the standard -- or what the jury instruction would indicate

17    doesn't make any sense based upon the evidence.

18         And I believe based upon Coda's argument that they're

19    one and the same, they're not one and the same.

08:59:17 20         But in any event, that, I think, would be confusing to

21    the jury.

22         So with that, you can add anything you want to the

23    record.  I want to go back and finalize jury instructions.

24         Anything further?

08:59:31 25              MS. QUADRINO:  No, Your Honor.

1      MR. CASTANIAS:  No, Your Honor.  Thank you very

2  much.

3      THE COURT:  All right.  We're going to put the

4  jury instructions in order, give you all copies -- would you

08:59:41  5  refer copies e-mailed to you or in paper form?

6      MS. HARTMAN:  May we have both, please?

7      THE COURT:  Both?

8      MR. GRIFFITH:  Paper for me, Your Honor.

9      THE COURT:  What?

08:59:50 10      MR. GRIFFITH:  Paper.

11      MR. CLOERN:  Yeah, I would like a paper copy.

12      MR. CASTANIAS:  And I think the parties would

13  appreciate having an e-mail copy for their records.  Those

14  are free.

09:00:01 15      MR. GRIFFITH:  Can we get it on a white board?

16      THE COURT:  So there will be an entry on the

17  Court's docket that adopts the exhibit lists so that we have

18  a record of the exhibit lists.

19      (Recess taken, 9:00 a.m.)

09:42:55 20      (Outside the presence of the jury, 9:43 a.m.)

21      THE COURT:  All right.  We will be escorting the

22  jurors now that our technical difficulties have been

23  resolved.  And each side will have 70 minutes.

24      Would anyone like warnings?  I know you have teams

09:43:34 25  here.  Would anyone like a warning?

1      No warnings.  Okay.

2      And, Mr. Cloern, are you going to give the initial

3  closing?

4          MR. CLOERN:  I'm going to give the closing, yeah.

09:43:44  5          THE COURT:  Who is going to doing the rebuttal?

6          MR. CLOERN:  I will do the rebuttal.

7          THE COURT:  You're doing the whole thing?

8          MR. CLOERN:  Yes, Your Honor.  I just wanted to

9  know who call upon.

09:43:55 10      What about Mr. Griffith, are you.

11          MR. GRIFFITH:  I am doing the closing.

12          THE COURT:  All right.  So now I know who to call

13  upon.

14      So what we'll do is read the jury instructions,

09:44:22 15  because it's a lot of sitting for the jurors.  Read the jury

16  instruction, take a ten-minute breaks, we'll hear your

17  initial close, Mr. Cloern, take a brief ten-minute break,

18  we'll hear your close, Mr. Griffith, and then we'll go

19  straight to rebuttal because that's usually more condensed,

09:44:42 20  I would presume.

21      We will take a -- oh, no, we won't take a break.  I'll

22  just have the rest of my jury instructions which are like a

23  page or two.  The jury goes to deliberations, so that's the

24  procedure we're going to use.

09:44:56 25      Two little breaks for the jury because otherwise

 1    they're sitting way too long.

 2         (Jury in, 8:45 a.m.)

 3              THE COURT:  Good morning, members of the jury.

 4              JURORS:  Good morning.

 5              THE COURT:  I apologize for the delay in start

 6    time.  It was my primarily due to some technical

 7    difficulties that we had, but those have been worked out.

 8    And appreciate your patience.

 9         On your way into the courtroom you were handed -- you

10    were carrying in your notebooks and you were also given some

11    jury instructions.  There is a tab marked jury instructions

12    in your notebooks.  If you would place those jury

13    instructions and the verdicts forms, as well, in your

14    notebooks, we will proceed.

15         All right.  So this morning the Court will instruct

16    you on the law that applies.  Following my instructions, you

17    will hear from the attorneys relative to closing arguments.

18    Then I will have some very brief instructions for you.  And

19    then you will retire to deliberate on the case.

20         So that's the order of events.

21         We will take two fairly short breaks, one after I read

22    the instructions and one after you hear the plaintiffs'

23    closing argument.

24         So just know that that's how we're going to break it

25    up this morning.

1    So if you would at this time, please turn to your jury

2    instructions.  You will see that on pages 2 and 3 of your

3    instructions, there is a table of contents.  That's just to

4    assist you, should you want to refer to jury instructions

09:48:52  5    during your deliberations.

6    We're now going to begin on page 4.

7    And if you wish, you may read along as the Court reads

8    the instructions to you.

9    Now that you have heard the evidence, it is my duty to

09:49:09  10    instruct you about the applicable law.  It is your duty to

11    follow the law as I will state it and to apply it to the

12    facts as you find them from the evidence in the case.  Do

13    not single out one instruction as stating the law, but

14    consider the instructions as a whole.  You are not to be

09:49:28  15    concerned about the wisdom of any rule of law stated by me.

16    You must follow and apply the law.

17    The lawyers may refer to some of the governing rules

18    of law in their arguments.  If there is any difference

19    between the law stated by the lawyers and as stated in these

09:49:45  20    instructions, you are governed by my instructions.

21    Nothing I say in these instructions indicates that I

22    have any opinion about the facts.  You, not I, have the duty

23    to determine the facts.

24    You must perform your duties as jurors without bias or

09:50:01  25    prejudice as to any party.  The law does not permit you to

1    be controlled by sympathy, prejudice, or public opinion.

2    All parties expect that you will carefully and impartially

3    consider the evidence, follow the law as it is now being

4    given to you, and reach a just verdict regardless of the

09:50:20  5    consequences.

6         During your deliberations, you must not communicate

7    with or provide any information to anybody by any means

8    about this case.  You may not use any electronic device or

9    media such as the telephone, a mobile phone, smartphone,

09:50:38  10   iPhone, or computer, the internet, any internet service, any

11   text or instant messaging service, any internet chat room,

12   blog, or website such as Facebook, Google+, MySpace,

13   LinkedIn, YouTube or Twitter, to communicate to anyone any

14   information about this case or to conduct any research about

09:50:58  15   this case until I accept your verdict.

16        In other words, you cannot talk to anyone on scores

17   responsible request anyone or electronic communicate with

18   anyone about this case.  You can only discuss the case in

19   the jury room with your fellow jurors during deliberations.

09:51:16  20   I expect you will inform me as soon as you become aware of

21   another jurors' violation of these instructions.

22        You may not use these electronic means to investigate

23   or communicate about the case because it is important that

24   you decide this case based solely on the evidence presented

09:51:30  25   in this courtroom.  Information on the internet or available

1   through social media might be wrong, incomplete or

2   inaccurate.  You are only permitted to discuss the case with

3   your fellow jurors during deliberations because they have

4   seen and heard the same evidence you have.

09:51:47   5       In our judicial system, it is important that you are

6   not influenced by anything or anyone outside of this

7   courtroom.  Otherwise, your decision may be made based on

8   information known only by you and not your fellow jurors or

9   the parties in this case.  This would unfairly and adversely

09:52:07  10   impact the judicial process.

11       You may use the notes taken by you during the trial.

12   However, the notes should not be substituted for your

13   memory.  Remember, notes are not evidence.  If your memory

14   should different from your notes, then you should rely on

09:52:22  15   your memory and not your notes.

16       Unless I state otherwise, you should consider each

17   instruction given to apply separately and individually to

18   plaintiffs and to defendants.  You should consider and

19   decide this case as a dispute between persons of equal

09:52:38  20   standing in the community, of equal worth, and holding the

21   same or similar stations in life.  A corporation is entitled

22   to the same fair trial as a private individual.  All

23   persons, including corporations, stand equal before the law,

24   and are to be treated as equals.

09:52:57  25       The burden is on Coda to prove every element of its

1    claim.  Coda bears that burden of proofing its claim by a

2    preponderance of the evidence with the exception of one

3    issue which I will address later.  Failure to prove

4    ascension almost of a claim defeats that claim.

09:53:14    5    To establish by a preponderance of the evidence means

6    to prove that something is more likely so than not so.  In

7    other words, a preponderance of the evidence means such

8    evidence as, when considered and compared with the evidence

9    opposed to it, has more convincing force and produces in

09:53:32   10    your minds a belief that what is sought to be proved is more

11    likely true than not true.  The preponderance of the

12    evidence is also referred to as the greater weight of the

13    evidence.  This standard does not require proof to an

14    absolute certainty since proof to an absolute certainty is

09:53:50   15    seldom possible in any case.

16    In determining whether any fact in issue has been

17    proved by a preponderance of the evidence, you may, unless

18    otherwise instructed, consider the testimony of all

19    witnesses regardless of who may have called them, and all

09:54:03   20    exhibits received in evidence, regardless much who may have

21    produced them.

22    You may not have heard of the term proof beyond a

23    reasonable doubt.  That is a stricter standard that applies

24    in criminal cases.  It does not apply in civil cases such as

09:54:18   25    this.  You should, therefore, put it out of your mind.

1    Unless you are otherwise instructed, the evidence in

2    the case consists of the sworn testimony of the witnesses

3    regardless of who called the witness, all the exhibits

4    received in evidence, regardless of who may have produced

5    them, and all facts and events that may have been admitted

6    or stipulated to.  Statements and arguments by the lawyers

7    are not evidence.  The lawyers are not witnesses.  What they

8    have said in their opening statements and what they will say

9    in their closing arguments at another time is intended to

10   help you interpret the evidence, but it is not evidence.

11   However, when the lawyers on both sides stipulate or agree

12   to the existence of a fact, you must, unless otherwise

13   instructed, accept the stipulation and regard that fact as

14   proved.

15       The lawyers' questions and statements are not

16   evidence.  If a lawyer asks a witness a question that

17   contains an assertion of fact, you may not consider the

18   assertion as evidence of that fact.

19       When a lawyer asked a questioned or offered an exhibit

20   into evidence and a lawyer on the other side thought it was

21   not permitted by the rules of evidence, that lawyer may have

22   objected.  If I overruled the objection, the question was

23   permitted to be answered, or the exhibit received into

24   evidence.  If I sustained the objection, the question was

25   not permitted to be answered and the exhibit was not

1    received into evidence.  Therefore, if I sustained an

2    objection to a question or to the admission of an exhibit,

3    you must ignore the question and must not guess what the

4    answer to the question might have been.  In addition you pus

09:55:55  5    not consider evidence that I have ordered stricken from the

6    record.

7        Generally speaking there are two types of evidence

8    that are presented during a trial, direct evidence and

9    circumstantial evidence.  Direct evidence is direct proof of

09:56:09 10    a fact.  Direct evidence is the testimony of a person who

11    asserts or claims to have actual knowledge of a fact such as

12    an eyewitness, about what the witness said or heard or did.

13    Indirect or circumstantial evidence is proof of a claim of

14    facts and circumstances indicating the existence or

09:56:27 15    nonexistence of a fact.  Indirect or circumstantial evidence

16    is proof of one or more facts from which you could find

17    another fact.

18        You should consider both kinds of evidence.  The law

19    makes no distinction between the weight or value to be given

09:56:48 20    to either direct or circumstantial evidence.  Nor is a

21    greater degree of certainty required of circumstantial

22    evidence.  You are simply required to find the facts in

23    accordance with the preponderance of all the evidence in the

24    case, both direct and circumstantial.  You are to decide how

09:57:07 25    much weight to give any evidence.

1          You are to consider only the evidence in the case.

2     However, you are not limited to the statements of the

3     witnesses.  In other words, you are not limited to what you

4     see and hear as the witnesses testify.  You may draw from

09:57:20 5     the facts that you find have been proved such reasonable

6     inferences as seem justified in light of your experience.

7     Inferences are deductions or conclusions that reason and

8     common sense lead to you draw from facts established by the

9     evidence in the case.

09:57:37 10          The law does not require any person to call as

11     witnesses all persons who may have been present at any time

12     or place involved in the case, or who may appear to have

13     some knowledge of the matters at issue in this trial.  Nor

14     does the law require any party to produce as exhibits all

09:57:58 15     papers and things mentioned in the evidence in the case.

16          The rules of evidence ordinarily do not permit

17     witnesses to testify as to opinions or conclusions.  There

18     is an exception to this rule for expert witnesses.  An

19     expert witness is a person who by education and experience

09:58:19 20     has become expert in some art, science, profession or

21     calling.  Expert witnesses state their opinions as to

22     matters in which they profess to be expert and may also

23     state their reasons for their opinions.  You should consider

24     each expert opinion received in evidence in this case and

09:58:37 25     give it such weight as you think it deserves.  If you should

1    decide the opinion of an expert witness is not based upon

2    sufficient education and experience, or if you should

3    conclude the reasons given in support of the opinion are not

4    sound, or if you feel the expert's evidence is outweighed by

09:58:59  5    other evidence, you may disregard the opinion entirely.

6        Sometimes evidence may be admitted concerning only a

7    particular party or only for a particular purpose and not

8    generally against all parties or for all purposes.  For the

9    limited purpose for which this evidence has been received,

09:59:16 10    you may give it such weight as you feel it deserves.  You

11    may not, however, use this evidence for any other purpose or

12    against any party not specifically mentioned.

13        Certain graphics, charts, and summaries have been

14    shown to you in order to help explain facts disclosed by

09:59:35 15    books, records, and other documents that are in evidence in

16    the case.  These graphics, charts, or summaries are not

17    themselves evidence or proof of any facts.  If the graphics,

18    charts, or summaries do not correctly reflect facts or

19    figures shown by the evidence in the case, you should

09:59:53 20    disregard them.  In other words, the graphics, charts, or

21    summaries are used only as a matter of convenience.  To the

22    extent that you find they are not truthful summaries of

23    facts or figures shown by the evidence in the case, you are

24    to disregard them entirely.

10:00:09 25        Evidence as to any oral statements or admissions

1    claimed to have been made outside of Court by a party to any

2    case should always be considered with caution and weighed

3    with great care.  The person alleged to have made the

4    alleged statement or admission may not have expressed

10:00:29    5    clearly the meaning intended or the witness testifying to an

6    alleged admission may have misunderstood or may have

7    misquoted what was actually said.

8         However, when an oral statement or admission made out

9    side of Court is proved by reliable evidence, the statement

10:00:44 10    or admission may be treated as trustworthy and should be

11    considered along with all other evidence in the case.

12         The weight of the evidence is not necessarily

13    determined by the number of witnesses testifying to the

14    existence or nonexistence of any fact.  You may find the

10:01:02 15    testimony of a small number of witnesses as to any fact is

16    more credible than the testimony of a large number of

17    witnesses to the contrary.

18         You are not bound to discuss any issue of fact in

19    accordance with the testimony of any number of witnesses

10:01:15 20    that does not produce in your minds belief in the likelihood

21    of truth as against the testimony of a lesser number of

22    witnesses or other evidence producing such belief in your

23    minds.  The test is not what side brings the greater number

24    of witnesses or takes the most time to present its evidence,

10:01:34 25    but which witnesses and which evidence appealed to your

1    minds as being most accurate and otherwise trustworthy.

2         In deciding the facts, you may have to decide which

3    testimony to believe and which testimony not to believe.

4    You may believe everything a witness says, part of it, or

5    none of it.  In considering the testimony of any witness,

6    you may take into account many factors, including the

7    witness's opportunity and ability to see, hear, and know the

8    things the witness testified about, the quality of the

9    witness's memory; the witness's appearance and manner while

10   testifying; the witness's interest in the outcome of the

11   case; any bias or prejudice the witness may have; other

12   evidence that may have contradicted the witness's testimony,

13   and the reasonableness of the witness's testimony in light

14   of all of the evidence.  The weight of the evidence does not

15   necessarily depend upon the number of witnesses who testify.

16        You are the sole judges of the credibility of the

17   witnesses and the weight their testimony deserves.  You may

18   be guided by the appearance and conduct of the witnesses, or

19   by the manner in which the witness testifies or by the

20   character of the testimony given or by evidence contrary to

21   the testimony.  You should carefully examine all the

22   testimony given, the circumstances under which each witness

23   has testified, and every matter in evidence tending to show

24   whether a witness is worthy of belief.  Consider each

25   witness's intelligence, motive, and state of mind and

1    demeanor or manner while testifying.

2          Consider the witness's ability to observe the matters

3    as to which the witness has testified and whether the

4    witness impresses you as having an accurate reckless of

10:03:21  5    these matters.  Also, consider any relation each witness may

6    have with either side of the case, the manner in which each

7    witness might be affected by the verdict, and the extent to

8    which the testimony of each witness is either supported or

9    contradicted by other evidence in the case.

10:03:37  10          Inconsistencies or discrepancies in the testimony of a

11    witness or between the testimony of different witnesses may

12    or may not cause you to discredit such testimony.  Two or

13    more persons seeing an event may see or hear it differently.

14    In weighing the effect of a discrepancy, always consider

10:03:56  15    whether it pertains to a matter of importance or an

16    unimportant detail, and whether the discrepancy results from

17    innocent error or intentional falsehood.

18          After making your own judgment, you will give the

19    testimony of each witness such weight, if any, that you may

10:04:12  20    think it deserves.  In short, you may accept or reject the

21    testimony of any witness in whole or in part.

22          Some testimony was presented by way of videotaped or

23    transcript deposition.  A deposition consists of sworn

24    recorded answers to questions asked of a witness in advance

10:04:31  25    of the trial by one or more of the attorneys for the parties

1    to the case.  The questions and answers were shown or read

2    to you during the trial.  Such testimony is entitled to the

3    same consideration and is to be judged as to credibility and

4    weighed and otherwise considered by you insofar as possible,

5    in the same way as if the witness had been present and had

6    testified from the witness stand.

7         A witness may be discredited or impeached by

8    contradictory evidence or by evidence that at some other

9    time the witness has said or done something or has failed to

10   say or do something that is inconsistent with the witness's

11   present testimony.

12        If you believe any witness has been impeached and thus

13   discredited, you may give the testimony of that witness such

14   credibility, if any you think this deserves.

15        If a witness is shown knowingly to have testified

16   falsely about any material matter, you have a right to

17   distrust such witness's other testimony and you may reject

18   all the testimony of that witness or give it such

19   credibility as you think -- as you may think it deserves.

20        An act or omission is knowingly done if that act is

21   done voluntary and intentionally and not because of mistake

22   or accident or other innocent reason.

23        A corporation may act only through natural persons as

24   its agents or employees.  In general, any agent or employee

25   of a corporation may bind the corporation by acts and

1    declarations, including unlawful acts made while acting

2    within the scope of the authority delegated by the

3    corporation or within the scope of the duties as an employee

4    of the corporation.

5    If a party fails to produce evidence upped that

6    party's control and reasonably available to that party and

7    not reasonably available to the adverse party, then you may

8    infer that the evidence is unfavorable to the party who had

9    produced it and did not -- who could have produced it and

10   did not.

