# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **CODA DEVELOPMENT s.r.o., CODA INNOVATIONS s.r.o., and FRANTISEK HRABAL,** | Case No. 5:15-CV-01572-SL |
| Plaintiffs, | |
| v. | JUDGE SARA LIOI |
| **THE GOODYEAR TIRE & RUBBER COMPANY and ROBERT BENEDICT,** | |
| Defendants. | |

## DEFENDANTS' RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW AND, IN THE ALTERNATIVE, TO REMIT EXCESSIVE PUNITIVE AWARD

# TABLE OF CONTENTS

**Page**

I.     THE TRIAL .................................................................................................. 1

II.    LEGAL STANDARD.................................................................................. 2

III.   ARGUMENT .............................................................................................. 3

     A.    No Reasonable Jury Could Have Found Misappropriation Of Trade Secret 24.......................................................................................................... 3

         1.    Alleged Trade Secret 24 Is Indefinite ...................................... 3

         2.    Alleged Trade Secret 24 Was Not "Secret" Because Coda Published It ................................................................................ 6

     B.    Coda Failed To Prove That Alleged Trade Secrets 7, 11, And 23 Were Secrets ................................................................................................ 10

     C.    No Reasonable Jury Could Have Found Misappropriation Of Trade Secret 7.......................................................................................................... 11

     D.    No Reasonable Jury Could Have Found Misappropriation Of Trade Secret 11........................................................................................................ 12

     E.    No Reasonable Jury Could Have Found Misappropriation Of Trade Secret 20........................................................................................................ 13

     F.    No Reasonable Jury Could Have Found Misappropriation Of Trade Secret 23........................................................................................................ 16

     G.    The Court Should Grant JMOL Or, Alternatively, Order Remittitur As To Punitive Damages .............................................................................. 17

         1.    Coda Failed To Prove "Actual Malice" .................................. 17

         2.    Alternatively, The Court Should Reduce The Punitive Damages Award.................................................................................... 19

IV.   CONCLUSION......................................................................................... 20

# TABLE OF AUTHORITIES

CASES

*Alice's Home v. Childcraft Educ. Corp.*,
  No. 09AP-299, 2010 WL 3448319 (Ohio Ct. App. Sept. 2, 2010)...........................................2

*Arnos v. MedCorp.*,
  No. L-09-1248, 2010 WL 1730139 (Ohio Ct. App. Apr. 30, 2010)......................................10

*AtriCure, Inc. v. Jian Meng*,
  842 F. App'x 974 (6th Cir. 2021) ...........................................................................................2

*Becker Equip. v. Flynn*,
  2004-Ohio-1190 (Ohio Ct. App., 12th Dist. 2004)...........................................................17, 18

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
  157 F.3d 1340 (Fed. Cir. 1998)..............................................................................................2

*Champion Foodservice, LLC v. Vista Food Exch., Inc.*,
  No. 1:13-CV-1195, 2016 WL 4468001 (N.D. Ohio Aug. 24, 2016)......................................10

*E.E.O.C. v. Harbert-Yeargin, Inc.*,
  266 F.3d 498 (6th Cir. 2001) ...............................................................................................20

*Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*,
  No. 14-cv-748, 2017 WL 4357993 (W.D. Wis. Sept. 29, 2017), *further
  modified on appeal*, 980 F.3d 1117 (7th Cir. 2020)...............................................................20

*Futhey v. United Trans. Union. Ins. Assn.*,
  No. 1:14 CV 463, 2017 WL 1296887 (N.D. Ohio Feb. 10, 2017) ...........................................2

*Imwalle v. Reliance Med. Prods., Inc.*,
  515 F.3d 531 (6th Cir. 2008) ..................................................................................................2

*In re Heparin Prod. Liab. Litig.*,
  No. 09-HC-60186, 2011 WL 3875361 (N.D. Ohio Sept. 1, 2011)........................................20

*Lucarell v. Nationwide*,
  7th Dist. No. 13 MA 74, 2015-Ohio-5286, *rev'd sub nom. on other grounds*,
  *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15 .............................................................20

*Noble v. C. Crane & Co.*,
   169 F. 55 (6th Cir. 1909) ....................................................................10

*Sivit v. Vill. Green of Beachwood, L.P.*,
   143 Ohio St. 3d 168 (2015)...............................................................20

*Sunkin v. Hunter Eng'g Co.*,
   No. 5:15-CV-892, 2016 WL 5390408 (N.D. Ohio Sept. 27, 2016)........................................10

*Thermodyn Corp. v. 3M Co.*,
   593 F. Supp. 2d 972 (N.D. Ohio 2008)..................................................2

*Trandes Corp. v. Guy F. Atkinson Co.*,
   996 F.2d 655 (4th Cir. 1993) ............................................................20

*UOP LLC v. Exterran Energy Sols., L.P.*,
   No. 4:21-CV-02804, 2021 WL 8016712 (S.D. Tex. Sept. 28, 2021) ....................................11

## STATUTES

1 CV Ohio Jury Instructions 537.11 .............................................................20

O.R.C. § 1333.61 ........................................................................17, 19

O.R.C. § 1333.63 ......................................................................1, 3, 17, 19

Defendants—collectively, "Goodyear"—renew their motion for JMOL under Rule 50(b), and, alternatively, request remittitur of the jury's statutorily excessive punitive award. Goodyear incorporates by reference its Rule 50(a) motions (Dkt. 361 at 1731:1–1739:8; Dkt. 360 and 363).

The Court cannot be surprised at this motion. It has struggled for years now to pin down Coda's trade-secret theories, and the jury was plainly left at sea by Coda's strategically vague and malleable "trade secrets." As a matter of law, even the five trade secrets that the jury found misappropriated—nos. 7, 11, 20, 23, and 24—were legally deficient, their misappropriation factually unsupported, or both. The Court should grant JMOL and order judgment for Goodyear.

