# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CODA DEVELOPMENT s.r.o., CODA INNOVATIONS s.r.o., and FRANTISEK HRABAL, | ) ) ) ) ) | CASE NO. 5:15-cv-1572 |
| PLAINTIFFS, | ) ) | JUDGE SARA LIOI |
| vs. | ) ) | **MEMORANDUM OPINION AND ORDER ON DEFENDANTS'** |
| GOODYEAR TIRE & RUBBER COMPANY and ROBERT BENEDICT, | ) ) ) ) | **RENEWED RULE 50 MOTION** |
| DEFENDANTS. | ) | |

Before the Court is the renewed Rule 50(b) motion for judgment as a matter of law ("JMOL") filed by defendants Goodyear Tire & Rubber Company and Robert Benedict ("Benedict") (collectively, "Goodyear" or "defendants"). (Doc. No. 376; *see also* Doc. No. 360, original JMOL Motion; Doc. No. 363, Supplement.) Goodyear's JMOL seeks judgment entered in its favor as to liability on each of plaintiffs' remaining claimed trade secrets as well as, alternatively, seeking remittitur as to the jury's punitive damages award. Plaintiffs Coda Development s.r.o., Coda Innovations s.r.o., and Frantisek Hrabal ("Hrabal") (collectively, "Coda" or "plaintiffs") filed a brief in opposition. (Doc. No. 385.) Goodyear filed a reply brief. (Doc. No. 387.) For the reasons set forth herein, Goodyear's motion is granted.

I.      **Procedural Summary**[1]

On August 9, 2015, Coda filed its complaint against Goodyear, Benedict, and a third defendant (who has since been dismissed), alleging various claims relating to the purported misappropriation by defendants of Coda's confidential and proprietary Self-Inflating Tire ("SIT") technology, allegedly invented by Hrabal (Coda's CEO) and allegedly orally disclosed to Goodyear under a non-disclosure agreement during the course of two meetings in January and June of 2009. The original complaint set forth thirteen claims for correction of inventorship under 35 U.S.C. § 256, one claim under the Lanham Act, and several state law claims (two for fraudulent non-disclosure, one for misappropriation of trade secrets, two for tortious interference with business relations/prospective economic advantage, one for negligent misrepresentation, and one for unjust enrichment).

On February 22, 2019, the Federal Circuit vacated orders of this Court dated September 29, 2016 (dismissing the case) and September 26, 2017 (denying Coda's post-dismissal motion for leave to amend the complaint). The Federal Circuit remanded for further proceedings, including permitting Coda to file an amended complaint. *Coda Dev., s.r.o. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350 (Fed. Cir. 2019).[2]

On April 15, 2019, Coda filed the currently operative first amended complaint setting forth five claims: three seeking correction of inventorship, one for misappropriation of trade secrets, and

---

[1] This case has an unusually long history, which includes many written opinions and rulings by this Court. Some of what is contained herein may be verbatim from other orders but, for the sake of simplicity, the Court will omit quotation marks and/or citations to those previous orders of record. Generally speaking, the Court assumes familiarity with the primary procedural facts.

[2] The Federal Circuit vacated this Court's dismissal order for two procedural reasons. First, the appeals court concluded that this Court's consideration on a motion to dismiss of matters outside the pleadings (*i.e.*, Hrabal's 2008 *Tire Technology* article), without converting the motion to one for summary judgment, was a procedural error. *Coda Dev., s.r.o.*, 916 F.3d at 1360. Second, the appeals court concluded that this Court's dismissal on statute of limitations grounds went "to the merits" of an affirmative defense "[rather] than the complaint's sufficiency." *Id.* at 1361–62.

one for a declaratory judgment. (Doc. No. 53.[3]) Goodyear answered on May 13, 2019, having been

granted an unopposed extension of time. (Doc. No. 57.)

Early in the course of discovery, during the first status conference—with both counsel and

all party representatives participating (*see* Minute Order [non-document] (11/1/2019))—the Court

discussed Goodyear's concern that "Coda refuses to . . . provide a closed-ended response [to certain

interrogatories.]" (Doc. No. 74, Defendants' Notice of Discovery Dispute, at 2.[4]) In an order issued

on November 21, 2019, the Court determined:

> Under the peculiar circumstances of this case, where the alleged disclosure
> of trade secrets was *entirely oral*, the danger of plaintiffs "molding" their claims by
> way of subsequent supplementation of their original recollection of those two 2009
> conversations is of particular concern. Plaintiffs claim they *told* defendants their
> trade secrets and defendants thereafter misappropriated them. Under that scenario,
> it is entirely reasonable for defendants to request . . . that plaintiffs supply a "closed"
> recital of their recollection of what was orally imparted in the two meetings of
> limited duration in 2009.

(Doc. No. 82, Memorandum Opinion and Order, at 7 (emphases in original).) The Court then

ordered:

> Accordingly, the Court will require that plaintiffs supply a "closed"
> response to [the relevant interrogatory[ies]], supplying sufficient specificity and
> description to permit defendants to know what discovery will be relevant and what
> specific claims of trade secret misappropriation they must defend against.
>
> As a final caution, the Court directs plaintiffs to take this discovery mandate
> seriously and *not* provide a response so broad that it is meaningless or so

---

[3] Of the five claims in the first amended complaint, one claim for correction of inventorship (Count Three) was
voluntarily dismissed on February 2, 2021. (*See* Doc. No. 218, Order.) The case proceeded as to the other four counts.
Ultimately, Count Four (Misappropriation of Trade Secrets) was tried to a jury; Count One (Correction of
Inventorship), Count Two (Joint Inventorship), and Count Five (Declaratory Judgment) remained for resolution by
the Court, which the parties agreed to resolve by briefing (*see* Doc. No. 371, Notice as to Inventorship Claims; Doc.
No. 372, Order). After the jury trial, plaintiffs voluntarily abandoned Count Two (*see* Doc. No. 378, Plaintiffs'
Opening Brief, at 7 n.1), leaving for the Court only Counts One and Five. A separate ruling will issues as to those
counts, as well as defendants' affirmative defense of laches.

[4] Except as otherwise noted for trial transcripts (*see* n.6), all page number references herein are to the consecutive
page numbers applied to each individual document by the Court's electronic filing system, a practice recently adopted
by the Court (which differs from the directives in the Initial Standing Order (Doc. No. 19)).

3

incomplete, vague, and evasive that it is useless. Should the Court determine that plaintiffs fail in this regard, and do so purposefully, it will reserve the right to sanction plaintiffs up to and including dismissal. This is not prejudicial to plaintiffs because *plaintiffs themselves* are the ones who know what they said to defendants during the two meetings. There is no need to *discover* anything from the defendants in order for plaintiffs to write down their recollection of those meetings.[5]

> [5] Presumably, it was also plaintiffs themselves who made the choice to rely entirely upon an *oral* disclosure, which easily lends itself to the very situation the parties find themselves in now.

That said, although general supplementation will not be permitted, should it be determined that plaintiffs *inadvertently* failed to include something in their answer[s] . . . , the Court will remain open to entertaining limited supplementation upon a showing of an exceptional reason for doing so.