11   Evidence that, at some other time while not under

12   oath, a witness who is not a party to this action has said

13   or done something inconsistent with the witness's testimony

14   at trial, may be considered for the sole purpose of judging

15   the credibility of the witness.  However, such evidence may

16   never be considered as evidence of proof of the truly of any

17   such statement.

18   Where the witness is a party to the case and by such

19   statement or other conduct admits some fact or facts within

20   the witness's interest, then such statement or other

21   conduct, if knowingly made or done, may be considered as

22   evidence of the truth of the fact or facts so admitted by

23   such party, as well as for the purpose of judging the

24   credibility of the party as a witness.

25   Any act or omission is "knowingly" done if that act is

1    done voluntarily and intentionally and not because of

2    mistake or accident or other innocent reason.

3         That concludes the part of my instructions explaining

4    your duties and the general rules that apply in every civil

10:08:03  5    case.  In a moment, I will explain the elements of the

6    plaintiffs' claim against defendants.

7         As you already know, there are three plaintiffs in

8    this lawsuit.  Coda Development s.r.o., Coda Innovations

9    s.r.o., and Frantisek Hrabal.  In these instructions, I

10:08:21 10   refer to them collectively as either Coda or plaintiffs.

11   Similarly, there are two defendants, the Goodyear Tire &

12   Rubber Company, and Robert Benedict, whom I refer to

13   collectively as either Goodyear or defendants.

14        Plaintiffs have asserted a claim for misappropriation

10:08:40 15   of trade secrets under Ohio law involving multiple alleged

16   trade secrets.  Generally Coda claims that Goodyear

17   misappropriated Coda's trade secrets by using them in

18   Goodyear's air maintenance tire, referred to as AMT,

19   programs and by disclosing them in its patent filings.

10:09:01 20        During this trial, you have heard testimony regarding

21   17 asserted trade secrets.  That number is now 12.  You need

22   not be concerned about the reasons for this change, but

23   should proceed to decide the remaining trade secret issues

24   as they are presented to you in these instructions.

10:09:17 25        Before you can find for the plaintiffs, you must find

1    by a preponderance of the evidence that, A, the information

2    at issue was a trade secrets, and B, the defendants

3    misappropriated one or more of plaintiffs' trade secrets by

4    improper meanings, and C, the plaintiffs suffered damages

5    proximately caused by the misappropriation.

6        Before you can decide whether defendants

7    misappropriated any Coda trade secrets, you must first find

8    that Coda proved by a preponderance of the evidence that it

9    possessed specific identifiable trade secrets.

10       Trade secrets -- trade secret means information,

11   including the whole or any portion or phase of any

12   scientific or technical information, design, process,

13   procedure, formula, pattern, compilation, program, device,

14   method, technique or improvement, business information or

15   plans, financial information, listing of names, addresses,

16   or telephone numbers, that satisfies all of the following.

17       A, the information derived independent economic value,

18   actual or potential, from, one, not being generally known to

19   other persons who can obtain economic value from its

20   disclosure or use, and, two, not being readily ascertainable

21   by proper means by other persons who can obtain economic

22   value from its disclosure or use, and B, the information is

23   the subject of efforts that are reasonable under the

24   circumstances to maintain its secrecy.

25       Because Coda claims rights and trade secrets, it bears

1    the burden of defining the information for which protection

2    is sought with sufficient definiteness to permit the jury to

3    apply the criteria for protection and to determine the fact

4    of an appropriation.  Generic descriptions of broad areas of

10:11:19  5    technology do not qualify as trade secrets.  Trade secrets

6    must be concrete.

7         The item for which trade secret protection is claimed

8    must also have some independent economic value.  Information

9    is valuable to a business if it gives that business a

10:11:38 10    competitive advantage over other businesses that do not know

11    the information.

12         To help you determine whether Coda enjoyed either an

13    actual or potential competitive advantage, you may consider

14    such things as:

10:11:52 15         One, the degree to which the information was generally

16    known or readily ascertainable by others.

17         Two, the extent to which Coda used or uses the

18    information in its business.

19         Three, whether the information allows Coda to earn

10:12:08 20    increased profits or operate its business more efficiently.

21         Four, what gain or benefits Goodyear's business would

22    have obtained from the information and

23         Five, what money, effort, and time Coda expended to

24    develop the information.

10:12:22 25         In order to be a trade secret, something cannot be

1    generally known or readily ascertainable in the try.  If the

2    information could be readily learned or ascertained by

3    legitimate means, such as by reading publicly available

4    literature or by examining publicly available products or if

10:12:42  5    the information is commonly known in the industry, no one

6    may claim it as a trade secret.

7         Therefore, if you find that any of the items that Coda

8    is claiming to be trade secrets are actually in the public

9    domain, then he must find that the item is not a trade

10:13:01 10    secret and you cannot award Coda damages for that item.

11         Also, information disclosed in a patent is a matter of

12    public record and thus by definition is not subject to trade

13    secret protection.  Therefore, if you find that any of the

14    claimed trade secrets are disclosed in Coda's patents or

10:13:22 15    published patent applications, then you must find that item

16    is not a trade secret and you cannot award Coda damages for

17    that item.

18         If the information could be readily learnedly

19    legitimate methods such as by reading publicly available

10:13:40 20    literature or by examining publicly available products or if

21    the information is commonly known in an industry, no one may

22    claim it as a trade secret.  However, a trade secret can

23    exist in a combination of characteristics and components,

24    each of which, by itself, is commonly known or in the public

10:13:58 25    domain.  As long as the unified process, formula or design

1   is unique and affords its owner a competitive advantage, it

2   is a trade secret.

3      "Misappropriation" means the:

4      A, acquisition of another's trade secret by a person

10:14:15 5   who knows or has reason to know that the trade secret was

6   acquired improper means, or

7      B, disclosure and/or use of another trade secret by a

8   person who both lacked the express or implied consent of

9   that other person, and who:

10:14:29 10      One, used improper means to acquire knowledge of the

11   trade secret or

12      Two, knew or had reason to know at the time of the

13   disclosure and/or use that the knowledge of the trade secret

14   that the person acquired was derived from or through a

10:14:46 15   person who had utilized improper means to acquire it,

16   acquired it under circumstances giving rise to a duty to

17   maintain its secrecy or limit its use, or derived from or

18   through a person who owed a duty to the plaintiffs to

19   maintain its secrecy or limit its use.

10:15:05 20      Before you can find for the plaintiffs, you must find

21   by preponderance of the evidence that the defendants

22   misappropriated one or more of plaintiffs trade secrets by

23   improper means.

24      "Improper means" includes theft, misrepresentation, a

10:15:21 25   breach of a duty to maintain secrecy, or inducement of a

1    breach of a duty to maintain secrecy.  This can include

2    otherwise lawful conduct that is improper under the

3    circumstances.  Improper means does not include discovered

4    information by independent invention or reverse engineering.

5    Reverse engineering is starting with a known product and

6    working backward to find the method by which it was

7    developed.

8         The user of another's trade secret is liable even if

9    they use it with modifications or improvements upon it

10   affected by their own efforts, so long as the substance of

11   the process is substantially derived from the other's

12   asset -- I'm sorry, from the other's secret.

13        The designation of a document as "confidential" does

14   not automatically make anything contained in the document a

15   trade secret.

16        Additionally, the fact that Goodyear and/or Dr.

17   Benedict may have signed a nondisclosure agreement with Coda

18   does not automatically mean that any information they

19   obtained from Coda are trade secrets.

20        Finally, when looking at the exhibit, you may not

21   consider extraneous highlighting, markings or labels such as

22   "confidential" or "attorney's eyes only" in determining

23   whether a trade secret exists.  These extraneous marks were

24   made by attorneys during pretrial discovery and are

25   irrelevant to your evaluation of the evidence.  You must

1      determine whether a particular item is a trade secret on the

2      instructions I have given you.

3          Coda claims that Goodyear misappropriated some or all

4      of Coda's trade secrets, which I will list for you now.  Do

10:17:13  5   not be concerned that there are trade secret numbers missing

6      from this list.

7          To prove its claim, Coda must prove that an any of the

8      following qualify as a trade secret that Goodyear

9      misappropriated.

10:17:31 10      We have alleged trade secret 1.  A self-inflation

11     system that operates when the tire rotates in either

12     direction and the desirability of a symmetrical

13     implementation of the pump system in the tire such as the

14     use of two mirror-image pumps.

10:17:54 15      Alleged trade secret number 2.  Coda's knowledge of

16     how to design and develop a peristaltic pump with symmetry

17     that takes into consideration symmetrical pump tubes

18     providing bidirectional functionality and uniformity,

19     variant pump tube lengths and configurations that can be

10:18:18 20   less than fully circular, fully circular and super circular

21     and a bidirectional arrangement implementing the principles

22     of symmetry such as the example of 360-degree oppositely

23     oriented pumps in each sidewall of a tire.

24         Alleged trade secret number 3.  Use of a regulator

10:18:41 25   with a threaded member in a self-inflating tire to adjust

1   the space between the membrane and the aperture, thereby

2   resulting in a change in regulator pressure.

3       Alleged trade secret number 5.  Coda's technique

4   regarding the alternative to molding a pump chamber into the

10:19:02  5   tire by embedding and removing a filament to form a cavity

6   in the tire, and the improvements in the filament embedding

7   process by coating the filament in a silicone lubricant

8   before pressing and vulcanizing the tire.

9       Alleged trade secret number 7.  Coda's design and

10:19:24 10   development of a multi-purpose interface for transporting

11   air in a self-inflating tire that can connect to the air

12   source, connect to the tire interior, connect to the

13   peristaltic pump, serve as an end to the peristaltic pump,

14   connect to the regulator, carry the regulator, go around or

10:19:46 15   through the bead, go around or through the tire layers,

16   click to the bead, and whole the filter.

17       Alleged trade secret number 11.  Coda's knowledge of

18   how to design and develop self-inflating tire pump and

19   groove solutions consisting of round pump tubing in an

10:20:04 20   outward facing groove with straight angled interior

21   geometry; pump tubing with geometry that interlocks with its

22   seat; pump tubing with elliptical interior cross-section;

23   variant pump tube, groove and chamber dimensions, size and

24   materials; pump tube and groove design to minimize internal

10:20:27 25   friction; a "tubeless" pump solution, that is, a pump that

1    may compose an integral part of tire; cross-section designs

2    that minimize stress on compression in order to improve

3    durability; and tubing with reason forced wall.

4         Alleged trade secret number 16.  Coda's design,

5    development, and testing regarding the feasibility and

6    improvements in self-inflating tire technology by embedding

7    a tube in a groove in a tire sidewall to act as a

8    peristaltic pump.

9         Alleged trade secret number 20.  Coda's knowledge of

10   how to design and develop self-inflating tire systems with

11   circulating and noncirculating pump variations comprised of

12   the disclosure of technical information through observations

13   and descriptions of the three-way valve regulator and

14   explanations of the function and air paths for the states of

15   recirculation and inflation; closure elements related to

16   recirculation systems and a pressurized air reservoir that

17   would permit the storage of air within the system without

18   the need to engage the pump tube with each tire revolution;

19   recirculation at different pressures such as ambient

20   pressure; recirculation through various paths, such as

21   through the tire, the atmosphere and the pump tube; the

22   safety benefit of recirculating around the pump tube

23   isolated from the tire cavity; a check valve on intake

24   between the pump tube and the atmosphere, to only permit air

25   in when pressure in the pump tube falls below atmospheric

1    pressure; an a check valve on output, paren, between the

2    pump tube and tire interior, paren, to only allow air into

3    the tire when pressure in the pump tube exceeds the tire

4    pressure.

5         Alleged trade secret number 22.  Coda's design and

6    development of pressure management device alternatives for

7    self-inflating tires consisting of pressure management

8    devices with the membrane containing a reference space, a

9    spring-assisted membrane, a spring-loaded closure element,

10   and electronic management, and knowledge of the different

11   pressure-temperature response characteristics of these

12   alternatives.

13        Alleged trade secret number 23.  Coda's development of

14   a functional self-inflating tire as demonstrated by the test

15   results confirming that the tire pump can generate pressure

16   higher than the pressure in the tire cavity, through the

17   test results showing that the pump placed on the tread could

18   generate 6.5 absolute atmospheres of pressure, paren, 5.5

19   relative atmospheres, close paren; the test results showing

20   that the tube in groove pump of the prototype could generate

21   3.3 absolute atmospheres of pressure; and test results that

22   demonstrated that the flap tubes could generate 1 relative

23   atmosphere of pressure.

24        Alleged trade secret number 24.  Coda's knowledge

25   regarding the optimal location for placement of a pump in a

 1    tire for tire manufacturers, namely, in the sidewall close

 2    to and above the rim where the cyclically -- I'm sorry,

 3    where the tire cyclically deforms in response to

 4    deformation; or

 5        Alleged trade secret number 25.  Coda's knowledge of

 6    potential tire making cost savings promoted by

 7    self-inflating tire technology, by permitting the removal or

 8    reduction of inner liner.

 9        And that's the end.  There should not be an "or"

10    there.

11        In deciding whether the information at issue satisfies

12    the definition of a trade secret, you may consider any or

13    all of the following factors:

14        A.  The extent to which the information is known

15    outside of the business.

16        B.  The extent to which the information is known to

17    those inside of the business such as by the employees.

18        C.  The precautions taken by the plaintiffs to guard

19    the secrecy of the information.

20        D.  The value of the plaintiffs in having exclusive

21    possession of the information.

22        E.  The amount of effort or money extended in

23    obtaining or developing the information and

24        F, the amount of time and expense it would take for

25    others to acquire and duplicate the information.

1        The plaintiffs -- that should read the plaintiffs are

2    required only to take reasonable active steps under the

3    circumstances to protect the trade secrets.  This does not

4    require absolute secrecy or that the plaintiffs use all

10:25:51  5    conceivable efforts to maintain secrecy.

6        Under the nondisclosure agreement between the parties,

7    Goodyear could not share any confidential information

8    Goodyear and inquired from Coda during the two 2009 meetings

9    with anyone or use it except to evaluate a possible

10:26:12 10    cooperation with Coda.

11        Goodyear, however, had no obligation to Coda with

12    respect to any information that was available to the general

13    public at the time of disclosure; became at a later date

14    available to the general public through no fault of

10:26:33 15    Goodyear; and then only after such date, or Goodyear

16    demonstrated was in its possession before receipt.

17        In the case of disclosures of confidential information

18    made orally or by visual inspection, Coda had the right, or

19    if requested by Goodyear, the obligation to confirm in

10:26:58 20    writing within 60 days after the disclosure was made the

21    fact and general nature of such disclosure.

22        All of the parties' obligations under the disclosure

23    agreement ended after January 1, 2012.

24        You may award damages only for those injuries or

10:27:19 25    damages that you find have been proven by a greater weight

1    of the evidence to have been proximately or directly caused

2    by the other party's wrongful conduct.  You must distinguish

3    between the existence of a wrongful act and the existence of

4    injuries or damages naturally resulting from the wrongful

10:27:41  5    act.  Thus, even if you find for Coda on a claim, you must

6    ask yourself whether Coda has also proven by the greater

7    weight of the evidence, that the wrongful act caused the

8    actual losses Coda alleges to have suffered.

9         If you find that defendants misappropriated one or

10:28:01  10    more of plaintiffs' trade secrets, plaintiffs are entitled

11    to recover compensatory damages.

12         Plaintiffs bear the burden of proving damages and may

13    not recover if their entitlement to damages is based upon

14    speculation or conjecture.  If it is certain that damages

10:28:19  15    have resulted, however, mere uncertainty as to the amount

16    will not preclude the right of recovery.  Although to set a

17    damage figure arbitrarily or through pure guesswork is

18    impermissible, once the existence of damage has been shown,

19    all that an award of damages requires is substantial

10:28:41  20    evidence in the record to permit you to draw reasonable

21    inferences and make a fair and reasonable assessment of the

22    amount of damages.

23         If you find for Coda but Coda failed to prove by the

24    greater weight of the evidence any amount of damages, you

10:28:56  25    may also award Coda nominal damages.  "Nominal" means

1    trifling or small.

2         One form of compensatory damages is the actual loss to

3    the plaintiffs caused by the misappropriation.

4         Actual loss means the plaintiffs' lost profits.  Here

5    plaintiffs seek their lost profits in the form of lost

6    licensing revenue.  Such damages are calculated by deciding

7    what the plaintiffs were entitled to receive had the

8    misappropriation of trade secrets not occurred.

9         Coda may recover damages for trade secret

10   misappropriation only for the period in which information is

11   entitled to protection as a trade secret plus an additional

12   period, if any, in which Goodyear retained an advantage over

13   good faith competitors because of the a misappropriation.

14   This period may be measured by the time it would have taken

15   Goodyear to obtain the information by proper means such as

16   researching publications, reverse engineering, or

17   independent development.

18        The amount you find as damages must be based on the

19   value attributable to each misappropriated trade secret as

20   distinct from nontrade secret features or other factors such

21   as Coda's patents, nonmisappropriated trade secrets, public

22   or general knowledge, know-how, marketing, or advertising or

23   Goodyear's size or market position.  An amount compensating

24   Coda for damages must reflect the value attributable to the

25   misappropriated trade secret or secrets and no more.  The

1       process of separating the value of the allegedly

2       misappropriated secret or secrets from the value of all

3       other features is calmed apportionment.  Your award must be

4       apportioned so that it is based only on the value of the

10:31:05  5   misappropriated trade secrets -- trade secret or secrets and

6       no more.

7           If you find that Goodyear misappropriated Coda's trade

8       secret or secrets, you must decide whether you find by clear

9       and convincing evidence that Goodyear acted with malice.

10:31:21 10      "Clear and convincing" means that the evidence must

11      produce in your minds a firm belief or conviction about the

12      facts to be proved or the truth of the matter.  It must be

13      more than evidence that simply out weighs or over balances

14      the evidence opposed to it.  This is the standard that

10:31:42 15   applies to any punitive damages that you may award.

16          Conduct is malicious if it is done with a state of

17      mind characterized by hatred, ill will or a spirit of

18      revenge or if it is done with a conscious disregard for the

19      rights and safety of another person that has a great

10:32:02 20   probability of causing substantial harm.  Substantial means

21      major or significant and not trifling or small.

22          The fact that I have instructed you as to the proper

23      measure of damages should not be considered as indicating

24      any view of mine as to which party is entitled to your

10:32:19 25   verdict in this case.  Instructions as to the measure of

 1    damages are given for your guidance only in the event you

 2    should find in favor of the plaintiffs from a preponderance

 3    of the evidence in the case in accordance with the other

 4    instructions.

10:32:41  5    Okay.  So next we are going to review the verdict

 6    forms that you will have to consider in this case and record

 7    your verdict.

 8    And those are located in your binders after numbered

 9    page 29.