If necessary, the Court should also grant JMOL on the jury's finding of actual malice for lack of evidentiary support, thereby removing the legal basis for any punitive award.

Finally, in the event that anything is left of this verdict after those two exercises, the Court should exercise its duty under Ohio law and remit the punitive damages award to "an amount not exceeding three times" the compensatory damages award, as O.R.C. § 1333.63(B) requires.

## I. THE TRIAL

***Alleged Trade Secrets.*** Coda originally alleged 27 trade secrets. It withdrew 10, and presented only 17 at trial. The Court then granted JMOL under Rule 50(a)—after close to eight hours of argument—that five more of those alleged trade secrets were indefinite, sending 12 to the jury. Dkt. 364 at 2649:23–2650:2. Even so, the Court advised that it "still has concerns regarding the definiteness of some or all of the trade secrets not addressed just now" and that "the Court will submit the action to the jury, subject to the Court's later deciding the legal questions raised by the [Rule 50(a)] motion." *Id.* at 2650:16–24. The jury found for Goodyear on seven of the remaining alleged trade secrets, but found misappropriation of nos. 7, 11, 20, 23, and 24. Dkt. 369 at 24224.

***Actual Malice and Punitive Damages.*** The jury gave Coda $2.8 million in compensatory damages. *Id.* at 24226. Despite finding that Goodyear did not misappropriate most of Coda's

asserted secrets, and was only modestly damaged relative to its claim, the jury found "willful and malicious" misappropriation, awarding $61.2 million in punitive damages. *Id.* at 24227.

## II.    LEGAL STANDARD

"The 'standard for granting a renewed motion for [JMOL] under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion.'" *Futhey v. United Trans. Union. Ins. Assn.*, No. 1:14 CV 463, 2017 WL 1296887, at *1 (N.D. Ohio Feb. 10, 2017) (quotation omitted).   JMOL is compelled when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008) (citations omitted). "When a claim or defense cannot be maintained or defeated without a favorable finding on a material issue, and there is not substantial evidence supporting that finding, the verdict cannot stand and the court must render [JMOL]." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1348 (Fed. Cir. 1998).

Under the OUTSA, "a plaintiff must establish: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 985 (N.D. Ohio 2008) (citations omitted).   And, as this Court has held, "'[a] plaintiff is required to identify a trade secret with specificity to separate the secret from general knowledge.'" Dkt. 262 at 16, quoting *AtriCure, Inc. v. Jian Meng*, 842 F. App'x 974, 980 (6th Cir. 2021); *see also Alice's Home v. Childcraft Educ. Corp.*, No. 09AP-299, 2010 WL 3448319, at *4 (Ohio Ct. App. Sept. 2, 2010) (a trade-secret plaintiff must "'fully articulat[e] . . . precisely what aspects of [a product] constitute[ ] a protectable trade secret[ ]'").   In short, a trade secret must be described with particularity.   Dkt. 221 at 19.   More simply, to quote the Court, "we have to be exacting."   Dkt. 359 at 1569:15.

The law of the case also demands definiteness.   On November 21, 2019, this Court ordered

Coda to articulate its allegedly orally disclosed (but uncorroborated) trade secrets with "sufficient specificity and description to permit defendants to know . . . what specific claims of trade secret misappropriation they must defend against." Dkt. 82 at 2671. The Court warned Coda to "*not* provide a response so broad that it is meaningless or so incomplete, vague, and evasive that it is useless. Should the Court determine that plaintiffs fail in this regard, and do so purposefully, it will reserve the right to sanction plaintiffs up to and including dismissal." *Id.* (emphasis in original).

## III. ARGUMENT

The Court should grant JMOL for Goodyear. *First*, on the trade-secret findings, Coda failed to prove the definiteness of nos. 7, 11, 20, 23, and 24, or their misappropriation. The Court rightly harbored "very serious concerns" about these vague, indefinite trade secrets, and the record confirms the validity of that concern. *Second*, on the jury's punitive-damages verdict, the Court should grant JMOL because there is no evidence on this record on which a reasonable jury could have found that Goodyear acted with "actual malice." And *third*, though it should not be necessary for the Court to reach this issue, Ohio law compels a remittitur of the jury's excessive punitive award. O.R.C. § 1333.63(B).

### A. No Reasonable Jury Could Have Found Misappropriation Of Trade Secret 24

Coda framed alleged trade secret 24 as:

> Coda's knowledge regarding the optimal location for placement of a pump in a tire for tire manufacturers, namely, in the sidewall close to, and above, the rim where the tire cyclically deforms in response to deformation.

Dkt. 365 at 2690:24–2691:4. This is both indefinite and not a trade secret at all.

#### 1. Alleged Trade Secret 24 Is Indefinite

Trade secret 24 starts with the "Coda's knowledge" language that plagued so many of its deficient trade secrets, including nos. 4, 18, 19, and 27, which the Court has already found legally

deficient. Coda tried to address this issue by adding the "namely" clause to this alleged secret. But Coda's arguments against JMOL during trial illustrate the mischief (and indefiniteness) that the "knowledge" preamble makes of the alleged trade secret.

Here's the basic problem: As Goodyear shows in Section III.A.2, long before the 2009 meetings with Goodyear, Coda disclosed—in at least two publications (the 2007 PCT application and the 2008 *Tire Technology* article)—the idea of locating a peristaltic pump in the tire sidewall close to and above the rim where the tire cyclically deforms, for example, in the lug boss portion of the sidewall. *E.g.*, Dkt. 356 at 625:9–12 ("Q. So locating a peristaltic pump in the tire sidewall near the rim in an area where it cyclically deforms was not a trade secret? A. This is public."); 663:2. Yet, with a straight face, Coda told this Court, and the jury, that it hadn't actually disclosed placing the pump "in the sidewall close to, and above, the rim where the tire cyclically deforms."