(*Id*. at 7–8 (footnote and emphases in original).) Coda subsequently supplemented its responses to Goodyear's interrogatories. (*See* Doc. No. 223-20, Plaintiffs' Supplemental Responses to Defendants' First Set of Interrogatories.) In particular, Coda listed twenty-seven trade secrets that it allegedly disclosed to Goodyear relating to its SIT technology. (*Id*. at 24–27.)[5] Subsequent to that supplementation, Coda withdrew ten of these trade secrets and proceeded with a misappropriation claim as to the following seventeen:

- TS 1: A self-inflation system that operates when the tire rotates in either direction and the desirability of a symmetrical implementation of the pump system in the tire, such as the use of two mirror-image pumps;

- TS 2: Coda's knowledge of how to design and develop a peristaltic pump with symmetry that takes into consideration symmetrical pump tubes providing bi-directional functionality and uniformity, variant pump tube lengths and configurations that can be less than fully circular, fully circular and super circular, and a bi-directional arrangement implementing the principles of symmetry, such as

---

[5] There is no dispute that there was no written list of trade secrets until November 2015, three months after Coda filed this lawsuit; Hrabal himself never wrote them down. Dan Jackson, a retired investment banker who ultimately invested in Coda (Doc. No. 358, Transcript ["Tr."] at 1062–63; 1065), along with lawyers he engaged as he investigated whether to invest, created a "compilation of potential trade secrets and other Coda ideas used by Goodyear[.]" (*Id*. at 1088; Ex. D-293.) He acknowledged that Hrabal "had given a presentation to Goodyear that was a complete information package . . . mixing public information, patented and unpatented, and trade secret information without regard to those categories but solely with regard to what he thought would persuade Goodyear to start a development." (*Id*. at 1089.) Jackson admitted that the "compilation" was his effort "to get the lawyers thinking about categories and whether they could be used as trade secrets." (*Id*.) According to Jackson, Coda's lawyers used his "compilation" to "formulat[e] correct trade secrets." (*Id*. at 1090–91.)

the example of 360-degree oppositely oriented pumps in each sidewall of a tire;

- TS 3: Use of a regulator with a threaded member in a self-inflating tire to adjust the space between the membrane and the aperture, thereby resulting in a change in regulator pressure;

- TS 4: Coda's knowledge of how to design and develop a pump-system for a self-inflating tire, which comprises the following design alternatives: "dead space" in the pump chamber in order to limit the maximum pump pressure to prevent over-inflation of the tire; a nonrecirculating system where a portion of the pump tube is not compressed during tire rotation to ensure that the tire is not over-inflated, and the incompressible portion of the tube is between the pumping portion and the tire interior, and the tube is open to the atmosphere; a non-recirculating system where an incompressible portion of the tube is between the pumping portion and atmosphere, and the tube is open to the tire; a recirculating system that eliminates dead space; a regulator with a three-way valve that would recirculate the air while the tire is not being inflated, which minimizes pump wear and maximizes energy efficiency; a recirculating system whereby operation of the tire in reverse does not damage the system; and the design considerations for a system without recirculation;

- TS 5: Coda's technique regarding the alternative to molding a pump chamber into the tire by embedding and removing a filament to form a cavity in the tire, and the improvements in the filament embedding process by coating the filament in a silicone lubricant before pressing and vulcanizing the tire;

- TS 7: Coda's design and development of a multi-purpose interface for transporting air in a self-inflating tire that can connect to the air source, connect to the tire interior, connect to the peristaltic pump, serve as an end to the peristaltic pump, connect to the regulator, carry the regulator, go around or through the bead, go around or through the tire layers, click to the bead and hold the filter;

- TS 11: Coda's knowledge of how to design and develop self-inflating tire pump and groove solutions, consisting of round pump tubing in an outward-facing groove with straight, angled interior geometry; pump tubing with geometry that interlocks with its seat; pump tubing with elliptical interior cross-section; variant pump tube, groove and chamber dimensions, size and materials; pump tube and groove design to minimize internal friction; a "tubeless" pump solution (i.e., a pump that may compose an integral part of tire); cross-section designs that minimize stress on compression in order to improve durability; and tubing with reinforced wall;

- TS 15: Coda's improvements in self-inflating tire technology by assessing alternative locations of a peristaltic pump in the following areas: on the radial face of the bead abutting the rim; in the tread area; in the sidewall against the rim, with use of a spacer to shift the flexion in order to create room for the chamber; between the tire and the rim with flap tubes; in the sidewall near and above the rim at the end of a flap passage; and in the sidewall near and above the rim in an outward facing groove;

- TS 16: Coda's design, development, and testing regarding the feasibility and improvements in self-inflating tire technology by embedding a tube in a groove in a tire sidewall to act as a peristaltic pump;

- TS 18: Coda's knowledge regarding how moving the pump relative to the tire bead (axially or radially) affects the leverage and compressive force exerted on the pump, impacts the ability to open and close the tube, and the magnification of the leverage from the flexion of the sidewall, as demonstrated by the built-out groove of the prototype;

- TS 19: Coda's knowledge regarding the behavior of the tire sidewall during the course of tire rotation to evaluate a preferred location for the pump tube based on rigidity, centrifugal forces, and proximity to the air source;

- TS 20: Coda's knowledge of how to design and develop self- inflating tire systems with circulating and non-circulating pump variations, comprised of the disclosure of technical information through observations and descriptions of the three-way valve regulator, and explanations of the function and air-paths for the states of recirculation and inflation; closure elements related to recirculation systems and a pressurized air reservoir that would permit the storage of air within the system without the need to engage the pump tube with each tire revolution; recirculation at different pressures, such as ambient pressure; recirculation through various paths, such as through the tire, the atmosphere and the pump tube; the safety benefit of recirculating around the pump tube isolated from the tire cavity; a check valve on intake (between the pump tube and the atmosphere) to only permit air in when pressure in the pump tube falls below atmospheric pressure; and a check valve on output (between the pump tube and tire interior) to only allow air into the tire when pressure in the pump tube exceeds the tire pressure;

- TS 22: Coda's design and development of pressure management device alternatives for self-inflating tires, consisting of pressure management devices with the membrane containing a reference space, a spring-assisted membrane, a spring-loaded closure element, and electronic management, and knowledge of the different pressure-temperature response characteristics of these alternatives;

- TS 23: Coda's development of a functional self-inflating tire as demonstrated by the test results confirming that the tire pump can generate pressure higher than the pressure in the tire cavity, through the test results showing that the pump placed on the tread could generate 6.5 absolute atmospheres of pressure (5.5 relative atmospheres); the test results showing that the tube-in-groove pump of the prototype could generate 3.3 absolute atmospheres of pressure; and test results that demonstrated that the Flap Tubes could generate 1 relative atmosphere of pressure;

- TS 24: Coda's knowledge regarding the optimal location for placement of a pump in a tire for tire manufacturers, namely, in the sidewall close to, and above, the rim where the tire cyclically deforms in response to deformation;

- TS 25: Coda's knowledge of potential tire-making cost-savings promoted by self-inflating tire technology, by permitting the removal or reduction of the inner liner; and

- TS 27: Coda's knowledge presented and disclosed to Goodyear at the January and June, 2009 meetings, consisting of the PowerPoint presentation; the prototype self-inflating tire, regulators, pump tubes, mock-ups, and other physical exhibits; the possible location of a pump in a tire; the design and build of the pump; the pressure management system options (dead space or recirculation); the efficacy of the pump in compensating for ordinary tire leakage; SIT testing mechanisms including the use of wireless sensors; marketing strategies directed to the commercial trucking industry; and tests and test results on self-inflating tire prototypes, combined with Coda's technology disclosed in its patents and patent applications regarding self-inflating tire technology.