10:32:56 10    You'll see that there is a document there entitled

11    "Verdict Forms."

12    And that document consists of seven pages.

13    Have you all located that document?  Okay.

14    So I'm going to just read through the documents.

10:33:16 15    So on the first page it says:  In answering the

16    following questions and filling out the verdict forms, you

17    are to follow all the jury instructions I have given.  Your

18    answers to each question must be unanimous.  Some of the

19    questions contain legal terms that are defined and explained

10:33:31 20    in detail in the jury instructions.  Please refer to the

21    jury instructions if you are unsure about the meaning or

22    usage of any legal term that appears in the questions below.

23    So just as we've been using all along, or doing all

24    along, in this verdict form, Coda refers collectively to

10:33:52 25    plaintiffs Coda Development s.r.o., Coda Innovations s.r.o.,

1    and Frantisek Hrabal.

2         Goodyear refers collectively to defendants the

3    Goodyear Tire & Rubber Company and Robert Benedict.

4         So then we go to the next page.  You'll see the first

10:34:08  5    form.

6         So the first form asking you a question.  Has Coda

7    proven by a preponderance of the evidence that in January

8    2009 and/or June 2009, it possessed specific identifiable

9    trade secrets that derive independent economic value, actual

10:34:24 10   or potential, from not being generally known to or readily

11   ascertainable by proper means by other persons who can

12   obtain economic value from their disclosure or use.

13        And then you'll see that there is a chart there with

14   the 12, a list of the 12 trade secrets that you will

10:34:43 15   consider in this case.  And if you find that Coda has proven

16   that they had a secret which meets the definition,

17   then -- and you'll analyze each trade secret

18   separately -- you will then check that box yes which would

19   be a finding for Coda.

10:35:05 20        If you find that any one or more of the alleged trade

21   secrets do not meet that definition, then you would, for

22   each one that you so find, you would check the appropriate

23   box of no.  And then you would find -- that would be a

24   finding for Goodyear.

10:35:27 25        So if you have answered no -- no, then you'll see

1       there is some directions at the bottom of the page.

2              If you have all no answers for question 1, then you'll

3       stop answering all the questions and you'll go to the last

4       page of the verdict form.  And each of you will then sign

10:35:51  5     the verdict form and date it.  And, again, your decision has

6       to be unanimous.

7              Now, if -- you'll see the second instruction on that

8       page 2 is verdict form continues on the next page if you

9       check yes in any of the boxes.

10:36:11  10    So we'll review verdict form number 2.  It says for

11      each listed trade secret where you answered yes in question

12      1, has Coda proved by a preponderance of the evidence that

13      Goodyear misappropriated Coda's trade secrets?  And you'll

14      check the boxes below that reflect your verdict for each of

10:36:29  15    the trade secrets that you'll be -- that you might consider

16      relative to verdict form number 2.

17             Again, if you have all no answers for what you will

18      answer in question 2, should you -- then you stop answering

19      questions.  Go to the last page and seen the verdict form.

10:36:55  20    If you have any yeses checked, then you'll go to

21      number 3 on the next page.

22             And that says for each listed trade secret where you

23      answered yes in question 2, has Coda proven by a

24      preponderance of the evidence that Coda suffered damage

10:37:16  25    proximately caused by the misappropriation?

1        And, again, if you consider this form, you'll check

2    either yes or no.

3        If your answers to all the questions that you may

4    consider relative to this form is no, then you'll stop

10:37:34  5    answering questions.  You'll go to the last page and sign

6    the verdict form.  You won't complete any of the pages in

7    between.

8        If you checked yes for any of them, then you go to

9    verdict form number 4.

10:37:49 10        And that reads, what amount of compensatory damages do

11    you award to Coda for its actual loss caused by Goodyear's

12    trade secret misappropriation?  State the amount, or if you

13    find that Coda failed to prove by the greater weight of the

14    evidence any amount of damages set forth a nominal amount

10:38:11 15    such as $1.

16        Should you consider punitive damages in this case,

17    you'll not -- you should not include it in any dollar amount

18    that you mind find for number 4, if you consider that form.

19        Now, number 5, has Coda proven by clear and convincing

10:38:31 20    evidence that Goodyear's misappropriation was willful and

21    malicious?

22        So if you consider this form, then you'll check either

23    yes or no.  If you check yes, then you'll see the

24    instruction says if you answered yes, what punitive damages

10:38:49 25    if any do you find Coda is entitled to?  And you'll fill in

1    the dollar amount on the line provided.

2         After then with that, you come to the end of the

3    verdict form, and again, that, this last page is where you

4    sign whatever verdict you render in the case.

10:39:08  5         So, I will ask the attorneys -- so anything

6    further -- let me put it this way.  Anything further that

7    you believe the Court should explain relative to the verdict

8    forms.

9         Mr. Cloern?

10:39:37 10              MR. CLOERN:  No Your Honor.

11              THE COURT:  And Mr. Griffith?

12              MR. GRIFFITH:  Nothing, Your Honor.

13              THE COURT:  All right.  And are there any

14   corrections, or objections to the instructions as given?

10:39:46 15        Mr. Cloern?

16              MR. CLOERN:  No, Your Honor.

17              THE COURT:  Mr. Griffith.

18              MR. GRIFFITH:  No, Your Honor.

19              THE COURT:  All right.  So now as promised, you

10:39:51 20   get your first break.  It will be a brief ten-minute break.

21   Upon your return, you will then hear the closing arguments

22   of counsel.

23        So your notebooks may just remain on your chairs.  So

24   we'll be in recess for ten minutes.

10:40:05 25              THE DEPUTY CLERK:  All rise.

 1          (Jury out 10:40 a.m.)

 2          (Recess taken.)

 3          (Jury in, 10:5.)

 4          THE COURT:  All right.  Members of the jury, as I

 5   indicated prior to the break, at this time counsel for the

 6   parties will have an opportunity to make closing arguments

 7   to you.  Each will be given an opportunity to review with

 8   you the evidence each believes has been offered.  It is also

 9   their opportunity to suggest to you what inferences they

10   think you can reasonably draw from the evidence.  Just, as I

11   have indicated a number of times shall the closing arguments

12   of counsel are not evidence.

13        So with that, Mr. Cloern, on behalf of Coda

14   plaintiffs, you may no present your closing argument.

15          MR. CLOERN:  Thank you, Your Honor.

16        My name Boyd Cloern, and I have the privilege of

17   representing Mr. Hrabal and Coda.  I want to start by

18   thanking you for your service.  I know that you've all got

19   busy lives.  You just spent two weeks of those lives here

20   with us, and we appreciate it.  It's a sacrifice, I know,

21   but it's an important one because the American justice

22   system depends on it.  It wouldn't function without citizens

23   donating their time in the way that you have.

24        So I thank you on behalf of the myself, behalf of my

25   team, and behalf most importantly, of Mr. Hrabal, and all of

1    the people who have stood behind him and Coda over the years

2    to help him try to bring self-inflating tire technology on

3    the road, make it a reality, because it truly is a

4    transformative technology for the economic, for the

10:54:56  5    environment, and for safety.

6         So, look, you guys have been here a long time.  I'm

7    going to get right to the point, or at least what we think

8    the point is.

9         The case really comes down to one central issue, and

10:55:10 10    that's who do you believe?  Do you believe Mr. Hrabal?  Or

11    do you believe Dr. Benedict?

12         And the issue is this:  Who do you think invented

13    this, a peristaltic pump tube location for a tube in groove

14    embodiment.

10:55:32 15         Dr. Benedict and Mr. Hrabal both agree on a couple

16    things, that this is an innovative and new solution over the

17    prior art, and that it is very valuable.

18         So the question, though, is whose idea was it?  That

19    is for the jury.  You guys, to decide.

10:56:04 20         Do you brief Mr. Hrabal, a man who spent six years of

21    his life studying tire deformation, working with peristaltic

22    pump tubes, quit his job, sold his car, burned through his

23    savings to go fund his research.  But he was in the end

24    successful.  He's the first person to create a prototype

10:56:31 25    peristaltic pump self-inflating tire that could generate

1    sufficient pressure to inflate in commercial truck tire.

2           And no one had ever done that before.

3           Or do you believe that Dr. Benedict came up with this

4    idea, which he says occurred to him in about an hour-long

5    meeting one afternoon with one of his colleagues, when he

6    had had no self-inflating tire peristaltic pump experience,

7    and only after meeting with Mr. Hrabal to study his

8    prototype.

9           So that's not for me to decide.  That's for you to

10    decide based on the facts, and that's the testimony and

11    documents that you've seen in this case.

12           So let's go to the evidence.

13           So these are the trade secrets, just to set the table,

14    that Coda has asserted in this case.  And let's first talk

15    about the trade secrets that -- and SIT technology that Mr.

16    Hrabal developed.

17           And so he testified about some of his first

18    experiments with peristaltic pump tubes, where after having

19    the idea he comes home and stitches a peristaltic pump on a

20    bicycle tire around spins it around and, lo and behold, the

21    balloon inflates.

22           So then he is obsessed.  He's off.  He builds the tire

23    rig that you see over here and he brought into court, pushes

24    tires together, starts studying tire deformation, really

25    obsessively.

1          He carves grooves in tire.  You can see that the

2     bottom right-hand corner, and puts tubes there and tests

3     them.

4          He built his own rigs so that he could test.  He

5     couldn't afford to buy them, so he built them.  And he

6     brought one here to show you.

7          He approached tire manufacturers in 2003 with his

8     early very undeveloped but early ideas.  And it was too

9     early stage, but he learned from those conversations with

10    tire manufacturers, he learned what he needed to go back and

11    do, and he set about doing that.  That's what he quits his

12    job, he sells his car, but ultimately burns through his

13    savings, and he has to go back to work.  But he keeps

14    working nights and he keeps working weekends.

15         He builds another test rig.  And importantly, he

16    obtains funding.  And so at the end of 2005, he's able to

17    quite his job, incorporate start Coda, and become an

18    official startup.  But he uses his money wisely.  And he

19    buys the testing -- the much high powered testing rig that

20    you see her on this slide.  And he builds his own testing

21    system.  He testified about that.  The electronics that are

22    needed to take the pressure and the data measurements so

23    that when he forms these tubes and tests them, that he can

24    then experiment and tweak and learn from what he's doing.

25         So -- but he doesn't have access to a tire plant.  So

1    he can't actually modify a tire.  And what he does, is he

2    begins -- he has this idea to create what he called a flap

3    tube, and you can see it up here, or a section of one on the

4    top right corner of the slide and so the flap tube is

11:00:13  5    peristaltic tube and it's got two flaps and you put it in

6    between the tire and rim, and it closes those flaps and

7    there is a cavity left inside.

8        And the reason he's using those is because he can make

9    those.  And you see the molds he brought over there in which

11:00:27 10   he makes thee flap tubes.  And he can make them.  It allows

11   him to experiment with different shapes and kinds of tubes

12   and advance his learning.

13       So he actually files for a patent on his flat tube,

14   and now we're up to around 2007.

11:00:47 15   He submits -- he signs up to go to the SAE show.

16   That's Society of Automotive Engineers and it's in the

17   spring of 2008.

18       What he -- to display his technology.  The problem is

19   his flat tube only pumps about one atmosphere.  It's not

11:01:11 20   enough to inflate tires.  It's pumping.  The concept works.

21   But he can't get enough pressure.

22       And you may recall Mr. Hrabal's testimony that the

23   peristaltic pumping motion of the tire deformation actually

24   is forcing the flat tube out of its seat where it's supposed

11:01:28 25   to be held in between the tire and the rim.

1    So what he does, he's got this show coming up.  He

2    needs to get the pumping results that he knows is there and

3    available.  And so he builds his prototype.

4    He builds an extension on the rim, and an extension on

11:01:49  5    the sidewall of the tire.  Because, again, in that -- and

6    that forms a groove in between.  Because, Mr. Hrabal, again,

7    doesn't have the funds or access to a tire plant to actually

8    mold a tire and create a new tire.

9    So he has to test these any way that he can.

11:02:07  10    And what's significant about this is that this -- the

11    groove structure that he creates in between a tire sidewall

12    extension and a rim extension actually holds the tube in

13    place.  It allows him to achieve over -- well, it's called

14    6.5 atmospheres, but the takeaway is it's enough to pump up

11:02:26  15    a commercial truck tire, and that is significant.

16    And so he publishes those results, not a specific

17    data, but publishes those results and he wins the SAE Tire

18    Technology Award in 2008.

19    So at this point Mr. Hrabal has -- oh, I'm sorry.  I

11:02:52  20    left this part out.  So it's not just the pump.  It's the

21    valves, and these are the prototype valves that Mr. Hrabal

22    created in around the same time, 2006, '7.

23    And so at this point, Mr. Hrabal has both patents, but

24    he also has trade secrets.  And now we're talking about the

11:03:11  25    beginning of 2008.

1          And that's the SAE award that I was talking about.

2          That garnered interest from General Motors.  Mr.

3     Hrabal testified about that.  And General Motors is

4     ultimately who pushed Mr. Hrabal toward, and Goodyear toward

5     Mr. Hrabal.

6          All right.  So I mentioned -- well, first, Coda's

7     trade secrets are not generally known or readily

8     ascertainable.  That's one of the things that you'll have to

9     decide and look at in determining whether Coda has trade

10    secrets.  And of course, it's Coda's position that they were

11    not.

12         So let's look at some of what Goodyear pointed out to

13    you over the course of this trial.

14         On the top left is this 2007 PCT that you've heard so

15    much about.  The 2007 PCT is directed toward this flap tube

16    that going in between the tire and the rim, in between the

17    tire and the rim.

18         The Tire Tech article on the right is an article about

19    the exact same thing.  So those are not public disclosures

20    of a tube in a groove that is in the tire sidewall close to

21    and above the rim powered by the cyclic deformation of the

22    sidewall.

23         None of the other of Coda's public disclosures

24    are -- render its alleged trade secrets generally known.  So

25    on the bottom left is Coda's website video that does show

1    its prototype.  But, again, Coda's prototype shows pinching

2    a tube against the rim.  It's a rim extension and a sidewall

3    extension.

4        That does lead Mr. Hrabal to get confirmation in his

11:05:04   5    mind that the location where the tire sidewall extension is,

6    is a location in the sidewall that would power a peristaltic

7    pump.  And that it -- and that it is away from the rim.

8        So there is two other patents.  On the left is another

9    patent that, once again, discloses prior art, peristaltic

11:05:31  10    pump tubes that are pinched between the tire sidewall and

11    the rim.

12        And then we have the Sheppard patent which has its

13    pump tubes in the tread.

14        Now, let's look at what Goodyear said, because in

11:05:51  15    multiple documents Goodyear characterized what Goodyear saw

16    Coda's prior art as.

17        So Goodyear -- this is from Goodyear's Department of

18    Energy application in 2011.  And on the left, in the figure,

19    Goodyear has what it says is the prior art.  And that's that

11:06:14  20    tube pinched between the tire and the rim.

21        And on the right is the new location which is farther

22    away from the rim.

23        And what Goodyear says about that it, says another

24    innovative feature of the AMT is that the -- sorry.  That's

11:06:38  25    actually the wrong quote.

1      But that's all right because I remember it any way.

2          What it says -- and we'll get to it a little bit later

3    again in the presentation -- is that what is innovative

4    about this new location is exactly its location.  And it

11:07:04  5    says in the DOE application, it says the prior art, e.g.,

6    Coda, relies on the rim as a pinch point with a tube between

7    the tire and the rim.

8          And that's not what this invention is.  This invention

9    is moving the tube radially outward up into the sidewall to

11:07:24 10    avoid the issues with the rim.  Because Goodyear doesn't

11    like tubes on the rim.  They -- there is chafing, and then

12    Goodyear doesn't make the rim.  So the rim is an X factor.

13    Other companies make rims.  Goodyear make the rubber tires.

14    And rims come in different shapes and sizes and can affect

11:07:43 15    the operation of the peristaltic pump.

16          So I'm going to talk about reasonable measures now,

17    but before we get there, the next element is -- derive

18    economic value from being secret.  And we'll get there when

19    we start looking at the Goodyear documents and how they used

11:08:12 20    and how they valued Coda's trade secrets.

21          But reasonable measures, we entered about numerous

22    nondisclosure agreements.  Mr. Hrabal testified.  They're

23    all in the record.  You can look at them.  Mr. Hrabal had

24    nondisclosure agreements and never spoke with anyone where

11:08:31 25    he didn't get agreements on confidentiality.

1          All right.  Let's talk about misappropriation.

2          So in December of 2008, because of all this publicity

3     from Coda winning the SAE show and achieving what it

4     achieved with the prototype, the Dunlop organization within

11:08:56  5     Goodyear actually takes the Coda patented idea and does a

6     market study based on it.  And it tests very high.  The

7     document said it's one of the strongest concepts ever

8     tested.

9          And so the business, Dunlop, calls David Anckaert,

11:09:17  10     who's the head of Advanced Concepts, who tasks Bob Benedict

11     with looking into this technology.  And Bob Benedict comes

12     back and he talks about Coda.  And that's what he's asked to

13     do.  And he says that Coda is at a readiness level of 4 and

14     that there has been a prototype demonstration in the lab.

11:09:37  15          At this point, Dr. Benedict, and he testified to this,

16     that prior to meeting Coda, he had never worked on a

17     peristaltic pump base air maintenance system or a

18     self-inflating tire.  So he doesn't have any experience in

19     this at the time.

11:09:52  20          So based on Dr. Benedict's recommendation, the Dunlop

21     folks, and that's Alexander Vaisse, e-mail Coda and they say

22     we want to meet and we want to see your confidential

23     information.  We've already looked at your public materials.

24     We want to know what we can find out beyond that.

11:10:11  25          So they sign a NDA.  And what's important about that

1    is it says a recipient of confidential information disclosed

2    under this agreement shall not use the confidential

3    information except for discussing a possible cooperation in

4    the field of self-inflating tires.

5         So what's disclosed can only be used if they work

6    together.  And otherwise it can't.

7         So let's talk about the first meeting for a second.

8         You saw the PowerPoint that was discussed at that

9    meeting.  There was lots of discussion about that.  Dr.

10   Benedict and David Anckaert were on the phone from Akron.

11   Who was in the room, as Mr. Hrabal testify, was a lot of

12   marketing people.  There were a couple technical people but

13   it was mostly market folks.

14        And Mr. Hrabal concluded what he really needed to do

15   first is get Goodyear excited about the market opportunity.

16   So that's why over half of this PowerPoint are really about

17   the market opportunity, the advantages of the technology,

18   and the channels that you would launch it through.

19        There were, however, some questions.  There was a

20   question -- actually over the phone from the folks in Akron,

21   about bidirectionality, can you make this bidirectional.

22   And Mr. Hrabal testified that he answered that question that

23   you could.