How did it manage this legerdemain? Word games, pure and simple. In response to Goodyear's Rule 50(a) motion, Coda repeatedly argued that the lug boss portion of the sidewall "is not in the sidewall that's referred to in trade secret 24. Trade secret 24 is talking about a ***normal standard*** sidewall like what's in [Figure] 2A [of the 2007 PCT]." Dkt. 364 at 2559:13–16; *see also id.* at 2561:15–18 ("And the sidewall [in trade secret 24] is a ***traditional*** sidewall. It doesn't say in the special addition to a sidewall that's shown in the 2007 PCT."). This is why the Court noted its "frustration with this case since inception, that we keep morphing, morphing, morphing." *Id.* at 2560:17–19.

Morphing, indeed. Trade secret 24 never says anything about "normal" or "traditional" sidewalls (whatever those may be), nor does it say "in the sidewall but not in the lug boss portion of the sidewall." This is particularly troubling because Coda repeatedly described the lug boss to Goodyear as being part of the sidewall. *E.g.*, Ex. P-322 at 41–43 (showing the "in the sidewall"

option as in the lug boss). That's how Coda described it, publicly, to the industry. *E.g.*, Ex. D-90 (public Hamburg presentation) at 33–35, showing the "in the sidewall" option as in the lug boss.

Coda's morphing of trade secret 24 into requiring only a "normal" sidewall is further troubling because no trial witness ever explained what a "normal" sidewall is. And Coda never attempted to show that the sidewall depicted in Goodyear's '586 patent and invention disclosure (which Coda claims disclosed trade secret 24) is a "normal" sidewall. In fact, Benedict's sidewall (below left and center left) looks more like the lug boss sidewall in Fig. 2(c) (center right) than it does the supposedly "normal" sidewall in Fig. 2(a) (right).



Ex. P-36; Ex. P-9; Ex. D-43, Figs. 2(c) and 2(a) (from left to right). Any "normalcy" requirement only adds more indefiniteness.

Coda's attempt now to rewrite trade secret 24 by redefining "sidewall" is just more morphing and moving of the target—precisely what this Court admonished Coda *not* to do. Dkt. 355 at 442:23–443:5 ("So I guess I think the problem is -- and I've read these trade secrets now, alleged trade secrets a number of times. And they're always -- not always, but many of them are Coda's knowledge presented and disclosed to Goodyear. Well, that doesn't say what the knowledge was. And you can't -- unless you elaborated in your answer to the interrogatory, you can't now elaborate. That was the whole point of saying it was going to be a closed record.").

Similarly, Coda suggested that the reason trade secret 24 was not generally known was

because the 2007 PCT involved "rim crush." Dkt. 356 at 655:25–657:10; Dkt. 361 at 1962:7–8. The Court, however, noted that this was another example of trying to morph the trade secret. Dkt. 364 at 2614:17–24 ("For instance, the one [trade secret 24] that we spent a lot of time talking about an hour ago was when we talked about the location so that it would prevent rim crush. Well, so that it would prevent rim crush is not in the trade secret. So that is why I thought it was essential, imperative that we know exactly what the trade secret was with particularity so we wouldn't be sitting here saying, well, what does that mean?"). Trade secret 24 is indefinite.

### 2. Alleged Trade Secret 24 Was Not "Secret" Because Coda Published It

Alternatively, or additionally, the Court should grant JMOL because trade secret 24 was not just "generally known or readily ascertainable," but actually, specifically known through Coda's own actions: Coda published it in its 2007 PCT publication and in Hrabal's 2008 *Tire Technology* article. As noted, Hrabal admitted that "locating a peristaltic pump in the tire sidewall near the rim in an area where it cyclically deforms was not a trade secret." Dkt. 356 at 625:9–12.

Coda's 2007 PCT publication (Ex. D-43) *repeatedly* discloses a peristaltic pump chamber in the sidewall "close to, and above, the rim":

- "The fig. 3.h) shows the circular chamber <u>1</u> created in the ancillary structure <u>6</u> . . . . [I]t is possible to create the chamber <u>1</u> with the extended surfaces <u>10</u> *in the tire <u>4</u> sidewall*." Ex. D-43 at 17:11–17.
- "Although the chamber <u>1</u> in the examples is placed mainly to the tire <u>4</u> bead, it can be created . . . anywhere else *in the wall* or at the wall *of the tire <u>4</u>* . . . ." *Id.* at 18:2–5.
- "The chamber <u>1</u> can be created in the ancillary structure <u>6</u> or *directly in the tire <u>4</u> wall*, namely either between the layers of the commonly produced tire <u>4</u>, or if there is not enough space in the tire <u>4</u> wall, it can be created in the lug boss on the tire <u>4</u> wall, which is analogous to the ancillary structure <u>6</u>." *Id.* at 18:27–32.

And Figures 2(a) (common tire option) and 2(c) (lug boss option) expressly depict locations in the sidewall "close to, and above, the rim" that are "in the tire <u>4</u> sidewall":



| FIG. 2A | FIG. 2B | FIG. 2C |
|---------|---------|---------|
| Sidewall | Ancillary Structure | Lug Boss |

DDX 7.19; Ex. D-43 at 38. The 2007 PCT also shows other structures (*e.g.*, *id.* at 43 (Fig. 7 a); right) that have a pump chamber (item <u>1</u>, highlighted) in the lug boss part of the sidewall, close to and above the rim <u>7</u>. *See also* Dkt. 356 at 663:2 (Hrabal admitting that "[t]he lug boss is on the rim near and above the rim").