(*See* Doc. No. 223-20, at 24–27; *see also* Doc. No. 365, Tr. at 2687–91.[6])

Following a multiplicity of discovery disputes that necessitated repeated extensions of the case management plan (eight to be exact), referrals to the magistrate judge, and further lengthy rulings by this Court, finally, on February 8, 2021, defendants filed their motions for summary judgment on all remaining claims and on damages. (*See* Doc. Nos. 221, 222.) Briefing ensued and the motions were at issue on June 4, 2021. On September 30, 2021, the Court denied both dispositive motions. (*See* Doc. No. 262, Memorandum Opinion and Order.)

On October 8, 2021, the Court issued a final pre-trial conference and trial order, setting all trial-related deadlines and a trial date of August 22, 2022 (*see* Doc. No. 263), which was subsequently modified slightly (*see* Order (non-document) dated 8/18/22). Several motions in limine were filed on April 29, 2022, followed by full briefing, several days of argument, and rulings by the Court (on all but one motion) during a hearing on August 17, 2022.[7]

---

[6] Because the various volumes of trial transcripts are consecutively numbered from page 1 to page 2804, rather than citing to any individual transcript's page number applied by the electronic filing system (which is the Court's usual practice), the Court will instead cite to the actual transcript page number(s) applied by the court reporters.

[7] Although the docket reflects a request by plaintiffs for a transcript of the August 17th proceedings (*see* Doc. No. 344), no official transcript was ever filed, probably because plaintiffs only requested a realtime unedited transcript.

The case proceeded to trial, with the jury being selected on August 29, 2022 (*see* Doc. No. 353, Transcript) and testimony being heard between September 6–15, 2022 (*see* Doc. Nos. 355–359, 361–62, 364, Transcripts). Notably, only Coda's trade secrets claims were tried to the jury; its inventorship claims were reserved for trial to the Court. Closing arguments and instructions to the jury occurred on September 16, 2022, with the jury beginning its deliberations that same day. (*See* Minutes of Proceedings (non-document), dated 9/16/2022.)

On September 14, 2022, after Coda had rested its case on its trade secret claims, the Court heard arguments outside the jury's presence on defendants' Rule 50(a) JMOL motion (Doc. Nos. 360, 363). (*See* Doc. No. 361, Tr. at 1731–39; 1936–2086.) On September 15, 2022, after the defense rested its case, the Court heard additional arguments outside the presence of the jury on Goodyear's renewed Rule 50(a) motion (*see* Doc. No. 364, Tr. at 2544–2622), and issued a ruling regarding which of the remaining seventeen trade secrets would not be permitted to go to the jury (*see id.*, Tr. at 2644–50). In summary, the Court eliminated Trade Secrets 4, 15, 18, 19, and 27, finding that they were indefinite. But the Court also noted:

> The Court still has concerns regarding the definiteness of some or all of the trade secrets not addressed just now.
>
> Pursuant to [] Rule 50, the Court will submit the action to the jury, subject to the Court's later deciding the legal questions raised by the motion.
>
> So this is not the end of the road relative to whether these are definite enough to really even be trade secrets. As I said, I do have some very serious concerns.
>
> * * *
>
> And finally, the Court recognizes that Goodyear has raised several additional grounds which will also be submitted to the jury subject to the Court's later deciding the legal questions raised by the motion.

So I have to say very honestly, I do have some grave concerns. I have spent hours, days, weeks, trying to understand some of these trade secrets. It's very difficult. I cannot imagine, with the language used, how many of these trade secrets could possibly put anyone on notice as to what the secret was.

I've been, in my opinion, very conservative in my approach to what I'm not allowing the jury to consider. I'm not closing the record on the Rule 50 motion relative to the other issues.

(*Id.*, Tr. at 2650–51.) The Court permitted the remaining twelve alleged trade secrets to go to the jury, subject to the reservation just quoted.

The jury ultimately found that, of the twelve alleged trade secrets disclosed by Coda to Goodyear during the 2009 meetings, only seven actually were trade secrets (TS 3, 5, 7, 11, 20, 23, and 24).[8] The jury further found that Goodyear had misappropriated five of those trade secrets (TS 7, 11, 20, 23, and 24), causing Coda $2.8 million in compensatory damages. The jury also concluded that Coda was entitled to recover $61.2 million in punitive damages because Goodyear's misappropriation was willful and malicious. (*See generally* Doc. No. 369, Verdicts.)

Thereafter, the parties filed their respective briefs now before the Court, along with briefs on the merits of Coda's inventorship claims and Goodyear's affirmative defenses. The Court addresses herein the renewed Rule 50 motion and will issue a separate ruling on the equitable claims, which are not automatically precluded by the instant ruling.[9]

---

[8] Perhaps illustrative of how confusing and ill-defined Coda's "trade secrets" are, by the end of trial Coda had evolved its theory of damages to rely on two "foundational trade secrets" (TS 16 and TS 24), (*see* Doc. No. 361, Tr. at 2061–62 ("[I]t's trade secrets 16 and 24, that are . . . foundational. They're the important ones[.])), and counsel for Coda seemed to focus on these two "foundational trade secrets" alone in its closing argument. (*See* Doc. No. 365, Tr. at 2732:9–18.) But in the end, the jury found one of the "foundational trade secrets" was not definitive enough to be a trade secret while the other was. (Doc. No. 369 (Verdict Forms).)

[9] Without citing any authority, in its brief in opposition to plaintiffs' brief on the equitable claims, Goodyear declares that, if the Court grants Goodyear's Rule 50(b) motion, there will be no basis for Coda to claim inventorship, allowing the Court to "short-circuit Coda's bizarre request to reallocate the ownership of a patent Coda thinks is worthless and unenforceable[.]" (Doc. No. 380, at 2.) Plaintiffs did not respond to that assertion, but the Court concludes that the issues are separate and have different elements of proof. The mere fact that a person *may not* have a protected trade

## II.     Judgment as to Liability on Remaining Trade Secrets

Fed. R. Civ. P. 50(b) provides in relevant part:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. . . . In ruling on the renewed motion, the court may:
>
>> (1) allow judgment on the verdict, if the jury returned a verdict;
>> (2) order a new trial; or
>> (3) direct the entry of judgment as a matter of law.

This Court may grant Goodyear's Rule 50(b) motion "'only if in viewing the evidence in the light most favorable to [Coda], there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party.'" *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (quoting *Radvansky v. City of Olmstead Falls*, 496 F.3d 609, 614 (6th Cir. 2007)); *see also* Fed. R. Civ. P. 50(b) advisory committee note to 1991 amendment ("In ruling on [a Rule 50(b)] motion, the court should disregard any jury determination for which there is no legally sufficient evidentiary basis enabling a reasonable jury to make it."). The Court does not "reweigh the evidence or assess witness credibility," *id.*, and must restrict its review "to the evidence . . . admitted at trial." *Sykes*, 625 F.3d at 305 (citing 9B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2540 (3d ed. 2008)).[10]

Ordinarily, for Goodyear to succeed on its challenge, it must "overcome the substantial deference owed a jury verdict." *Radvansky*, 496 F.3d at 614. Here, however, Goodyear's renewed challenge relates in part to a threshold issue that the Court decides before sending trade secret

---

secret does not automatically mean they could not (or did not) contribute to a patented invention. As a result, the Court will issue a separate ruling on the equitable matters that were left for the Court's determination.