24        There was also some discussion of pressure management,

25   and some of those slides are in the presentation, as well as

        1    a discussion of how bidirectional pump tubes require

        2    pressure management.  So you've got to have a regulator that

        3    can handle rolling backwards so that the air can flow

        4    backwards in the oppositely oriented pump so that pump

11:12:06  5    doesn't get destroyed when it's mounted in the opposite

        6    direction.

        7         And there was the discussion of removing the inner

        8    liner, which is that expensive rubber that's there to try to

        9    keep air from leaking out.  But if you have SIT, you don't

11:12:24 10    need it.

       11         So after the meeting, as asked, Mr. Hrabal follows up

       12    with his testing data and results.  More confidential

       13    information conveyed.

       14         There is also a document that's interesting after the

11:12:43 15    meeting it's what is referred to in the document as a

       16    scribble, and it's pointing out that there is no know how

       17    whatsoever by -- on the pressure adjusting device in

       18    Goodyear.

       19         There is a January 27 presentation shortly after the

11:13:01 20    meeting that shows these two puzzle pieces.  And you can see

       21    SIT is defined as the business opportunity, and Coda is

       22    defined as the technical opportunity, and they have got them

       23    together.

       24         They're looking at acquiring Coda.  The yellow is

11:13:22 25    Coda.  The blue is Goodyear.  And that would be the point to

1    get Goodyear where Coda is, and the document talks about

2    Coda being -- having a functional prototype and having this

3    readiness level around a 4 or 5.

4         But elsewhere, Dr. Benedict -- and this is his

11:13:47  5    presentation -- he, on his part of the slide, he downgrades

6    Coda to a TRL of less than 2.  That's a technology readiness

7    level of less than 2.

8         So ask yourself if this makes sense.

9         And if you look at this document, Goodyear is at a 2.

11:14:08 10    So which is it?  Is Coda advanced and acquire Coda

11    technology so Goodyear can catch up?  Or is Coda actually

12    less advanced than Goodyear?

13         And I think you heard the testimony from David

14    Anckaert who agreed that Goodyear at this point in time had

11:14:27 15    no experience in peristaltic pump based self-inflating tire

16    technology, must less the world's first prototype of the

17    kind, or the SAE award or the prestigious Tire Tech Award

18    which Coda would win about two weeks later.

19         There it is.

11:14:46 20         Goodyear was up for this award in 2009 and Coda beat

21    Goodyear out.  But somehow, according to Dr. Benedict, he's

22    representing that Coda's readiness level is somehow below

23    Goodyear's.  But that didn't hold up with the witnesses on

24    the stand.

11:15:04 25         So David Anckaert then e-mails, if you feel the

1    urgency and need to secure access to Coda Development, let's

2    discuss.  That's after the first meeting.  And that was

3    after the Tire Tech article.

4         So what happens next?  General Motors calls.  They

11:15:24  5    want to do prototyping.  Goodyear responds, says we're

6    interested in -- David Anckaert responds, says we are

7    interested in this technology, whether it's with Coda or

8    not.

9         Talks about two or three-way deal with GM and Coda,

11:15:41  10    and says talk to the lawyers about investment IP revenues of

11    the deal.  That's what they're looking into at this point.

12         So here we are, we're at the fork in the road that we

13    talked to you about in the opening, which way is Goodyear

14    going to go?

11:15:56  15         Well, we get our answer.  Shortly after that, Dr.

16    Benedict files two invention disclosures, one on the

17    bidirectionality ideas and the other on the pressure ideas

18    that were confidential from the first meeting.

19         The next thing that happens at Goodyear is there

11:16:15  20    is -- they talk about this ICP, innovation creation process.

21    Well, they do their own internal process.  And it comes back

22    as a go.  So now Goodyear has their own SIT development.

23    But they're double tracking because they're also pointing

24    out that Coda remains to be considered as an open innovation

11:16:37  25    partner, but they've got the legal setup to review.

1          So what happens next?

2          Consistent with starting their own internal program,

3     we start to see e-mails that there is a goal at this stage

4     to produce a physical prototype.  And that's an e-mail with

11:16:55  5     Dr. Benedict.

6          And so what happens?

7          Now Dr. Benedict e-mails and says is there any

8     progress on the relationship with Coda?

9          And the next thing he does is to work on a project

11:17:12 10    development plan.  And I have that right here.  And the

11    project development plan is substantial.  It does all the

12    things that you would do in a project development plan.  It

13    has the gate reviews that you heard about, the white papers,

14    the project approach, prior art searches, and studies.  And

11:17:35 15    then it has pick brains of Coda.

16          And that task is assigned to Bob Benedict.

17          And the very next task, after picking Coda's brains,

18    is generate ideas for technical solutions to meet the need

19    of the product.

11:18:01 20          There is a lot of testimony about Lynn Geiger who put

21    this document together, and Dr. Benedict admits that he is

22    mostly providing the content for this document.

23          Okay.  What do we see next?

24          We see Christian Spieker reached from the Dunlop

11:18:25 25    group, reaching out to Coda to set up a new meeting, a

1    second meeting.  And Dr. Benedict writes, we want to review

2    your prototype.

3         Think about that.  While Dr. Benedict is working on

4    what Goodyear has now decided to do their own track, their

11:18:43  5    own internal development, and they're saying the stage, the

6    point is for Goodyear to make a prototype.

7         What do they do?

8         Dr. Benedict goes back, after deciding the next step

9    in the plan is to pick Coda's brains, to go examine Coda's

11:19:01 10    prototype.  And they set up a second meeting, and Dr.

11    Benedict sends an e-mail making sure that's what he's going

12    to get to do, that he's going to get to examine Coda's

13    prototype.

14         So that meeting happens on June 15.  You can see here

11:19:14 15    on the top left the pictures -- the picture that Dr.

16    Benedict took.

17         And what was discussed at that meeting, and you

18    heard -- you heard Mr. Hrabal talk about it -- and I'm not

19    going to go over everything, but the key trade secret that's

11:19:38 20    been at issue in this case, Mr. Hrabal does discuss his flap

21    tubes.  He discusses those.  That's what's patented.

22         And he tells Dr. Benedict, he explains the prototype.

23    He explains why he made it.  He explains the development

24    that led to it.  And he says, if I was the tire

11:20:03 25    manufacturer, and had the ability to make a tire any way I

1    want, I would put the tube right here.  And explains, and

2    explains the leverage and compression that operates this

3    prototype with these extensions and how it would even be

4    more so inside that tire.

11:20:25  5        That's what he explains to Dr. Benedict, and that is

6    exactly what Dr. Benedict put in his invention disclosure

7    that we looked at when I first started talking to you 20

8    minutes ago.

9        Let's look at the reactions.  What did Frantisek

11:20:48  10   Hrabal say when he was asked about that invention

11   disclosure?  He was definitive.  Is that Dr. Benedict's

12   invention?  No.  Whose is it?  It's mine.

13       But what did Dr. Benedict say here under oath?  Did

14   Mr. Hrabal ever tell you anything about pinching the

11:21:05  15   peristaltic pump tube without rim contact but rather by

16   adjust the forces in the sidewall?  I don't think so.  I

17   don't think so.

18       And it's not just Mr. Hrabal's word about having this

19   separate invention, that that was his idea.  Later in the

11:21:27  20   summer, he sets up a meeting with MPR, that's a design firm,

21   because he wants to take his prototype to the next level.

22       And he meets with them, and this drawing is what comes

23   out.  And he testifies he takes the prototype tire and he

24   goes to MPR and he goes through exactly what he went through

11:21:50  25   with Dr. Benedict.

1           And that is a tube in groove that is in the

2      sidewall -- up in the sidewall where there is cyclic

3      deformation that's close to but above the rim.

4           All right.  Interestingly, the same day, a few hours

5      after the January 15 meeting, we see David Anckaert

6      suggesting a different description of their self-inflating

7      tire.

8           And it says when rolling tire is compressed and pumps

9      air into the tire cavity through a special passage

10      integrated into the tire sidewall.

11           That is a few hours after Dr. Benedict met with Mr.

12      Hrabal.

13           Okay.  Benedict -- Dr. Benedict does a report, and

14      this is the first time he says let's develop this ourselves.

15      I don't want to work with Coda.  Monitor the IP closely,

16      because Coda has thought about this, unlike Dr. Benedict,

17      and Goodyear, Coda has thought about this product for many

18      years.

19           Now, you've seen this numerous times, so I'm not going

20      to belabor it again.  But the issue of IP conflict is

21      raised.  It's raised by Goodyear management in their

22      official gate review process to decide as a company what

23      they're going to do.

24           Dr. Benedict suggests to make the best product we can,

25      worry about IP later.  May have to negotiate later.  Not

1    constrained by IP.  Not right now.

2        And that's what they do.  And now Dr. Benedict -- this

3    is his invention disclosure, and he's differentiating what

4    he claims is this new invention from prior art where the

11:23:44  5    tube is in between the tire and the rim.

6        What Goodyear would later characterize to the DOE as

7    Coda.

8        And Dr. Benedict admits that there is no documentation

9    between the June 15 meeting with Coda and when he comes up

11:24:04  10    with this -- and when he claims to have come up with this

11    idea.

12        He says, he sits down with Mr. Losey.  In about an

13    hour they conclude, that, well, this seems like a pretty

14    good location.

11:24:18  15        There is no testing done.  There is nothing.  This

16    took Mr. Hrabal years to figure out.  Dr. Benedict and Mr.

17    Losey can figure it out in a few minutes chatting in their

18    office.

19        But they do testing.  They absolutely do testing.

11:24:35  20    They just do all of it after they claim to have invented the

21    idea.

22        But before I get to that, importantly, you may recall

23    the testimony of Mr. Losey.  He was not told that Dr.

24    Benedict went to Coda.  He didn't have any idea.

11:24:53  25        And then they asked Dr. Gobinath to actually go find

1       the pinching region.  So they already know the answer, and

2       they know where it is, and they want Dr. Gobinath to confirm

3       it with his computer modeling.

4            And what does he do?

11:25:11  5       He comes back and he says a brand new concept that

6       utilizes the cyclic deformation of a lower sidewall GG

7       groove area slot, not only circumvents this problem but make

8       the self inch freighting concept reasonably closer to a

9       practical reality.

11:25:29 10       So he's saying this is a brand new concept, what we

11      see here on the tube on the right, farther up on the

12      sidewall.  He says that's a brand new concept.

13           And if you look earlier here, he says many patent

14      disclosures on the concept of self-inflating tires advocate

11:25:46 15      the use of crushing deformation of a tube between the tire

16      and the rim.  And he says reference 1.  And who is he

17      talking about?  Right here.  Coda.  He says Coda is

18      different.  The Coda prior art is different.

19           This is not disclosed in the Coda 2007 PCT or in

11:26:11 20      anything else.

21           All right.  So what's Dr. Benedict doing?

22           He's still thinking about licenses Coda maybe.  And he

23      says in the bottom, he's got two alternatives.  He calls

24      them his visions.  He's got to two alternatives.  One is a

11:26:26 25      nonexclusive license, but the second is an exclusive license

1    where Goodyear would license -- would license Coda's IP and

2    then would sublicense to its competitors.

3         So here we are again at the fork in the road.  And

4    what happens?

5         Goodyear says we appreciate your interest, but we're

6    not in a position, another meeting would be premature.  And

7    they hold brainstorming sessions on self-inflating tires

8    themselves and go ahead and filed for these two patents, the

9    '586 patent on the pump tube location with a tube in groove

10   embodiment and the '254 patent, okay.

11        So we also see here there is other evidence of

12   misappropriation on the right, the inner face.  On the left

13   this is the Excaliber, you know, embedding the filament and

14   removing, that Mr. Hrabal testified about, that was the

15   basis of the program in Luxembourg.  The tube in groove was

16   the basis of the program in Akron.

17        We have the regulator that allows bidirectional air

18   flow on the left.  And on the right we have the tube in

19   groove pump location of the commercial project.

20        All right.  Goodyear takes off.  What happens next?

21        DOE, they get publicity, all kinds of awards, more

22   awards.  Then they do focus fleet testing.  So they get

23   these 1.5 million from the DOE and they have to report to

24   the DOE every year.  And those reports are fairly glowing.

25   They have some problems, yes.  They overcome them.  They're

1   running focus fleets, driving a thousand miles a day.  These

2   are AMT tires on the road driving down the highway next to

3   families in minivans.

4        It is significant what has to be done to get a new

11:28:37  5   tire on the road.  The suggestion that this technology

6   doesn't work, never work, never will work, you heard Mr.

7   Anderson, is just not credible.  It wouldn't be on the

8   roads.  And you see on the right it's inflating the tires.

9        The AMT tires are not losing their pressure.  NonAMT

11:29:06  10   tire are.

11        So what do we see here?

12        In 2016, the final report to the DOE, they talk about

13   the millions of miles that have been driven.  They talk

14   about the project's health indicator goes to green.  And now

11:29:21  15   at the bottom box with an eye towards commercialization.

16        So the technology works.  It's done.  All you have to

17   do is build it right, and what that means, an eye toward

18   commercialization that's now Goodyear can make this, they

19   can make it perfectly, all they have to do is make the

11:29:39  20   changes to their plants so they can produce a lot every day

21   to mass produce and keep it in the market.

22        But there's a very different impact on Coda after AMT

23   is announced.  You heard the testimony about all the

24   publications that contacted Mr. Hrabal saying what's going

11:29:56  25   on?  Whose technology is this?

1          And the e-mails about internal Goodyear confusion.

2     And Mr. Losey's e-mail saying stop all this discussion about

3     how we look like Coda, how much we're like Coda, we're in a

4     lawsuit, no more e-mails.

11:30:13  5          You heard about the partnerships, TVS, Apollo, that

6     were lost, where TVS and Apollo were raising concerns about

7     Goodyear.  And you heard about the complete destruction of

8     Coda from Mr. Hrabal and Mr. Jackson and all the doors that

9     were closed in their face because of Goodyear being in the

11:30:36 10     market, claiming this technology as its own.  Nobody had any

11     idea who owned what.  But Goodyear had hundreds of patents.

12     That's what they were reporting to and touting to the DOE,

13     that they had hundreds of patents.  Nobody was going to come

14     near this technology.

11:30:52 15          Okay.  What happens next?

16          Goodyear abruptly shuts down AMT.  So now we're in

17     2018.  This is the CTO report from September 2018.  And what

18     does it say?  To develop a fully reliable, fully reliable

19     marketable product, an additional six months will be

11:31:19 20     required.  You saw the documents.  They were scheduling

21     launches, an additional six months is what they needed.

22          Interestingly, if you look on the left, this

23     presentation is dated September 7.  But somebody makes a

24     change to it on apparently sometime or after September 12.

11:31:41 25     And it says after decision taken September 12 by John

1    Bellissimo to stop AMT valve stem project, all ongoing

2    activity is discontinued.

3         So how does that make sense?

4         We're six months from commercialization, and you heard

11:31:57  5    Mr. Anckaert testify ten years of work, millions of dollars,

6    I think he said 50 engineers put into this.  They're six

7    months from a fully reliable marketable product and then

8    John Bellissimo shuts the program down.

9         In response to that communication, what do we see?

11:32:23 10    Other senior managers saying pretty clear from a VP, I

11   do not want to hear anyone from GMS working on this project.

12   If they are, want to talk to them personally.

13        Shut it down.

14        Okay.  Now the engineers, they have one last

11:32:42 15   opportunity.  They get to write the closeout report which

16   pulls everything together.  And then what do they say?

17   Again, another six to 12 months would be needed to perfect

18   the AMT design for production ready.  Upper management

19   decided not to continue.  Overall the team felt it was

11:33:01 20   successful from a technical perspective.

21        So now think about Mr. Anderson coming in here and

22   telling you it never worked.  It never would work.  But this

23   is what the documents say.  This is what the engineers

24   wrote.

11:33:17 25        Okay.  And we had Mark Mineur come in, expert, 30

1    years at Goodyear, retired.  Now has his own tire companies.

2    Invented run flat and made the biggest tire in the world.

3         He looked at those issues that were in the closeout

4    report and he talked about how he agreed with the Goodyear

11:33:41  5    engineers that they were within months of resolving all of

6    them and they're pretty standard issues that you approach

7    when you set up a plant to manufacture a new tire.

8         Okay.  So now let's talk about damages.

9         As you have seen throughout this trial, Goodyear made

11:34:04 10    choices and choices have consequences.  It chose to take

11    trade secrets that did not belong to it and build a program

12    so large, and with a patent thicket so dense that no one

13    else in the industry would dare touch it or challenge

14    Goodyear in this space.

11:34:23 15         So Mr. Hrabal, he was shut out.  We just went through

16    some of that evidence.  Shut out in really two ways.

17         One, he's directly shut out from his own -- what used

18    to be his own trade secrets because now they're disclosed in

19    Goodyear patents, so they're not secret anymore.  They're

11:34:43 20    not trade secrets.  Goodyear has them and Mr. Hrabal can't

21    license them, can't even use them.

22         And he's getting otherwise shut out because of the

23    confusion in the market and Goodyear occupying that space.

24         Goodyear's choices have consequences.  And so you

11:35:08 25    heard this in the instructions.  The measure of damages is

1    to determine what would have happened had Goodyear taken the

2    right path, right?

3        So what would Goodyear have paid Mr. Hrabal and Coda

4    in a license agreement?  That's the question.  So that's the

5    way the law looks at this.  They call it, you know, this

6    hypothetical world, but for misappropriation.  So what would

7    happen if there hadn't been misappropriation?

8        What would happen if Goodyear would have taken the

9    right path instead of the wrong path?  What license would

10    they have agreed to?

11        And as Judge Lioi instructed, damages here is -- are

12    what's called actual loss, right?  So -- and that's measured

13    by lost profits.  And so what are the profits for Coda?

14        Coda doesn't make tires.  It doesn't make products.

15    It's an R&D company.  It generates technology.  And it has

16    to have an industrial partner that has big tire plants.

17        So the way that works is Coda partners with a tire

18    manufacturer, and tire manufacturer pays a license for

19    Coda's technology.  So Coda's lost profit here is the

20    licensing revenue that they should have gotten from Goodyear

21    that they didn't receive.

22        So you heard from Ms. Webster that this is determined

23    by considering what Mr. Hrabal and Goodyear would have

24    negotiated back in 2009 to partner together had that

25    actually happened, had Goodyear done the right thing.

1      That's what the law calls a hypothetical negotiation.

2          But this is how experts calculate damages in IP cases.

3      Now we heard a lot from Goodyear about, oh, imaginary this

4      or imaginary that.  But Mr. Jarosz, Goodyear's own expert,

5      admitted on the stand that is how it's done.  That's how he

6      does it.  That's how everybody does it.  That is how the law

7      calculates the damages in IP cases for actual loss and for a

8      royalty.