At trial, Hrabal admitted that the Figure 3(h) lug boss embodiment, with a hose to contain the chamber, locates a peristaltic pump in the sidewall near and above the rim where it cyclically deforms:

> Q. If one does that with the 3(h) embodiment, lug boss embodiment, do you agree that the hose in that embodiment would be near and above the rim?
>
> A. Yes.
>
> Q. Okay. And in an area of the tire that cyclically deforms, correct?
>
> A. That cyclically deforms here, it refers to the location within the tire sidewall itself, in the tire sidewall.
>
> Q. The lug boss is in the tire sidewall, right?
>
> A. Lug boss is tire sidewall extension between the tire and the rim. It's just –
>
> Q. It's in the sidewall?
>
> A. It's part of the tire sidewall.

Dkt. 356 at 665:23–666:11. That's trade secret 24 exactly.

So, too, was Hrabal's pre-litigation admission that "any chambers in our patent [the 2007 PCT] can be considered above [the] upper boundary of the rim (at least partially), but this [Figure]

3h is there in full . . ." Ex. D-152 at 4. In that same document, Hrabal admitted disclosing, on his 2003-2007 website, putting a pump *in the same location as Goodyear's design that is accused of using trade secret 24. Id*. at 14.

Coda also published alleged secret 24 in Hrabal's 2008 *Tire Technology* article. It states:

- "The peristaltic tubing can be implemented *in the tire wall*";
- "the tubing can be created as a crevice *in the tire sidewall*";
- "it becomes a sealed tubing *inside the tire wall*"; and
- "[t]he crevice *in the tire wall* . . . is shown in Figures 3 and 4."

Ex. D-58 at 3. Figure 4 shows the pump that is a "crevice in the tire wall" (circled in red below):



Figure 4.4 shows leak at the crevice in the tire wall and its sealing during wheel assembly. This pressure between tire and rim is up to 10 times more than tire pressure.

DDX 7.22 (showing annotated version of Fig. 4 from Ex. D-058). That's "close to, and above, the rim," and no reasonable jury could find otherwise. In fact, Hrabal repeatedly admitted this at trial. Dkt. 356 at 622:11–623:5 ("Q. And this worked by cyclical deformation of the tire wall, correct? And this being the lug boss version? A. It's the cyclical deformation of the peristaltic pump which is placed between the tire and the rim. . . . Q. Correct. So it needs the rim to operate, but as you described it in your article, the *Tire Technology* article, it's in the sidewall? A. It's in the sidewall."). Hrabal published the close-to-and-above-the-rim location to help tire manufacturers:

Q. So locating a peristaltic pump in the tire sidewall near the rim in an area where it cyclically deforms was not a trade secret?

A. This is public.

Q. Correct, okay. And if a tire manufacturer made and sold this design, you believe that they could make a lot of money doing that, right?

A. That's right.

Q. You believed it was a good design?

A. That's why I marketed it.  That's why I made it public.

Dkt. 356 at 625:9–20; *see also id.* at 624:7–14 (admitting the lug boss is part of the tire sidewall); *see also id.* at 622:19–623:5, 642:7–11 (same); *see also* Ex. D-90 (public Hamburg presentation) at 33–35, characterizing lug boss design as being part of the sidewall, and Ex. P-322 (presentation to Goodyear) at 41–43, also characterizing lug boss design as being part of the sidewall.

How did Coda's expert, Coughlin, address this problem with Coda's case?  By playing word games with "optimal."  Note that Coda's counsel's question here was "is it optimal?", and not "is the pump close to and above the rim?":

Q. Does the [2007] PCT disclose the optimal location asserted in trade secret 24 for a pump tube?

A. No, this does not assert this trade secret.

Q. Why not?

A. So the teaching [*sic*] of the 2007 PCT are around these ancillary structures. So the structure shown this Figure 3(h) is a flap tube.  And that flap tube is then embedded, if you recall down and in the area between the tire sidewall and on the rim and is compressed by the mounting of the tire on to the rim.

The analogue or another embodiment of the system is the lug boss, which is shown in that structure in figure 7.  And, again, that lug boss is a chamber that's placed between the tire and on the rim.  And actuates in its peristaltic pumping location by that action.

This is not the optimal location for placement of a pump in a tire for tire manufacturers, this trade secret 24.

Dkt. 359 at 1597:21–1598:13.

Coughlin focused on the subjective word "optimal" (as counsel's question invited him to). But the wording of the trade secret did not give him license to do that:  The only thing disclosed as "optimal" was what appears in the "namely" clause of the trade secret—"in the sidewall close to, and above, the rim where the tire cyclically deforms."  Yet Coughlin's only answer was to say that the "teaching" of the 2007 PCT application was the lug boss embodiment with a "chamber

that's placed between the tire and on the rim," which in his view was not "optimal." Further, Coughlin ignored that Coda's articles and patents stated that the lug boss is part of the tire sidewall.

The Court should grant JMOL. Alleged secret 24 was not adequately defined, nor a secret.

## B. Coda Failed To Prove That Alleged Trade Secrets 7, 11, And 23 Were Secrets

"A plaintiff bears the burden of proving the elements of the claim, including that information is a trade secret." *Sunkin v. Hunter Eng'g Co.*, No. 5:15-CV-892, 2016 WL 5390408, at *4 (N.D. Ohio Sept. 27, 2016). So Coda had to prove that each of its alleged trade secrets was secret—that is, "not generally known or readily ascertainable."