[10] To the extent Ohio law governs because the Court in considering a state law claim for misappropriation of trade secrets, it is worth noting that Ohio courts apply this same standard. *See*, *Masterson v. Brody*, 197 N.E.3d 628, 637 (Ohio Ct. App. 2022) (citing, *inter alia*, *Posin v. A.B.C. Motor Court Hotel, Inc.*, 344 N.E.2d 334, 338 (Ohio 1976)).

matters to a jury—namely, whether the trade secrets, as articulated, are sufficiently definite to warrant protection under the Ohio Uniform Trade Secrets Act ("OUTSA"). Further, as outlined above, although the Court permitted twelve of Coda's seventeen alleged trade secrets to go to the jury, it did so after noting significant concerns about whether even these twelve met this threshold requirement of definiteness and after expressly reserving its right to revisit all legal questions raised by Goodyear's Rule 50 motions.

> Goodyear's renewed JMOL motion raises three arguments:[11]
>
> *First*, on the trade-secret findings, Coda failed to prove the definiteness of nos. 7, 11, 20, 23, and 24, or their misappropriation. The Court rightly harbored "very serious concerns" about these vague, indefinite trade secrets, and the record confirms the validity of that concern. *Second*, on the jury's punitive-damages verdict, the Court should grant JMOL because there is no evidence on this record on which a reasonable jury could have found that Goodyear acted with "actual malice." And *third*, though it should not be necessary for the Court to reach this issue, Ohio law compels a remittitur of the jury's excessive punitive award. O.R.C. § 1333.63(B).

(Doc. No. 376, at 7.)

Upon its renewed consideration, the Court concludes that Goodyear's first argument is dispositive to the extent it addresses lack of definiteness in, and/or misappropriation of, the five trade secrets.

Although Ohio Rev. Code § 1333.61(D), which defines a trade secret, contains nothing addressing how "definite" the information constituting a "trade secret" must be, courts have made clear that "a trade-secrets plaintiff must 'defin[e] the information for which protection is sought with sufficient definiteness to permit a court to apply the [statutory] criteria for protection . . . and

---

[11] Because Doc. No. 376 is a renewed Rule 50 motion, only issues and arguments presented in the original motion (Doc. No. 360) may be considered. *See* Fed. R. Civ. P. 50 advisory committee note to 2006 amendment. In Doc. No. 360—the original motion—Goodyear argued that four of these five trade secrets were among all of the trade secrets that it characterized as "indefinite." (Doc. No. 360, at 4–9.)

to determine the fact of an appropriation.'" *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, No. 21-5345, 2022 WL 16846585, at *5 (6th Cir. Apr. 28, 2022) (quoting Restatement (Third) of Unfair Competition § 39 cmt. *d*) (applying the Kentucky Uniform Trade Secrets Act); *see also TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, 966 F.3d 46, 53 (1st Cir. 2020) ("Courts interpreting the [Act] have uniformly followed this requirement.") (citing cases). In fact, this Court noted the same when, on November 21, 2019, it ordered Coda to "supply a 'closed' response to Interrogatory No. 1, *supplying sufficient specificity and description* to permit defendants to know what discovery will be relevant and what specific claims of trade secret misappropriation they must defend against." (Doc. No. 82, at 7.) *See also Caudill Seed*, 2022 WL 16846585. at *5 ("Reasonable particularity must be particular enough as to separate the trade secret from matters of general knowledge in the trade or special knowledge of persons skilled in the trade." (internal quotation marks and citations omitted)).[12]

---

[12] In its opposition brief, Coda places great stock in *Caudill Seed*'s affirmance of the denial of a Rule 50(b) motion. (Doc. No. 385, at 8–9 (citing *Caudill Seed*, 2022 WL 16846585, at *7, for the proposition that the jury's verdict on liability will not be disturbed—regardless of claims that plaintiff presented "a constantly shifting trade secret . . . .").) But, as correctly noted by Goodyear, "Caudill [Seed] had real evidence of *bona fide* secrets—a poached employee [Kean Ashurst] who stole thousands of physical R&D files and then implemented his former employer's specific process for his new employer." (Doc. No. 387, at 8.) In fact, the district court in *Caudill Seed* described the trade secrets that were stolen by Ashurst as "[a] significant body of research and development relating to seeds and seed extraction processes [that] had been developed by Caudill Seed prior to Ashurst's arrival at Caudill Seed and was available to and utilized by Ashurst in his work for Caudill Seed." *Caudill Seed & Warehouse Co. v. Farrow Formulas, Inc.*, No. 3:13-cv-82, 2020 WL 3065626, at *1 (W.D. Ky. June 9, 2020). Importantly, the district court noted:

> During the years of his employment at Caudill Seed, Ashurst maintained crucial notes and formulas in stenographer's notebooks, a composition notebook, and on an external computer hard drive. He carefully guarded these items as they were the principal repositories for his task lists, thought processes and research results in his work for Caudill Seed. He kept the lab locked and generally inaccessible. The steno pads were locked in a file cabinet and the lab notebook and hard drive were either kept with Ashurst or were locked in the lab. To Caudill Seed's great regret, it entrusted most of the memorialization of its science solely to Ashurst.

*Id.*, at *2. *Caudill Seed* bears no resemblance to the instant case where there was *no* compilation of Coda's alleged trade secrets until *after* this case was filed. Certainly there is no evidence here of notebooks, computer hard drives, locked cabinets, or locked labs. Hrabal's disclosures were entirely oral.

12

Case law is clear that one cannot claim as a trade secret an entire body of knowledge without articulating "'at least the boundaries within which the secret lies.'" *Top Agent Network, Inc. v. Zillow, Inc.*, No. 14-cv-4769, 2015 WL 10435931, at *2 (N.D. Cal. Aug. 6, 2015) (quoting *Diodes, Inc. v. Franzen,* 260 Cal. App. 2d 244, 253 (1968)). "If a plaintiff 'effectively assert[s] that all information in or about its [product] is a trade secret,' then it brings a case 'both too vague and too inclusive,' and does not allow a jury to 'separate the trade secrets from the other information that goes into any' product in the field." *Caudill Seed*, 2022 WL 16846585. at *5 (quoting *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583–84 (7th Cir. 2002) (applying the Wisconsin Uniform Trade Secrets Act)).

That said, the Court further notes that the Ohio Supreme Court does recognize that a trade secret may be articulated as a "combination" of components. In *State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E.2d 661, 674–75 (Ohio 1997), the court cited *Anaconda Co. v. Metric Tool & Die Co.*, 485 F. Supp. 410, 422 (E.D. Pa. 1980), which noted, in reliance on the Second Circuit case of *Imperial Chem. Indus. v. Nat'l Distillers and Chem. Corp.*, 342 F.2d 737, 742 (2d Cir. 1965), that "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret."

This Court previously determined, after argument and briefing, that the question of definiteness is one for the Court to make, ideally before the matter goes to the jury. (*See* Doc. No. 347, Defendants' Supplemental Brief on Definiteness Requirement; Doc. No. 348, Plaintiffs' Response to Defendants' Supplemental Brief on Definiteness Issue; *see also* Doc. No. 353, Tr. at 173.) In this case, the Court made that determination as to five of Coda's seventeen alleged trade secrets, not permitting them to go to the jury. (*See* Doc. No. 364, Tr. at 2644–50.) As to the

13

remaining twelve, the Court expressed its continued concerns, but decided to reserve the matter until after the jury delivered its verdict as to misappropriation. The jury concluded that Goodyear had misappropriated TS 7, 11, 20, 23, and 24. (*See* Doc. No. 369, at 3.)