9          They create a hypothetical world to figure out what

10      money would have been earned if the wrongdoer had actually

11      done right and paid for the intellectual property.

12          All right.  So first, let's look at the

13      evidence -- and we've seen this before so I'm going to go

14      quickly through it -- that, in fact, Goodyear would have

15      licensed from Coda.

16          So that's what they're talking about doing.  If you

17      feel the urgency for a license, call me.  At the bottom.

18      Any progress on developing a technical relationship?  Yes,

19      we're interested in that technology, whether it's with Coda

20      or not.  Let's review the legal terms, the investment, the

21      IP, the revenues for Coda.  They're going down this road.

22          But what do they do?

23          They take Dr. Benedict's recommendation to do it

24      themselves, even though they've already looked and infected

25      their brains with the confidential information of Coda,

1    they're going to do it themselves.  They're going to go

2    their own way.  They're going to make the best product they

3    can without Coda, and they're going to worry about those

4    consequences later.

11:38:48  5        But they're still thinking about it.  They're still

6    thinking about this license, and even the right licensing

7    structure.

8        So had Goodyear not misappropriated this technology,

9    the technology that Goodyear says to the DOE is what's

11:39:08 10   opening the door to the market opportunity, all the prior

11   art, including Coda's, according to Goodyear, is pinched

12   between the tire and the rim, uses the rim as a pinch point.

13   And that doesn't work.  Doesn't work for tire manufacturers.

14        The rim doesn't work.

11:39:28 15        So Goodyear tells the DOE, fund our development of

16   something very different, new and innovative.  And that is

17   this tube in the groove that is farther away, above the rim,

18   because you don't have all those problems with rim and the

19   chafing and the damage to the tube and how different rims

11:39:50 20   can impact the functioning.  That opens the door to this

21   market opportunity for Goodyear.  And there is only one

22   place they can get that door opening technology.  And that's

23   from Coda.  So if Dr. Benedict doesn't take it and claim it

24   as his own, Goodyear's only option is to license it.  And

11:40:06 25   that's what they would have done.

1          So let's look about the calculation of damages then.

2      What would that license have looked like?  One of the things

3      you look at is market demand.  And Goodyear did a lot of

4      studies.  They talked about Honda.  They talked with BMW.

5      They put the Honda and BMW people in vehicles with AMT tires

6      and they loved it.  You saw that evidence.

7          They did a study of what the market would pay, called

8      a willingness to pay.  And they saw right here $200 for a

9      steer tire, $199 for a drive tire, and $157 for a trailer

10     tire.  And what they ultimately went with in their business

11     models was $150 a tire.

12         They also looked at how customers respond.  And

13     overwhelmingly customers said we will buy this.

14         And so they develop a business case using all of this

15     data, all of their detail market analysis, and what do they

16     expect to make in just the first five years of sales?  $411

17     million.

18         It's pretty valuable technology.

19         Now, later, in 2017, Norm Anderson who you heard from

20     revises that.  He adds in a bunch of costs.  He changes the

21     assumptions, and you heard him talk about it.  He said,

22     well -- he tried to say Brian Buckham no longer stands

23     behind this $150 number, but we showed him the e-mail from

24     Brian Buckham in 2016 confirming that he did.  And he

25     ultimately says, well, price isn't the issue.  Price was

1    fine.  It's the technology.  The technology never worked.

2         Well, we already looked and saw that that's not true.

3         And now we see this reduction of the business case.

4    But it's still highly profitable.  Even if what Mr. Anderson

11:42:19 5    said was true and even if Mr. Anderson's reductions in this

6    second revised business case were valid -- and we would

7    submit that they're not -- it's still highly profitable.

8    They're still making $68 million in just the first five

9    years.

11:42:36 10        And this is on one tire.  Remember, he reduced -- he

11   is only looking at the profits from one tire.

12        And here is Goodyear's own documents where Goodyear

13   includes in the business plan licensing its competitors like

14   Bridgestone.  That's what they planned to do.  And they

11:42:59 15   planned to get $25 a tire.

16        Okay.  So we've talked about demand.  We've talked

17   about the expected profitability.  We've talked about the

18   importance of the innovation.

19        And now let's talk about what the parties expected at

11:43:21 20   the time.  Both Ms. Webster and Mr. Jarosz agree you have to

21   look at what Mr. Hrabal and Goodyear would have expected in

22   their hypothetical negotiation.

23        Now, as far as Mr. Hrabal and Coda, in 2009, Mr.

24   Hrabal commissioned a study from that leading firm in the

11:43:38 25   Czech Republic, Cyrrus, who prepared an extensive analysis,

2731

1    as Mr. Jarosz, Goodyear's expert, acknowledged.

2         And Cyrrus concluded that the expected range of

3    royalty rates was between 4 to $8 a commercial tire and 1 to

4    $2 for a passenger tire.

11:43:59 5    And what was the evidence of Goodyear's expectations?

6    Well, we're looking at one right now.  They think they can

7    license it to their competitors for $25 a tire, and they

8    think they're going to make, depending on who you believe,

9    the original program manager, John Kotanides, $400 million

11:44:19 10   in the first five years, or Norm Anderson, $68 million in

11   the first five years.

12        So Goodyear had pretty significant expectations, too.

13   Q.   And the question is if you imagine if you're Goodyear

14   and you're thinking I can make somewhere in just the first

11:44:34 15   five years between 70 and $400 million.

16        How much do you pay for the technology that unlock the

17   door to that opportunity?

18        Goodyear had high expectations.  They would have paid,

19   if they had to, and if they would have done the right thing

11:44:57 20   and licensed, they would have paid something significant

21   because the technology opens the door to the market

22   opportunity that warrants it.

23        So Ms. Webster's royalty rates are not based on

24   speculation.  She relied on the best evidence available.

11:45:18 25   She relied on Goodyear's evidence.

1          She relied on the Cyrrus report for the royalty rates.

2     And she concludes that the damages ranges here are 89

3     million under the low case to 246 million under the high

4     case, depending on what the royalty rates are and when the

11:45:50  5     product would have been launched appropriately.

6          And the total Coda's actual lost licensing revenue

7     from not partnering with Goodyear in this deal is between 89

8     million and 246 million.

9          So as for Mr. Jarosz is saying that the loss needs to

11:46:26 10     be apportioned among the number of trade secrets.  Remember

11     his admission that what gets licensed is a bundle of rights.

12     What he once called access to a field of knowledge.  That's

13     how licenses work in the real world.  That's why it matters

14     that trade secrets 16 and 24 are foundational.

11:46:45 15          They are what cover that tube in that groove in that

16     optimal location, and they're what unlocked the door to the

17     market opportunity.  And that's exactly what Goodyear told

18     the DOE in writing in 2011.

19          Now, remember when Goodyear said that they would worry

11:47:02 20     about the IP later?

21          Well nothing can bring back the value of Coda's trade

22     secrets.  But doing justice for Mr. Hrabal and Coda to keep

23     it going as a business is possible in the form of a

24     significant damages award.  To give them the licensing

11:47:21 25     revenue that they should have gotten if Goodyear would have

 1    taken the right path.  This is the actual loss, the lost

 2    licensing revenues.

 3         Goodyear not only used Mr. Hrabal's trade secrets for

 4    itself, but it ensured that Mr. Hrabal and no one else would

 5    be able to do so.  Because it has the foundational patents

 6    on this technology that it got using Mr. Hrabal's trade

 7    secrets.

 8         Now, Coda is entitled, we believe, to more than

 9    compensatory damages.  And that's what we just talked about.

10    Compensatory damages.  To compensate for the actual harm,

11    the actual loss.  Because the law also has I think what

12    people colloquially hear as punitive in groove damages.

13         And as the judge instructed you, a defendant can be

14    held liable for punitive damages if the misappropriation

15    was -- and these are the magic words -- willful and

16    malicious.  It's got to be both.

17         Willful means intent, intentional.  We think that's

18    absolutely covered.  Malicious means, as the Judge

19    instructed you, with a conscious disregard for rights of

20    others.

21         And so here we're not alleging that Goodyear

22    misappropriated Coda's trade secrets, its ideas by accident.

23    We went through the evidence.  Dr. Benedict doesn't have any

24    background in peristaltic pumps for self-inflating tires.

25    All he's really ever done is go and evaluate the Cycloid for

1    an afternoon and oversee an intern writing one paper on a

2    different kind of self-inflating tire technology.

3         He meets Coda and comes out with his first two

4    invention disclosures and immediately starts downgrading to

11:49:32  5    everybody else who will listen in Goodyear which Dr.

6    Anckaert -- I'm sorry, Mr. Anckaert, says yeah, that's not

7    true.  It's not true that Coda is less advanced than

8    Goodyear.

9         Goodyear decides to do their own internal development.

11:49:50  10   Dr. Benedict is tasked with the plan.  One of the goals to

11   make their own prototype.  And what does he immediately do?

12        He says let's go meet Coda again.  Actually has the

13   nerve to put in a development plan to go pick Coda's brains

14   and then the next step to get the technological solutions

11:50:11  15   internally for ourselves.  That is willful and malicious,

16   and that's what he does.

17        He meets Mr. Hrabal.  He learns from Mr. Hrabal

18   secrets of the prototype, what Mr. Hrabal has concluded from

19   that and determined from his extensive years of testing.

11:50:32  20   And then he goes off and he submits an invention disclosure

21   that that's his idea, files for patents, gets them, and he

22   is off to the races.  And that is the end of Coda, because

23   they get more patents out of that and more patents out of

24   those original ones as they report to the DOE.

11:50:53  25        All the publicity, all the awards, all the confusion

1    from other third parties in the market and internal at

2    Goodyear.  Who owns what?  How are we different than Coda?

3    We don't know.  Not even internally at Goodyear can they

4    figure it out.

11:51:11  5         And you heard Mr. MacMaster.  You heard his testimony.

6    He was an advisory board member for free, uncompensated for

7    Coda.  He was the chief operating officer of Yokohama North

8    America for like 20 years, head of the U.S. Rubber, which is

9    what senior Goodyear people are now.  They're U.S. Rubber

11:51:33 10   Association.  He is a major statesman in the tire industry.

11         And what did he say?

12         He said you would have to be crazy to invest with

13   Coda.  He said if he was at Yokohama, he would kill that

14   investment given where Goodyear occupies in the marketplace.

11:51:50 15        He said that he typed in SIT into Google and he's

16   redirected to Goodyear's cite.  No way is anybody going to

17   touch Coda.  They're radioactive at this point.

18         So we ask that you award Mr. Hrabal and Coda

19   compensatory damages in the range of 89 million to 246

11:52:12 20  million plus punitive damages.

21         We have faith that the evidence will guide you to the

22   appropriate amount and bring justice to Mr. Hrabal and Coda.

23         So I think I'm going to reserve the rest of my time

24   for any rebuttal comments.  But I'll leave you with this.

11:52:48 25        When you go back to the jury room, you get to take

1    three things with you.  The facts, the law, and your common

2    sense and sense of fairness.

3         You have the ability to make this right.  That is your

4    decision, and it is in your hands.  Thank you.

11:53:08  5         THE COURT:  Okay.  Thank you, Mr. Cloern, you

6    have ten minutes remaining.

7         Members of the jury, we'll go ahead and take our very

8    brief recess.  So ten minutes, and same admonition I've been

9    giving you all along applies.  With that, the Court is in

11:53:28 10   recess.

11         THE DEPUTY CLERK:  All rise.

12         (Jury out, 11:53 a.m.)

13         (Recess taken.)

14         (Jury in, 12:05 p.m.)

12:07:23 15        THE COURT:  All right.  Mr. Griffith, you may now

16   present the closing argument on behalf of Goodyear

17   defendants.

18         MR. GRIFFITH:  Thank you, Your Honor.

19         May it please the Court, ladies and gentlemen of the

12:07:38 20   jury, first I want to say thank you.  Everyone on our side

21   of the courtroom is grateful for the time you've spent on

22   this case and the sacrifice you've made.

23         And it is essential to our legal system to have the

24   contributions from folks like you.

12:07:58 25        I told you in my opening statement that this case was

1     a shakedown based on alleged trade secrets made up after the

2     fact.  Phony secrets.  The evidence proved just that.  Look

3     how sketchy Coda's story is.

4           Mr. Hrabal supposedly told all these secrets to

12:08:24  5     Goodyear in two two-hour meetings back in 2009.  Never

6     writes anything down.  No written record of the alleged

7     trade secrets in 2009.  Goodyear and Coda go their own ways.

8     Then a few years later, Mr. Hrabal gets a new active

9     investor, an investment banker with two law degrees who

12:08:46 10    starts scheming to sue Goodyear.

11          Now, the banker wasn't at the two meetings in 2009.

12    But that doesn't stop him and some lawyers from making up

13    some trade secrets that Coda supposedly passed to Goodyear

14    back then.

12:09:14 15          The alleged trade secrets.  The ones that Goodyear is

16    getting sued on, were made up for the first time months

17    after this lawsuit was filed.  They were written up by that

18    investment banker, not by Mr. Hrabal, and then reworded by

19    the lawyers.

12:09:35 20          They were made up after this lawsuit began for

21    purposes of trying to score a jackpot.  The banker's words,

22    not mine.

23          That's what this case is about.  That is what the

24    evidence showed.  It's a fake case in search of a payday,

12:09:53 25    and you should reject it.

1        What did Goodyear and Dr. Benedict do to deserve this

2   phony lawsuit?  They made the mistake of investigating the

3   possibility of a collaboration with Coda, and then decided

4   that Coda had little to offer in the way of development

5   assistance.

6        Goodyear engaged in its own independent development

7   program and did its own creative work, which Coda could not

8   tolerate.  Coda fancies itself the inventor of SIT,

9   self-inflating tires, and does not want anyone else working

10  in that area without them.

11       I told you in my opening statement that there were

12  four simple truths that would prove -- that we would prove

13  and that would guide you in your deliberations in this case.

14       First, Coda did not invent self-inflating tires.

15  There was a lot of public information out there on the

16  subject before Coda came around.

17       Second, Coda itself made public a lot of information,

18  really a ton of information about its self-inflating tire

19  technology.

20       Third, Goodyear did its own independent development

21  work.

22       And fourth, Goodyear, like, everyone else who has

23  tried to make a self-inflating tire with a peristaltic pump,

24  failed to make it to market.

25       I want to go through these four simple truths and

1    review what the evidence showed.

2        And let's start with what was known before 2009, the

3    year in which the meetings took place.  And as a prelude to

4    that, I want to remind the jury that the very first thing

12:11:46  5    that Mr. Hrabal told you when he took the stand was I am the

6    inventor of the self-inflating tire.  That's what he said.

7        It wasn't true.  On cross, he had to admit that he

8    wasn't even the inventor of a self-inflating tire with a

9    peristaltic pump.

12:12:10  10        And as you learned, that's the actual truth, before

11    Mr. Hrabal, others came up with self-inflating tire ideas

12    and self-inflating tire ideas using peristaltic pumps.

13        I told you about the Sheppard patent in my opening

14    statement and you learned a good bit about it over the

12:12:37  15    course of the trial.  It's from 1967, more than 50 years

16    old.  It's a self-inflating tire that uses two peristaltic

17    pumps, one on each side.

18        One pump works when going in one discretion and the

19    other works when going in the other direction.  It's

12:12:54  20    bidirectional.  That's the term for it.

21        Dr. Sprague came here and explained exactly how this

22    worked and he played an animation for you so you could

23    understand what that technology is.

24        You also learned about the element patent owned by BMW

12:13:11  25    from the mid 2000's those.  It's a self-inflating tire that

1    use as peristaltic pump placed in a groove.  They call it a

2    duct, in either the rim or the tire sidewall.

3         Dr. Sprague also explained how this patent works.  It

4    has a tube in a groove design.

12:13:30 5         Now, Coda bears the burden of proving that its alleged

6    trade secrets were not generally known or readily

7    ascertainable from earlier work like this.

8         But Coda did almost nothing to teach you about these

9    earlier patents, this earlier technology.  We had to do

12:13:51 10   that.

11        Now, let's talk about some much Coda's publications.

12   Coda's counsel mentioned this one, and you've seen a lot

13   about this over the trial, the 2007 patent publication.

14        It has a lot of information in it about how to put a

12:14:09 15  peristaltic pump in a tire for self-inflating tire purposes.

16        And first off, two years before Coda's meetings with

17   Goodyear, you heard a lot about the document and how it

18   teaches that you could put a pump in the tire sidewall, in

19   the lug boss in the tire sidewall, or to be at a

12:14:43 20  separate -- they call it ancillary structure.  And explained

21   in detail how you could put a pump in any of those

22   locations.

23        Then we talked about Figure 3H a good bit.  And that

24   shows a circular chamber inside of ancillary structure,

12:15:05 25  sometimes called a flat tube.  And it points out the 3H

design can be done by putting it in the tire sidewall.  It's

right there, in the tire sidewall.

Mr. Hrabal agreed.

Now, let's play an animation that Dr. Sprague

presented to you to help visualize exactly how this works.

This is the ancillary structure.  But you can do it as

a lug boss.  That's the lug boss arrangement where it's

integral with the tire.  It's part of the tire sidewall.

And he's going to go show a cutout, you may recall, so

you can see a cross-section and how when the tire rolls, it

pumps.  It's near and above the rim, the pump chamber is,

and it's pumping.

Now, Mr. Hrabal agreed that this wasn't a secret

location, and he also agreed that it was near and above the

rim, which has big significance for the trade secrets in

this case, of which I heard very little in opposing

counsel's closing argument.

So Mr. Hrabal's agreed that you could put a pump, a

hose into that chamber, yes, so that would be a peristaltic

pump, yes.  If one does that with a 3H embodiment, the lug

boss embodiment, do you agree that the hose in that

embodiment would be near and above the rim?  Yes.

And in an area of the tire that cyclically deforms.

He agreed with that, that cyclically deforms here.

Refers to the location in the tire sidewall itself.

1          The lug wall is in the tire sidewall, right.

2          The lug boss is tire sidewall extension between the

3     tire and rim.  It's in the sidewall.

4          It's part of the sidewall.  It's clear.

12:17:24   5          We're going to come back to this when we get to the

6     trade secrets.

7          This is was part of what was known.

8          Mr. Hrabal wrote a Tire Technology article and he

9     talked about putting the tubing, creating the tubing in the

12:17:42  10    tire sidewall, in the tire sidewall.  And it's near and

11    above the rim.  That's a trade secret, an alleged trade

12    secret, and it was published by Mr. Hrabal.  It's in the lug

13    boss, and they call that in this in the sidewall because the

14    lug boss is part of the sidewall.

12:18:02  15          Another publication that Mr. Hrabal had back -- he

16    filed this in 2008, it was published in August 2009, and

17    this was all about pressure management systems.  It's

18    Exhibit D127, you'll have it back in the jury room with you.

19    It's full of information about pressure management systems.

12:18:26  20    And specifically about the items that are alleged to be

21    trade secrets here.