It didn't. Coda's expert never even addressed this essential element of a misappropriation claim as to trade secrets 7, 11, or 23 (*see* Dkt. 359 at 1595:25–1618:11), other than with bare, conclusory statements. Dkt. 361 at 1695:7–11, 1696:9–11. And all Hrabal offered was a naked assertion that none of the 12 asserted trade secrets was generally known or readily ascertainable. *See* Dkt. 356 at 539:16–20. Unreasoned, unelaborated say-so cannot support a jury verdict or defeat JMOL. *Noble v. C. Crane & Co.*, 169 F. 55, 59–60 (6th Cir. 1909) ("A mere dogmatic assertion, which does not appeal to the reason of the court, which does not have substance and relevant consequence, which does not have fitness to induce conviction, is not proof, even if uncontradicted, and does not interfere with the duty of the court to direct a verdict."); *Champion Foodservice, LLC v. Vista Food Exch., Inc.*, No. 1:13-CV-1195, 2016 WL 4468001, at *13 (N.D. Ohio Aug. 24, 2016) ("conclusory averments" are "insufficient to establish trade secret status under Ohio law and do not form a basis upon which a reasonable jury could conclude that the [alleged trade secret] constitutes a trade secret"); *Arnos v. MedCorp.*, No. L-09-1248, 2010 WL 1730139, at *3 (Ohio Ct. App. Apr. 30, 2010) ("Conclusory statements as to trade secret factors without supporting factual evidence are insufficient to meet the burden of establishing trade secret status.").

## C.      No Reasonable Jury Could Have Found Misappropriation Of Trade Secret 7

Coda claimed alleged trade secret 7 as:

> Coda's design and development of a multi-purpose interface for transporting air in a self-inflating tire that can [1] connect to the air source, [2] connect to the tire interior, [3] connect to the peristaltic pump, [4] serve as an end to the peristaltic pump, [5] connect to the regulator, [6] carry the regulator, [7] go around or through the bead, [8] go around or through the tire layers, [9] click to the bead and [10] hold the filter.

Dkt. 365 at 2688:9–16 (bracketed numbers added).  Even beyond Coda's failure to prove secrecy, no reasonable jury could find Goodyear misappropriated this alleged secret—*first*, it is indefinite; *second*, Goodyear neither used nor disclosed it.

*Indefiniteness.*  Alleged trade secret 7 recites "Coda's design" in vague, functional terms (an interface "that can" accomplish certain ends), without any detail as to how those functions are to be carried out, or what secret design might accomplish the ten recited functions.  But "'disclosures that only reveal the end results of, or functions performed by, the claimed trade secrets, and various concepts, elements, or components that make up designs' do not satisfy the [reasonable particularity] requirement." *UOP LLC v. Exterran Energy Sols., L.P.*, No. 4:21-CV-02804, 2021 WL 8016712, at *1 (S.D. Tex. Sept. 28, 2021) (citation omitted).

Hrabal's trial testimony further proved the indefiniteness of alleged secret 7.  He testified that it relates to "how the interface that the interface you might consider that it *shouldn't go through* the tire wall itself."  Dkt. 355 at 459:3–16.  Thus, instead of the "secret" design being one that can "go around *or through* the tire layers," as the trade secret actually says, at trial Hrabal tried to claim otherwise—that the interface "shouldn't" go through the tire layers.  The legal definiteness requirement, as emphasized in this Court's Orders, was intended to prevent such gamesmanship.  Dkt. 82 at 2671.  JMOL should be granted on the ground of indefiniteness.

***No Misappropriation.*** Coda offered no evidence that Goodyear ever used or disclosed the 10-function interface set out in alleged trade secret 7. Coughlin couldn't find six of those 10 functions in the Goodyear patent (Ex. P-10) that supposedly used or disclosed the alleged secret. Dkt. 359 at 1638:14–1639:6; *see also* Dkt. 297 at 14087. He never even tried to show that the Goodyear patent's "interface" can (1) "connect to the peristaltic pump," (2) "serve as an end to the peristaltic pump," (3) "connect to the regulator," (4) "carry the regulator," (5) "go around or through the tire layers," or (6) "click to the bead." *Id.* No reasonable jury could have found that Goodyear used or disclosed the 10-function interface of trade secret 7, so JMOL should be granted.

### D.  No Reasonable Jury Could Have Found Misappropriation Of Trade Secret 11

Coda described alleged trade secret 11 as:

> Coda's knowledge of how to design and develop self-inflating tire pump and groove solutions, consisting of [1] round pump tubing in an outward-facing groove with straight, angled interior geometry; [2] pump tubing with geometry that interlocks with its seat; [3] pump tubing with elliptical interior cross-section; [4] variant pump tube, groove and chamber dimensions, size and materials; [5] pump tube and groove design to minimize internal friction; [6] a "tubeless" pump solution (i.e., a pump that may compose an integral part of tire); [7] cross-section designs that minimize stress on compression in order to improve durability; and [8] tubing with reinforced wall.

Dkt. 365 at 2688:17–2689:3 (bracketed numbers added). This secret is indefinite, and Coda failed to show that it was not generally known. *See* Section III.B, *supra*.