The Court must now render a decision as to Goodyear's renewed challenge with regard to the definiteness (or lack thereof) of these five trade secrets. If any individual trade secret is now determined to be indefinite, the jury's verdict of misappropriation cannot stand as to that trade secret.

The Court will address the challenged trade secrets in the order that Goodyear's motion addresses them.

### *Trade Secret 24*

Coda articulated TS 24 as follows:

> Coda's knowledge regarding the optimal location for placement of a pump in a tire for tire manufacturers, namely, in the sidewall close to, and above, the rim where the tire cyclically deforms in response to deformation.

(Doc. No. 223-20, at 27.)

This trade secret has the same problem as many of the others in that it claims that the secret is "Coda's knowledge." Although the Court rejected several similarly phrased trade secrets, not permitting them to go to the jury, the Court allowed for the possibility that the "namely" portion of this trade secret might serve to render it more definite by specifying that the "optimal location" was "in the sidewall close to, and above, the rim where the tire cyclically deforms[.]" But the evidence at trial only served to show that this phraseology was *anything but* definite. Hrabal himself offered numerous explanations for the meaning of this phrase.

In its brief in opposition to Goodyear's renewed motion, Coda argues both that it must be presumed that the jury followed the Court's instructions with respect to trade secret claims (Doc.

14

No. 385, at 10–11)[13] *and* that the Sixth Circuit holds that "[w]hether information constitutes a trade secret is a question of fact" (*id*. at 11, quoting *AtriCure, Inc. v. Jian Meng*, 842 F. App'x 974, 979 (6th Cir. 2021) (further citations omitted)). While both of these propositions are true, Coda disregards entirely that the "definiteness" determination is one for the Court in the first instance, a determination that this Court reserved as to several of Coda's trade secrets, including TS 24. (*See also* Doc. No. 387, at 7 (challenging Coda's reference to the verdict as proof that its "secrets" were adequately defined, and noting that this is a matter for the Court, not the jury).) Therefore, Coda's arguments do not become operative until definiteness is first determined, and even then there must be a "legally sufficient evidentiary basis enabling a reasonable jury to make" a finding that a trade secret exists.

Goodyear points out that, when Hrabal was questioned at trial about his 2007 PCT application (Ex. P-466) and the 2008 *Tire Technology* article (Ex. D-058) regarding locating a peristaltic pump in the tire sidewall close to, and above, the rim where the tire cyclically deforms (for example, in the lug boss portion of the sidewall), Hrabal indicated that this was "public" knowledge. (Doc. No. 356, Tr. at 625 ("Q. So locating a peristaltic pump in the tire sidewall near the rim in an area where it cyclically deforms was not a trade secret? A. This is public.").) When pressed about whether the lug boss is in the tire sidewall, Hrabal testified that it was. (*Id*., Tr. at 666 ("Q. The lug boss is in the tire sidewall, right? A. Lug boss is tire sidewall extension between the tire and the rim. It's just --. Q. It's in the sidewall? A. It's part of the tire sidewall.").) In fact,

---

[13] The Court instructed the jury at some length about trade secrets. It directed, *inter alia*, that the jury must find "that Coda proved by a preponderance of the evidence that it possessed specific identifiable trade secrets[]" (Doc. No. 365, Tr. at 2682), that "the information for which protection is sought [is defined] with sufficient definiteness to permit the jury to apply the criteria for protection and to determine the fact of an appropriation[]" (*id*., Tr. at 2683), and that the information was not "generally known or readily ascertainable" (*id*., Tr. at 2684).

Hrabal contradicted himself many times on whether the lug boss is part of the sidewall. (*Compare* Doc. No. 356, Tr. at 622–23 ("in the sidewall"), at 624 ("part of the tire sidewall"), at 642 ("part of the tire sidewall"), *with id*. Tr. at 658 ("not in the sidewall," but rather "on" the sidewall); *see also id*., Tr. at 661 (Court overruling plaintiff's counsel's objection to continued questioning of Hrabal and noting: "The reason I was allowing it is because he keeps changing his answer. And I'm not sure what his final answer is.").)

In its brief in opposition to Goodyear's renewed motion, Coda challenges Goodyear's "[c]it[ation] to snippets of the record[.]" (Doc. No. 385, at 14.) Coda claims that Hrabal's testimony, taken as a whole, provides "no clear admission that would provide a basis for setting aside the jury's verdict." (*Id*., citing *Kusens v. Pascal Co., Inc.*, 448 F.3d 349, 360 (6th Cir. 2006) ("evidence must be construed most strongly in favor of the nonmovant").) Once again, Coda is assuming that TS 24 was properly sent to the jury, having first passed the "definiteness" test. But that determination was reserved by the Court and can be made now.

Both here (*see* Doc. No. 385, at 14–16) and in its original response to Goodyear's Rule 50 motion, Coda insists that the lug boss portion of the sidewall about which Hrabal testified (and upon which Goodyear relies) "is not in the sidewall that's referred to in trade secret 24." (Doc. No. 364, Tr. at 2559.) At trial, Coda's counsel argued that "Trade secret 24 is talking about a normal standard sidewall like what's in [Figure] 2A [of the 2007 PCT]." (*Id*.) Elsewhere Coda argued that "the sidewall [in TS 24] is a traditional sidewall. It doesn't say in the special addition to a sidewall that's shown in the 2007 PCT." (*Id*., Tr. at 2561.) In its opposition brief, Coda claims that "Hrabal made clear that a 'lug boss' is not part of a conventional tire sidewall." (Doc. No. 385, at 14–15.) But the descriptive words "normal" or "standard" or "traditional" or "conventional" are not in TS 24. Furthermore, Coda itself has repeatedly described the lug boss as being part of the tire sidewall.

16

(*See*, *e.g.*, Ex. P-322, at 41–43; Ex. D-90, at 33–35.) It is this evidence, not counsel's arguments, that are the focus of the Court's analysis.

Elsewhere in the Rule 50 arguments relating to TS 24 that were made at trial, the Court itself noted that there had been much discussion about the relationship between the optimal location of the pump and prevention of rim crush. (Doc. No. 364, Tr. at 2614 ("For instance, the one [TS 24] that we spent a lot of time talking about an hour ago was when we talked about the location so that it would prevent rim crush. Well, so that it would prevent rim crush is not in [TS 24]. So that is why I thought it was essential, imperative that we know exactly what the trade secret was with particularity so we wouldn't be sitting here saying, well, what does that mean?").)

Thus, although Coda's opposition brief argues that this Court must credit the jury's findings with respect to TS 24, the argument ignores the fact that, as to the threshold determination on definiteness, the Court probably should not have sent TS 24 to the jury because, based on the testimony at trial, Coda failed to meet its "burden of defining the information for which protection is sought with sufficient definiteness to permit a court to apply the [statutory] criteria for protection . . . and to determine the fact of an appropriation." *TLS Mgmt. & Mktg. Servs.*, 966 F.3d at 53. Rather, the testimony showed that the language of the trade secret was susceptible to *too many* interpretations regarding the so-called "optimal location" and shed no light on *which* interpretation might be the one Coda claimed as secret.

The Court concludes that TS 24 does not meet the threshold requirement of definiteness and should not have been sent to the jury—with the necessary result that the jury's verdict as to TS 24 must be set aside. But even if this determination is incorrect, TS 24 was not "secret" and no reasonable jury could have concluded otherwise on this record.