22          So that was the situation before Goodyear and Coda met

23    in January 2009.

24          Coda had published a lot of information about its

12:18:42  25    technology.  People in the prior art published a lot of

1    information about peristaltic pumps in self-inflating tires.

2         There was a lot of talk it generated, and awards had

3    been won by Mr. Hrabal about self-inflating tires, and folks

4    in the industry were intrigued with this opportunity.

12:19:04  5    So Coda and Goodyear meet and they sign a NDA as

6    Coda's counsel referred to.

7         A couple of things about that.  It provided that

8    things that become public were no longer subject to

9    confidential restrictions, which is common sense, right, but

12:19:21  10    that's an actual provision in the agreement.  That's section

11    11.  You'll be able it look that up.

12         The NDA also required that things that were disclosed

13    in writing or in tangible form had to be marked as

14    confidential.  If they're not marked they're not

12:19:42  15    confidential.  That's the rule under the agreement.

16         And everyone's obligations under the NDA expired on

17    January 21 -- I'm sorry, January 1, 2012.

18         Now, the January meeting in, 2009, conveniently, has a

19    very well developed good record of what was discussed and

12:20:05  20    what was disclosed.  It's in a PowerPoint.  And as Dr.

21    Coughlin admitted, it's got all the key points in it.

22    That's what you put on your PowerPoint slides, the key

23    points.

24         Now, interestingly, it discloses a good bit of

12:20:26  25    information about where to put the pump.  Put it in as part

 1    of the tire, rim, or in between, all viable options.

 2         You can create it as part of the tire sidewall, or

 3    tire wall only contains seat or separate tubing.  It's a

 4    tube in a groove.  You could make different lengths of the

 5    tubing, you can utilize dead space.  If gives a lot of

 6    information about how to do your peristaltic pump and where

 7    to put it.  A lot of options.

 8         We have illustrations which is consistent with what we

 9    have seen in the Tire Technology article and our

10    publications.

11         Now, Mr. Hrabal explained that what's actually in the

12    PowerPoint slide itself really isn't confidential.  It's

13    what he says about it that he believes is confidential.

14         So that is a great written record of what was actually

15    discussed.

16         Now, there is also a further written record, and that

17    comes in with meeting minutes that Goodyear prepares.

18    Goodyear employees put together meeting minutes that are

19    longer than this, but one of the things that -- and they

20    track basically the PowerPoint presentation.  They just

21    track the PowerPoint presentation.

22         But one of the things that Coda's counsel mentioned is

23    that they do say in here that a limitation on the Coda

24    concept is that it operates only in one direction and it

25    would require to add another SIT system on the second bead

 1    which will operate for the other rotating direction.

 2          So what does that sound like?  Sheppard?  Right.  It's

 3    the same thing as Sheppard.  Two tubes on each side of the

 4    tire.  One is oriented one way so that operates when you're

 5    going like this.  And the other operates in the other

 6    direction, in reverse.

 7          I'm going to come back to that later.

 8          David Anckaert and Bob Benedict testified about the

 9    January meeting.  The information did not strike them as

10    particularly confidential.  But even so, even so, no one

11    disclosed the PowerPoint presentation or something such as

12    that.

13          Goodyear was still interested in the possibility of

14    collaboration with Coda.  They had advertised that they were

15    a year away from production, production of an actual tire on

16    a production line once you start the next round of R&D.

17          So that suggests they're pretty far along

18    developmentally, and yet some of the information that came

19    in the meeting didn't seem to substantiate that.  So they

20    didn't really know where they were precisely in terms of

21    development.

22          The next thing this year, in 2009, Coda wins another

23    award.  It gives a presentation at the Hamburg conference.

24    And Goodyear gets a copy of that, receives a copy of that at

25    that time, or around that time.  And the remarkable thing

1    about this presentation is -- and you'll be able to go

2    through it.  Let me get the exhibit number for you.  It's

3    D90.

4         If you go through that and compare it to the Goodyear

12:24:05 5   presentation, it's basically the same.  It has the same

6    information about where to put the peristaltic pump.  Part

7    of the tire sidewall or tire wall contains only seat or

8    separate tubing.

9         Same illustrations that you find in the Goodyear

12:24:23 10  presentation confirming, confirming the impression that Dr.

11   Benedict and Mr. Anckaert had about the information that was

12   disclosed to them due respect seem to be particularly

13   confidential.  It looked like things they had seen in Coda

14   publications on the website and so forth.

12:24:42 15       Now, in May of 2009, Dr. Benedict is going to be doing

16   a European trip for work and he is interested in checking on

17   the prototype that Coda has.  He wants to know, is it

18   a -- are they pretty close to a fully functional prototype.

19   If they are, then a development collaboration would be

12:25:20 20  something that would leap them ahead in the development

21   schedule.  It would get them to where they don't have to go

22   through a long period of time developing a fully functional

23   prototype.

24        So they're interested in that.

12:25:32 25       They meet again in June for an hour or two.  Coda

1    showed them the PowerPoint again.  And showed them the

2    prototype tire and a prototype valve.

3         They were not mark confidential, which means that they

4    weren't deemed confidential under the agreement.  But no

12:25:53  5    matter, Dr. Benedict, you will recall, took photos of them

6    at that meeting.  And he never publicized those photos.

7         Mr. Hrabal says it was okay.  There was a disagreement

8    between them as to precisely of the timing of the

9    photographs, but it doesn't really matter.  It doesn't

12:26:13  10   really matter.  They agreed it was okay, and the photographs

11   were never published.

12        And this is testimony from Mr. Hrabal to that effect.

13        So about the prototype, Coda's counsel said that Mr.

14   Hrabal said, pointed to something and said put the pump

12:26:46  15   there with his finger.

16        There is no record of that, but what the facts are,

17   what the cold hard record says, is that a tube in the

18   prototype was pinched between the rim extension and the tire

19   extension.

12:27:06  20        So that's what it actually shows.  There can be no

21   debate about that.

22        And you could see that on the website.  There was a

23   website video.

24        So this wasn't something that was even confidential,

12:27:28  25   how it operated.

1          Now, Dr. Benedict gets back and writes up his trip

2     report.  He points out that there were no Coda facilities to

3     see, so he didn't think, based on what he had seen, that

4     there wasn't any substantial or significant helpful

5     development assistance that Coda could give, no functional

6     tire prototype.  This is just something for testing.  You

7     can't put it the on the car.  It's not close to being able

8     to put on a car.  No hard test data was provided.  So they

9     showed the same data that you could see.  You saw it on the

10    screen in the web site video.

11         So the recommendation that Dr. Benedict gave was to

12    monitor the public records to find out if they were getting

13    new IP, and that's a responsible thing for a responsible

14    company to do, to keep an eye on what other company's

15    patents are, patent applications are in a given area, you

16    can keep an eye on whether you are going to have a need for

17    a patent license or not in the future.

18         So that was the right thing to do.

19         What is absent from the record, from any record, and

20    including interest Coda's record, is evidence of Coda

21    placing a tube in a groove in a tire sidewall, or placing a

22    tube in a groove in a bending region, or placing a tube in a

23    groove in a compression side of the neutral axis of the

24    bending region.

25         And you will recall Dr. Benedict's invention, and I'm

1    going to come back to that.

2         So those are the facts.  No conspiracy theories, no

3    speculation.  Those are facts.

4         At the end of July, there is a gate B review to make a

5    decision as to whether Goodyear, Dr. Benedict as a principal

6    investigator, will go ahead to the next phase of R&D.  So

7    they've just been in concept phase, and now they're going

8    to -- the question is whether they're going to move into the

9    prototype phase and experimentation phase, and they decide

10   to do that.  They note, as you may recall, that the project

11   is a long shot.  But they're going to do it.

12        Now, Coda's counsel mentioned the three invention

13   disclosures in this timeframe.  And he kind of sped through

14   them.  Let's take our time and go through them and see what

15   they actually say.

16        So the first invention disclosure was on -- this is

17   March 2009.  It was on the bidirectional peristaltic pump.

18   And you may recall that what Mr. Hrabal claims as his

19   concept -- it's not clear who said it in the January

20   meeting, but it doesn't matter.  His concept was two tubes,

21   opposite sides of the tire, arranged in -- oriented in

22   different directions, just like the Sheppard design.

23        And what Dr. Benedict came up with was using one tube

24   on one side and using two T valves, an inlet and an outlet,

25   to accomplish bidirectionality.  That was his idea.  It was

1    different from what others had done.  And they're placed 180

2    degrees apart.  That was his idea.  It's different.  There

3    is no disputing that.

4         Now -- and this is the comparison.  You may recall

5    this from my opening statement.

6         The other design, Mr. Hrabal says is his, is two

7    pumps.  The Benedict design is one pump on one side, two T

8    shaped valves 180 degrees apart.

9         There is also an invention disclosure on an adjustable

10   pressure regulating valve.  And this related to, as Dr.

11   Benedict testified, it's kind of a cruise control design.

12   And you could pump your tire up, and then once it was at the

13   pressure level that you wanted, you could press a button.

14   It would have been a plunger on it, you could press a

15   button, and that would set your pressure level for your

16   self-inflating tire at that level.

17        So you pick the pressure that you wanted in that tire,

18   and then you set it by pushing the button.  It's not an idea

19   that is in any of the alleged trade secrets.  You're not

20   going to find it there.  In fact, you may recall I asked Dr.

21   Coughlin about this.  And Dr. Coughlin admitted there was no

22   mention of a plunger or the setting of the pressure in that

23   fashion.

24        In fact, he said this does not disclose any -- I

25   asked:

1          "Q.  This does not disclose any trade secrets 3, 4, 20

2     or 22.

3          Those are the pressure management trade secretes.

4          He says:

5          "A.  Specific language in here does not map on to

6     those trade secrets, but the general intent and it was

7     created then into the patent application, in my opinion did

8     disclose the trade secret in the patent application."

9          Well, there was one problem with that.  You may recall

10    that no patent application was filed on that valve.  That

11    Mr. Cloern told you in his opening statement that it

12    couldn't be filed because of the 2009 PCT.  So no witness

13    actually analyzed that against it here.

14         However, no patent application was ever filed.  It

15    does not use any of the trade secrets in 3, 4, 20, or 22.

16    Those are the pressure management trade secrets.

17         All right.  Here is the third invention disclosure.

18    And this is the one about the tube in a groove in the

19    bending region.  So Dr. Benedict and Bob Losey thought of

20    this in August of 2009.  Late August 2009.  And Coda has

21    made much of, well, they didn't do any work on this before

22    then.

23         Well, because they hadn't thought of it.  This is the

24    conception of the idea.  This is the first conception of

25    this idea by them.  They both have substantial background in

1   finite element analysis.  They both have been tire engineers

2   for a couple decades at this point in time.  In fact, this

3   is a finite element analysis grid.

4          And first, they point out the prior art.  What's the

12:34:41  5   prior art?  It's a tube in a groove near and above the rim.

6   But it's not their invention.  It's not in the bending

7   region, which we're going to get into in a moment.  But

8   that's the prior art.  Tube in a groove near and above the

9   rim.

12:34:58  10   What's their invention?  They put a tube closed by

11   compression due to tire sidewall bending in the footprint.

12   That gives them freedom of placement and no rim contact.  So

13   that was a potential advantage.

14          Now, did Dr. Benedict and Mr. Losey know that was

12:35:27  15   going to work at that point in time?  No.  They didn't know.

16   They were going to have to do experimental work to figure

17   that out.  That's what inventors do.  You come up with an

18   idea and then you work on it.  And they did.  They had Dr.

19   Gobinath do finite element analysis.  But they didn't just

12:35:46  20   do that.  They also did their own experimental work and they

21   started making prototypes all in the fall of 2009.

22          There was evidence presented, I believe, that they

23   didn't know at this point in early September whether they

24   were going to use a tube between the rim and the tire wall.

12:36:06  25   And they didn't know that at that point in time.

1       When they tried that, they gotten too much abrasion,

2   but is that something you can solve?  Maybe.  With this

3   work, they didn't know for sure, so you got to keep your

4   options open.

12:36:24  5       They file a patent on it, patent application, and they

6   explain exactly what their principle is.  You may recall Dr.

7   Benedict showing the principle to you.  If you bend it, and

8   your grid, your FEA grid has pinching.  On one side of the

9   neutral axis you get expansion.  On the other side you get

12:36:48  10   contraction.  That was their principle.  You had a

11   compression side and an expansion side -- extension side of

12   a neutral axis.

13       They described that in their patent application.  It's

14   not a patent on tube in a groove near and above the rim.

12:37:05  15   It's not a patent on putting it there.  It's a patent on a

16   particular way and how of getting a tube to be pressed shut

17   in regions of a tire that have certain stresses and strains.

18       They explain this in detail.  And they explain

19   that -- this is important -- they wanted the groove to be a

12:37:37  20   maximum distance from a neutral axis.  They wanted to

21   cross -- he explained that.  If you would cross the neutral

22   axis, you won't get pinching.  You won't get pumping.  You

23   had to stay on one side of the neutral axis and be a maximum

24   distance away from it.

12:37:56  25       They explained that this if phenomenon can be achieved

2754

1    in multiple places in the tire sidewall.  Not just down by

2    the bead.  So they're thinking in terms of the how, what are

3    the stresses?  What are the forces going on in the tire?

4    They're not thinking put something there.

12:38:21   5        Now, what was the principle that Mr. Hrabal described

6    to you in his testimony about how he said his idea operated?

7    He said it's a scissoring effect.  If you want to cut

8    something harder, you have to push your object towards the

9    axis of the scissor.  Towards the axis.  Okay.  That's the

12:38:39  10   opposite, exactly the opposite of what Dr. Benedict and Mr.

11   Losey came up with.

12        There could not be a more clear distinction between

13   what Mr. Hrabal asserts as his idea and what Dr. Benedict

14   and Mr. Losey describe as their idea.

12:38:59  15        That's technical.  And those facts can't be debated.

16   But that's technical.

17        What about -- what about the reaction from Mr. Hrabal

18   when he sees the Benedict and Losey patent application

19   because the patent application gets published?

12:39:24  20        In 2011, Mr. Hrabal and others at Coda see it.  And

21   they learn about Goodyear's work on self-inflating tires

22   from news about the DOE grant, the Department of Energy

23   grant.

24        I'm sorry.  This was -- before I go to that, this was

12:39:44  25   Dr. Benedict's testimony regarding how his idea was actually

1    the opposite of the scissoring effect.  The opposite.

2         All right.  I'm going to come back to the reaction,

3    but this was mentioned, the MPR report was mentioned in

4    opposing counsel's closing argument.  And I don't know what

12:40:11  5    to say about this.  This was supposedly Mr. Hrabal's -- it's

6    not written by him.  But it's supposedly his concept, his

7    concept of a tube in a groove in an outward facing groove.

8    That's in his earlier patent applications, but he says this

9    is the idea.

12:40:33  10        Well, it's a big gash.  It goes all the way across the

11   tire sidewall almost.  It certainly crosses the neutral

12   axis.  It would rip apart, crossing the neutral axis it

13   wouldn't pump.  It's not the same thing that Benedict and

14   Losey had done.

12:40:50  15        I asked him.  That would be a dangerous way to make a

16   tire, correct?  He said I don't believe so, but I could not

17   make a judgment.

18        And they say that Dr. Benedict didn't know much about

19   SIT, self-inflating tires and how to design them.  Well, I

12:41:09  20   think he knew a thing or two.  I think he knew not to do a

21   design like this.

22        And if you make a tire like, it would rip open,

23   correct?

24        Could be.  I don't know.

12:41:21  25        Could be, I don't know.

1          That's not anything like what Dr. Benedict came up

2     with.

3          I don't know what it is.  But it's not like that.

4          And if he told a tire manufacturer to do that, they

12:41:37  5     were wrong because that tire with that design won't last.

6          All right.  What was the reaction when they see the

7     Benedict and Losey patent?

8          So let's go back in time to August of 2011, because

9     their reactions say a lot of the folks at Coda.

12:41:59 10          We showed you Coda e-mails in evidence in which they

11     discuss their thoughts about the impact of Goodyear's patent

12     activity on Coda and its business, and given the claims in

13     this case, you would have thought that Mr. Hrabal and others

14     at Coda, upon learning of those patent applications, would

12:42:22 15     their reaction to be to scream.  They've taken my trade

16     secrets.  That would be what you would expect.

17          But that's not what happened.  Coda never mentioned,

18     never mentioned trade secrets in its reaction to seeing

19     Goodyear's patents.  There was never any reaction of, hey,

12:42:39 20     that's what I told Dr. Benedict in that meeting.  I don't

21     understand that.  How can that be?  If you think someone has

22     published your trade secret, aren't you going -- isn't that

23     going to be your reaction?

24          Well, what do we see?

12:42:56 25          I do not think this is bad news for us.  If I were

1    Goodyear and wanted our SIT, I would do exactly the same

2    thing they did now.

3         That was Ladislav Szabo who said that.

4         Mr. Topoli said -- looked at SIT, you know, our

12:43:23 5    patented protection.  That's what he mentions.  Their

6    patented protection.  Not trade secrets, and says the ideal

7    solution if it's possible they will realize during their

8    research that bypassing our patents is disadvantageous.

9         So Mr. Topoli is looking nor a patent licensing

12:43:42 10   opportunity.  That's rational.  That's logical.  They have a

11   big patent portfolio, and they see this.  It's in the

12   self-inflating tire area.  They realize it's possible that

13   what Goodyear is doing might fall within the scope of their

14   patents.  They don't know.  Goodyear doesn't know.  Why?

12:44:02 15  Because nobody knows for sure what the product is going to

16   be at this point in time.  Nobody knows.  Nobody knows for

17   sure what the scope of Coda's patents is going to be at this

18   point in time.  It's not clear.

19        You may recall learning that the U.S. patent that

12:44:19 20  issued from that 2007 PCT, so the PCT is just an

21   application.  The patent that issued was maybe 2020 or so.

22   It was after Mr. Jackson came on board, after to 2015, and

23   it was plausible that it was 2020.

24        So it takes a long time.  Nobody knows.

12:44:41 25        This is Mr. Hrabal's reaction.  This patent does not

 1    harm us.  He also says it clearly falls under our patent.

 2    This is in his communications with Richard Pivnicka who is a

 3    counselor to Coda.

 4         There is even more.  When he says clearly fall under

 5    our patent, he's talking about the application for the '254

 6    patent, the bidirectional.  He thinks that might be within

 7    the scope of an earlier Coda patent.  So -- and you'll be

 8    able to look at this document and read through the whole

 9    thing.  It's Defense Exhibit 179.  This is a quote from it.