Coda framed trade secret 11 as its "knowledge of how to design and develop self-inflating tire pump and groove solutions." Here again, "Coda's knowledge"—what was inside Coda's head—is the subject of this alleged secret, and such "knowledge" is indefinite unless the rest of the secret describes, with particularity, the entirety of the knowledge claimed to have been a secret. What follows in this alleged secret is a conjunctive list of eight elements, without any explanation of how those elements are to be used to "design and develop" such "solutions"—it's just an undifferentiated list of different kinds of tubing (or tubeless) elements. Worse, several of the eight

are hopelessly vague—elements [4], "variant pump tube, groove and chamber dimensions, size and materials," [5], the "pump tube and groove design to minimize internal friction," and [7], the "cross-section designs that minimize stress on compression in order to improve durability." What are the "variant . . . dimensions, size, and materials"? What are the "designs" that "minimize" "internal friction" and "stress on compression"? The secret doesn't say; Goodyear (and the jury) were left to guess. Further, to the extent these elements can even be understood, they were disclosed in the 2007 PCT. Ex. D-43 at, *e.g.*, 4:16–22, 5:13–17, 7:6–33, 8:1–20, 13:27–29, 23:13–16, 24:5–20 and Figure 3. No witness explained how they weren't known.

Coda made things worse at trial by trying to present this alleged secret not as the conjunctive eight-element secret it disclosed, but as a simple one- or two-element secret. When asked, "Can you tell us what trade secret 11 relates to," Hrabal could only point to two features—features of his *published* prototype, no less—not the eight in his trade secret as described. Dkt. 355 at 433:12–434:14. Then, when asked, "What did you discuss about trade secret 11" with Goodyear, he pointed to just *one* feature, "pump tube geometry that interlocks, in its seat"—all the while admitting that this one feature was "demonstrated by the [published] prototype itself." *Id.* at 463:10–15. Coda's expert Coughlin likewise offered no testimony that Goodyear used or disclosed all eight elements, instead offering the sweeping and conclusory assertion that this alleged secret (along with alleged secrets 15, 16, 18, 19, and 24) could be found somewhere in Exs. P-33 or P-36, or in Benedict's testimony—without ever explaining where, or how, or why. Dkt. 359 at 1631:4–1635:11. JMOL should be granted as to this alleged secret as well.

### E.    No Reasonable Jury Could Have Found Misappropriation Of Trade Secret 20

Coda described alleged trade secret 20 as:

Coda's knowledge of how to design and develop self-inflating tire systems with circulating and non-circulating pump variations, comprised of [1] the disclosure of technical information through observations and descriptions of the three-way valve

regulator, and explanations of the function and air-paths for the states of recirculation and inflation; [2] closure elements related to recirculation systems and a pressurized air reservoir that would permit the storage of air within the system without the need to engage the pump tube with each tire revolution; [3] recirculation at different pressures, such as ambient pressure; [4] recirculation through various paths, such as through the tire, the atmosphere and the pump tube; [5] the safety benefit of recirculating around the pump tube isolated from the tire cavity; [6] a check valve on intake (between the pump tube and the atmosphere) to only permit air in when pressure in the pump tube falls below atmospheric pressure; and [7] a check valve on output (between the pump tube and tire interior) to only allow air into the tire when pressure in the pump tube exceeds the tire pressure.

Dkt. 365 at 2689:9–2690:4 (bracketed numbers added). Here again, the Court is faced with an indefinite "Coda's knowledge" secret followed by a conjunctive list of seven vague elements. Further, Coda never proved that this alleged secret was actually secret in 2009.

**Indefiniteness.** As noted, a secret that claims "Coda's knowledge" as its secret cannot be definite unless the rest of the secret as written and disclosed provides a complete disclosure of what that "knowledge" is. Here, the purported knowledge is a conjunctive list of seven elements, but that list leaves the "knowledge" undefined, because, as with alleged secret 11, a number of the required elements are themselves vague and indefinite:

- "technical information [what information?] through observations [what observations, made by whom?] and descriptions [what are these descriptions?] of the three-way valve regulator";
- "explanations of the function and air-paths for the states of recirculation and inflation" [what functions and air-paths?];
- "recirculation at different pressures" [what different pressures?] and "recirculation through various paths" [what various paths?]; and
- "safety benefit of recirculating around the pump tube isolated from the tire cavity" [what safety benefit did it provide?].

To this day, the scope of this "secret" remains a mystery. Coda never defined it with particularity.

Coda took liberties with this mushy "secret." When asked, "And pressure management trade secret 20, did you share that with Goodyear at the June 15 meeting," Hrabal responded:

Yes. This is, for example, the first one, is a trade secret which relates to three-way

14

> valves, which allows for the recirculation when the pressure is not needed, when you don't need to inflate which is circulate the air, when you need to inflate, you are shipping the air into the tire. And that's the first bullet pointing, for example.

Dkt. 355 at 465:8–24. This "for example" testimony doesn't cut it—the alleged secret was a conjunctive list of eight distinct (albeit vague) elements, so Coda had to show that it disclosed all eight at the 2009 meetings. It didn't come close. Likewise, Hrabal testified only about circulating systems (*id.*), even though the secret was supposedly "Coda's knowledge of how to design and develop self-inflating tire systems with circulating *and non-circulating* pump variations . . . ." Not a word about "non circulating pump variations."

The indefiniteness of this alleged secret blossomed into full flower when Coda tried to show misappropriation. Coughlin simply lumped this seven-element secret together with other alleged "pressure management trade secrets" (3, 4, 20, and 22) and addressed them *en masse*:

> Q. And did you see any evidence of Goodyear disclosing or using pressure management trade secrets of Coda?
>
> A. There is the *various closeout reports*, again, where they're using *various pressure regulating devices* mounted inside of tires.
>
> Q. And are there -- is there any evidence of the trade secrets appearing in patents?
>
> A. Yes. So in *other patent applications and things*, there are descriptions of needing pressure management devices. In particular, in regards to bidirectionality.
>
> Q. Did Goodyear incorporate the pressure management trade secrets into any particular Goodyear patents?
>
> A. In any particular patents?
>
> Q. Goodyear patents.
>
> A. Yes, there are *some inclusions* in *various Goodyear patents*.