This Court allowed TS 24 to go to the jury on the chance that the "namely" portion of TS 24 might have sufficiently articulated something secret. But the record shows that Coda published the "'namely' secret" in its 2007 PCT publication and Hrabal published it in his 2008 *Tire Technology* article. (*See* Doc. No. 376, at 10–14 (marshaling the trial testimony revealing that TS 24 was not secret and had been repeatedly published).)

In light of the above, Goodyear's Rule 50(b) motion as to TS 24 is granted and the jury's verdict as to TS 24 is set aside.

### *Trade Secret 7*

Coda articulated Trade Secret 7 as follows:

Coda's design and development of a multi-purpose interface for transporting air in a self-inflating tire that can [1] connect to the air source, [2] connect to the tire interior, [3] connect to the peristaltic pump, [4] serve as an end to the peristaltic pump, [5] connect to the regulator, [6] carry the regulator, [7] go around or through the bead, [8] go around or through the tire layers, [9] click to the bead and [10] [hold] the filter.

(Doc. No. 223-20, at 25 (numbering added).)

As argued by Goodyear, the "design" this trade secret references is in vague, functional terms (*i.e.*, an interface "that can" accomplish certain ends). But there is no detail as to how the functions are to be carried out and, importantly, there is no articulation of the actual "design and development" of any such interface that is the actual subject of the trade secret. "[D]isclosures that only reveal the end results of, or functions performed by, the claimed trade secrets, and various concepts, elements, or components that make up designs" do not satisfy the [definiteness] requirement." *UOP LLC v. Exterran Energy Sols., L.P.*, No. 4:21-cv-2804, 2021 WL 8016712, at *1 (S.D. Tex. Sept. 28, 2021) (citation omitted).

18

In opposition, Coda argues that the jury could have credited Hrabal's explanation of the "specific value of trade secret 7 . . . [as] allow[ing] for integration of separate functions in a single unit." (Doc. No. 385, at 17 (citing Doc. No. 355, Tr. at 459).) That might explain its functional value, but it sheds no light on how that fact would render the articulation of TS 7 "definite."

Coda further argues in opposition that the *UOP* case cited by Goodyear is not binding and is inapposite because it involved a motion to compel discovery. (Doc. No. 385, at 18.)[14] Coda relies instead upon the recent Sixth Circuit decision in *Caudill Seed*, *supra*, which arose in the context of a Rule 50(b) motion. With absolutely *no* explanation, Coda simply conclusorily asserts that "Goodyear's challenge fails under *Caudill*, 2022 WL 16846585, at **6–7." (Doc. No. 385, at 18.) As explained, *supra*, the Court does not agree that *Caudill Seed* is sufficiently on point to offer guidance as to the requisite definiteness (or lack thereof) of any of the trade secrets here, including TS 7, which relates to the design and development of a multi-purpose interface. Nor does the conclusory one-liner in Coda's brief shed any light on Coda's reasoning. In *Caudill Seed*, the plaintiff had physical, concrete proof that went "beyond merely listing technical concepts" and "had a collection of documents that showed 'the process from the seed all the way to the making of [the product].'" *Id*. at *6. The *Caudill Seed* plaintiff was able to "establish that 'the combination of known elements or components [in its asserted trade secret] [was] unique.'" *Id*. at *5 (citation omitted). There is no such evidence here.

The Court concludes that TS 7 does not meet the threshold requirement of definiteness and should not have been sent to the jury—with the necessary result that the jury's verdict as to TS 7

---

[14] Coda also argues, oddly, that "even under the exacting standards for claiming an invention in a patent, the law allows for use of functional language." (Doc. No. 385, at 18 n. 6 (citing 35 U.S.C. § 112(f)).) The claims tried to the jury here did not involve patents. Even so, as Goodyear argues in its reply, "even § 112(f) doesn't allow a patentee to assert functional claims without specifying structure, like Coda tries to do here." (Doc. No. 387, at 13.)

must be set aside. But even if this determination is incorrect, there is no evidence of use or disclosure by Goodyear of a ten-function interface, and no reasonable jury could have concluded otherwise on this record.[15] Coda's own expert, (Edward) Bryan Coughlin, testified only vaguely about Ex. P-13 (U.S. Patent No. 8,852,371) as "list[ing] an interface where a filter and an air intake system are able to draw air from the outside, pass it under the bead and into the tire cavity." (Doc. No. 359, Tr. at 1638.) This testimony completely fails to identify all ten of the claimed functions in Goodyear's supposedly offending patent.

In light of the above, Goodyear's Rule 50(b) motion as to TS 7 is granted and the jury's verdict as to TS 7 is set aside.

### *Trade Secret 11*

Coda articulated Trade Secret 11 as follows:

Coda's knowledge of how to design and develop self-inflating tire pump and groove solutions, consisting of [1] round pump tubing in an outward-facing groove with straight, angled interior geometry; [2] pump tubing with geometry that interlocks with its seat; [3] pump tubing with elliptical interior cross-section; [4] variant pump tube, groove and chamber dimensions, size and materials; [5] pump tube and groove design to minimize internal friction; [6] a "tubeless" pump solution, (*i.e.*, a pump that may compose an integral part of tire); [7] cross-section designs that minimize stress on compression in order to improve durability; and [8] tubing with [reinforced] wall.

(Doc. No. 223-20, at 25 (numbering added).)

TS 11 is another one that claims "knowledge" as a trade secret—"knowledge of how to design and develop self-inflating tire pump and groove solutions." But the bulk of the trade secret as articulated is no more than an undifferentiated list of components, which, as already noted, cannot meet the definiteness requirement. *UOP LLC*, 2021 WL 8016712, at *1. And, to make

---

[15] Goodyear also argues in its reply brief that TS 7 is not secret and the "Coda offers nothing to the contrary in its opposition." (Doc. No. 387, at 13.) Presumably, Coda concedes this point.

matters worse, some of those components are so vague as to be meaningless, *e.g.*, claiming knowledge of "variant pump tube, groove and chamber dimensions, size and materials[,]" but without disclosing what the variant dimensions, variant sizes, and/or variant materials are; or claiming "pump tube and groove design to minimize internal friction[,]" but failing to disclose *what* that friction-minimizing design is.

In opposition, Coda argues that TS 11 "concerned the various considerations for designing the groove of a tube-in-groove-type self-inflating tire." (Doc. No. 385, at 20.) It claims that Goodyear's arguments fail because the jury "was properly instructed and found against Goodyear on trade secret 11." (*Id.*) Again this jumps ahead of the threshold analysis of definiteness.

Coda asserts that TS 11 is not indefinite because it "listed at least eight specifics that comprise Coda's knowledge." (*Id.*) In support of this argument that these "eight specifics" make TS 11 definite, Coda points to Hrabal's testimony regarding "a key hurdle he overcame—the problem of the pump tube 'walking away.'" (*Id.* at 20–21, quoting Doc. No. 355, Tr. at 433–35; 458–59.) But TS 11 contains no mention that this particular combination (or choice) of components solves the "walking away" problem. If Coda was trying to claim as a trade secret its solution to the "walking away" problem, it failed to articulate that in TS 11. In fact, Coda actually included that "secret" in TS 12, which it withdrew before trial.[16]

---

[16] TS 12 stated:

> Coda's knowledge regarding the pitfalls of pump tubes of the self-inflating tire "walking away" from their seats during tire rotation, and the need for interlocking structures to prevent it from happening.