10    He says, Goodyear works on the solution, i.e., they work for

11    us."  They work for us.

12         He was looking at the possibility that Goodyear was

13    going to prove up the concept in a way that he had not been

14    able to do and that there might be a licensing opportunity

15    there.

16         What did Coda do after that?

17         Well, for the next three years, Coda continued to

18    pursue licensing activities, and this was communication with

19    a company called Alliacense, a licensing operation, and he

20    was looking at building a licensing strategy through them,

21    possibly for addressing Goodyear and getting a licensing

22    deal with them.

23         Now, the year goes on.  This is 2013.  And Mr. Hrabal

24    is now looking at the '586 patent, the Benedict and Losey

25    patent.  And what is he doing?

1          He's comparing some of his earlier work against it and

2     saying I think this is the same idea.

3          And so he has a website.  He has a website on here.

4     This is from 2003 to 2007.  And he circles a location on the

12:47:01 5     website that says this shows the location of tire tubing.

6     If you make seat for separated tubing in tire sidewall in

7     this location, then it becomes what is described in Goodyear

8     claim 1.  That's what he thought.  He thought this was the

9     same location as the Goodyear.  You may he recall from those

12:47:21 10     presentations he had given to Goodyear and the industry,

11     that he specifically described that you could have a seat

12     for separate tubing in the tire sidewall.  And that's what

13     he's describing right here.  He's describing that that, in

14     his opinion, is near and above the rim.

12:47:39 15          Now, you may recall I asked Mr. Hrabal about when he

16     created the list of trade secrets, his involvement in the

17     list of trade secrets that are actually in your jury

18     instructions, the ones that you're going to be looking at.

19          And I asked him if he wrote the list.

12:48:12 20          I was helped.

21          By your lawyers?

22          Yes.

23          So your lawyers and you wrote the list?

24          Yes.

12:48:18 25          Do you know who wrote the first draft?

1          I don't know who wrote the first draft.

2          Well, we find out.  Enter Daniel Jackson, an

3     investment banker.

4          And you're going to find out that the long list of

5     trade secrets didn't exist until he came in and put them

6     together.

7          This is -- he comes in and he's interested in the

8     possibility of suing Goodyear for patent infringement.  He's

9     hiring potential litigation -- or looking at potential

10    litigation funder and lawyers he's talking with and

11    investigating the possibility.  But then he realizes and

12    says, I can't do anything now.  There is no damages.  They

13    haven't commercialized.

14         But he's looking at a potential jackpot.  That's his

15    return on investment.

16         This lawsuit has been filed.  There is no patent

17    infringement claim that they can bring.  So they filed a

18    lawsuit in August of 2015, and in November of 2015, Mr.

19    Jackson puts together a list of potential trade secrets,

20    potential trade secrets.  Not actual trade secrets.

21         He divides them into two different categories.  There

22    are those that have some hope of arguing a degree of

23    secrecy.  Some hope of arguing a degree of secrecy.  But for

24    many these, the concept disclosed to Goodyear is uncertain.

25         The other category is almost certainly published by

2761

1    Coda and used by Goodyear, useful for compilations.

2    Compilation theory, excuse me, was some topics of disclosure

3    as somewhat nonspecific.

4         So Dr. Jackson is the brainchild of the trade secrets

12:50:25  5    that we're looking at in this case.

6         For the second category, for the second category,

7    almost certainly published but maybe we can put them in some

8    kind of a compilation.  We asked him about that.  How did

9    that come about?  Did you speak with Mr. Hrabal?

12:50:43  10   Mr. Hrabal's not an IP lawyer.  He's a Czech engineer.

11   He's also -- he is the last person I would ask about our

12   compilation theory.

13        Shouldn't he be the first?  He's the guy who

14   supposedly came up with the trade secret.  Mr. Jackson

12:51:01  15   wasn't in the 2009 meetings.  He wasn't with the company in

16   2009.

17        Shouldn't Mr. Hrabal have been the first person you

18   ask?

19        We're going to go through this chart in connection

12:51:25  20   with some of the specific trade secrets because it records

21   interesting information with respect to them.  And

22   undermines that there are any real trade secrets here.

23        In fact, this chart undermines that there were any

24   trade secrets in existence in this 2009 that they were in

12:51:44  25   possession of trade secrets in 2009.

2762

1          After all, why do you have to come up with a list of

2     potential trade secrets if you knew what your trade secrets

3     were in 2009?

4          All right.  Let's start with some of the trade

12:52:02  5     secrets.  I didn't see too much of those discussed with any

6     kind of focus in Coda's counsel's presentation.

7          So the first one is Coda's design, development, and

8     testing regarding the feasibility and improvements in

9     self-inflating tire technology by embedding a tube in a

12:52:26 10     groove in a sidewall to act as a peristaltic pump.

11          Now, you have in your jury instructions an instruction

12     about definiteness.  So a trade secret must be definite.  It

13     must be particular.

14          And one of the problems with this alleged trade secret

12:52:45 15     is that it doesn't say what the design, development, and

16     testing is.  What is the testing that is described by this

17     trade secret?  It's not set forth in the alleged trade

18     secret.

19          So Dr. Sprague testified that this is indefinite.  You

12:53:07 20     can understand what embedding a tube in a groove in a tire

21     sidewall means, to act as a peristaltic pump.  That's

22     understandable.

23          But what's the rest of this stuff, probably from the

24     lawyers is my guess, but what's that?  And he testified you

12:53:25 25     don't know.  It's not definite.  And he's right.

1          Nobody, no witness, not one witness from the other

2     side testified to the contrary.  Not one -- Dr. Coughlin

3     never opined on this.  That testimony is unrebutted.

4          Now, as to embedding a tube in a groove in a tire

12:53:46  5     sidewall, that wasn't secret.  How do we know that?  Well,

6     going back to the 2007 PCT -- so remember 3H, the lug boss

7     embodiment has a tube and a slot.  It's called a slot, in

8     the tire sidewall.  It's part of the tire sidewall with a

9     hollow hose to contain the chamber in the slot.  This is

12:54:19 10     called the slot.

11          Well, this is Mr. Hrabal's own words.  Slot equals

12     groove.  A hollow hose to contain the chamber can be put

13     into slot form by matrix 9.  That's the language from the

14     2007 PCT, paren, slot equals groove.

12:54:47 15          There is no doubt about this.  This one is easy.

16          Now, Coda's counsel may argue that he's asking a

17     question.  This is what he's telling them, his lawyer, this

18     is actually what he's telling his lawyer.  And they're going

19     to say, he's just asking a question.  But there is no

12:55:02 20     question mark at the end of that.  And Mr. Hrabal is the

21     engineer here.

22          Now, here is a contradiction in that.

23          So Mr. Hrabal tried to say in his cross-examination

24     that he didn't know what groove meant.  So how is it then,

12:55:31 25     how is it that he could tell Goodyear to put a tube in a

2764

1    groove in 2009 if he isn't familiar with that term?

2         That doesn't add up.

3         That's an excuse to get out of what he understood to

4    be the case which is that this is a slot, this is a groove.

12:55:54  5    This is a tube in a groove in the tire sidewall where it

6    presses and deforms is a peristaltic pump.

7         The 2007 PCT application discloses this trade secret.

8    It's not secret.

9         All right.  Let me talk about trade secret 24.  This

12:56:17 10   is also a pump location.  This is what they said are

11   foundational trade secrets, the most important.  That's what

12   they say.

13        So, again, we have this preamble, Coda's knowledge

14   regarding the optimal location for placement of a pump in a

12:56:31 15   fire for tire manufacturers, namely in the sidewall close to

16   and above the rim where the tire cyclically deforms in

17   response to deformation.

18        I don't know what all that preamble means about

19   knowledge.  The knowledge isn't described in here.  Dr.

12:56:49 20   Sprague explained that that is indefinite.  Again, nobody

21   rebutted that testimony.  No witness on their side said Dr.

22   Sprague was wrong.  Dr. Coughlin did not address it.

23        But let's just focus on what comes after namely.  So

24   they're going to say, well, all that leads up to what we

12:57:12 25   have in blue on the slide is just gobbledygook.  You don't

1    have to pay attention to that.

2          So that's, you know, that's the real trade secret

3    they're going to say.

4          Well, we know, right, we know from the 2007 PCT that

12:57:26  5    putting a peristaltic pump in the sidewall close to and

6    above the rim where the tire cyclically deforms was known.

7    We've been through that.

8          This is Dr. Coughlin explaining that this is a

9    transitional -- foundational trade secret.

12:57:45  10          And the portion of the 2007 PCT that explains that

11    this is in the sidewall is on page 17, it says it's possible

12    to create the chamber with the extended surfaces in the tire

13    sidewall.  That's Figure 3H, done in the tire sidewall.

14          Obviously near and above the rim.  I mean, you can see

12:58:09  15    it.  And that's why -- that's what -- same thing that you

16    see in the Tire Technology article.  This is not secretive

17    information.

18          Mr. Hrabal agreed in cross-examine here.  If you do

19    this 3H embodiment, it's near and above the rim, he said.

12:58:28  20    It's part of the tire sidewall.  That trade secret

21    is -- that trade secret that you see there, isn't secret.

22    This is what he doesn't want to go through.  They want to

23    speed through a whole bunch of documents that you don't get

24    to look at, but they don't want to look at the actual trade

12:58:49  25    secrets.

1          All right.  Trade secret 1, what's that about?

2     Bidirectionality, right.  That's pretty -- a system that

3     operates when the tire rotates in either direction with

4     symmetrical implementation of the pump system in the tire.

12:59:11  5          Where do we see that in?  That's the Sheppard patent,

6     55 years old.  You don't get to claim as a trade secret

7     things that other people came up with 55 years ago.  That's

8     not what trade secret law is all about.  It's real clear.

9          All right.  Trade secret number 2.  Also related to

12:59:36 10   bidirectionality.  It's got -- the lawyers really went to

11    work on this, or maybe the investment banker, but this has

12    got a lot of moving parts in it and it's kind of hard to

13    tell exactly what it means.

14         Dr. Sprague opined it was indefinite.  Nobody

12:59:54 15   challenged that.  Nobody challenged that.

16         But it does say a bidirectional arrangement

17    implementing the principles of symmetry such as the example

18    of a 360-degree oppositely oriented pumps in each sidewall

19    of the tire.  That's just an example.  Okay?

13:00:10 20        So, again, the Sheppard patent is another example of

21    this trade secret.  It's not secret.

22         This was another patent, Lindner patent that discloses

23    the same idea.

24         Trade secret 11, is they also group into this a pump

13:00:33 25   configuration.

1        And it's indefinite.  It has the same confusing

2   description.  I don't know exactly -- it's hard to say

3   exactly what this means.  But we do know that Mr. Hrabal did

4   not testify that he told all of this to Goodyear.  On the

13:00:50  5   left, on this slide, is what Mr. Hrabal said, says that he

6   said to Goodyear.  And on the right we show how that's only

7   a handful of the elements of this trade secrets.

8        You have to judge, your job is to judge, did Goodyear

9   even use, let alone misappropriate, did they even use this

13:01:15 10   idea?  You're allowed to come up with an idea on your own,

11   by the way.  You're allowed to do that.  That's not a

12   violation of someone's else's trade secrets, if you

13   independently come up with your own idea.

14        But this, they don't even identify things that

13:01:32 15   Goodyear did that is commensurate with the trade secret.

16        Trade secret number 3.  That's all about using a

17   regulator with a threaded member.  That's a multiple

18   syllable way of saying set screw.  That's a set screw.  And

19   you can adjust the space between a -- in a reference

13:01:53 20   pressure.

21        Well, the 2009 PCT allows for adjustment of the

22   pressure box.  You'll be able to go through that in detail.

23   It doesn't specify in there that you can adjust it with a

24   set screw, but set screws are the most commonly known ways

13:02:13 25   to do that.  And it describes that you do want to be able to

1    adjust the setting for that.

2            On Coda's website, they showed adjusting the pressure

3    setting for the self-inflating tire system using a threaded

4    member.  You could see it on there.  And, look, Coda didn't

13:02:35 5    invest set screws, right?  I mean those go back centuries.

6            So he agreed that that was shown on his website.

7            And Dr. Sprague explained why this would have been

8    something that's readily ascertainable, readily

9    ascertainable.  So it's not merely is it generally known, as

13:02:54 10    you'll see in your jury instruction, but it's also, is the

11    idea readily ascertainable.  And set screws are readily

12    ascertainable.

13            This is alleged trade secret number 20.  There is a

14    lack of evidence here that it was even disclosed to

13:03:11 15    Goodyear.  Here is what Mr. Hrabal described disclosing to

16    Goodyear.  And you can see on the right it doesn't add up to

17    all the elements in the trade secret.

18            So this was his description that he disclosed.  It's

19    not the same as the trade secret.

13:03:30 20            Trade secret number 22.  Dr. Coughlin agreed that that

21    was actually disclosed by the 2009 PCT.  It's not secret as

22    of August 2009.

23            So that is 13 years ago.

24            And you can -- you can confirm it for yourself, the

13:03:55 25    disclosure in the 2009 PCT are ample.

1          All right.  Now, here is one, alleged trade secret

2     number 5.  This is what Coda's counsel referred to as

3     Excaliber.  So the idea is pulling a filament that's been

4     coated with silicone from a green tire to leave a pump

13:04:19  5     chamber inside.  So you mold a pump chamber into the green

6     tire.  You use a filament coated with silicone to pull it

7     out.

8          Now, you may recall -- well, let's go back to the

9     Jackson chart, this one is particular interesting.  The

13:04:38  10     Jackson chart identified this alleged trade secret.  At the

11     time it was potential.  Maybe they could call it a trade

12     secret.

13          Well, what did Mr. Jackson say about the trade secret?

14     He recorded that F.H., Frantisek Hrabal, did this at a

13:04:56  15     retread shop.  He says he often told the story.  He often

16     told the story.  That doesn't sound like a trade secret.

17     What's more, he don't remember if it came up in the Goodyear

18     meetings.  He doesn't recall.

19          And he points out further, it sounds like Frantisek

13:05:15  20     Hrabal did not try to keep it secret.  So this isn't a trade

21     secret.

22          You may recall that I asked Dr. Coughlin how he even

23     could assess whether the Goodyear engineers who came up with

24     the silicone strip -- it wasn't a filament coated with

13:05:38  25     silicone.  It was a sill crown strip.  I asked him how he

1    could tell whether they had ever had any -- if they got the

2    idea from Coda.

3        And he had no idea.  He had no idea whatsoever.  It

4    was two and a half years later.  They were in Europe.  They

5    were engineers with their own engineering background.

6    He didn't know anything about them.  He didn't know the

7    circumstances under which they came up with their invention,

8    which was in the patent.  He had no idea whatsoever.

9        So -- and that's actually the way all of these trade

10   secrets are, all these alleged trade secrets are.  There is

11   actually no evidence that Goodyear, in doing this work, in

12   whatever is accused of being a trade secret, got the idea

13   from Mr. Hrabal.

14       The big argument, the big argument there are those

15   three inventions disclosures that I talked about at the

16   outset; the bidirectional, the valve and the tube in groove

17   in bending region.

18       Well, it's pretty clear that Dr. Benedict's ideas, Mr.

19   Losey's in the case of a tube in the groove in the bending

20   region, got their ideas from their own.  They're different

21   from what Mr. Hrabal.  There is no scissor effect.  They're

22   admitted in the case of the valve not to map on to the trade

23   secrets.  They're different.

24       All right.  So there is -- oh, the 2007 PCT is also

25   interesting for this alleged trade secret 5.  It describes

1    that you could use a matrix, it's called, to form a chamber

2    in the green tire.  And you could coat the matrix with a

3    separator.  So a separator to be like silicone.  You know,

4    it could be that.

13:07:45    5         So -- and then he also says in the 2007 PCT, you could

6    pull it out longitudinally.  These are not trade secrets.

7         And Dr. Sprague discussed this.

8         Now, let's go to trade secret 7 which relates to the

9    interface.  So the interface is a way to go from the outside

13:08:14   10    to the inside of a tire.

11         In this particular interface has about ten different

12    requirements for it.  And first off, it's note clear exactly

13    what it's getting at.

14         But if you folks can sort through it and figure it

13:08:31   15    out -- Dr. Sprague explained it's indefinite.  Nobody

16    challenged him.  But if you folks can figure it out, what

17    you're going to find is that most of the requirements that

18    are in it are not even close to being met by the thing

19    that's been identified as the thing that's supposedly uses

13:08:55   20    the trade secret.

21         And this is why Dr. Coughlin didn't go through that

22    very carefully.  This is why Coda's counsel didn't go

23    through the trade secrets in any detail.  This is not a good

24    subject for them.

13:09:07   25         The investment banker's chart created after the --

 1    defining the trade secrets after this litigation began, is

 2    instructive on this.  He said the mock-up of the interface

 3    was F.H. doesn't remember discussion of this.  The mockup is

 4    displayed at trade shows.  That's not secret.  Him playing

 5    them at trade shows isn't secret.

 6        Trade secret 23.  This is the test results, which is

 7    one test result, 6.5 absolute atmosphere.

 8        Whether it's a trade secrets or not, how does that,

 9    how is that a multi-million dollars trade secret?  Did

10    anyone -- did any witness, did Ms. Webster explain how the

11    value of this is millions of dollars?

12        But Mr. Hrabal and Coda didn't hesitate to display

13    their test results on their website.  This is a screenshot

14    of the test results on the website.

15        The e-mail to Goodyear in which this was disclosed

16    wasn't even marked confidential.  It's not a trade secret.

17        All right.  Trade secret 25, and this is one that Dr.

18    Coughlin called a marketing commercialization trade secret.

19    Of course, Goodyear, as you know, never marketed and never

20    commercialized.  So how they ever got to this alleged trade

21    secret is beyond me.

22        But the knowledge, potential tire making cost savings

23    through -- by permitting the removal and introduction of the

24    inner liner.

25        So what they did, they found an internal e-mail, not

1    published an internal e-mail, one, where Massimo Russo said

2    instead of improving inner liner performances, we could

3    invest in SIT technology.

4         That's it.  Nothing ever happened.  He doesn't even

13:11:24  5    say reduce the inner line.  He doesn't say eliminate it.  He

6    just says we might not have to improve it.  That doesn't

7    match up with his trade secret, and my God, this is an

8    internal e-mail, once, once.  That's not trade secret

9    misappropriation.  That doesn't match up with this alleged

13:11:49 10    trade secret.

11         Those are some of the details I would like you folks

12    to think about when you're doing your deliberations.

13    Because that list of trade secrets is in your jury

14    instructions.  And it's not easy.  It's not easy, but you

13:12:07 15    are tasked with the job of going through it.

16         I don't think at that time plaintiffs helped you very

17    much in that task in explaining what these things are and

18    how you should go about that task.  I think Dr. Sprague did.