Dkt. 359 at 1630:13–1631:3. "[V]arious," unspecified "pressure regulating devices"; "other patent applications and things"; "some inclusions" contained in "various Goodyear patents"—conclusory testimony like this can neither support a verdict nor prevent JMOL. *See* p. 10, above (citing cases).

***Generally known.*** Nor was there any evidence to distinguish this alleged secret from what was generally known or readily ascertainable. When Coughlin was asked, "Why in your opinion

does the 2009 PCT not disclose trade secrets 4 and 20," he responded:

> There is a number of reasons here.  We're discussing the implementation of dead space.  And the need to have an important characteristic being the ability to do recirculation so that a pump -- if a pump is operating, you don't necessarily always need to inject air into the tire, so you could just simply be recirculating that.  And there is a number of different modes of recirculation that you would need to consider to make a functional pressure regulator.

Dkt. 359 at 1606:6–16.  "Dead space"?  Where is that in trade secret 20?  "Recirculation" *is* part of the trade secret, but Coda published recirculation in its 2009 PCT.  Ex. D-127 at 4:1–26, Figs. 1(a)–2(c); *see also* Dkt. 364 at 2618:25–2619:11 (Coda admitting this); Ex. D-48 and Dkt. 361 at 1827:16–1828:24 (Benedict testimony regarding public Coda video about recirculation).  Neither Coda nor Coughlin tried to show all seven elements were secret.  JMOL should be granted.

### F.      No Reasonable Jury Could Have Found Misappropriation Of Trade Secret 23

Coda described alleged trade secret 23 as:

> Coda's development of a functional self-inflating tire as demonstrated by the test results confirming that the tire pump can generate pressure higher than the pressure in the tire cavity, through [1] the test results showing that the pump placed on the tread could generate 6.5 absolute atmospheres of pressure (5.5 relative atmospheres); [2] the test results showing that the tube-in-groove pump of the prototype could generate 3.3 absolute atmospheres of pressure; and [3] test results that demonstrated that the Flap Tubes could generate 1 relative atmosphere of pressure.

Dkt. 365 at 2690:13–23.  Coda's evidence that it disclosed alleged trade secret 23 to Goodyear, Ex. P-471, fails as a matter of law for three independent reasons.

*First*, Coda's only evidence of "use" by Goodyear is an email from Hrabal (Ex. P-471), following the January 2009 meeting, that disclosed a single test result (achieving 6.5A pressure with the prototype).  Coughlin never testified as to anything Goodyear did with it (which was nothing).  Dkt. 359 at 1639:7–1640:2; *see also* Dkt. 356 at 598:5–9 (Hrabal was not aware of Goodyear ever disclosing his test result email to anyone).

*Second*, the email *was not marked confidential.*  That's undisputed.  The parties' Disclosure

Agreement—on which Coda relies for its claim of secrecy—requires such a marking for any written materials to be protected as confidential. Ex. P-585 at ¶ 8. That shreds two essential elements of Coda's misappropriation claim—that the information was "secret," and that Coda took reasonable measures to protect it. O.R.C. § 1333.61(D)(1)–(2). No reasonable jury could find otherwise.

*Third*, Hrabal's email and trade secret 23 don't match. The email discloses a *different* test result with the prototype (6.5A) than alleged trade secret 23 claims (3.3A), and leaves out trade secret 23's other two "secret" test results (with tread and flap tube pumps) altogether.

## G. The Court Should Grant JMOL Or, Alternatively, Order Remittitur As To Punitive Damages

Assuming that any portion of the liability verdict were allowed to stand, no reasonable jury could have found that Coda proved, by clear and convincing evidence, that Goodyear acted with actual malice toward Coda. The Court should grant JMOL that Coda failed to prove this essential element of its punitive-damages case (a task made even easier when considered in light of Coda's clear-and-convincing burden). Alternatively, the Court should grant remittitur and reduce the excessive punitive award, which, at most, must comply with the statutory cap on punitive damages. O.R.C. § 1333.63(B) (not exceeding three times the compensatory damages award).

### 1. Coda Failed To Prove "Actual Malice"

The OUTSA provides that punitive or exemplary damages may be awarded only "[i]f willful and malicious misappropriation exists." O.R.C. § 1333.63(B). Because this statutory requirement is conjunctive, Ohio courts read "willful and malicious" to require a showing of "actual malice." *Becker Equip. v. Flynn*, 2004-Ohio-1190, ¶ 16 (Ohio Ct. App., 12th Dist. 2004), defined as "'(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons

17

that has a great probability of causing substantial harm.'" *Id.* (quotation omitted).

No reasonable jury could have found Goodyear's misappropriation was done with "actual malice"—particularly in view of the jury's own verdict that Goodyear *didn't* misappropriate most of the asserted trade secrets. Coda never tried to prove that Goodyear's state of mind was "characterized by hatred, ill will or a spirit of revenge." Dkt. 365 at 2733:18–20. Nor could a reasonable jury have found that Goodyear's state of mind was marked by "a conscious disregard for the rights and safety of [Coda] that has a great probability of causing substantial harm." The evidence is wholly to the contrary: Goodyear had no reasonable basis for believing that it had received *any* trade secrets in 2009 (let alone the ones conjured up by Coda's investor and lawyers after this case was filed)—Coda never identified any orally conveyed trade secrets in writing to Goodyear, as the Disclosure Agreement provided it could, so Goodyear couldn't have "consciously" disregarded any of Coda's rights. Coda's own behavior was consistent: When Hrabal first learned of Goodyear's patent applications—the applications that supposedly destroyed his secrets—his reaction was "this patent *do[es] not harm us*." Ex. D-179. Before this case, Coda viewed Goodyear's actions as *benefiting* Coda. *E.g.*, Ex. D-178 at 4 ("If I were GY and wanted our SIT, I would do exactly the same thing that they did now."); *id.* ("I do not think that this is bad news for us."). The record—out of Coda's own mouth—shows the antithesis of Goodyear's actions being "conscious disregard" or having "a great probability of causing substantial harm."