(Doc. No. 223-1, Declaration of David M. Maiorana, at 25.)

Coda also argues that Hrabal offered plenty of proof that TS 11 was "secret." Coda points to Hrabal's testimony regarding his "great efforts to preserve the secrecy of his technology[.]" (Doc. No. 385, at 20 (citing its argument relating to TS 7, which cited Doc. No. 355, Tr. at 369–94, 452, 540, 542).) But these types of broad references to Hrabal's testimony regarding the alleged secrecy of his "technology" do not suffice to pinpoint evidentiary proof as to the secrecy of TS 11 in particular.

In reply, Goodyear correctly notes that the "secret" in TS 11 is "knowledge of how to design and develop self-inflating tire pump and groove solutions, consisting of" a combination of eight elements or components. (Doc. No. 387, at 16.) Coda does not actually articulate the "knowledge" and, importantly, it makes no showing that the eight-part combination was not generally known or readily ascertainable in 2009.

The Court concludes that TS 11 does not meet the threshold requirement of definiteness and should not have been sent to the jury—with the necessary result that the jury's verdict as to TS 11 must be set aside. But even if this determination is incorrect, there is neither evidence of secrecy on Hrabal's part nor of use/disclosure by Goodyear of Hrabal's eight-element solution, and no reasonable jury could have concluded otherwise on this record. Nor does Coda refute Goodyear's argument that Hrabal testified that he disclosed only one of the eight elements in TS 11 (the second one) and also admitted that this one element was in his prototype. (*See* Doc. No. 355, Tr. at 433–34.)

In light of the above, Goodyear's Rule 50(b) motion as to TS 11 is granted and the jury's verdict as to TS 11 is set aside.

### _Trade Secret 20_

Coda articulated Trade Secret 20 as follows:

Coda's knowledge of how to design and develop self-inflating tire systems with circulating and non-circulating pump variations comprised of [1] the disclosure of technical information through observations and descriptions of the three-way valve regulator and explanations of the function and air-paths for the states of recirculation and inflation; [2] closure elements related to recirculation systems and a pressurized air reservoir that would permit the storage of air within the system without the need to engage the pump tube with each tire revolution; [3] recirculation at different pressures, such as ambient pressure; [4] recirculation through various paths, such as through the tire, the atmosphere and the pump tube; [5] the safety benefit of recirculating around the pump tube isolated from the tire cavity; [6] a check valve on intake (between the pump tube and the atmosphere) to only permit air in when pressure in the pump tube falls below atmospheric pressure; and [7] a check valve on output, (between the pump tube and tire interior) to only allow air into the tire when pressure in the pump tube exceeds the tire pressure.

(Doc. No. 223-20, at 26 (numbering added).)

Again we have a trade secret claiming protection for "knowledge of how to design and develop" something, with no disclosure of what that knowledge is and/or what the design or development is. Although the trade secret lists seven components, it does not disclose how they fit together (_i.e._, how they are designed) to create "self-inflating tire systems with circulating and non-circulating pump variations[.]" Moreover, as outlined in Goodyear's motion (Doc. No. 376, at 18–19), the testimony of neither Hrabal nor Coughlin sheds any clarifying light on the subject.

Coda's brief in opposition offers no argument as to why TS 20, as articulated, is definite. It merely outlines all the testimony from which the jury could find misappropriation and states "the jury resolved [the definiteness] question against Goodyear after being properly instructed." (Doc. No. 385, at 23.) Again Coda is ahead of the analysis.

Coda argues that TS 20 "concerns the design considerations for constructing the overall SIT assembly for a self-inflating tire." (Doc. No. 385, at 21.) But that is not what TS 11 _says_.

23

Goodyear in its reply aptly points out (with reference to its motion, Doc. No. 376, at 18) that "Coda skirts the myriad questions raised by its own description." (Doc. No. 387, at 17 (identifying several questions: "what information? . . . what observations, made by whom? . . . what are these descriptions? . . . what functions and air-paths?" . . . what different pressures? . . . what various paths? . . . what safety benefit did it provide?").) Coda argues that these questions "trade[ ] rhetoric for evidence." (Doc. No. 385, at 23 (citing Doc. No. 355, Tr. at 451:10–23).) The Court fails to see how Hrabal's cited testimony (quoted in full below) has any evidentiary value:

> Q.    . . . Trade secret 20 is Coda's knowledge of how to design and develop self-inflating tire systems with circulating and non[-]circulating pump variations, comprised of the disclosure of technical information through observations and descriptions of the three-way valve regulator, and explanations of. And then it lists a number of bullet points of technical items that were related to the regulator.
>
> Do you agree with that?
>
> A.    Yes.
>
> Q.    Okay. And does this relate to these specifics [sic] technical items in relation to your three-way valve regulator?
>
> A.    Yes.

(Doc. No. 355, Tr. at 451.)

The Court concludes that TS 20 does not meet the threshold requirement of definiteness and should not have been sent to the jury—with the necessary result that the jury's verdict as to TS 20 must be set aside. But even if this determination is incorrect, there is neither evidence of secrecy on Hrabal's part nor of use/disclosure of TS 20 by Goodyear, and no reasonable jury could have concluded otherwise on this record. As Goodyear pointed out in its reply, any effort by Coda to rely on disjointed testimony regarding some—but not all—of the seven required elements of TS 20 (*see* Doc. No. 385, at 22–23) is insufficient to prove secrecy as to the entire combination. *See*

24

*Caudill Seed*, 2022 WL 16846585, at *5 ("[T]he plaintiff must establish that 'the combination of known elements or components is unique.' . . . Because all of a combination trade secret's elements may individually be publicly known, the uniqueness of the combination is critical to establishing trade-secret protection."). In addition, there is no evidence that Hrabal disclosed the entire combination of elements to Goodyear, nor is there evidence that Goodyear used that combination.[17]

In light of the above, Goodyear's Rule 50(b) motion as to TS 20 is granted and the jury's verdict as to TS 20 is set aside.

### *Trade Secret 23*

Coda articulated Trade Secret 23 as follows:

> Coda's development of a functional self-inflating tire as demonstrated by the test results confirming that the tire pump can generate pressure higher than the pressure in the tire cavity, through [1] the test results showing that the pump placed on the tread could generate 6.5 absolute atmospheres of pressure (5.5 relative atmospheres); [2] the test results showing that the tube-in-groove pump of the prototype could generate 3.3 absolute atmospheres of pressure; and [3] test results that demonstrated that the Flap Tubes could generate 1 relative atmosphere of pressure.

(Doc. No. 223-20, at 27 (numbering added).)

Goodyear's current motion makes no specific argument that TS 23 is indefinite, nor did it make any such argument in its original motion. (*See* Doc. No. 360, at 4.) The Court, therefore, assumes there is no challenge to definiteness as to TS 23 and will, therefore, not reconsider its

---

[17] Coda claims that "Goodyear used both the dead space and the recirculation concepts in its patents and AMT project." (Doc. No. 385, at 22 (citing portions of Hrabal's testimony).) But use of one or two elements is not proof of use of the entire combination. As aptly noted in Goodyear's reply, that would be "just like saying that using carbonated water is enough to misappropriate the secret formula for Coca-Cola." (Doc. No. 387, at 19.)

original decision to send TS 23 to the jury. That said, Goodyear also raises three substantive challenges to the jury's verdict on TS 23, which the Court now addresses.