19    But that's the task that you have to do.

13:12:26 20         As to damages, there are none.  You don't get damages

21    on phony trade secrets and for products that never existed.

22    There were no products that were ever marketed here.

23         The thing that was six months away from production was

24    a monodirectional design that was unacceptable to business.

13:12:53 25    So they were six months away, at best, and Mr. Anderson

1    testified they were six months away ever since 2013.

2        Coda was 12 months away ever since 2008.  This is the

3    nature of engineers.  They're optimists.  But nothing was

4    ever marketed.  And the thing that had -- that plaintiffs

13:13:18  5    say had the potential for marketing was unacceptable to the

6    business much that's a fact.  That's not conjecture.

7        I said in my opening that their damages theory is

8    preposterous.  89 million or whatever, for a product that's

9    never been brought to market.  That's ridiculous.

13:13:43 10        But that's all I'm going to say about damages.  There

11   aren't any.

12        Ladies and gentlemen of the jury, the very first

13   question on your verdict form is:

14        Has Coda proved by a preponderance of the evidence

13:14:06 15   that in January 2009 and/or June 2009, it possessed

16   specific, identifiable trade secrets that derived

17   independent economic value, actual or potential, from not

18   being generally known or readily ascertainable by proper

19   means by other persons who obtain economic value from their

13:14:29 20   disclosure?

21        First thing they have to prove is possession.

22        And as we learned, they don't really keep track of

23   their trade secrets.  That's why the investment banker was

24   writing them up with the help of the lawyers after this

13:14:42 25   lawsuit was filed.  They didn't exist in 2009.

1          And they certainly, as drafted, certainly, to the

2     extent you can understand them, they certainly were

3     generally known.  There is no evidence that what Goodyear

4     did was done on the basis of something that Coda taught Dr.

13:15:06  5     Bob Benedict or anyone else at Goodyear.  These unknown

6     people who did the silicone strip and so forth.

7          So on behalf of the defendants, the Goodyear Tire &

8     Rubber Company, Dr. Benedict, again, I want to thank you for

9     your service.  I respectfully ask that you return a verdict

13:15:31 10     in favor of the defense.

11          Thank you.

12               THE COURT:  Thank you, Mr. Griffith.

13          Members of the jury, why don't you stand and stretch?

14     We're just going to hear the rebuttal argument and then I'll

13:15:48 15     of give you the final instructions, so allow the attorneys

16     to switch places.

17          (Pause.)

18               THE COURT:  All right.  So members of the jury,

19     as I indicated, Mr. Cloern, on behalf of Coda plaintiffs,

13:16:45 20     will now have an opportunity to make what is known as a

21     rebuttal argument.  And they have this opportunity because

22     the plaintiffs bear the burden of proof in this case.

23          And so with that, Mr. Cloern, you may present your

24     final closing to the jurors.

13:17:05 25               MR. CLOERN:  Thank you, Your Honor.

1          What we just heard, victim blaming.  That's what you

2     do when you know you're wrong and you don't have a real

3     defense.  You get up and you blame the victim and you try to

4     misdirect.  That's what that was.  It was victim blaming

13:17:23  5     with a little bit of slight of hand on top, and I'm going to

6     quickly talk about both because I've only got ten minutes.

7          So the way trade secret cases work is you file a

8     complaint.  That's the first thing you do.  You have to have

9     a basis for filing that complaint.  You have to understand.

13:17:46 10     You have to believe in good faith that there is a trade

11     secret.

12          After that, in discovery, there is an exchange of

13     information, and that's when you write down and you exchange

14     lists of trade secrets.  Companies keep confidential

13:17:58 15     information.  Mr. Hrabal testified about this.  No one keeps

16     existing lists of trade secrets.  Why?  Look at the

17     definition of a trade secret.  It's confidential

18     information.  That meanings it's not generally known and

19     readily ascertainable, and it's got value, and you kept it

13:18:18 20     secret.

21          If you're inventing and you're an R&D shop, you're

22     creating valuable confidential information every day.  You

23     don't stop to make it into some sort of list.

24          You know that valuable and confidential information

13:18:33 25     was taken.  Mr. Hrabal was asked about that on the stand.

1 And he said, absolutely I knew valuable confidential

2 information was taken.  He saw the '586 patent, he saw the

3 '254 patent.  He says those are my inventions.  Those are my

4 ideas.  That was absolutely clear.  He had a basis to file

13:18:51 5 the complaint.

6 And the suggestion that he didn't, why are we here

7 today, if he didn't have a basis to file the complaint?  Why

8 have we litigated for seven years if he didn't have the

9 basis to file the complaint.

13:19:04 10 Don't ob you think our judicial system is maybe a

11 little bit better than that?  I do.

12 Victim blaming, and misdirection.

13 Let's bring up, please, D294.

14 This is Mr. Jackson's chart.  Goodyear doesn't just

13:19:33 15 blame Coda and Mr. Losey.  They bring in the investors.

16 They blame Mr. Jackson.

17 This is the chart that Goodyear was so excited about.

18 Nothing in this first column, those aren't the asserted

19 trade secrets.  This chart -- Mr. Jackson testified this

13:19:53 20 chart was an effort to make sure that no trade secret was

21 claimed in this case that was publicly disclosed or that

22 there was not a firm conviction with Mr. Hrabal that it was

23 communicated.

24 That was what the purpose of this chart was.

13:20:15 25 And in a trade secret case, the plaintiffs work with

1    the lawyers to say look at all this confidential

2    information.  How are we supposed to identify it

3    particularly?  Because it's just -- it is your knowledge.

4    It's the confidential information that that you haven't

13:20:32  5    disclosed.

6         That's what this chart was.  Mr. Jackson explained it.

7    He came here where he lives in Prague.  He flew here and

8    stood and sat if front of the jury, and he was

9    cross-examined about it.  And you get to decide whether you

13:20:52 10    believe Mr. Jackson or not.  This chart shows the good faith

11    of Coda.

12         Now, there is one thing I will point out.

13         Can you highlight, Mr. Montgomery, row 5?

14         The one thing in this chart that's closest to a trade

13:21:08 15    secret that remains is radially outward placement of tube in

16    groove.

17         So you start with the prior art where everything is on

18    the rim, as Goodyear said repeatedly, as Goodyear

19    characterized Coda, and you move radially.  Radially means

13:21:25 20    like did you ever see the sun and it glows in every

21    direction?  That's radially.

22         So you've got the center of the tire.  You move the

23    tube out a little bit radially, so the radially outward

24    placement of the pump tube.  And this chart says it was

13:21:39 25    absolutely communicated.  The core innovation in the '586

1  patent, and no public disclosures.

2          That's what this case was based on.  All right.  Let's

3  move on.

4          So let's talk about this 2007 PCT and this idea that

13:22:01  5  it somehow discloses the trade secret 16 and 24.

6          Could I have the Elmo, please?

7              THE COURT:  You may.

8              MR. CLOERN:  This is, and I put a red flag on it,

9  something that Goodyear's counsel used in this its close

13:22:23  10  that I think actually make the point wonderfully.

11          So this is the 2007 PCT.  It's actually a drawing from

12  the Tire Tech article that they relied on so much.  They're

13  the same thing.  They showed it to you a million times.

14          This is this thing right here called the lug boss that

13:22:48  15  they talk about.  It's the same thing as an ancillary

16  structure.  And it's that flat tube.  They're all the same

17  thing.  The flat tube goes in between the tire and the rim.

18  That's what Mr. Hrabal testified about.

19          And if you look, that's the tube between the tire and

13:23:04  20  the rim.  That is in the same place.

21          And it's in the same place as right there, the prior

22  art, that Dr. Benedict says is different than what he calls

23  his inventive new location.

24          The 2007 PCT is on the rim.  That's right on the rim.

13:23:23  25          I showed you the slide.  I've shown you multiple

1    documents.  I showed you the DOE document that talked about

2    how this innovation right here, that it's innovative

3    specifically because it's in this new location.  That's what

4    Goodyear told the Department of Energy to get their grants.

13:23:51  5    And then said the prior art, and they used this location and

6    said, e.g., Coda.  That's what Goodyear told the world the

7    Coda prior art, the 2007 PCT, the Tire Tech article.  That's

8    what Coda is.

9         Don't -- Department of Energy, don't give Coda money.

13:24:10 10    Don't fund Coda because they are -- because that's what Coda

11    is.  We have something new.  But what they didn't tell the

12    DOE is that they took it from Coda.

13         And nowhere have you heard Goodyear explain why it is

14    that in all their documents they're calling this location

13:24:29 15    that's away from the rim and pinches the tube with the

16    cyclic deformation, why they're saying that's a new

17    invention and getting patents on it and getting grants on it

18    and in those very same documents distinguishing Coda as the

19    prior art that's on the rim where it's problematic, how is

13:24:55 20    that consistent?  That's the slight of hand.  They're trying

21    to trick you and say this is what the trade secrets claim.

22    But they don't explain all their past statements.

23         And the evidence, the proof that Mr. Hrabal had this

24    idea, not down on the rim, that was disclosed in his 2007

13:25:22 25    PCT.  It's actually building out a corner like that to put

2781

1    the pump in.  This is higher in the sidewall.

2    It's -- that's what it means.  It's above the rim.  It's in

3    the sidewall itself, not in this lug boss which Mr. Hrabal

4    testified was added on.

5          The last thing I'll say is what you heard very little

6    about is Goodyear closing this program down.  Talked about

7    it a lot in the opening, but then the evidence came in.

8          Mr. Anderson came on and you got to see Mr. Anderson

9    and how he said, oh, the tech never work.  Never would work,

10   and that was consistent with all the documents, because they

11   don't have a good answer for why the program was closed down

12   except the July 24 gate B meeting minutes where we know in

13   2009 what Goodyear said and what Goodyear thought was we

14   have to pay when we launch a product?  That's what they said

15   in those meeting minutes.  Take the IP now.  Worry about the

16   IP later.

17         Coda has thought about it for many years.  That's

18   fine.  Make the best product we can.  Let's see if we have

19   to pay for it later.  And they knew that day would come if

20   they launched a product.

21         So ask yourself, when they're six months from being

22   done, they spent $30 million, and you have the market

23   opportunity, their worst case scenario was making 68

24   million.  Why was that shut down?  That's what you have to

25   answer.

1          Thank you.  We appreciate the time that you've spent

2     here these last two weeks.  I'm tired.  I'm sure you are.

3     So I'm done.

4               THE COURT:  Thank you, Mr. Cloern.

13:27:05  5          Thank you, counsel.

6          I will ask the attorneys if the exhibit are in order?

7          Mr. Cloern?

8               MR. CLOERN:  As far as I know.

9               THE COURT:  And Mr. Griffith.

13:27:18 10               MR. GRIFFITH:  As far as I know, though, I have

11    to confess I'm relatively ignorant on the subject, but I'm

12    going to trust --

13               THE COURT:  I'll tell you what, I'll give the

14    attorneys one last opportunity to check the exhibits before

13:27:30 15    we send them back to the jury room.  I know that you've been

16    working hard on compiling those so we'll do that before

17    they're presented to the jurors.

18          Member of the jury, if you would turn in your

19    instructions to page 28.

13:27:49 20          All right.  The verdict must represent the considered

21    judgment of each of you.  In order to return a verdict, it

22    is necessary that each juror agree.  Your verdict must be

23    unanimous.

24          It is your duty as jurors to consult with one another

13:28:16 25    and to deliberate with a view to reaching an agreement if

1    you can do so without disregard of individual judgment.  You

2    must each decide the case for yourself, but only after an

3    impartial consideration of the evidence in the case with

4    your fellow jurors.

13:28:33  5        In the course of your deliberations, do not hesitate

6    to reexamine your own views and change your opinion if

7    convinced it is erroneous.  But do not surrender your honest

8    conviction as to the weight or effect of the evidence solely

9    because of the opinion of your fellow jurors or for the mere

13:28:50 10   purpose of returning a verdict.  Remember at all times that

11   you are not partizans.  You are judges, judges of the facts.

12   Your sole interest is to seek the truth from the evidence in

13   this case.

14        In conducting your deliberations and returning your

13:29:05 15   verdict, there are certain rules you must follow.

16        First, when you go to the jury room, you just select

17   one of your members as your foreperson.  The foreperson will

18   preside over your discussions and speak for you here in

19   court.

13:29:17 20        Second, it is your duty as jurors to discuss this case

21   with one another in the jury room and try to reach -- I'm

22   sorry.  Strike that.

23        I'll start that steps again.

24        Second, it is your duty as jurors to discuss this case

13:29:35 25   with one another in the jury and try to reach agreement.

1   You should try to reach agreement if you can do so without

2   violence to individual judgment because a verdict must be

3   unanimous.

4          Each of you must make your own conscientious decision

13:29:51  5   but only after you have discussed all the evidence,

6   discussed it fully with your fellow jurors, and listened to

7   the views of your fellow jurors.

8          Do not be afraid to change your opinions if the

9   discussion persuades you that you should.  But do not come

13:30:07 10   to a decision simply because other jurors think it is right

11   or simply to reach a verdict.  Remember at all times that

12   you are judges of the facts.  Your sole interest is to seek

13   the truth from the evidence in the case.

14          Third, if you need to communicate with me during your

13:30:22 15   deliberations, you may send a note to me through the

16   courtroom deputy signed by one or more jurors.  I will

17   respond as soon as possible either in writing or orally in

18   open court.  Remember that you should not tell anyone,

19   including me, how your votes stand numerically.

13:30:40 20          Fourth, your verdict must be based solely on the

21   evidence and on the law that I have given to you in my

22   instructions.  The verdict must be unanimous.

23          Fifth, nothing said in these instructions and nothing

24   in any verdict form prepared for your convenience is meant

13:30:55 25   to suggest or convey in any way or manner any suggestion or

1      hint as to what verdict I think you should find.  What the

2      verdict shall be is your sole and exclusive duty and

3      responsibility.

4           Finally, the verdict form is simply the written notice

13:31:12  5      of the decision that you reach in this case.  You will take

6      the forms to the jury room, and when each of you has agreed

7      on the verdict, you are to sign the form of the verdict to

8      which you have agreed and advise the courtroom deputy clerk

9      that you are ready to return to the courtroom.

13:31:32 10           So I will have a final copy of the jury instructions

11      for you along with the verdict forms.  And they will be

12      given to you along with the exhibits in this case.  The

13      exhibits are in binders.  However, if it's more convenient

14      for you, they've also been placed on a thumb drive, and we

13:31:54 15      can provide you with a thumb drive and a computer if you

16      wish to review the exhibits in that fashion.

17           With that, anything further before the jury retires to

18      deliberate?

19           Mr. Cloern?

13:32:05 20                MR. CLOERN:  No, Your Honor.

21                THE COURT:  Mr. Griffith?

22                MR. GRIFFITH:  No, Your Honor.

23                THE COURT:  All right.  So, members of the jury,

24      the case is now in your hands.  And you may retire to the

13:32:14 25      jury room to deliberate.

1        And with that, I'll ask the courtroom deputy clerk to

2   please escort the jurors to the jury deliberation room and

3   also deliver to them the exhibits, the final jury

4   instructions and verdict forms.

13:32:49  5        THE DEPUTY CLERK:  All rise.

6        (Jury out, 1:32 p.m.)

7        THE COURT:  So make sure my courtroom deputy

8   clerk has your contact number, counsel, in the event that we

9   have to reach you.  And I just wish to express my

13:34:24  10   appreciation for your prepared negligence during the trial,

11   your diligence, the hard work that you put in this, and

12   should we receive any word from the juror or any questions,

13   you will of course be contacted.

14        (Lunch recess taken.)

15

16

17

18

19

20

21

22

23

24

25

1    Afternoon Session, Friday, September 16, 2022

2    THE COURT:  We are on the record in Coda

3    Development, etcetera, et al. versus the Goodyear Tire &

4    Rubber Company, et al.  And the jurors have now given the

5    Court two communications.  The first communication I

6    addressed with the attorneys.

7    And the attorneys, as I understand for purpose of

8    these communications, you're waiving the appearance of your

9    clients in court and you're consenting to proceed in this

10   fashion by telephone.

11   Is this correct?

12   Mr. Cloern on behalf of the Coda plaintiffs?

13   MR. CLOERN:  Yes, Your Honor.

14   THE COURT:  And Mr. Griffith on behalf of the

15   Goodyear defendants?

16   MR. GRIFFITH:  Yes, Your Honor.

17   THE COURT:  All right.  So the first request was

18   for Exhibit 5, Defendant's Exhibit 005, which was the

19   Sheppard patent.  And the parties gave the Court permission

20   to take that exhibit to the jurors.  It was talked about all

21   during the trial, even in closing arguments, and so the

22   Court did deliver that exhibit.

23   The second question or communication is, I'm reading

24   from the communication, "Allowed to see the PowerPoint of

25   the testimonies of Coughlin and Sprague."

2788

1       And the Court's typewritten response is:  "Jurors, you

2  have requested to see the PowerPoint presentations presented

3  during the testimony of Bryan Coughlin and James Sprague.

4  The PowerPoint presentations were used during trial to

16:21:40  5  assist you in following and understanding the evidence, but

6  they were not admitted into evidence.  Therefore, the

7  PowerPoint presentations will not be given to you.  You must

8  rely upon your collective memories as to the testimony of

9  Bryan Coughlin and James Sprague."

16:21:40  10       Is this satisfactory to the Coda plaintiffs?

11            MR. CLOERN:  Yes, Your Honor.

12            THE COURT:  Is this a satisfactory response to

13  the Goodyear defendants?

14            MR. GRIFFITH:  It is, Your Honor, and I would add

16:21:40  15  for the record that we are also, the Goodyear defendants are

16  also willing to send it back.  But I understand that that's

17  not the normal procedure.

18            THE COURT:  Okay.  And I understand that the

19  plaintiffs would prefer that those not be given to the jury.

16:21:40  20       Correct, Mr. Cloern?

21            MR. CLOERN:  Correct, Your Honor.

22            THE COURT:  Okay.  So I will staple the response

23  to the communication and have the courtroom deputy clerk

24  give it to the jurors.

16:21:40  25       Appreciate your cooperation in working through another

2789

1    communication with me.  Take care.

2                MR. CLOERN:  Thank you.

3                MR. GRIFFITH:  Thanks.

4          (Recess taken.)

5          (Proceedings concluded at 5:35 p.m.)

6

7                  C E R T I F I C A T E

8

9              I certify that the forgoing is a correct

10   transcript from the record of proceedings in the

11   above-entitled matter.

12

13            S/Caroline Mahnke              9/16/202

14            Caroline Mahnke, RMR, CRR, CRC    Date

15

16            S/Lori A. Callahan             9/16/2022

17            Lori A. Callahan, RMR, CRR        Date

18

19

20

21

22

23

24

25