Further, there is no evidence that Coda even possessed the five alleged trade secrets in 2009. (*Supra*, part III.A–F; *see also* Ex. D-106 ("[P]lease understand there is not much more to see than what is already on our website.").) Again, Coda never availed itself of the process provided by the Disclosure Agreement to provide contemporaneous written notice of any confidential or secret information purportedly disclosed orally. Ex. P-585 at ¶ 8; Dkt. 356 at

710:21–711:8.  And Goodyear's obligations to protect any confidential Coda information expired, by the terms of the Disclosure Agreement, on January 1, 2012 (Ex. P-585 at ¶ 6), yet no documentary evidence shows that Coda even knew of the alleged trade secrets before 2015.  Dkt. 356 at 583:3–13.  And from 2009 through the filing of this case, the evidence shows that Coda was waiting to sue Goodyear for *patent infringement*—not trade-secret misappropriation.  Ex. D-179 at 2 ("GY works on the solution which falls under our patent, i.e. they work for us.  If this is the case do we want to limit them?  Attacking their patent may cause change of their direction so they will primarily develop other solution."); Ex. D-214 at 2 ("[I]f they build it like this then they will in my opinion have to use solution described in our patent.").

It defies all logic that Goodyear could be guilty of acting with actual malice by misappropriating alleged trade secrets in 2009, when those "secrets" were not even imagined by Coda until *after this lawsuit was filed* in 2015—and even then, not by Hrabal, but by his investors and lawyers.  Ex. D-293; Dkt. 356 at 582:7–18 (Hrabal did not know who wrote the first draft of the list of asserted trade secrets); Dkt. 358 at 1112:5–9 (Jackson testifying that Hrabal was the last person he would ask about potential trade-secret compilations); *id.* at 1106:11–25 (Jackson was "hoping that some of these items might turn out to actually be secret or confidential").  As the Court knows, Coda has resisted defining its alleged secrets with particularity (*see* Dkt. 82), and they have remained moving, gelatinous targets all the way past the end of trial.  "Actual malice" is not present on this record.

### 2.    Alternatively, The Court Should Reduce The Punitive Damages Award

The Ohio legislature capped punitive damages in trade-secret cases at three times the compensatory award.  O.R.C. § 1333.63(B).  This is the extent of the punitive damages Coda sought.  Dkt. 53-1 at 2318 (Prayer for Relief in operative complaint:  "Award Plaintiffs treble damages pursuant to the Ohio Trade Secrets Act, O.R.C. §§ 1333.61–1333.69.").  Following the

procedures prescribed by the Ohio Judicial Conference, the Court is duty-bound to reduce the punitive award to comply with the cap. *Sivit v. Vill. Green of Beachwood, L.P.*, 143 Ohio St. 3d 168, 170–71 (2015) (holding "[r]emittitur of punitive damages is required" where jury's punitive damages awarded exceeded statutory cap); *E.E.O.C. v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 517 (6th Cir. 2001) (reducing jury award to comply with statutory cap in sexual harassment case); *In re Heparin Prod. Liab. Litig.*, No. 09-HC-60186, 2011 WL 3875361, at *6 (N.D. Ohio Sept. 1, 2011) (plaintiff could not seek punitive damages in excess of statutory cap); *Lucarell v. Nationwide*, 7th Dist. No. 13 MA 74, 2015-Ohio-5286, ¶ 188 (reversing and reducing punitive damages award "to comply with the statutory cap"), *rev'd sub nom. on other grounds*, *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15, ¶ 29. In fact, the Ohio Judicial Conference expressly states that "[i]f the jury's award of punitive damages exceeds three times the compensatory damages, then the court must adjust the award to three times the award of compensatory damages." CV 537.11 Trade secrets [Rev. 6/27/20], 1 CV Ohio Jury Instructions 537.11.

This authority aligns with those in other jurisdictions where legislatures have imposed statutory caps in trade-secret cases. *See, e.g.*, *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 657–58 (4th Cir. 1993) (reversing denial of defendant's motion for remittitur of damages award in excess of "the statutory cap that limits punitive damages to twice compensatory damages" under Maryland UTSA); *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, No. 14-cv-748, 2017 WL 4357993, at *8 (W.D. Wis. Sept. 29, 2017) (capping punitive damages at 2:1 ratio in accordance with "Wisconsin's statutory cap"), *modified on appeal*, 980 F.3d 1117, 1144–45 (7th Cir. 2020).

The Court is obligated by law to grant remittitur and reduce the award to, at most, the statutory maximum of $8.4 million. On this record, however, even that is excessive.

## IV.     CONCLUSION

For these reasons, the Court should grant JMOL in favor of Goodyear.

Dated: October 14, 2022             Respectfully submitted,

*/s/ David M. Maiorana*
Calvin P. Griffith (0039484)
David M. Maiorana (0071440)
John C. Evans (0081878)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
cpgriffith@jonesday.com
dmaiorana@jonesday.com
jcevans@jonesday.com

Gregory A. Castanias (*pro hac vice*)
Tracy A. Stitt (0079949)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C.  20001
gcastanias@jonesday.com
tastitt@jonesday.com

*Attorneys for Defendants The Goodyear Tire
& Rubber Company and Robert Benedict*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of October, 2022, a copy of the foregoing was electronically filed with the Court and was served upon counsel of record via the Court's electronic filing system.

/s/ David M. Maiorana
One of the Attorneys for Defendants