In Goodyear's first and third arguments, it asserts that Coda's only evidence of "use" by Goodyear is an email from Hrabal (Ex. P-471), following the January 2009 meeting, that disclosed a single test result (*i.e.*, achieving 6.5A pressure with the prototype) (Doc. No. 376, at 20), and that, in any event, this test result does not even match the prototype test result in TS 23 (*i.e.*, 3.3A pressure) and leaves out the other two "secret" test results (*id*. at 21). Goodyear asserts that Coughlin never testified that Goodyear did anything with this information (Doc. No. 376, at 20 (citing Doc. No. 359, Tr. at 1639–40)), and that Hrabal had no knowledge of Goodyear ever disclosing this test result email to anyone (*id*. (citing Doc. No. 356, Tr. at 598)).

In opposition, Coda argues that there were "numerous other inferences" (besides Coughlin's testimony) regarding Coda's testing results—that must be weighed in Coda's favor— from which the jury could have reasonably inferred that Goodyear "relied heavily on Coda's testing data." (Doc. No. 385, at 24 (citing Ex. P-425, at 3–4; Ex. P-202; Doc. No. 357, Tr. at 943; Doc. No. 361, Tr. at 1892.) The Court sees little to no support in any of Coda's record references. Nor does Coda make a convincing argument that the lack of "match" between the test results is irrelevant, since, according to Coda, "it is plain that Goodyear relied on Coda's testing data." (*Id*.) This is merely argument, without supporting evidence.

Goodyear's third argument is that Hrabal's post-January 2009 meeting email was not marked "confidential," which the non-disclosure agreement between the parties required in order that information be protected. (Doc. No. 376, at 20–21 (citing Ex. P-585 at ¶ 8).) Goodyear claims that this also "shreds" any claim of secrecy. (*Id*.)

26

In opposition, Coda unconvincingly asserts that the email "was plainly shared in connection with the parties' discussions under the non[-]disclosure agreement, and the OUTSA does not require such markings to establish secrecy." (Doc. No. 385, at 24 (citations omitted).) Coda has consistently relied upon the non-disclosure agreement and it cannot now disregard one of its key requirements.

All that said, it appears clear that TS 23 actually reveals no secret at all. Testimony shows that the concept of a self-inflating tire was not new when Coda and Goodyear engaged in conversations in 2009. TS 23 is merely a bald declaration that Coda developed such a tire that is "functional." Coda's attempts to confirm that success by making reference to certain test results does not convert TS 23 into a trade secret and Coda does not argue that these testing results themselves are the trade secret.

In light of the above, Goodyear's Rule 50(b) motion as to TS 23 is granted and the jury's verdict as to TS 23 is set aside.

## III.    Remittitur of Jury's Award of Punitive Damages

Having determined that Goodyear is entitled to judgment as a matter of law as to liability for Coda's claims as to Trade Secrets 24, 7, 11, 20 and 23, it follows that the jury's award of damages, including punitive damages, must be set aside as well. But even if defendants were not entitled to judgment on liability as to each remaining trade secret, the Court would be required to reduce the jury's $61.2 million award of punitive damages under Ohio law.[18]

---

[18] Goodyear also argues that the entire punitive damages award should be set aside because Coda failed to prove actual malice. (Doc. No. 376, at 22.) Although the Court need not address this issue because it has determined that Goodyear is entitled to judgment as a matter of law on the merits of the remaining trade secrets, the Court finds that if any of the trade secrets had been definitive enough to be presented to the jury then there would have been sufficient evidence presented to the jury to support the jury's finding of actual malice in this case. (*E.g.*, Doc. No. 356, Tr. at 599 (Hrabal's testimony that Goodyear took photos of his prototype without his permission); Ex. P-407 at 2 (internal Goodyear document saying to "make the best product and worry about the IP later.").)

Ohio Rev. Code § 1333.63(B) explicitly limits any award of punitive damages for the misappropriation of trade secrets to "an amount not exceeding three times" the compensatory damages award. Plaintiffs ask this Court to ignore this explicit Ohio statutory damages cap, and controlling Ohio Supreme Court case law, and instead hold Section 1333.63(B) unconstitutional. This Court must follow Ohio law in this case and the Court is not convinced that Section 1333.63(B) is unconstitutional on its face or as applied under either the Ohio Constitution or the United States Constitution.

Plaintiffs admit that Ohio Supreme Court precedent has upheld the constitutionality of punitive damages caps. *Arbino v. Johnson & Johnson*, 880 N.Ed.2d 420, 441 (Ohio 2007) ("[P]recedent conclusively establishes that regulation of punitive damages is discretionary and that states may regulate and limit them as a matter of law without violating the right to a trial by jury."). The Ohio Supreme Court recently heard an as-applied challenge to another damages cap. *Brandt v. Pompa*, No. 2021-0497, 2022 WL 17729469 (Ohio Dec. 16, 2022). In holding that that compensatory-damages cap for noneconomic losses was unconstitutional as applied to child victims of sexual abuse, to the extent it fails to include an exception for victims who have suffered permanent and severe psychological injuries, the Ohio Supreme Court distinguished but did not overrule *Arbino* or otherwise comment on statutory caps to punitive damages. *Brandt*, 2022 WL 17729469, at 6–10.[19] As such, Section 1333.63(B) remains good law, as does the Ohio Supreme Court precedent upholding caps on punitive damages.

Further, the Supreme Court of the United States has recognized the constitutionality of caps on punitive damages awards. *E.g.*, *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532

---

[19] *See also* Doc. No. 389, Defendants' Notice of Subsequent Authority (citing *Brandt*); Doc. No. 390, Plaintiffs' Response to Notice of Supplemental Authority.

U.S. 424, 433, 121 S. Ct. 1678, 149 L. Ed. 2d 674 (2001). Moreover, it is "grossly excessive" punitive damages that the Supreme Court has found can be unconstitutional. *BMW of N. Am. v. Gore*, 517 U.S. 559, 568, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996). The Supreme Court has instructed courts reviewing punitive damages to consider three guideposts, including "the disparity between the actual or potential harm suffered by [the plaintiff] and [the] punitive damages award." *Id.* at 575. Although the Court has "decline[d] . . . to impose a bright-line ratio which a punitive damages award cannot exceed[,]" its "jurisprudence and the principles it has now established demonstrate . . . that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 424–25, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003). Here, the jury's award of punitive damages ($61.2 million) was more than 21 times its award of compensatory damages ($2.8 million), which suggests this Court would be required to reduce the jury's award of punitive damages even without Ohio's statutory cap.

Thus, even if defendants were not entitled to judgment on liability as to each remaining trade secret, the Court would be required under Ohio law to reduce the jury's award of punitive damages to $8.4 million.

## IV.    Conclusion

Upon revisiting the question of the definiteness of Coda's articulation of Trade Secrets 24, 7, 11, and 20, the Court concludes that none of them meets this threshold requirement and none of them should have been sent to the jury. In any event, Goodyear was also entitled to judgment as a matter of law under Rule 50(a) on the merits of Coda's claims as to Trade Secrets 24, 7, 11, 20 *and* 23, and is also now entitled to judgment notwithstanding the verdict under Rule 50(b). As a result, the jury's verdicts are set aside, including any verdicts with respect to damages.

This ruling resolves Count Four of the first amended complaint entirely in Goodyear's favor. The Court will issue a separate ruling with respect to plaintiffs' equitable claims in Counts One, Two and Five, Count Three having already been voluntarily dismissed by the parties.

**IT IS SO ORDERED**.

Dated: March 31, 2023

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

30